ORIGINAL

1 | COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
2 | SHAWN A. WILLIAMS (213113)
100 Pine Street, 26th Floor
3 | San Francisco, CA  94111
Telephone:  415/288-4545
4 | 415/288-4534 (fax)
ShawnW@csgrr.com
5
COUGHLIN STOIA GELLER RUDMAN
6 |   & ROBBINS LLP
SAMUEL H. RUDMAN
7 | EVAN J. KAUFMAN
58 South Service Road, Suite 200
8 | Melville, NY  11747
Telephone:  631/367-7100
9 | 631/367-1173 (fax)
SRudman@csgrr.com
10 | EKaufman@csgrr.com

11 | Attorneys for Plaintiff

12 | [Additional counsel on signature block]

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA

**CW**

15

**CV 09       3362**

16 | CITY OF ANN ARBOR EMPLOYEES'
RETIREMENT SYSTEM, on Behalf of Itself
and All Others Similarly Situated,

Case No.

17 |                        Plaintiffs,

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

18

19 |     vs.

<u>JURY TRIAL DEMANDED</u>

20 | ACCURAY INCORPORATED, EUAN S.
THOMSON, ROBERT E. McNAMARA,
WADE B. HAMPTON, TED TU, WAYNE
21 | WU, JOHN R. ADLER, JR., and ROBERT S.
WEISS,

22

23 |                   Defendants.

24

25

26

27

28

1     Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which

2 included a review of United States Securities and Exchange Commission ("SEC") filings by Accuray

3 Incorporated ("Accuray" or the "Company"), as well as regulatory filings and reports, securities

4 analysts reports and advisories about the Company, press releases and other public statements issued

5 by the Company, and media reports about the Company, and Plaintiff believes that substantial

6 additional evidentiary support will exist for the allegations set forth herein after a reasonable

7 opportunity for discovery.

8                        **NATURE OF THE ACTION**

9     1.     This securities class action is brought on behalf of purchasers of Accuray common

10 stock pursuant or traceable to the Company's Initial Public Offering (the "IPO") on or about

11 February 7, 2007, as well as purchasers of the Company's common stock between February 7, 2007

12 and August 19, 2008, inclusive (the "Class Period"), seeking to pursue remedies under Sections 11,

13 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the

14 Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation

15 Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

16     2.     Defendant Accuray designs, develops, and sells the CyberKnife system, an image-

17 guided robotic radio surgery system for the treatment of solid tumors. The CyberKnife system

18 combines continuous image-guidance technology with a compact linear accelerator to deliver high

19 doses of radiation to a tumor from different directions.

20     3.     Defendants (defined below) misrepresented and failed to disclose material

21 information concerning the quality and realistic likelihood of fulfillment of contracts in Accuray's

22 "backlog," a figure representing the direct revenue that Accuray expects to receive from the sale and

23 servicing of the CyberKnife system. As detailed herein, Defendants knew or recklessly disregarded

24 that at the time they made their statements, potential sales that were accounted for as backlog would

25 not come to fruition.

26     4.     During the Class Period, Defendants repeatedly highlighted Accuray's backlog as a

27 barometer of the Company's health and an accurate indicator of whether the Company would, or

28 could, achieve its stated earnings guidance. This practice misled investors by portraying the

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS     - 1 -

1 Company's financial condition and prospects as favorable based on the correspondingly favorable
2 backlog numbers, when, in fact, just the opposite was true.

3      5.     During the Class Period, Defendants issued materially false and misleading
4 statements regarding the Company's financial performance, including the Company's backlog. As
5 alleged herein, the true facts, which were known or recklessly disregarded by each of the Defendants
6 but concealed from the investing public during the Class Period, were as follows:

7      (a)     At the time of Accuray's IPO, Accuray changed its definition of backlog to
8 include both contingent and non-contingent contracts;

9      (b)     Throughout the Class Period, Defendants overstated the amount of the
10 Company's backlog by at least $127 million;

11      (c)     There was a significant risk that a substantial portion of backlog customers
12 were of high credit risk and would not be able to raise capital to pay for the CyberKnife system;

13      (d)     Defendants reported as backlog a large percentage of contingent and
14 non-contingent orders for the CyberKnife system that did not have a substantially high probability of
15 being booked as revenue;

16      (e)     A significant portion of commissions paid to CyberKnife sales personnel were
17 earned prior to those potential sales being booked as revenue;

18      (f)     Accuray sales personnel entered into contingent contracts for CyberKnife
19 systems that did not have a substantially high probability of being booked as revenue; and

20      (g)     Accuray did not have adequate internal controls and procedures to ensure that
21 potential orders reported as backlog had a substantially high probability of being booked as revenue.

22                        **JURISDICTION AND VENUE**

23      6.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of
24 the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the Exchange
25 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

26      7.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities
27 Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and
28 1337.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 2 -

1    8.    Venue is properly laid in this District pursuant to Section 22 of the Securities Act,

2  Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). Many of the acts charged herein,

3  including the dissemination of materially false and misleading information, occurred in substantial

4  part in this District and Accuray's principal executive offices are located in this District.

5    9.    In connection with the acts alleged in this Complaint, Defendants, directly or

6  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

7  the mails, interstate telephone communications and the facilities of the national securities markets.

8                                          **PARTIES**

9    10.    Plaintiff City of Ann Arbor Employees' Retirement System purchased Accuray

10  common stock, as set forth in the accompanying certification and incorporated by reference herein,

11  at artificially inflated prices during the Class Period and has been damaged thereby.

12    11.    Defendant Accuray is incorporated in Delaware and headquartered in Sunnyvale,

13  California. The Company designs, develops, and sells the CyberKnife system, an image-guided

14  robotic radio surgery system for the treatment of solid tumors. The CyberKnife system combines

15  continuous image-guidance technology with a compact linear accelerator to deliver high doses of

16  radiation to a tumor from different directions.

17    12.    (a)    Defendant Euan S. Thomson, Ph.D. ("Thomson") was President, Chief

18  Executive Officer and a director of Accuray at all relevant times herein. Thomson signed the

19  Registration Statement (defined below).

20         (a)    Defendant Robert E. McNamara ("McNamara") was Senior Vice President

21  and Chief Financial Officer of Accuray at all relevant times herein. McNamara signed the

22  Registration Statement.

23         (b)    Defendant Wade B. Hampton ("Hampton") has served as Senior Vice

24  President, Chief Sales Officer of Accuray since April 2007. Prior to that appointment, Hampton

25  served as Senior Vice President, Worldwide Sales beginning in August 2006.

26         (c)    Defendant Ted Tu ("Tu") was a director of Accuray at all relevant times

27  herein. Tu signed the Registration Statement

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 3 -

1        (d)    Defendant Wayne Wu ("Wu") was Chairman of Accuray's Board of Directors

2 at all relevant times herein. Wu signed the Registration Statement.

3        (e)    Defendant John R. Adler, Jr., M.D. ("Adler") was a director of Accuray at all

4 relevant times herein. Adler signed the Registration Statement.

5        (f)    Defendant Robert S. Weiss ("Weiss") was a director of Accuray at all relevant

6 times herein. Weiss signed the Registration Statement.

7        (g)    Thomson, McNamara, Hampton, Tu, Wu, Adler and Weiss are collectively

8 referred to herein as the "Individual Defendants."

9        (h)    The Defendants listed above in (a) – (g) are collectively referred to herein as

10 the "Individual Defendants."

11    13.    Because of the Individual Defendants' positions with the Company, they had access

12 to the adverse undisclosed information about the Company's business, operations, operational

13 trends, financial statements, markets and present and future business prospects via internal corporate

14 documents, conversations and connections with other corporate officers and employees, attendance

15 at management and Board of Directors meetings and committees thereof and via reports and other

16 information provided to them in connection therewith.

17    14.    It is appropriate to treat the Individual Defendants as a group for pleading purposes

18 and to presume that the false, misleading and incomplete information conveyed in the Company's

19 public filings, press releases and other publications as alleged herein are the collective actions of the

20 narrowly defined group of Defendants identified above. Each of the above officers of Accuray, by

21 virtue of their high-level positions with the Company, directly participated in the management of the

22 Company, was directly involved in the day-to-day operations of the Company at the highest levels

23 and was privy to confidential proprietary information concerning the Company and its business,

24 operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants

25 were involved in drafting, producing, reviewing and/or disseminating the false and misleading

26 statements and information alleged herein, were aware, or recklessly disregarded, that the false and

27 misleading statements were being issued regarding the Company, and approved or ratified these

28 statements, in violation of the federal securities laws.

15.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and the Securities Act, and was traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Accuray, each of the Individual Defendants had access to the adverse undisclosed information about Accuray's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Accuray and its business issued or adopted by the Company materially false and misleading.

17.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

1      18.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of

2   business that operated as a fraud or deceit on purchasers of Accuray common stock by disseminating

3   materially false and misleading statements and/or concealing material adverse facts. The scheme:

4   (i) deceived the investing public regarding Accuray's business, operations, management and the

5   intrinsic value of Accuray common stock; (ii) enabled the Individual Defendants and other Accuray

6   insiders to sell more than 10.5 million shares of their personally-held Accuray common stock,

7   generating proceeds of more than $209 million; and (iii) caused Plaintiff and other members of the

8   Class to purchase Accuray common stock at artificially inflated prices.

9                   **CLASS ACTION ALLEGATIONS**

10      19.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

11   Procedure 23(a) and (b)(3) on behalf of itself and all other purchasers of Accuray common stock

12   pursuant or traceable to the Company's IPO, as well as purchasers of Accuray common stock

13   between February 7, 2007 and August 19, 2008, inclusive, who were damaged thereby (the "Class").

14   Excluded from the Class are Defendants herein, members of the immediate family of each of the

15   Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in

16   which any Defendant has a controlling interest or which is related to or affiliated with any of the

17   Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of

18   any such excluded party.

19      20.    The members of the Class are so numerous that joinder of all members is

20   impracticable. Accuray sold more than 18 million shares in the IPO and throughout the Class

21   Period, and Accuray common shares were actively traded on the NASDAQ. While the exact number

22   of Class members is unknown to Plaintiff at this time and can only be ascertained through

23   appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the

24   proposed Class. Record owners and other members of the Class may be identified from records

25   maintained by Accuray or its transfer agent and may be notified of the pendency of this action by

26   mail, using the form of notice similar to that customarily used in securities class actions.

27

28

1    21.    Plaintiff's claims are typical of the claims of the members of the Class as all members

2    of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

3    complained of herein.

4    22.    Plaintiff will fairly and adequately protect the interests of the members of the Class

5    and has retained counsel competent and experienced in class and securities litigation.

6    23.    Common questions of law and fact exist as to all members of the Class and

7    predominate over any questions solely affecting individual members of the Class.   Among the

8    questions of law and fact common to the Class are:

9              (a)    whether the federal securities laws were violated by Defendants' acts as

10   alleged herein;

11             (b)    whether statements made by Defendants to the investing public during the

12   Class Period misrepresented material facts about the business, operations and management of

13   Accuray; and

14             (c)    to what extent the members of the Class have sustained damages and the

15   proper measure of damages.

16   24.    A class action is superior to all other available methods for the fair and efficient

17   adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the

18   damages suffered by individual Class members may be relatively small, the expense and burden of

19   individual litigation make it impossible for members of the Class to individually redress the wrongs

20   done to them.   There will be no difficulty in the management of this action as a class action.

21                            **SUBSTANTIVE ALLEGATIONS**

22   25.    Defendant Accuray designs, develops, and sells the CyberKnife system, an image-

23   guided robotic radio surgery system for the treatment of solid tumors.   The CyberKnife system

24   combines continuous image-guidance technology with a compact linear accelerator to deliver high

25   doses of radiation to a tumor from different directions.

26   26.    Accuray's business model includes three main sources of revenue: (i) product

27   revenue; (ii) shared ownership revenue; and (iii) services revenue.   Product revenue is generated

28   from the sale of CyberKnife systems, which are capital equipment purchases for hospitals or

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 7 -

radiation treatment facilities. Accuray's second source of revenue is its shared ownership program, whereby a CyberKnife system is placed in a hospital with Accuray retaining the title. The customer is responsible for building the room and making minimum monthly payments to Accuray. Any revenue generated over and above those minimum payments is shared between Accuray and the customer. The third revenue generator is from Accuray's service contracts, which are typically signed for four- to five-year periods and in most cases include six technology upgrades, when and if available, during the period.

27. The CyberKnife system has a relatively long sales and installation cycle because it is a major capital item for its customers and usually requires the approval of senior management at purchasing institutions. The typical sales and installation cycle is 12 to 18 months in duration and involves multiple steps, which may include pre-selling activity, execution of a letter of intent ("LOI"), execution of contracts for the purchase or acquisition of the CyberKnife system and multiyear service plans, and installation of the CyberKnife system. Prior to installation, a purchasing institution must typically obtain a radiation device installation permit, and in some cases, a certificate of need, both of which must be granted by state and local government bodies. In addition, the purchasing institution must build a radiation shielded facility or upgrade an existing facility to house the CyberKnife system.

28. According to Accuray, on average it takes three months from the signing of an LOI to the execution of a contract. Accuray typically receives a deposit at the time the CyberKnife system purchase contract is executed, and the remaining balance for the purchase of the CyberKnife system upon installation. The customer also typically signs a service plan contract at the time of signing a CyberKnife system purchase contract.

29. Upon installation, Accuray recognizes as reserve the CyberKnife system purchase price minus any specific undelivered elements, typically the fair value of one year of service. Accuray recognizes the fair value of the first year of service as revenue *pro rata* over the twelve months following installation.

30. The Class Period commences on February 7, 2007. On that date, Accuray filed a Form S-1/A Registration Statement (the "Registration Statement") with the SEC for the IPO. On or

1   about February 7, 2007, the Prospectus (the "Prospectus") with respect to the IPO, which forms part

2   of the Registration Statement, became effective and, including the exercise of the over-allotment,

3   more than 18 million shares of Accuray's common stock were sold to the public at $18.00 per share,

4   thereby raising more than $331 million.

5        31.   Both the Company and certain selling stockholders sold shares in the IPO.  The

6   Company sold 10,399,000 shares, including the exercise of the over-allotment, for more than

7   $187 million.  The selling stockholders, including some of the Individual Defendants, sold 8,000,000

8   shares, including the exercise of the over-allotment, for approximately $144 million.

9        32.   The Registration Statement and Prospectus contained untrue statements of material

10  facts, omitted to state other facts necessary to make the statements made not misleading and were not

11  prepared in accordance with the rules and regulations governing its preparation.

12       33.   The Registration Statement described installations and pending installations of the

13  CyberKnife system and stated, in pertinent part, as follows:

14       We market the CyberKnife system through a direct sales force in the United States
         and a combination of direct sales personnel and distributors in the rest of the world.
15       As of September 30, 2006, we had 83 CyberKnife systems installed at customer sites
         and 78 pending installation.  Of the 83 systems installed, 52 are in the United States.
16       For the year ended June 30, 2006, our total net revenue was $52.9 million, our net
         loss was $33.7 million and our net cash provided by operating activities was $25.5
17       million.  For the quarter ended September 30, 2006, our total net revenue was $32.8
         million, our net income was $2.0 million, and our net cash used in operating
18       activities was $2.1 million.

19       34.   The Registration Statement described the sales and installation cycle of the

20  CyberKnife system, in pertinent part, as follows:

21       The CyberKnife system has a lengthy sales and purchase order cycle because it is a
         major capital equipment item and requires the approval of senior management at
22       purchasing institutions.  The sales process in the United States often begins with a
         letter of intent between us and the customer.  After the letter of intent is signed, we
23       enter into a definitive purchase contract with the customer.  Generally following the
         execution of the contract, the customer begins the building or renovation of a facility
24       to house the CyberKnife system, which together with the subsequent installation of
         the CyberKnife system, can take approximately 12 months or longer to complete.
25       During this period, the customer must build a radiation-shielded facility to house
         their CyberKnife system.  In order to construct this facility, the customer must
26       typically obtain radiation device installation permits, which are granted by state and
         local government bodies, each of which may have different criteria for permit
27       issuance.  If a permit were denied for installation at a specific hospital or treatment
         center, our CyberKnife system could not be installed at that location.

28

1   Under our revenue recognition policy, we generally do not recognize revenue
    attributable to a CyberKnife system purchase until after installation has occurred.
2   For international sales through distributors, we typically recognize revenue when the
    system is delivered to the end user's site. Therefore the long sales cycle together
3   with the timing of CyberKnife system shipments and installations may result in
    significant fluctuations in our reporting of quarterly revenues. Under our current
4   forms of purchase and service contracts, we receive a majority of the purchase price
    for the CyberKnife system upon installation of the system. Events beyond our
5   control may delay installation and the satisfaction of contingencies required to
    receive cash inflows and recognize revenue, such as:

6
    • procurement delay;
7
    • customer funding or financing delay;
8
    • organizational delay caused by customer personnel;
9
    • construction delay;
10
    • delay pending customer receipt of a building or radiation device installation permit;
11      and
12
    • delay caused by weather or natural disaster.
13
    In the event that a customer does not, for any of the reasons above or other reasons,
    proceed with installation of the system after entering into a purchase contract, we
14  would only recognize the deposit portion of the purchase price as revenue.
    Therefore, delays in the installation of CyberKnife systems or customer cancellations
15  would adversely affect our cash flows and revenue, which would harm our results of
    operations and could cause our stock price to decline.
16
    35.     The Registration Statement described the Company's backlog, in pertinent part, as
17
    follows:
18
    **Backlog**
19
    We define backlog as the sum of the following two components: deferred revenue
20  and future payments that our customers are contractually committed to make, but
    which we have not yet received. Backlog includes contractual commitments from
21  CyberKnife system purchase agreements, service plans and minimum payment
    requirements associated with our shared ownership programs.
22
    As of September 30, 2006, our backlog was approximately $330.2 million, which
23  includes $145.2 million of deferred revenue and $185.0 million of contractually
    committed future payments from customers. Of the total backlog, $204.8 million
24  represents CyberKnife system sales, and $125.4 million represents revenue through
    service plans and shared ownership programs. We anticipate that this backlog will
25  be recognized over the next five years as installations occur, upgrades are delivered
    and services are provided. Although backlog includes contractual commitments
26  from our customers, we may be unable to convert all of this backlog into recognized
    revenue due to factors outside our control.
27

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 10 -

1    36.    The statements referenced above in ¶¶33-35 were each materially false and

2  misleading when made because they failed to disclose and misrepresented the following adverse

3  facts:

4         (a)    At the time of Accuray's IPO, Accuray changed its definition of backlog to

5  include both contingent and non-contingent contracts;

6         (b)    Beginning in the fiscal quarter ending March 31, 2007 (at the time of the

7  IPO), Accuray would report backlog that consisted of both contingent and non-contingent backlog,

8  thereby increasing the total reported backlog;

9         (c)    Defendants materially overstated the amount of the Company's backlog;

10        (d)    Accuray reported as backlog orders for the CyberKnife system that did not

11  have a substantially high probability of being booked as revenue;

12        (e)    A significant portion of commissions paid to CyberKnife sales personnel were

13  earned prior to those potential sales being booked as revenue;

14        (f)    Accuray sales personnel entered into contingent contracts for CyberKnife

15  systems that did not have a substantially high probability of being booked as revenue;

16        (g)    Accuray did not have adequate internal controls and procedures to ensure that

17  potential orders reported as backlog had a substantially high probability of being booked as revenue;

18  and

19        (h)    based on the foregoing, Defendants lacked a reasonable basis for their positive

20  statements about the Company, its backlog, earnings, operations and prospects.

21    37.    On March 15, 2007, Accuray announced its second quarter fiscal 2007 financial

22  results for the period ended December 30, 2006 in a press release titled "Accuray Incorporated

23  Reports Second Quarter Fiscal 2007 Financial Results" (the "3/15/07 Press Release"). The 3/15/07

24  Press Release stated, in pertinent part, as follows:

25        Accuray Incorporated (NASDAQ:ARAY), a global leader in the field of robotic
          radiosurgery, today announced financial results for the second quarter ended
26        December 30, 2006. Total net revenues were $26.3 million for the quarter ended
          December 30, 2006, as compared to $11.3 million for the quarter ended December
27        31, 2005, an increase of 133 percent. The net loss for the second quarter was $7.3
          million, or $0.45 per share, compared to a net loss of $7.9 million, or $0.50 per share,
28        for the same quarter in 2005. The fiscal 2007 second quarter results are consistent

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 11 -

1    with the ranges for revenue and net loss included in the Registration Statement on
     Form S-1 (Reg. No. 333-138622) filed with the U.S. Securities and Exchange
2    Commission in connection with our initial public offering in February.

3                              *       *       *

4    "We are pleased with Accuray's strong growth in both U.S. and international
     markets," said Euan S. Thomson, Ph.D., president and chief executive officer of
5    Accuray.

6                              *       *       *

7    As of December 30, 2006, 91 CyberKnife systems had been installed at customer
     sites, up from 83 at the end of the first quarter.  This includes 80 systems sold
8    directly to customers and 11 placed under shared ownership agreements. Of the 91
     systems installed, 58 are in the United States, 24 in Asia and 9 in Europe. *Reported*
9    *backlog at the end of the quarter ended December 30, 2006 was approximately*
     *$328 million, compared to approximately $330 million at the end of the quarter*
10   *ended September 30, 2006.  Reported backlog includes only contracts which*
     *contain no contingencies, or for which all contingencies have been met and does*
11   *not include signed contracts that have contingencies such as the receipt of certain*
     *approvals, financing dependencies, or the formation of certain legal structures.*
12   *The number of signed contracts with contingencies continued to increase in the*
     *quarter ended December 30, 2006.  These contingent contracts will be added to*
13   *backlog once all contingencies have been met.* [Emphasis added.]

14        38.    Also on March 15, 2007, Accuray filed its Form 10-Q with the SEC for the period

15   ended December 31, 2006 (the "3/15/07 10-Q"), which contained the financial information reported

16   in the 3/15/07 Press Release. The 3/15/07 10-Q described the Company's backlog and stated, in

17   pertinent part, as follows:

18   We define backlog as the sum of the following two components: deferred revenue
     and future payments that our customers are contractually committed to make, but
19   which we have not yet received.  Backlog includes non-contingent contractual
     commitments from CyberKnife system purchase agreements, service plans and
20   minimum payment requirements associated with our shared ownership programs.
     Backlog does not include signed contracts that have contingencies such as board
21   approvals, financing dependencies or the formation of certain legal structures.

22   As of December 31, 2006, our backlog was approximately $327.9 million, which
     includes $152.3 million of deferred revenue and $175.6 million of contractually
23   committed future payments from customers. Of the total backlog, $193.2 million
     represents CyberKnife system sales, and $134.7 million represents revenue through
24   service plans and shared ownership programs.  We anticipate that this backlog will
     be recognized over the next five years as installations occur, upgrades are delivered
25   and services are provided.  Although backlog includes contractual commitments
     from our customers, we may be unable to convert all of this backlog into recognized
26   revenue due to factors outside of our control.

27        39.    The statements referenced above in ¶¶37 and 38 were each materially false and

28   misleading when made because of the reasons set forth in ¶36.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 12 -

40.     On May 1, 2007, Accuray announced its fiscal third quarter 2007 financial results for the period ended March 31, 2007 in a press release titled "Accuray Reports Fiscal Third Quarter 2007 Financial Results; Fiscal Third Quarter 2007 Highlights" (the "5/1/07 Press Release").  In connection with its third quarter 2007 results, Accuray announced that it changed its definition of backlog for the fiscal quarter ended March 31, 2007 (and thus prior to the Company's IPO), which previously only included signed contracts without contingencies (*i.e.*, signed non-contingent contracts) as committed future payments.  Under the new terms, Accuray redefined backlog to include both signed non-contingent contracts as well as signed contingent contracts that management believed had a "substantially high probability" of being booked as revenue

41.     The 5/1/07 Press Release described that the Company changed the definition of backlog and stated, in pertinent part, as follows:

As of March 31, 2007, the Company's total backlog, which the Company now defines as backlog under signed non-contingent contracts as well as backlog under signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue, was approximately $559 million.  This represents a 60 percent increase and a 9 percent increase, respectively, over total backlog computed in accordance with this definition of $350 million at March 31, 2006 and $513 million at December 31, 2006.  Of the Company's total backlog at March 31, 2007, $306 million was associated with CyberKnife System purchases and $253 million was associated with services and other recurring revenues.

Contingencies under customer contracts included in backlog include customer acceptance of the Company's legal terms and conditions of sale, hospital board approvals, customer establishment of necessary financing or legal entities and, in certain U.S. states, government approval of a certificate of need (CON) for the operation of a radiosurgery system.  On a quarterly basis, the Company will review each contingent contract to determine whether progress toward satisfaction of contingencies is sufficient to support inclusion of the contract within backlog.  Going forward, it is the Company's intention to provide information regarding total backlog in accordance with the definition described above on a quarterly basis.

At the end of the fiscal third quarter 2007, 97 CyberKnife Systems were installed at customer sites.  This includes 87 systems sold directly to customers and 10 placed under shared ownership agreements.  Of the 97 systems installed, 63 are in the Americas, 25 in Asia and 9 in Europe.

*      *      *

"Our fiscal third quarter results demonstrate the continued recognition of the CyberKnife System as an effective treatment option for tumors anywhere in the body," said Euan S. Thomson, Ph.D., president and chief executive officer of Accuray. . . . The impressive growth that the CyberKnife System has gained in these applications is driven by our system's unique ability to autonomously track, detect and correct for tumor and patient movement in real-time during the procedure,

enabling delivery of precise, high dose radiation with sub-millimeter accuracy. We believe these unique capabilities combined with the momentum of our sales organization will continue to drive our success in building the market for radiosurgery."

42. On May 1, 2007, Accuray held a conference call with analysts to discuss the Company's financial performance reported in the 5/1/07 Press Release and to discuss the Company's backlog (the "5/1/07 Conference Call"). On the 5/1/07 Conference Call, Defendant Thomson stated:

As an additional indicator of our rate of growth in a quarter of record revenue, our total backlog also reached the record level of $559 million. This represents a 60% increase year-over-year and a 9% increase on a sequential basis.

The combination of record revenue and backlog growth within the same quarter confirms the acceleration of our business model to broaden the market for radiosurgery, as well as a growing acceptance of the CyberKnife as a premier radiosurgery technology.

43. On the 5/1/07 Conference Call, Defendant Thomson discussed the change in the reporting of the Company's backlog, in pertinent part, as follows:

I'll now give you a short summary of the reason for the change in our quoted backlog metric. Bob McNamara will also be giving you more detail in his report.

To position ourselves for ongoing growth and to support the increased volume of customer contracts, we've recently streamlined our internal contract process.

Historically our approach was to combine discussion of financial and legal terms in a single negotiation involving all relevant parties at Accuray and at our customer sites.

However, the significant growth in the number of new contracts has guided us to separate discussion of these terms.

***Our sales representatives in the United States now generally negotiate the business terms to acquisition and agree to term agreements containing all financial aspects of the transaction.***

***In parallel, the legal aspects of our contracts have become more standardized and any modifications to these terms are discussed subsequent to agreeing the financial terms of sale.***

I can report that this process, as hoped, has proven to be more efficient and has assisted us in the expansion of our sales program.

Now it's primarily this shift in our contractual process that has driven the change in reported backlog. Our old definition of non-contingent backlog precluded mentions of this new contract format.

***As the prevalence of these new term agreements has grown, it's become more appropriate and indicative of the state of our business to disclose total backlog.***

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 14 -

We also believe that the total backlog number now reported is in line with the industry standard. The timing of this change in quoted backlog strategy really results from our growing experience and confidence in the new contract process.

***On balance, we feel confident that 90% of the total backlog reported will be converted to revenue.***

***To aid interpretation of the backlog number, I'd like to point out what might be considered a fairly obvious point that the total backlog reported this quarter, taken in conjunction with reported revenue, is a good and reliable indicator that the new business generated during a given quarter.***

The majority of revenue is shipped from backlog. Simultaneously, new contracts generated by sales activities add to backlog.

***Once again I know this is an obvious point, but it explains my previous statement that achieving record backlog in the same quarter that we have achieved record revenue is a very positive indicator of the strength and upward trend in our business.*** [Emphasis added.]

44.    On the 5/1/07 Conference Call, Defendant McNamara discussed Accuray's backlog and stated, in pertinent part, as follows:

As of March 31, 2007 the company's backlog, which the company now defines as backlog under signed non-contingent contracts as well as backlog under signed contingent contracts that the company believes have a substantial high probability of being booked as revenue, was approximately $559 million.

This represents a 60% increase and a 9% increase, respectively, over total backlog computed in accordance with the definition of $350 million at March 31, 2006 and $513 million at December 31, 2006.

Of the company's total backlog at March 31, 2007, $306 million was associated with the CyberKnife system purchases and $253 million was associated with the company's Services and other recurring revenues.

Contingencies under customer contracts included in backlog include customer acceptance of the company's legal terms and conditions of sale, hospital Board approvals, customer establishment of necessarily financing or legal entities and in certain U.S. States, government approval of the Certificate of Need or CON for the operation of a radiosurgery system.

On a quarterly basis the company will review each contingent contract to determine whether progress towards satisfaction of contingencies is sufficient to support inclusion of the contract within backlog.

We look at a number of factors including any investment made by the customer, the progress on contingencies and the level of engagement by the customer.

Depending on the nature of the customer's activities relative to these factors, we will include it in backlog. ***We have confidence that at least 90% of the quoted backlog will convert to revenue.***

Going forward it is the company's intention to provide information each quarter regarding total backlog, in accordance with the definition I've just described.

Recall that our previously reported fiscal second quarter 2007 backlog of $328 million included only contracts that contained no contingencies or for which all contingencies had been met.

*We believe that our current definition of backlog is a more meaningful metric for Accuray as an indicator of future revenue.*

Using this definition, total backlog for our last four fiscal quarters, on an apples-to-apples basis, is as follows.

In fiscal Q3 '06 backlog was $350 million, in fiscal Q4 '06 backlog was $432 million, in Q1 2007 fiscal year backlog was $436 million, in Q2 2007 fiscal year backlog was $513 million, and now we've announced that fiscal Q3 2007 backlog is stated at $559 million.

In terms of roll out, the flow of backlog, meaning the flow of backlog to revenue realization is really dependent on the nature of the contract. For system revenue we are dependent on the customer having the facility ready to install.

Currently we expect to realize system revenue from backlog within 6 to 18 months. For Services and Shared Ownership revenue the realization period is typically one to four years.

In addition, we will have revenue from the upside of our Shared Ownership program over and above the minimum monthly payments included in backlog, and any contracts that come in and out of backlog.

That is to say the contracts are signed and converted to revenue within a 12-month period. [Emphasis added.]

45. On the 5/1/07 Conference Call, Mark Richter, an analyst from Jefferies & Company, commented that Accuray's backlog "grew nicely in the quarter."

46. On the 5/1/07 Conference Call, Defendant McNamara emphasized that Accuray used backlog as a tool for guidance on expectations for the Company and that analysts should also look to backlog when analyzing Accuray:

**Unidentified Participant**

Just some quick questions, one I notice that there's no guidance, can you provide any sort of color on expectations for next quarter? Or are you holding off on that?

**Robert McNamara – *Accuray Incorporated – SVP, CFO***

We're really holding off on that. What we use as a tool for guidance is really to look at the backlog and how it might roll out over the next couple of years.

And so we're currently using that as the metric for future revenue when people build their models.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 16 -

47.     On the 5/1/07 Conference Call, Defendants Thomson and McNamara responded to questions and characterized the new total backlog definition as a better metric than the prior definition of non-contingent backlog:

**Michael Cho – *Civic Global Healthcare – Analyst***

Hi, a couple quick ones. One is just help us with this transition of giving us new metrics, can you give us what the backlog would have been this quarter using your previous methodology?

**Robert McNamara – *Accuray Incorporated – SVP, CFO***

Well you know what we've decided is we are not going to disclose that because we really think that this metric, the total backlog is really a better metric for the business.

**Michael Cho – *Civic Global Healthcare – Analyst***

Okay.

Dr. Euan Thomson – Accuray Incorporated – President, CEO

It really comes down to we created essentially a contingency and we switched to the term agreements, on balance, may never put the contract into non-contingent backlog until the unit actually ships to the hospital. Because many people are not really satisfying the original criteria, if you follow me.

So it's like we could go straight from a term agreement to a shipment, we see the room is being constructed, the unit's arriving and in the same quarter suddenly it would flip. So it's just not a useful metric any longer for the contract process that we're using.

*          *          *

**Robert McNamara – *Accuray Incorporated – SVP, CFO***

Yes sorry, you know I can tell you that if we had reported on a previous definition, that that number would have increased.

But again what we're trying to do is get away from that number and really give a picture using a better metric, that being the total backlog.

**Michael Cho – *Civic Global Healthcare – Analyst***

Okay good. And then will you give us pending units?

**Robert McNamara – *Accuray Incorporated – SVP, CFO***

No because, again, what we're doing is we're not going to be discussing contracts per se, but again the dollars associated with backlog we feel is a pretty good metric in terms of what the revenues might be going forward.

48.    Analysts reacted positively to Accuray's statements about its backlog.  A May 2, 2007 analyst report by Jefferies & Company, Inc. titled "Impressive FY3Q Results; This is The Horse To Bet On In Radiation Oncology!" stated, in pertinent part, as follows:

**Investment Summary**

We would be buyers of ARAY at current levels.  We believe the stock will trade higher due to strong 2007 revenue growth, an expanding backlog, and growing CyberKnife unit placements.

*        *        *

- **Backlog was strong**. The company reported a strong uptake in backlog, going from $513 million in FY2Q to $559 million in the current Q. ARAY also announced that it would no longer only be reporting non-contingent backlog, and is now going to release a total backlog figure (which represents a combination of previously differentiated contingent and non-contingent backlog). The company believes that this new backlog recognition policy will give investors improved visibility into future revenue projections.  Total backlog will include contingent backlog when management deems that the contingent contract has a high probability of being realized and generating revenue. *We believe that this new backlog number will give a more reliable picture of the company's progress in booking new orders.*

- **Revising Estimates**. We are raising our FY07 revenue and F/T Cash EPS estimate from $139.5MM and $0.21 to $140.9MM and $0.22, respectively.   We are maintaining our FY08 revenue estimate of $275.5MM but raising our F/T Cash EPS estimate from $0.82 to $0.86.  [Emphasis added.]

49.    On May 14, 2007, JP Morgan hosted an investor lunch and day of meetings with Defendant McNamara and Accuray's contingent backlog was discussed.  Details were also disclosed concerning how CyberKnife sales representatives were compensated.  A summary of the meeting was reported by JP Morgan in a research report on May 17, 2007, which stated, in pertinent part, as follows:

- **Contingency specifics discussed**.  McNamara provided additional details around three primary contingencies, which are resolved after initial contract signing and, generally, a down payment: (1) Hospital board approval – the most common contingency and most likely to be resolved, although the process can typically take up to 6 months depending on the timing on Board meetings; (2) Legal entities (LLC or JV) – which are generally formed by a physician group (e.g., neurosurgeons) that sees profit potential from owning a shared CyberKnife. Interestingly enough, there is no correlation between LLCs/JVs and the Shared Ownership program (overall, LLCs/JVs account for apx. 20% of contingencies); and finally, (3) Certificate of Need (CON)/Certificate of Public Need (COPN) – only for public hospitals (primarily on the East coast), which after making a purchase decision, must receive approval from the State hospital board, a process which can take 24 months.  In general, ARAY continues to assume that 90% of orders (contingent or otherwise) will convert into backlog (vs. ~98% for VAR).

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 18 -

- • **CyberKnife sales reps paid on a ramping scale.** With backlog conversion times also of interest to investors, Mr. McNamara discussed pay structure for the 25 existing U.S. sales reps (32 in total), who are paid on a ramping scale, meaning that commission per sale increases as rep gets closer to and exceeds predetermined quarterly quotas. In addition, cash payments are made to reps in installments based on milestones, incl. contract signing, initial customer deposit, 10% customer deposit and CyberKnife installation (where ~60% of the commission is paid).

50.   Thus, CyberKnife sales representatives earned approximately 40% of their commission on sales before the CyberKnife system was installed and earned commissions on contingent backlog.

51.   On August 16, 2007, Accuray announced its fiscal fourth quarter and fiscal year 2007 financial results for the period ended June 30, 2007 in a press release titled "Accuray Reports Record Revenue in Fiscal Fourth Quarter and Fiscal Year Ended 2007; Revenue Growth of 166 Percent Year Over Year; Total Backlog Reaches Record Level of $619 Million" (the "8/16/07 Press Release"). The 8/16/07 Press Release stated, in pertinent part, as follows:

At the end of fiscal 2007, backlog increased to approximately $619 million, with approximately $321 million associated with CyberKnife(R) System contracts and approximately $298 million associated with services and other recurring revenue. Backlog is defined as signed contracts that the Company believes have a substantially high probability of being booked as revenue.

*      *      *

"***The Accuray team and I are very pleased with our*** strong financial performance, including record revenue, fourth quarter profitability and ***record backlog***. Accuray's clinical programs and R&D efforts are rapidly expanding utilization of the CyberKnife System, fueling the impressive momentum that Accuray is experiencing today," said Euan S. Thomson, Ph.D., president and chief executive officer of Accuray, Incorporated. "The CyberKnife System is the established brand leader in the rapidly expanding radiosurgery market. Its dramatic growth in extracranial usage, particularly for lung and prostate tumors, is driving greater acceptance among the medical community. ***Our strong fourth quarter provides solid momentum as we start an exciting new fiscal year***." [Emphasis added.]

52.   On August 16, 2007, Accuray held a conference call with analysts to discuss the Company's financial performance reported in the 8/16/07 Press Release and the Company's backlog (the "8/16/07 Conference Call"). On the 8/16/07 Conference Call, Defendant Thomson stressed the strong growth in backlog and stated, in pertinent part, as follows:

So to summarize, we're extremely pleased with our financial and operating performance in the fiscal fourth quarter [and] full fiscal year 2007. We achieved record revenue levels in both periods with dramatic year-over-year increases. ***We***

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 19 -

1    *also saw a record year-over-year backlog increase with impressive new contract*
     *value being added in the fourth quarter.*

2

3    In addition, profitability was achieved in the fourth quarter, marking a major
     financial milestone of which we're very proud. Bob will provide details of financial
     performance in a few minutes, but revenue for the fourth quarter was $44 million, a

4    106% increase over the fourth quarter last year. Full-year revenue for fiscal 2007
     was $140.5 million, an increase of 166% over the same period last year.  *But*

5    *backlog, which is the key indicator of future revenue, reached the record level of*
     *$619 million at the end of fourth quarter, growing $187 million during the fiscal*

6    *year.*

7    *This growth in backlog has particular significance in a year when revenue also*
     *grew to a record level. The combination of revenue increasing to approximately*

8    *$140 million and backlog increasing by $187 million in the same period is a very*
     *strong indicator of our current growth profile.*  As I will explain in a minute, we

9    believe that this dramatic growth is driven by changing clinical trends and a
     definitive move towards radiosurgery as a treatment of choice for cancer patients. At

10   the same time, we believe that CyberKnife has now become established as a brand
     name in radiosurgery treatment delivery.

11

12                         *        *        *

13   And again, as expected, we are already seeing the impact of the increasing diversity
     of treatments on our sales environment.  Radiosurgery throughout the body is now
     becoming more mainstream. As the range of application increases, the business case

14   our sales force presents to our new customers is getting more and more robust. *And*
     *as our record backlog indicates, our sales pipeline continues to grow.*  [Emphasis

15   added.]

16       53.    On the 8/16/07 Conference Call, Defendant McNamara also stressed the Company's

17   backlog and explained how backlog can be used to analyze both historical activity and future

18   activity, stating, in pertinent part, as follows:

19   Now I would like to turn to discuss backlog a little further, how it relates to
     economic value created and for guidance purposes, its relation to future revenue.

20   Let's start with what backlog is.  *Backlog is defined as signed contracts that*
     *Accuray believes have a substantially high probability of being realized as revenue*

21   *in the future. It can be used to analyze both historical activity and future activity.*
     *Historically, the change in backlog, combined with the revenue recognized, can be*

22   *used to determine the approximate economic contract value created over the past*
     *year.*  For example, the change in year-over-year backlog is $619 million, less the

23   beginning balance of $432 million.  This difference, $187 million, plus our annual
     revenue of $140 million that came out of backlog, equals a rough approximation of

24   the economic value of the contracts signed last year that went into backlog. This total
     is $327 million.

25
     *So that's a great way to look at the historical activity at the Company.*
26

27   *Moving to the future and guidance for going forward, Accuray's backlog provides*
     *excellent visibility into future revenue, again, since nearly all revenue comes out of*
     *that backlog number.*  Total backlog from signed contracts at the end of the fiscal

28   year is $619 million. It is comprised of two components – $321 million associated

with CyberKnife System purchases, and $298 million associated with service agreements and the minimum monthly payments from shared ownership programs. ***Although revenue recognition is dependent primarily upon system installation, which is in turn dependent upon customer facility readiness, we can use backlog as a foundation for guidance.*** We believe that the CyberKnife System portion of backlog generally will be realized over the next 18 months. We expect that the recurring component of backlog will be realized over the next 60 months.

***Using this as a backdrop and considering that more contracts have been signed in the second half of 2007 than the first half, we believe revenues for FY '08 should be between $250 million and $270 million.*** Given the strength of Q4 going from $37.3 million to $44 million, or the 18% sequential growth, we would expect first-quarter revenues to represent flat to modest growth on a sequential basis but to experience accelerated growth as we move through the year. [Emphasis added.]

54.     On the 8/16/07 Conference Call, Defendant Thomson discussed that the growth in backlog was from a diverse group of customers, including large established institutions and groups:

**Mark Richter – *Jeffries & Co. – Analyst***

Clearly, we thought – or $619 million in backlog was clearly better than we suspected or we had modeled for. Can you just talk about what is driving that? As well as, if my math is correct, you did about $104 million in new orders in the quarter; where that's coming from, and what is driving that?

**Euan Thomson – *Accuray Incorporated – President, CEO***

Yes, I can take that one. It's really very diverse. I think that what's fundamentally fueling it is the clinical diversification of radiosurgery and the fact that CyberKnife really if the only whole-body full-time solution for the radiosurgery market. So that is the basic fuel that goes into the engine. I think how it materializes in terms of customers is also pretty diverse. We're seeing, as we mentioned, hospitals that have been established for awhile, clinical demand locally is really driving them towards purchase of a second CyberKnife system, and we're mentioning that because it's definitely a trend that we would expect to see continuing.

Also, we're seeing, coming into the market sort of the larger group players, so like some of the – and we're not – as you know, we don't discuss individual contracts per se, but we can talk as a trend that we're getting increased interest from the stand-alone centers and some of the providers of multiple stand-alone systems. So it's really the complete spread; the big, high-end hospitals, community hospitals, the stand-alone centers, it's a very diverse mix.

55.     Analysts reacted positively to Accuray's 8/16/07 Conference Call and Press Release. On August 17, 2007, Jefferies & Company, Inc., issued a research report on Accuray titled "FY4Q Results Were Solid; Stereotactic Radiosurgery is the Wave of the Future," which stated, in pertinent part:

**Investment Summary**

1  We would be buyers of ARAY at current levels. We believe the stock will trade
   higher due to strong revenue growth, an expanding backlog, robust new orders, and
2  increasing CyberKnife unit placements.

3                          *       *       *

4  •   **Backlog and new orders were strong**. The company reported a strong uptake in
       backlog, increasing by $60MM from $559MM in FY3Q to $619MM in FY4Q
5      (beating our estimate of $585MM). FY07 backlog grew $187MM (+43% YoY) from
       $432MM to $619MM. New orders in FY4Q totaled $104MM, while new orders for
6      FY07 totaled $327.9MM. We believe that an important metric to follow is new order
       growth, and ARAY recorded an impressive 31% increase in new orders YoY (from
7      $249.9MM in FY06 to $327.9MM in FY07). The company's new order growth
       supports our thesis that demand for CyberKnife system is strong and growing as
8      more and more radiation oncology departments and radiation therapy centers are
       allocating budgetary dollars to the development of stereotactic radiosurgery
9      programs.

10     56.     On September 4, 2007, Accuray filed with the SEC its Form 10-K for fiscal year

11  2007, the period ended June 30, 2007 (the "9/4/07 10-K"), and reiterated the Company's financial

12  results reported in Accuray's 8/16/07 Press Release and Conference Call. The 9/4/07 10-K

13  described the treatment of backlog and stated, in pertinent part, as follows:

14     We previously defined backlog as the sum of the following two components:
       deferred revenue and future payments that our customers are contractually committed
15     to make, but which we have not yet received. Beginning with the quarter ended
       March 31, 2007, we revised our definition of backlog to consist of the sum of
16     deferred revenue, future payments that our customers are contractually committed to
       make and signed contingent contracts that we believe have a substantially high
17     probability of being booked as revenue from CyberKnife system purchase
       agreements, service plans and minimum payment requirements associated with our
18     shared ownership programs. We adopted this new definition of backlog in part
       because of the changes in our customer contracting process under which customers
19     initially enter into terms agreements setting forth the business and economic terms
       for purchase or acquisition of a CyberKnife system and then have a specified time
20     frame in which to negotiate legal terms. Contingencies associated with contingent
       contracts that are included within backlog may include final negotiation and
21     agreement upon our legal terms for the purchase or acquisition of the CyberKnife
       system, state or local government approval of a certificate of need for the installation
22     of a radiosurgery system, approval by the board of directors of the hospital or other
       purchaser of the system and establishment of financing and legal entities by
23     purchasers of systems. We review, on a quarterly basis with respect to each
       contingent contract included in backlog, whether customer engagement and progress
24     toward satisfaction of contingencies warrants continued inclusion of the contract
       within backlog.
25
       57.     The 9/4/07 10-K also revealed that Accuray's Compensation Committee changed the
26
27  financial metrics to be used in determining bonuses for Accuray's senior executive officers for fiscal

28  2008. It was revealed that backlog, which had been recently changed to include both non-contingent

1    and contingent backlog, would be the single largest financial metric for determining the bonuses of

2    certain senior executives, including Defendants Thomson and Hampton.

3            58.    On November 7, 2007, Accuray announced its fiscal first quarter 2008 financial

4    results for the period ended September 29, 2007 in a press release titled "Accuray Reports Record

5    Revenue in First Quarter of Fiscal 2008; Record Quarterly Revenue of $48.6 Million; Backlog

6    Reaches Record Level of $642 Million" (the "11/7/07 Press Release"). The 11/7/07 Press Release

7    stated, in pertinent part, as follows:

8            The first quarter of fiscal 2008 backlog increased by $23 million from the fourth
        quarter fiscal 2007, to approximately $642 million, with approximately $351 million
9        associated with CyberKnife(R) Robotic Radiosurgery System contracts and
        approximately $291 million associated with services and other recurring revenue.
10       Accuray's backlog is composed of firm, signed contracts that the company believes
        have a substantially high probability of being recognized as revenue.

11
        Accuray's cash balance at the end of the quarter was $192 million.
12
        "This is the third consecutive quarter where we have achieved record levels of both
13       revenue and backlog," said Euan S. Thomson, Ph.D., president and chief executive
        officer of Accuray Incorporated. "This growth is a great achievement for Accuray
14       and we believe that it reinforces the medical community's rapid acceptance of the
        CyberKnife System."
15
                            *       *       *
16
        Outlook
17
                            *       *       *
18
        Based on the current business outlook, Accuray is reiterating its fiscal 2008 revenue
19       guidance of $250 million to $270 million. Accuray expects that revenue growth will
        be greater in the third and fourth quarters of fiscal 2008.
20
            59.    On November 7, 2007, Accuray held a conference call with analysts to discuss the
21
     Company's financial performance reported in the 11/7/07 Press Release (the "11/7/07 Conference
22
     Call"). During the 11/7/07 Conference Call, Defendant Thomson said: "Once again achieving
23
     another quarter of record backlog and record revenue in the same quarter demonstrates a continued
24
     success of our sales effort with a very good indication of even more growth to come. A point of note
25
     is that this is the third consecutive quarter that we have grown both revenue and backlog to record
26
     levels."
27

28

1    60.    Analysts reacted positively to Accuray's 11/7/07 Press Release and Conference Call.

2  On November 8, 2007, Jefferies & Company, Inc. issued a research report on Accuray, which stated,

3  in pertinent part, as follows:

4    **Investment Summary**

5    We would be buyers of ARAY. We believe the company's fundamentals remain
     strong and continue to be encouraged by an expanding backlog, highly favorable
6    reimbursement landscape, impressive top line acceleration and increased interest in
     the clinical community for the CyberKnife system.

7                              *        *        *

8
     •    **Backlog and new orders were strong**. The company reported a strong uptake in
9         backlog as it increased by $23MM from $619MM in FY4Q07 to $642MM in
          FY1Q08. New orders in FY1Q08 totaled $71.6MM. We believe that new order
10        growth is an important metric to follow, and ARAY recorded an impressive 95%
          increase in new orders YoY albeit against an easy comparable (from $36.8MM in
11        FY1Q07 to $71.6MM in FY1Q08). The company's new order growth demonstrates
          the significant demand for the CyberKnife in the radiation oncology and surgical
12        communities.

13   61.    On November 13, 2007, Accuray filed with the SEC its Form 10-Q for the second

14  fiscal quarter of 2008, the period ended September 29, 2007, and reiterated the Company's financial

15  results reported in Accuray's 11/7/07 Press Release and Conference Call.

16   62.    The statements referenced above in ¶¶ 40-44, 46, 47, 51-54, 56-59 and 61 were each

17  materially false and misleading when made because they failed to disclose and misrepresented the

18  following adverse facts:

19        (a)    Throughout the Class Period, Defendants overstated the amount of the

20  Company's backlog by at least $127 million;

21        (b)    There was a significant risk that a substantial portion of backlog customers

22  were of high credit risk and would not be able to raise capital to pay for the CyberKnife system;

23        (c)    Defendants reported as backlog a large percentage of contingent and

24  non-contingent orders for the CyberKnife system that did not have a substantially high probability of

25  being booked as revenue;

26        (d)    A significant portion of commissions paid to CyberKnife sales personnel were

27  earned prior to those potential sales being booked as revenue;

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 24 -

1    (e)    Accuray sales personnel entered into contingent contracts for CyberKnife

2 systems that did not have a substantially high probability of being booked as revenue;

3    (f)    Accuray did not have adequate internal controls and procedures to ensure that

4 potential orders reported as backlog had a substantially high probability of being booked as revenue;

5 and

6    (g)    based on the foregoing, Defendants lacked a reasonable basis for their positive

7 statements about the Company, its backlog, earnings, operations and prospects.

8    63.    On January 30, 2008, Accuray announced its fiscal second quarter 2008 financial

9 results for the period ended December 29, 2007 and cut its full-year sales outlook in a press release

10 titled "Accuray Reports Continued Growth in Second Quarter of Fiscal 2008; Fourth Consecutive

11 Quarter of Record Revenue and Backlog" (the "1/30/08 Press Release"). The 1/30/08 Press Release

12 stated, in pertinent part, as follows:

13   Accuray Incorporated(NASDAQ:ARAY), a global leader in the field of
     radiosurgery, today announced financial results for the second quarter of fiscal 2008,
14   ended December 29, 2007.

15   For the second quarter of fiscal 2008, Accuray reported total revenue of $52.0
     million, a 98 percent increase over second quarter fiscal 2007 total revenue of $26.3
16   million.

17   Net income for the quarter ended December 29, 2007 was $2.3 million, or $0.04 per
     diluted share, compared to a loss of $7.3 million, or a loss of $0.45 per share, during
18   the same period last year. Shares used in computing fully diluted earnings per share
     were 61.3 million for the second fiscal quarter of 2008.
19
     Non-cash, stock-based compensation charges for the second fiscal quarter of 2008
20   were $4.3 million or $0.07 per diluted share.

21   For the period ended December 29, 2007, backlog increased to approximately $660
     million, with approximately $365 million associated with CyberKnife(R) Robotic
22   Radiosurgery System contracts and approximately $295 million associated with
     services and other recurring revenue. Accuray's backlog is composed of firm, signed
23   contracts that the company believes have a substantially high probability of being
     recognized as revenue.
24
     Accuray's cash balance at the end of the quarter was $187.5 million.
25
     For the six months ended December 29, 2007, total revenue was $100.7 million, a 70
26   percent improvement over the $59.1 million in total revenue during the same period
     last year. Net income for the first half of fiscal 2008 was $4.6 million, or $0.08 per
27   diluted share, compared to a loss of $5.3 million, or a loss of $0.33 per share, for the
     first half of fiscal 2007.
28

1   "Accuray continues to experience record-setting growth, with our fourth consecutive
quarter of increasing revenue and backlog. This sustained growth is a testament to
2   the impact that the CyberKnife System is having on meeting the demands for
extracranial radiosurgery, particularly prostate and lung cancer," said Euan S.
3   Thomson, Ph.D., president and CEO of Accuray. "While this was a positive quarter
with respect to revenue and backlog growth, we believe that broader credit market
4   issues are having a short-term impact on some of our U.S. customers' purchase and
installation timelines, as obtaining financing has become more difficult. We remain
5   confident in the clinical demand for the Cyber-Knife and our ability to further build
the market for extracranial radiosurgery."

6

Outlook

7

8   The following statements are forward-looking and actual results may differ
materially. Based upon current economic conditions, specifically the tightening of
credit markets in the United States, Accuray is adjusting revenue guidance for fiscal
9   2008 to be in the range of $210 million to $230 million, which would represent
revenue growth of 50 percent to 64 percent over fiscal 2007.

10

11   64.     Defendants held a conference call on January 30, 2008 to discuss the Company's

earnings and operations (the "1/30/08 Conference Call"). During the 1/30/08 Conference Call,

12

13   Defendant Thomson blamed the credit market for the reduction in guidance and stated, in pertinent

part, as follows:

14

15   I will now give an overview of clinical, technical and sales developments during the
quarter. I will finish with an overview of how we believe the near-term tightening of
the credit markets in the United States has led us to modify our full year revenue
16   guidance. I'll discuss this in more detail before turning the call to Bob McNamara.

17                          *       *       *

18   As Bob will explain in a minute, this increase in backlog also occurred at a time
when the changing financial environment resulted in us removing several purchased
19   contracts from backlog.

20                          *       *       *

21   While we have continued to grow our revenue, net income and backlog, we now feel
it's sensible to adjust our expectations for the remainder of the year. At the start of
22   this fiscal year, we stated revenue guidance of between $250 million and $270
million for fiscal year 2007. And we stated that we anticipated flat to moderate
23   growth in revenue for the first half of the year. Revenue in Q1 was $49 million, up
from a prior quarter value of $44 million. Q2 increased further to $52 million. Our
24   total year-to-date revenue is in excess of $100 million. Today, however, we are
adjusting the revenue guidance for FY 2008 to $210 million to $230 million, which
25   would represent annual revenue growth of 50% to 64%.

26   The primary reason for this change is that those customers requiring credit to finance
either their equipment purchase or the construction of their facility, are having
27   greater than expected challenges. As a result, some of our U.S. customers who had
committed to installation timetables have slowed their installation plans. This
28   inevitably has affected our revenue forecast for the year.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 26 -

*     *     *

Additionally, we have always stated that we review backlog on a quarterly basis and only include those contracts that we feel confident will lead to future revenue. This quarter we felt it sensible to remove a number of contracts from backlog in order to give our investors greater visibility into the potential effect of this market adjustment.

65.     During the 1/30/08 Conference Call, Defendant McNamara stated that "contracts most affected by the tightening economy were removed" and that those "customers were generally those whose financing is now delayed or in question." Defendant McNamara also stated that approximately $30 million of orders were taken out of backlog and "[p]retty much" all of those backlog customers were U.S. freestanding centers.

66.     In response to the disappointing news about Accuray's profit and revenue falling short of analyst estimates, the fact that customers were taken out of backlog, and the reduction of guidance, on January 31, 2008, the first day of trading after Accuray's financial results were reported, shares of Accuray plummeted from a close of $14.98 per share on January 30, 2008 to a close of $9.52 per share (a decline of more than 36%), on extremely high volume of more than 10 million shares.

67.     On January 31, 2008, a *Bloomberg* article titled "Accuray Plunges as Forecast Misses Expectations" stated, in pertinent part, as follows:

Accuray Inc., maker of the CyberKnife system for radiation surgery, lost a third of its value in NASDAQ composite trading after the company forecast lower fiscal 2008 sales than analysts expected.

The shares dropped $5.44, or 36 percent, to $9.54 – the most ever and the second-biggest percentage loss in U.S. trading. The shares have fallen 67 percent since peaking at 29.25 on Feb. 9, two days after the initial public offering.

Accuray forecast sales of $210 million to $230 million in the fiscal year ending June 28, the Synnyvale, California-based company said yesterday in a statement. That compares with the average estimate of $264.8 million in a Bloomberg survey of five analysts. Analyst Junaid Husain at Soleil Securities downgraded the company to hold from buy today on the "poor" performance this quarter and "too many uncertainties on the horizon," he said in a note to investors.

68.     Analysts covering Accuray's stock questioned whether credit issues were the real cause for the reduction in backlog. As stated in a research report dated January 30, 2008 by Oppenheimer & Co. Inc.:

1    • **A New Issue Emerges**. ARAY now says the credit markets are hurting their
      customers' ability to get financing, which has delayed some installations and also
2    eliminated about 7-10 contracts that were in their backlog. ***We checked with
      ARAY's competitors last night and no one seems to be having the same issue (VAR
3    had great results just last week)***. As a reminder, only ARAY includes "contingent"
      orders in its backlog, including a contingency for joint ventures that still need
4    financing.  Mgmt would not comment on how much more of backlog could be
      impacted in the future, and this in our opinion significantly taints any visibility.
5    [Emphasis added.]

6    69.    On April 29, 2008, Accuray announced it fiscal third quarter 2008 financial results for

7    the period ended March 29, 2007 in a press release titled "Accuray Reports Record Revenue in Third

8    Quarter of Fiscal 2008; Fourth Consecutive Quarter of Profitability" (the "4/29/08 Press Release").

9    The 4/29/08 Press Release stated, in pertinent part, as follows:

10        For the nine months ended March 29, 2008, total revenue was $159.4 million, a 65
          percent increase over the $96.5 million in total revenue during the same period last
11        year. Net income for the first nine months of fiscal 2008 was $5.2 million, or $0.09
          per diluted share, compared to a loss of $6.1 million, or a loss of $0.26 per share, for
12        the first nine months of fiscal 2007.

13        "Accuray's fifth quarter of record-setting revenue is evidence of continued
          momentum and worldwide demand for our CyberKnife(R) Robotic Radiosurgery
14        System," said Euan S. Thomson, Ph.D., president and CEO of Accuray.  "The
          flexibility of our CyberKnife System is changing the paradigm for cancer treatment,
15        giving physicians the tools to aggressively treat tumors anywhere in the body with
          pinpoint precision."
16
          Outlook
17
          The following statements are forward-looking and actual results may differ
18        materially. Accuray is reaffirming previously announced revenue guidance for fiscal
          2008 in the range of $210 million to $230 million, which would represent revenue
19        growth of 50 percent to 64 percent over fiscal 2007.

20    70.    That same day, Accuray held a conference call with analysts (the "4/29/08

21    Conference Call"), reiterated the Company's financial results and disclosed that Accuray eliminated

22    an additional $58 million in backlog.

23    71.    A research report by Oppenheimer & Co. Inc. dated April 29, 2008 commented on

24    Accuray's financial results and stated:

25        • **Backlog is Vanishing into Thin Air**. ARAY blamed regulatory uncertainty and
          customer financing difficulties at free standing clinics for another revision to
26        backlog, which eliminated $54M in contracts. For those keeping score, that's $88M
          in backlog revisions in just the past two quarters. We now estimate LTM new orders
27        (less this $88M) are down over 30% y/y. Simply put, we think the business is in
          trouble. Mgmt now says 64% of backlog is non-contingent orders, but we view this
28        backlog as largely irrelevant at this point, and expect more revisions to come.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 28 -

72.     In response to the disappointing news about the elimination of orders from backlog, on April 30, 2008, shares of Accuray fell from a close of $8.09 per share on April 29, 2008 to a close of $7.83 per share (or more than 3%), on extremely high volume.

73.     On the 4/29/08 Conference Call, Defendants Thomson and McNamara attempted to minimize the negative impact of the elimination in backlog. Defendant McNamara stressed that the elimination of backlog orders was restricted to mostly contingent contracts and "90% were non-hospital deals." Defendant Thomson sated that the Company "generated substantial new backlog."

74.     Based upon comments from Defendants, analysts continued to rate the Company favorably and had confidence in the Company's reported backlog. For example, in a research report dated April 30, 2008, Jefferies & Co. maintained a "Buy" rating on Accuray's stock.

75.     The statements referenced above in ¶¶ 63-65, 69-70 and 73 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts:

        (a)     Defendants overstated the amount of the Company's backlog by millions of dollars;

        (b)     Defendants reported as backlog a large percentage of contingent and non-contingent orders for the CyberKnife system that did not have a substantially high probability of being booked as revenue;

        (c)     Accuray sales personnel entered into contingent contracts for CyberKnife systems that did not have a substantially high probability of being booked as revenue;

        (d)     Accuray did not have adequate internal controls and procedures to ensure that potential orders reported as backlog had a substantially high probability of being booked as revenue; and

        (e)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its backlog, earnings, operations and prospects.

76.     On August 13, 2008, Jefferies & Co. downgraded Accuray's stock from a "Buy" to a "Hold" and stated that Accuray was subject to the same forces "that led to backlog revisions in FQ2 and FQ3, which implies that further revisions are possible in FQ4." Prior to this downgrade,

1 Accuray's stock closed at $8.67 per share on August 12, 2008 and, on August 13, 2008, traded as

2 low as $8 per share after the downgrade.

3      77.    On August 19, 2008, Accuray announced its fiscal fourth quarter and full year 2008

4 financial results for the period ended June 28, 2008 in a press release titled "Accuray Announces

5 Results for the Fourth Quarter and Fiscal Year End 2008; 28 New Contracts Valued at $115.5

6 Million Signed in Fourth Quarter" (the "8/19/08 Press Release"). That same day, Accuray held a

7 conference call with analysts and reiterated the financial results in the 8/19/08 Press Release and

8 revealed that Accuray removed another $39 million from backlog. Thus, Accuray removed

9 approximately $127 million in backlog during the last three quarters of fiscal 2008.

10      78.    A research report by Oppenheimer & Co. Inc. dated August 20, 2008 commented on

11 Accuray's financial results and stated:

12     SUMMARY

13     Here are the facts: sales and EPS missed Street once again, new orders were down
    y/y for the third straight quarter, backlog was "materially" revised downward for the
14     third straight quarter, and actual unit installations were down for the second
    consecutive year in the U.S. (and flat WW for the past three years). How this could
15     possibly be spun in a positive light is beyond our own imaginative capabilities, and
    thus we ascribe no confidence in the company's FY09 sales guidance or in remarks
16     about new orders. We reiterate our Underperform rating.

17     KEY POINTS

18     •    ARAY eliminated another $39M from backlog due to customer cancellations and
        other doubtful "stuff", and so about $127M has now been removed from backlog in
19         the past three quarters. *We view backlog as largely irrelevant at this point
        (expecting more revisions to come), and would focus attention on installations*
20         *instead*. [Emphasis added.]

21      79.    On August 20, 2008, in response to the disappointing news about the elimination of

22 orders from backlog, shares of Accuray declined from a close of $7.57 per share on August 19, 2008

23 to a low of $6.90 per share (or almost 9%), and eventually closed at $7.71 on extremely high

24 volume.

25      80.    The market for Accuray common stock was open, well-developed and efficient at all

26 relevant times. As a result of these materially false and misleading statements and failures to

27 disclose as set forth above, Accuray common stock traded at artificially inflated prices during the

28 Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Accuray

1  common stock relying upon the integrity of the market price of Accuray common stock and market

2  information relating to Accuray, and have been damaged thereby.

3       81.   During the Class Period, Defendants materially misled the investing public, thereby

4  inflating the price of Accuray common stock, by publicly issuing false and misleading statements

5  and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein,

6  not false and misleading.  Said statements and omissions were materially false and misleading in that

7  they failed to disclose material adverse information and misrepresented the truth about the Company,

8  its business and operations, as alleged herein.

9       82.   At all relevant times, the material misrepresentations and omissions particularized in

10 this Complaint directly or proximately caused or were a substantial contributing cause of the

11 damages sustained by Plaintiff and other members of the Class.  As described herein, during the

12 Class Period, Defendants made or caused to be made a series of materially false or misleading

13 statements about Accuray's business, prospects and operations.  These material misstatements and

14 omissions had the cause and effect of creating in the market an unrealistically positive assessment of

15 Accuray and its business, prospects and operations, thus causing the Company's common stock to be

16 overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading

17 statements during the Class Period resulted in Plaintiff and other members of the Class purchasing

18 the Company's common stock at artificially inflated prices, thus causing the damages complained of

19 herein.  When the true facts about the Company were revealed to the market, the inflation in the

20 price of Accuray stock was removed and the price of Accuray stock declined dramatically, causing

21 loss to Plaintiff and the other members of the Class.

22                      **Additional Scienter Allegations**

23       83.   As alleged herein, Defendants acted with scienter in that Defendants knew that the

24 public documents and statements issued or disseminated in the name of the Company were

25 materially false and misleading; knew that such statements or documents would be issued or

26 disseminated to the investing public; and knowingly and substantially participated or acquiesced in

27 the issuance or dissemination of such statements or Documents as primary violations of the federal

28 securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of

1   information reflecting the true facts regarding Accuray, their control over, and/or receipt and/or

2   modification of Accuray's allegedly materially misleading misstatements and/or their associations

3   with the Company which made them privy to confidential proprietary information concerning

4   Accuray, participated in the fraudulent scheme alleged herein.

5          84.      Defendants' scienter is further evidenced by unusual and suspicious insider trading,

6   as set forth in the chart below:

| Last Name | First Name | Position | Date | Ownership | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|---|
| ADLER | JOHN | Director | 2/8/2007 | Indirect | 220,000 | $18.00 | $3,960,000 |
|  |  |  | 11/12/2007 | Direct | 100,000 | $15.91 | $1,591,000 |
|  |  |  |  |  | 320,000 |  | $5,551,000 |
| LINDQUIST | ERIC | Senior Vice President, Chief Marketing Officer | 2/8/2007 | Direct | 48,000 | $18.00 | $864,000 |
|  |  |  | 10/30/2007 | Direct | 10,000 | $20.00 | $200,000 |
|  |  |  |  |  | 58,000 |  | $1,064,000 |
| RAANES | CHRIS | Senior Vice President, Chief Operating Officer | 2/8/2007 | Direct | 76,000 | $18.00 | $1,368,000 |
|  |  |  |  |  | 76,000 |  | $1,368,000 |
| THOMSON | EUAN | CEO, President, Director | 2/8/2007 | Direct | 200,000 | $18.00 | $3,600,000 |
|  |  |  |  |  | 200,000 |  | $3,600,000 |
| TU | TED | Director | 2/8/2007 | Indirect | 4,084,450 | $18.00 | $73,520,100 |
|  |  |  | 2/8/2007 | Indirect | 3,953,191 | $18.00 | $71,157,438 |
|  |  |  | 2/13/2007 | Indirect | 1,878,807 | $27.61 | $51,873,861 |
|  |  |  |  |  | 9,916,448 |  | $196,551,399 |
| WU | WAYNE | Director | 2/7/2007 | Direct | 59,000 | $18.00 | $1,062,000 |
|  |  |  |  |  | 59,000 |  | $1,062,000 |

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

85.      At all relevant times, the market for Accuray common stock was an efficient market

for the following reasons, among others:

       (a)      Accuray stock met the requirements for listing, and was listed and actively

traded on the NASDAQ, a highly efficient and automated market;

1          (b)     as a regulated issuer, Accuray filed periodic public reports with the SEC and

2   the NASDAQ;

3          (c)     Accuray regularly communicated with public investors via established market

4   communication mechanisms, including through regular disseminations of press releases on the

5   national circuits of major newswire services and through other wide-ranging public disclosures, such

6   as communications with the financial press and other similar reporting services; and

7          (d)     Accuray was followed by several securities analysts employed by major

8   brokerage firms who wrote reports which were distributed to the sales force and certain customers of

9   their respective brokerage firms. Each of these reports was publicly available and entered the public

10  marketplace.

11      86.     As a result of the foregoing, the market for Accuray common stock promptly digested

12  current information regarding Accuray from all publicly-available sources and reflected such

13  information in the price of Accuray stock. Under these circumstances, all purchasers of Accuray

14  common stock during the Class Period suffered similar injury through their purchase of Accuray

15  common stock at artificially inflated prices and a presumption of reliance applies.

16                                **NO SAFE HARBOR**

17      87.     The statutory safe harbor provided for forward-looking statements under certain

18  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

19  Many of the specific statements pleaded herein were not identified as "forward-looking statements"

20  when made. To the extent there were any forward-looking statements, there were no meaningful

21  cautionary statements identifying important factors that could cause actual results to differ materially

22  from those in the purportedly forward-looking statements. Alternatively, to the extent that the

23  statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are

24  liable for those false forward-looking statements because at the time each of those forward-looking

25  statements was made, the particular speaker knew that the particular forward-looking statement was

26  false, and/or the forward-looking statement was authorized and/or approved by an executive officer

27  of Accuray who knew that those statements were false when made.

28

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

88.     Plaintiff repeats and realleges each and every allegation contained above.

89.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

90.     The Registration Statement and Prospectus for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

91.     Accuray is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement and Prospectus.

92.     As the issuer of the securities in the IPO, Accuray is strictly liable to Plaintiff and the Class for the misstatements and omissions.

93.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true and without omissions of any material facts and were not misleading.

94.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

95.     Plaintiff acquired Accuray securities pursuant to the Registration Statement and Prospectus.

96.     Plaintiff and the Class have sustained damages. The value of Accuray securities has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

97.     Plaintiff repeats and realleges each and every allegation contained above.

98.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

1      99.    Defendants were sellers and offerors and/or solicitors of purchasers of the shares

2  offered pursuant to the Registration Statement and Prospectus.

3      100.    The Registration Statement and Prospectus contained untrue statements of material

4  facts, omitted to state other facts necessary to make the statements made not misleading, and omitted

5  to state material facts required to be stated therein. Defendants' actions of solicitation included

6  participating in the preparation of the false and misleading Registration Statement and Prospectus

7  and participating in road shows to market the IPO to investors.

8      101.    Defendants owed to the purchasers of Accuray's securities, including Plaintiff and

9  other Class members, the duty to make a reasonable and diligent investigation of the statements

10  contained in the IPO offering materials, including the Registration Statement and Prospectus

11  contained therein, to ensure that such statements were true and that there was no omission to state a

12  material fact required to be stated in order to make the statements contained therein not misleading.

13  Defendants, in the exercise of reasonable care, should have known of the misstatements and

14  omissions contained in the IPO offering materials as set forth above.

15      102.    Plaintiff and other members of the Class purchased or otherwise acquired Accuray

16  securities pursuant to and/or traceable to the defective Registration Statement and Prospectus.

17  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the

18  untruths and omissions contained in the Registration Statement and Prospectus.

19      103.    Plaintiff, individually and representatively, hereby offers to tender to Defendants

20  those securities which Plaintiff and other Class members continue to own, on behalf of all members

21  of the Class who continue to own such securities, in return for the consideration paid for those

22  securities together with interest thereon. Class members who have sold their Accuray securities are

23  entitled to rescissory damages.

24      104.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled

25  a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of

26  the Class who hold Accuray securities purchased in the IPO have the right to rescind and recover the

27  consideration paid for their securities and hereby elect to rescind and tender their Accuray common

28

1   stock to the Defendants sued herein. Plaintiff and Class members who have sold their Accuray

2   securities are entitled to rescissory damages.

3                                    **COUNT III**

4                    **Violation of Section 15 of the Securities Act**
                        **Against the Individual Defendants**

5
        105.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set
6
    forth herein.
7
        106.    This Count is brought pursuant to Section 15 of the Securities Act against the
8
    Individual Defendants.
9
        107.    Each of the Individual Defendants acted as controlling persons of Accuray within the
10
    meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior
11
    officer of Accuray. By reason of their senior management positions and/or directorships at the
12
    Company, as alleged above, these Individual Defendants, individually and acting pursuant to a
13
    common plan, had the power to influence and exercised the same to cause Accuray to engage in the
14
    conduct complained of herein. By reason of such conduct, the Individual Defendants are liable
15
    pursuant to Section 15 of the Securities Act.
16
        108.    Each of the Individual Defendants was a culpable participant in the violations of
17
    Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having
18
    signed the Registration Statement and having otherwise participated in the process which allowed
19
    the IPO to be successfully completed.
20
                                    **COUNT IV**
21
                    **Violation of Section 10(b) of the Exchange Act**
22                  **Against and Rule 10b-5 Promulgated Thereunder**
                        **Against All Defendants**
23
        109.    Plaintiff repeats and realleges each and every allegation contained above as if fully set
24
    forth herein.
25
        110.    During the Class Period, Defendants disseminated or approved the false statements
26
    specified above, which they knew or deliberately disregarded were misleading in that they contained
27

28

1 misrepresentations and failed to disclose material facts necessary in order to make the statements

2 made, in light of the circumstances under which they were made, not misleading.

3     111.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

4         (a)    employed devices, schemes, and artifices to defraud;

5         (b)    made untrue statements of material facts or omitted to state material facts

6 necessary in order to make the statements made, in light of the circumstances under which they were

7 made, not misleading; or

8         (c)    engaged in acts, practices, and a course of business that operated as a fraud or

9 deceit upon Plaintiff and others similarly situated in connection with their purchases of Accuray

10 common stock during the Class Period.

11     112.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

12 the market, they paid artificially inflated prices for Accuray stock. Plaintiff and the Class would not

13 have purchased Accuray stock at the prices they paid, or at all, if they had been aware that the

14 market prices had been artificially and falsely inflated by Defendants' misleading statements.

15     113.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and

16 the other members of the Class suffered damages in connection with their purchases of Accuray

17 common stock during the Class Period.

18 **COUNT V**

19 **Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

20

21     114.   Plaintiff repeats and realleges each and every allegation contained above as if fully set

forth herein.

22

23     115.   The Individual Defendants acted as controlling persons of Accuray within the

meaning of Section 20(a) of the Exchange Act. By reason of their positions as officers and/or

24

25 directors of Accuray, and their ownership of Accuray stock, the Individual Defendants had the

power and authority to cause Accuray to engage in the wrongful conduct complained of herein.

26

27 Accuray controlled each of the Individual Defendants and all of its employees. By reason of such

28

1   conduct, the Individual Defendants and Accuray are liable pursuant to Section 20(a) of the Exchange

2   Act.

3         WHEREFORE, Plaintiff prays for relief and judgment, as follows:

4         A.      Determining that this action is a proper class action, designating Plaintiff as Lead

5   Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil

6   Procedure and Plaintiff's counsel as Lead Counsel;

7         B.      Awarding compensatory damages in favor of Plaintiff and the other Class members

8   against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

9   wrongdoing, in an amount to be proven at trial, including interest thereon;

10        C.      With respect to Count II, Ordering that the IPO be rescinded;

11        D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

12  action, including counsel fees and expert fees; and

13        E.      Such other and further relief as the Court may deem just and proper.

14                            **JURY TRIAL DEMANDED**

15        Plaintiff hereby demands a trial by jury.

16  DATED: July 22, 2009                   COUGHLIN STOIA GELLER RUDMAN
                                            & ROBBINS LLP
17                                          SHAWN A. WILLIAMS (213113)

18

19                                          _____
                                                      SHAWN A. WILLIAMS
20
                                            100 Pine Street, 26th Floor
21                                          San Francisco, CA  94111
                                            Telephone:  415/288-4545
22                                          415/288-4534 (fax)
                                            ShawnW@csgrr.com
23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS     - 38 -

1

2

3

4

5

6

7

8

9

10

11

S:\CptDraft\Securities\CPT Accuray.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: 631/367-7100
631-367-1173 (fax)
SRudman@csgrr.com
EKaufman@csgrr.com

VANOVERBEKE MICHAUD &
   TIMMONY P.C.
79 Alfred Street
Detroit, Michigan 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

1

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2       Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3   named parties, there is no such interest to report.

4
                                            _____
                                            ATTORNEY OF RECORD FOR PLAINTIFF
5                                           SHAWN A. WILLIAMS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28