1
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
2
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
3
100 Pine Street, 26th Floor
San Francisco, CA 94111
4
Telephone: 415/288-4545
415/288-4534 (fax)
5
shawnw@csgrr.com
dpfefferbaum@csgrr.com
6
  – and –
DARREN J. ROBBINS (168593)
7
BRIAN O. O'MARA (229737)
655 West Broadway, Suite 1900
8
San Diego, CA 92101
Telephone: 619/231-1058
9
619/231-7423 (fax)
darrenr@csgrr.com
10
bomara@csgrr.com

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
MARK GOLDMAN
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
CKeller@labaton.com
JGardner@labaton.com
MGoldman@labaton.com

11
Co-Lead Counsel for Plaintiffs

12
UNITED STATES DISTRICT COURT

13
NORTHERN DISTRICT OF CALIFORNIA

14
OAKLAND DIVISION

15
ZHENGXU HE, Individually and as Trustee
for the He & Fang 2005 Revocable Trust and
16
Zhengxu He Roth IRA, THE CITY OF
BROCKTON RETIREMENT SYSTEM, and
17
WAYNE COUNTY EMPLOYEES'
RETIREMENT SYSTEM,
18
              Plaintiffs,
19
    vs.
20
ACCURAY INC., EUAN S. THOMSON,
21
ROBERT E. MCNAMARA, WADE B.
HAMPTON, TED TU, WAYNE WU, JOHN
22
R. ADLER, JR., and ROBERT S. WEISS
23
              Defendants.
24

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Master File No. 4:09-cv-03362-CW

CLASS ACTION

[CORRECTED] CONSOLIDATED CLASS
ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

[Caption continued on following page.]

25

26

27

28

1 | In re ACCURAY INC. SECURITIES ) LITIGATION )

2 | _____ )
                                    )
3 | This Document Relates To:       )
                                    )
4 |        ALL ACTIONS.             )
   | _____ )
5

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW .................................................................................................1

Defendants Publicly Disclose Change in Backlog Definition to Include
Contingent Deals Claiming It Represented a More Accurate Picture of
Accuray's Business........................................................................................................5

Defendants Provide Knowingly False Assurances Concerning Reported Backlog,
the Company Sets Knowingly False FY08 Revenue and Earnings
Forecasts ......................................................................................................................7

Through a Series of Disclosures and Backlog Reductions, the Company Revealed
that the Company's Reported Backlog Was Not a Reliable Metric by
Which to Measure the Company's Financial Condition........................................8

Because the Company's Backlog of CyberKnife Orders and Sales Was the
Admitted Core of the Company's Business That Defendants Knew of Its
Contents and Quality Throughout the Class Period..............................................11

Defendants Admit Reported Contingent Backlog Not a Good Indicator of Future
Revenue........................................................................................................................12

JURISDICTION AND VENUE ...................................................................................................13

PARTIES ...................................................................................................................................14

CONFIDENTIAL WITNESSES .................................................................................................16

CONTROL PERSONS ...............................................................................................................17

FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS IN
VIOLATION OF THE EXCHANGE ACT.........................................................................19

Reports from Confidential Witnesses Provide the True Facts Concerning the
Company's Sales and Backlog and Defendants' Knowledge of Falsity................26

The Registration Statement Misrepresented that Accuray Received Deposits and
Recognized Deposits as Revenue Even on Cancelled Orders ...............................29

Defendants Knew of and Encouraged the Artificial Inflation of Backlog and
Permitted Phony Sales to Be Entered Into and Reported as Backlog...................31

Defendants Knew that Reported Backlog, Including the "Definition" of Backlog
Before and During the Class Period, Was False Because They Failed to
De-book Deals They Knew Customers Had Cancelled or Had Become
Dormant .......................................................................................................................37

Accuray Changes FY08 Executive Bonus Structure to Be Weighted Toward
Backlog, Further Encouraging Sales Staff to Sign Deals Which
Defendants Already Knew, or Deliberately Disregarded, Were Including
Bogus Deals in Backlog..............................................................................................47

**Page**

Defendants Intentionally Exclude Analyst with a Negative Rating on Accuray
from Company Sponsored Investor Event; Big Investment Houses and
Underwriters Issue Positive Outlook Reports .......................................................48

Accuray Reiterates Knowingly False FY08 Forecast; Makes Even Bolder False
Backlog Statements and Issues Disclosure that the Company Was
Recognizing Revenue on International Deals Upon Shipment.............................50

Securities Analysts Criticize Weak Installation Figure; Wonder About the
International Sales Disclosure; Repeat Reiteration of 2Q08 Forecast and
Stock Price Declines. ........................................................................................52

CWs Report Accuray Recognized Revenue on Warehoused International
Shipments and Uninstalled Systems Including Chinese and Asian
Customers ........................................................................................................54

Accuray Announces 2Q08 Results – Misses Sales Revenue and Earnings
Expectations, Removes $34 Million from Backlog and Reduces 2008
Forecast by Up to $60 Million – Stock Price Collapses ......................................57

Defendants Continue to Misrepresent Backlog But Disclose Serial and Significant
Backlog Reductions ..........................................................................................63

Accuray Announces Revenue and Earnings Miss of Wall Street Estimates Again,
Removes Another $39 Million in Backlog ..........................................................67

Accuray Terminates Its Chief Financial Officer McNamara and Its General
Counsel Mitchell; Delays Quarterly Results Due to Internal Review ..................69

Accuray Admits Lack of Adequate Internal Controls and Inventory Overstatement........71

LOSS CAUSATION/ECONOMIC LOSS .......................................................................75

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
DOCTRINE ..............................................................................................................77

CLASS ACTION ALLEGATIONS ................................................................................78

NO SAFE HARBOR ...................................................................................................80

COUNT I ...................................................................................................................80

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
Defendants .......................................................................................................80

COUNT II ..................................................................................................................82

For Insider Trading Violations of Rule 10(b) and SEC Rule 10(b)(5)(1) Against
Defendants .......................................................................................................82

COUNT III..................................................................................................................82

1

2                                                                                    **Page**

3          For Violation of Section 20(a) of the Exchange Act Against the Individual

Defendants ...............................................................................................................82

PRAYER FOR RELIEF .........................................................................................83

JURY DEMAND ....................................................................................................83

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION AND OVERVIEW**

2    1.    This securities class action is brought on behalf of purchasers of Accuray Inc.

3  ("Accuray" or the "Company") securities pursuant to or traceable to the Company's Initial Public

4  Offering (the "IPO") on or about February 7, 2007, as well as purchasers of the Company's

5  securities between February 7, 2007 and August 19, 2008, inclusive (the "Class Period"), seeking to

6  pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

7  as amended by the Private Securities Litigation Reform Act of 1995 and Rule 10b-5 promulgated

8  thereunder (17 C.F.R. §240.10b-5).

9    2.    Defendant Accuray designs, develops, and sells the CyberKnife system, an image-

10 guided robotic radiosurgery system for the treatment of solid tumors. The CyberKnife system which

11 costs approximately $4 million, purports to combine continuous image-guidance technology with a

12 compact linear accelerator to deliver high doses of radiation to a tumor from different directions.

13    3.    During the Class Period, Accuray's business model includes three main sources of

14 revenue: (i) product; (ii) shared ownership; and (iii) services. Product revenue is generated from the

15 sale of the Company's CyberKnife systems, which are capital equipment purchases for hospitals or

16 radiation treatment facilities. Under the shared ownership program, a CyberKnife system is placed

17 in a hospital with Accuray retaining the title. The customer is responsible for building a radiation-

18 shielded room and making minimum monthly payments to Accuray. Any revenue generated over

19 and above those minimum payments is shared between Accuray and the customer. Service contracts

20 are typically signed for four- to five-year periods, and in most cases include six technology upgrades,

21 when and if available, during the period.

22    4.    According to the Company, the sales process in the United States involves a

23 combination of sales directors, sales specialists, customer account sales executives, product

24 managers, account managers and training specialists. Exhibit 1 at 70.[1]

25

26  _____

27  [1]    Exhibits referenced herein are attached to the Appendix of Exhibits, filed concurrently
     herewith.

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE         - 1 -
FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

5.      During the Class Period, the Company and the Individual Defendants (defined below) made materially false and misleading statements and failed to disclose material facts concerning the Company's current and future financial condition, in particular: (i) the definition, quality and makeup of backlog, including reported backlog which was used by defendants and investors to measure the current and future financial condition of the Company; (ii) the receipt of and accounting for customer deposits; (iii) the Company's revenue and earnings forecasts for FY08; and (iv) revenue recognition processes on CyberKnife systems sales to international customers.  As detailed herein, defendants knew or recklessly disregarded that the statements alleged herein were false and misleading when made.

6.      Beginning with the February 7, 2007 Registration Statement and Prospectus (collectively, the "Registration Statement") and throughout the Class Period, the Company publicly defined (and re-defined) its definition of backlog while simultaneously identifying it as the metric that investors should use to measure the growth of the Company.  The Company nevertheless made knowingly false representations regarding content and quality of backlog, including the likelihood that backlog would result in future revenue:

1)      *We define backlog as the sum of the following two components: deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received.  Backlog includes contractual commitments from CyberKnife system purchase agreements . . . .*

2)      *Reported backlog includes only contracts which contain no contingencies, or for which all contingencies have been met and does not include signed contracts that have contingencies . . . These Contingent contracts will be added to backlog once all contingencies have been met.*

3)      *Backlog includes non-contingent contractual commitments from CyberKnife system purchase agreements . . .  Backlog does not include signed contracts that have contingencies such as board approvals, financing dependencies or the formation of certain legal structures.*

4)      *Accuray's backlog is composed of firm, signed contracts that the company believes have a substantially high probability of being recognized as revenue.*

*Id.* at 44; Exs. 2-3, 20.

7.      In truth, as reported by confidential witnesses ("CW") prior to the filing of the Registration Statement, the Company had ***already*** changed its sales and contracting process from

using Letters of Intent ("LOIs") as referenced in the Registration Statement to using what it called Term Agreements which substantially affected the sales process, and materially impacted the makeup and reporting of backlog. The Company said in the Registration Statement that backlog consisted of CyberKnife sales and revenues with no contingencies, that customers were contractually committed to make. ¶53. The Company later repeated the statement with even stronger emphasis on the fact that backlog consisted of *only* of contracts with no contingencies. ¶56. However, CWs report that prior to February 2007, the Term Agreements were already in use and contained language allowing for contingencies to be self-satisfying *i.e.*, when a customer did not affirmatively inform the Company otherwise, the contingency was presumed satisfied. As a result, backlog was inflated as deals were reported as non-contingent or having a substantially high probability of being converted to revenue. For example, according to CW1, the Term Agreements stated that if the customer did not cancel the contract by a certain date – for instance 90 days from the date the term agreement was signed – *then Accuray would assume that the contingencies had been waived on the part of the customer*. *See infra* ¶68.

8.      In addition to the false representations concerning reported backlog, the Registration Statement materially misrepresented that the Company received customer deposits when sales contracts were executed, and that even upon cancellation of an agreement or contract, the Company would recognize the deposits as revenue. And finally, the Registration Statement falsely stated that the Company did not recognize revenue on CyberKnife sales until installation has occurred or for some international sales through distributors, upon delivery to the end-user's site:

> Under our revenue recognition policy, we generally do not recognize revenue attributable to a CyberKnife system purchase *until after installation has occurred. For international sales through distributors, we typically recognize revenue when the system is delivered to the end user's site.*
>
> *                 *                 *
>
> *In the event that a customer does not, for any of the reasons above or other reasons, proceed with installation of the system after entering into a purchase contract, we would only recognize the deposit portion of the purchase price as revenue. . . .*
>
> *We typically receive a deposit at the time the CyberKnife system purchase contract is executed, and the remaining balance for the purchase of the CyberKnife system upon installation. . . .*

1 | Ex. 1 at 13, 42.

2 |      9.    Confidential witnesses and internal documents and defendants' admissions together

3 | demonstrate that all three statements were patently false. In truth, (a) the Company was not

4 | receiving deposits and would put contracts or agreements without deposits into backlog; (b) as

5 | opposed to recognizing deposits as revenue on cancelled deals, the Company was instead issuing

6 | refunds on cancelled contracts; (c) the Company was recognizing revenue simply upon shipments to

7 | international distributors as opposed to or installation or delivery to the end-user's site. CWs further

8 | report that at times CyberKnife systems would sit in distributor or Accuray warehouses for months.

9 |      10.    On February 8, 2007, with this false information known or deliberately disregarded

10 | by defendants, Company insiders including certain of the Individual Defendants sold millions of

11 | shares of Accuray stock at artificially inflated prices of more than $28.00 per share. The Company's

12 | $18.00 per share IPO price would have been substantially lower without the misrepresentations:

| Last Name | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| ADLER | 2/8/2007 | 220,000 | $18.00 | $3,960,000 |
|  | 11/12/2007 | 100,000 | $15.91 | $1,591,000 |
|  |  | 320,000 |  | $5,551,000 |
|  |  |  |  |  |
| LINDQUIST | 2/8/2007 | 48,000 | $18.00 | $864,000 |
|  | 10/30/2007 | 10,000 | $20.00 | $200,000 |
|  |  | 58,000 |  | $1,064,000 |
|  |  |  |  |  |
| RAANES | 2/8/2007 | 76,000 | $18.00 | $1,368,000 |
|  |  | 76,000 |  | $1,368,000 |
|  |  |  |  |  |
| THOMSON | 2/8/2007 | 200,000 | $18.00 | $3,600,000 |
|  |  | 200,000 |  | $3,600,000 |
|  |  |  |  |  |
| TU | 2/8/2007 | 4,084,450 | $18.00 | $73,520,100 |
|  | 2/8/2007 | 3,953,191 | $18.00 | $71,157,438 |
|  | 2/13/2007 | 1,878,807 | $27.61 | $51,873,861 |
|  |  | 9,916,448 |  | $196,551,39 |
|  |  |  |  |  |
| WU | 2/7/2007 | 59,000 | $18.00 | $1,062,000 |
|  |  | 59,000 |  | $1,062,000 |

<u>Defendants Publicly Disclose Change in Backlog Definition to Include Contingent Deals
Claiming It Represented a More Accurate Picture of Accuray's Business</u>

11.     On May 1, 2007, the Company reported revenue and earnings for 3Q07.  The Company disclosed for the first time that it would change the way that it would calculate and report backlog – which would now include both contingent ***and*** non-contingent transactions:

> "[T]he Company now defines as backlog under signed non-contingent contracts as well as backlog under signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue, was approximately $559 million. . . ."

Ex. 5.

12.     Though some were skeptical, securities analysts generally applauded the decision to change the backlog definition and bought defendants' false and misleading claims that even with contingent transactions, including the reported backlog had a substantial likelihood of being recorded as revenue.

13.     After the Company publicly stated that it had changed backlog definition and configuration, resulting in a backlog of $559 million the Company's stock price catapulted from $23.28 on May 1, 2007 to $27.38 on May 8, 2007.

14.     The Company and the Individual Defendants knew but failed to disclose that they had no reasonable basis to support the statements concerning the content and quality of Accuray's reported backlog notwithstanding the new definitions.  Nor did they have a basis to claim that there was a substantial higher likelihood that total backlog would result in revenue.  In fact, confidential witnesses report that throughout the Class Period, the backlog figures, including both contingent and non-contingent figures, were bloated with transactions that should never have been included and had little likelihood of resulting in future revenue.  However, according to confidential witnesses, others should have been removed from backlog long before they actually were because customers had cancelled deals, but the Company simply delayed their removal; contingencies were self satisfying, salespeople were padding their sales with phony orders that had little or no chance of becoming installations and the Company was including deals in the backlog even though customers had not provided a sales deposit.  *See* ¶¶70-72.  Thus, defendants' statements concerning Accuray's backlog

1  figures were knowingly false and misleading and the Company had no reasonable basis for stating

2  that 90% of the reported backlog would result in revenue.

3        15.     In truth, however, confidential witnesses report that defendants actually knew that

4  statements regarding its backlog the Company's the Registration Statement and throughout the Class

5  Period were false and misleading for the following reasons:

6              (a)     Prior to the IPO, defendants had implemented changes in their contracting and

7  backlog calculation process by switching from LOIs to Term Agreements which materially impacted

8  the way in which backlog would be calculated and reported.

9              (b)     Defendants knew but failed to disclose that the Company's new term

10  agreements – which were reported to the market as "contracts" contained language which allowed

11  contingencies to be deemed satisfied or waived unless the customer notified the Company otherwise.

12             (c)     Defendants knew or deliberately disregarded that they included system sales

13  in backlog that the customer had paid no deposit at all.

14             (d)     Defendants knew or deliberately disregarded that backlog included sales

15  wherein a third-party financier – including a financing venture run by Accuray's former CEO –

16  placed a *refundable* deposit on behalf of institutions, sometimes without the institution's knowledge

17  or approval.

18             (e)     Defendants knew or deliberately disregarded that they included highly

19  suspicious deals that were included in backlog some which had no identifiable end-user and others

20  made by certain of its sales staff, including John Nash and Jim Mills, both of whom had a history of

21  suspect sales orders which failed to turn into system installs.

22             (f)     Defendants knew or were deliberately reckless in not knowing that sales to

23  international distributors were often made through interested partners with the Company, did not

24  include initial deposits, did not have specified end-users and revenue was being recorded upon

25  shipment to distributors as opposed to upon delivery to end-users.

26             (g)     Defendants knew or were deliberately reckless in not knowing that backlog

27  consisted of orders that customers had cancelled sometimes months or quarters before the Company

28  removed them from backlog.

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE     - 6 -
FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

<u>Defendants Provide Knowingly False Assurances Concerning Reported Backlog, the Company</u>
<u>Sets Knowingly False FY08 Revenue and Earnings Forecasts</u>

16.    Apart from particularly making false statements in the February 7, 2007 Registration Statement and beyond concerning the sales contracting process, backlog and international orders, the Company made materially false revenue and earnings forecasts for FY08 with actual knowledge of facts that materially undermined the reasonableness of the forecast.  For example, on August 16, 2007, the Company issued a FY08 revenue forecast of $250 million to $270 million.  *See* ¶78.  At the same time, the Company repeatedly provided false assurances that its backlog consisted of firm signed contracts that the Company had 90% confidence would result in revenue.  Further, the Company said that a review of the Company's backlog at any given time was the best way to evaluate the Company's revenue and earnings forecasts:

(a)    "On balance, we feel confident that 90% of the total backlog reported will be converted to revenue."

(b)    "We believe that our current definition of ***backlog is a more meaningful metric for Accuray as an indicator of future revenue.***"

(c)    "Backlog is defined as signed contracts that Accuray believes have a substantially high probability of being realized as revenue in the future.  ***It can be used to analyze both historical activity and future activity. . . .***"

(d)    Moving to the future and guidance for going forward, ***Accuray's backlog provides excellent visibility into future revenue***, again, since nearly all revenue comes out of that backlog number.

17.    Defendants actually knew, however, that FY08 sales, revenue and earnings forecasts were false and misleading when made.  First, the Company based the forecast in part on the artificially inflated backlog figures that defendants knew consisted of "contracts" with infirmities and contingencies that had little to no chance of materializing into installations and thus, revenue.  Defendants also knew but failed to disclose that even where there were contingencies, the Company was allowing them to be satisfied simply by the passage of time and the customer's silence.  Moreover, at least three CWs report that prior to the IPO, senior management polled the sales staff to determine what the Company's public forecast ought to be.  According to confidential witnesses, the sales staff reported to upper management, specifically, defendant Wade B. Hampton ("Hampton"), that it could sell 50 units.  Defendants ignored the sales staff and forecasted 100.  *See* ¶88.  At the

1  time, CWs 2, 3 and 4 reported that the sales staff told defendants, in particular Hampton, that there

2  was "no way" it could sell that many CyberKnife systems.  In fact, CW4 reported that even Senior

3  Sales Director Tom Snarsky ("Snarsky") told Hampton that such a forecast was "f-ing crazy."

4         18.    Indeed, the Company would miss FY08 forecasted results pre-announcing a

5  substantial reduction to the forecast in January 2008 causing sharp price declines and investor losses.

6  <u>Through a Series of Disclosures and Backlog Reductions, the Company Revealed that the
   Company's Reported Backlog Was Not a Reliable Metric by Which to Measure the Company's</u>

7  <u>Financial Condition</u>

8         19.    Though a series of partial disclosures (which were accompanied by continued

9  misrepresentations), the true facts concerning the Company's financial condition began to seep into

10 the market resulting in significant stock price declines.  For example, on August 16, 2007, the

11 Company issued its 4Q07 financial results in a press release.  Ex. 11.  During the conference call

12 following the press release, defendants could not substantiate or explain the way that it calculated

13 new order growth and how that "growth" translated into installations and backlog.  *See* ¶¶81-83.

14 Moreover, defendants could not explain why with large backlog growth, there were only 20

15 CyberKnife installations in FY07 as compared to 22 in FY06, especially since backlog was supposed

16 to be a key indicator of sales strength.  During the call defendant Euan S. Thomson ("Thomson")

17 engaged in an awkward exchange with at least one of the analysts regarding the financials and

18 Thomson could not explain what should have been simply how the Company had reached its current

19 installation and backlog numbers.  *See* ¶¶81-83.

20        20.    Afterward, notwithstanding the bold FY08 forecast, defendants' evasive yet defiant

21 statements concerning the real reported installation and sales figures, investors and analysts were left

22 puzzled by what appeared to be the true facts:

23        **4Q Leaves as Many Questions as Answers**

24        •    Overall, ARAY's 4Q left us with hard-to-answer questions. . . .*unit installs
             in the U.S. actually fell in FY07 vs. FY06, and FY08 sales guidance trailed
25           Street estimates*.

26        •    *"Product" orders of $50M (15 units) dropped q/q*. . . .

27        •    *With the significant growth in backlog last year, we are puzzled why the 20
             unit installs for FY07 (just ended) were down from 22 in FY06.*

28

- FY08 sales guidance is $250-$270M, below Street view of $266 million . . . . ***Our price target goes from $19 to $16***.

Ex. 13.

21. On August 17, 2007, the following day, two analyst firms, CIBC World Markets, Inc. ("CIBC") and J.P. Morgan Securities Inc. ("JPMorgan") downgraded the Company's stock and the Company's stock price declined from close of $18.07 per share on August 16, 2007 to a close of $13.45 per share on August 17, 2008, or 4,535,800 shares traded. The volume trading on August 16, 2007 was a mere 861,200.

22. On November 7, 2007, the Company reported its 1Q08 financial results. The Company once again reported CyberKnife disappointing installation numbers below expectations and inconsistent with reported backlog growth. Ex. 20. Defendants nevertheless repeated false FY08 revenue and earnings forecast and current backlog metrics. However, the Company revealed for the first time that sales to international distributors were being recorded as revenue upon shipment to the distributors (as opposed to installation or delivery to the end-user) a surprise disclosure to the investing public:

> ***Revenue and earnings hit the mark, but light CK installs raise questions.*** F1Q . . . *investors are likely to gravitate around the soft install (5 CK systems installed, all U.S., incl. 1 shared system), as the bulk of growth came from a combination of billed but-as-yet-uninstalled international systems (6 CKs placed, but awaiting validation) . . . .*

> ***Needless to say, questions remain abut the 6 "uninstalled yet billed" o-U.S. systems . . . more flow through distributors.***

> **Fiscal 1Q Analysis; Weak Installs Calls FY08 Sales Guidance Into Question**

> ***Only five units were installed in 1Q08,*** *all in the U.S.,* ***but ARAY said that it recognized revenue for another six units outside the U.S. that were sold trough distributors . . . . This may be perfectly legitimate, but we do point out that this is the first time we have come across this issue for ARAY (despite O-U.S. unit installations every prior quarter) . . . .***

Ex. 24.

23. After the disclosures, which began to cast doubt on the FY08 forecast, reported backlog and the number of sales resulting in actual CyberKnife installations, Accuray's stock price declined from more than $19.00 per share to $15.30 per share by November 15, 2007.

24.     On January 30, 2008, the Company reported its 2Q08 revenue and earnings report. Accuray (a) missed revenue forecasts; (b) missed forecasts; (c) slashed its FY08 earnings forecasts; and (d) removed $34 million from the Company's reported backlog.  *See* ¶¶105-111.  Securities analysts again took the Company to task for its weak quarterly results in comparison to public forecast and backlog declines:

(a)     "***ARAY has just put up what we consider the weakest, most confusing and most concerning quarterly results since its IPO one year ago.  Both revenue and EPS missed consensus, and FY08 guidance was lowered materially.***"

Ex. 28.

(b)     "***Net/net, this downward adjustment of backlog truly calls into question the reliability of ARAY's backlog on a go-forward basis, and thus into sales and EPS expectations. . . .***"

*Id.*

(c)     "As we have stated in prior notes, ***installation and revenue visibility have been chief concerns since Accuray first re-stated backlog in F3Q07 (May 2007) to include contracts with contingencies***.  While we have previously given the company ***some*** benefit of the doubt with regards to projections, the disappointing ***F2Q results, and accompanying reduction to guidance, clearly show the risks in adopting more lenient backlog standards***. . . ."

Ex. 29.

25.     The January 30, 2008 disclosures about the Company's missed earnings expectations, backlog removal and reduction of future revenue earnings expectations caused the stock price to crater from $14.98 per share to $9.52 per share on significantly increased trading volume.

26.     Notwithstanding the disclosures, the Company ***continued*** to mislead investors concerning the content and quality of its backlog figures which it knew to be unreliable and bloated with deals that had limited if any real probability on resulting in revenue and installations. Defendants repeated the mantra they knew to be false and misleading:

***For the period ended December 29, 2007, backlog increased to approximately $660 million, with approximately $365 million . . . .***

***Accuray's backlog is composed of firm, signed contracts that the company believes have a substantially high probability of being recognized as revenue.***

Ex. 26.

27.     On April 29, 2008, the Company reported its 3Q08 financial results announcing that it would be removing **$58 million from its backlog**, another indication that the Company's reported backlog figures were questionable at best at measuring the true financial condition of the Company, notwithstanding the reports of simultaneous growth in backlog.  Ex. 32.  On April 30, 2008, the Company's stock price declined from $8.09 per share to $7.83 per share.

28.     On August 19, 2008, the Company announced that it had again missed Wall Street revenue and earnings estimates and that backlog would be reduced once again, this time by $39 million.  Analysts were befuddled:

> Here are the facts: **sales and EPS missed Street once again**, new orders were down y/y for the third straight quarter, b**acklog was "materially" revised downward for the third straight quarter, and actual unit installations were down for the second consecutive year in the U.S.** (and flat WW for the past three years). . . .

> **ARAY eliminated another $39M from backlog due to customer cancellations and other doubtful "stuff", and so about $127M has now been removed from backlog in the past three quarters.  We view backlog as largely irrelevant at this point (**expecting more revisions to come**)**, and would focus attention on installations instead.

> Only six units were installed (vs our 12 est). . . .

Ex. 38.

29.     After the August 19, 2008 disclosures, the stock suffered an immediate decline from $7.57 per share to $6.90 per share.  ¶¶119-122.

<u>Because the Company's Backlog of CyberKnife Orders and Sales Was the Admitted Core of the Company's Business That Defendants Knew of Its Contents and Quality Throughout the Class Period</u>

30.     Defendants knew or were deliberately reckless in not knowing throughout the Class Period that the statements the Company made concerning and related to backlog were false and misleading.  The Company's reported backlog was admittedly the core indicator of the Company's business condition and the metric that the Company used to measure the current and future financial performance.  Indeed, CyberKnife sales were the Company's one-trick pony and defendants told investors that backlog was the most reliable and in fact an "excellent" way to predict the Company's future revenues.  Notwithstanding uncertainties by investors, the Company falsely assured investors

that it reviewed and in fact "scrutinized" the backlog every quarter to be certain of the quality of its

contents and confidence in the likely conversion to revenue:

> ***On a quarterly basis, the Company will review each contingent contract to determine whether progress toward satisfaction of contingencies is sufficient to support inclusion of the contract within backlog. . . .***

Ex. 5.

> We review, on a quarterly basis with respect to each contingent contract included in backlog, whether customer engagement and progress toward satisfaction of contingencies warrants ***continued inclusion of the contract within backlog***.

Ex. 25 at 22.

> ***[W]e go through quarter by quarter, we go through everything we have in backlog, the full range of backlog. We discuss in detail with the salespeople.*** Increasingly, we have direct points of contact with the hospitals themselves. ***And we get higher and higher quality data***, I would say, all the time about when these installations will take place. . . .

Ex. 44 at 11.

<u>Defendants Admit Reported Contingent Backlog Not a Good Indicator of Future Revenue</u>

      31.    During the Class Period and beyond, from January 30, 2008 to August 24, 2009, the

Company removed over $250 million in deals which were represented to be either a) contractually

committed or b) contingent but 90% likely to result in revenue:

| Disclosure Date | Period | Backlog Reduction in Millions |
|---|---|---|
| 01/30/08 | 2Q08 | $30 |
| 04/29/08 | 3Q08 | $54 |
| 08/19/08 | 4Q08 | $39 |
| 10/29/08 | 1Q09 | $5 |
| 01/29/09 | 2Q09 | $34 |
| 05/05/09 | 3Q09 | $27 |
| 08/24/09 | 4Q09 | $65 |
| **Total** | | $254 |

      32.    Moreover, despite defendants' statements that backlog was the key metric by which

investors should measure the Company, defendants continually manipulated the backlog figure to

present a misleadingly optimistic view of the Company's prospects. In fact, the Company would

later (after the Class Period) concede that its backlog calculation and reporting methodology during

the Class Period had no value and reversed its process to specifically exclude contingent backlog

from its public reporting process admitting that its "contingent deals" reduced the usefulness of the backlog as a predictor of future system shipments:

> *[b]eginning with fiscal year 2010, we will no longer provide information about contingent backlog. We think that such information is of limited use in building financial models. Orders that we consider to be contingent will not be disclosed until all contingencies have been cleared. . . .*

*Id.* at 5.

> *Over time we concluded that including contingent orders in backlog was reducing the usefulness of backlog as a predictor of future system shipments and revenue.*

Ex. 47 at 5. In addition, the Company admitted that even its non-contingent backlog reported during the Class Period was not reliable and would now be subject to refined scrutiny. *See* ¶128. Under the Company's refined definition of "non-contingent," it reduced reported backlog by an additional $274 million bringing the total reduction in reported backlog to $527 million.

33. Of course these admission were too little too late as investors had lost millions as a result of the Company's knowing or deliberately reckless misrepresentations during the Class Period.

## JURISDICTION AND VENUE

34. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10b-5.

35. This Court has jurisdiction over this action pursuant to §27 of the Exchange Act 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

36. Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District and Accuray's principal executive offices are located in this District.

37. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

38.    Lead plaintiff Zhengxu He, individually and as Trustee for the He and Fang 2005 Revocable Trust and Zhengxu He Roth IRA, purchased or acquired Accuray securities during the Class Period and suffered damages as a result of the conduct alleged herein.

39.    Lead plaintiff City of Brockton Retirement System purchased or acquired Accuray securities during the Class Period and suffered damages as a result of the conduct alleged herein.

40.    Plaintiff Wayne County Employees' Retirement System purchased or acquired Accuray securities during the Class Period and suffered damages as a result of the conduct alleged herein.  *See* Certification of Named Plaintiff attached hereto.

41.    Defendant Accuray is incorporated in Delaware and headquartered in Sunnyvale, California.  The Company designs, develops, and sells the CyberKnife system, an image-guided robotic radiosurgery system for the treatment of solid tumors.  The CyberKnife system combines continuous image-guidance technology with a compact linear accelerator to deliver high doses of radiation to a tumor from different directions.  Accuray generates revenue by selling the CyberKnife system and by providing ongoing services and upgrades to customers following installation.  Accuray had 386 employees as of December 31, 2006.

42.    Defendant Euan Thomson served as the Company's CEO and a member of the board of directors since March 2002.  He has been the President since October 2002 and at all relevant times herein.  From March 1999 to February 2002, Thomson served during various periods as President, CEO and a member of the board of directors of Photoelectron Corporation, a publicly held medical device company, which went bankrupt in 2003.  Thomson signed the Registration Statement (defined above).  During the Class Period, Thomson sold 235,000 shares of Accuray stock for $3,811,485.

(a)    Defendant Robert E. McNamara ("McNamara") served as Senior Vice President, Chief Financial Officer from December 2004 until his resignation on September 11, 2008.  McNamara signed the Registration Statement.  During the Class Period, McNamara also sat on the board of directors of Northstar Neuroscience Inc., a medical device company.

1    (b)  Defendant Wade Hampton served as Senior Vice President, Worldwide Sales

2 from August 2006 until April 2007, when he became Senior Vice President, Chief Sales Officer.

3 Hampton resigned from the Company on October 15, 2009.

4    (c)  Defendant Ted Tu ("Tu") has been a member of the board of directors since

5 May 2004 and at all relevant times herein.  Since May 2005, Tu has served as the President of

6 President International Development Corporation, an investment holding company, and since

7 January 2006, Tu has been the President of President Life Sciences Co., Ltd.  From May 2000 to

8 May 2005, Tu served as Executive Vice President of President International Development

9 Corporation.  Tu signed the Registration Statement.  During the Class Period, Tu indirectly sold

10 5,831,998 shares for $104,965,964.  President International Investment Holdings, Ltd. sold an

11 additional 2,900,000 shares for $15,908,500.

12    (d)  Defendant Wayne Wu ("Wu") has served as a member of the board of

13 directors since April 1998 and Chairman of the board of directors since May 2004 and at all relevant

14 times herein.  Wu signed the Registration Statement.  During the Class Period, Wu sold 59,000

15 shares of stock for $1,062,000.

16    (e)  Defendant John R. Adler, Jr., M.D. ("Adler") was a founder of the Company

17 and served as a member of the board of directors from December 1990 until his resignation on July

18 21, 2009.  From September 1999 through May 2004, Adler served as Chairman of the board of

19 directors, and from October 1999 to March 2002, as the Company's CEO.  From January 1995 until

20 July 1999, he served as the Vice Chairman of the board of directors.  Adler signed the Registration

21 Statement.  During the Class Period, Adler sold 320,000 shares for $5,551,000.

22    (f)  Defendant Robert S. Weiss ("Weiss") served as a member of the board of

23 directors since January 2007 and at all relevant times herein.  Weiss signed the Registration

24 Statement.

25    (g)  Thomson, McNamara, Hampton, Tu, Wu, Adler and Weiss are collectively

26 referred to herein as the "Individual Defendants."

27

28

**CONFIDENTIAL WITNESSES**

43.     The allegations included herein are based in part on information and belief and are supported by first-hand accounts of former Accuray employees referred to herein as confidential witnesses.  The information provided by the former employees is reliable because: (1) each witness worked at Accuray's headquarters in the Sunnyvale office or sold Accuray products in the United States and/or Canada during the Class Period; (2) each witness has personal knowledge of the information provided; (3) the witness' job title, position and responsibilities show s/he was in a position to know the fact on which s/he provided; (4) many of the witness accounts corroborate one another; and/or (5) the witnesses' accounts are corroborated by other information alleged herein.

        (a)     Confidential Witness No. 1 ("CW1") is a former Accuray Regional Sales Director ("RSD") responsible for sales of the CyberKnife system and associated products and services from 2004 to 2007.  CW1 was responsible for sales in the Mountain and Pacific regions, including California.

        (b)     Confidential Witness No. 2 ("CW2") is a former Accuray Regional Sales Director responsible for sales of the CyberKnife system and associated products and services between 2000 and 2007.  CW2 at one point covered sales covering one quarter of the United States and during 2005 to 2007 in CW's last year at the Company, his/her sales region covered the Northwest.

        (c)     Confidential Witness No. 3 ("CW3") was a Senior Sales Specialist at Accuray between 2006 and 2009.  S/he covered multiple regions of the United States including Colorado, Utah, Arkansas, Nevada, New Mexico, Minnesota, Iowa, Mississippi and New York.

        (d)     Confidential Witness No. 4 ("CW4") was a Regional Sales Director for the northeastern portion of the United States and Canada from 2005 to 2007.  CW4 also participated in weekly calls with other RSDs in the east and heard each of their forecasts.

        (e)     Confidential Witness No. 5 ("CW5") worked at the Company between 2000 and 2008 as a Director of Marketing and Placement.  CW5 worked with the Centers for Medicare & Medicaid Services to assure that CyberKnife procedures were covered and reimbursed.  S/he reported to CMO Eric Lundquist who reported to defendant Thomson.

        (f)     Confidential Witness No. 6 ("CW6") worked at Accuray as a Senior Manufacturing Engineer from 2004 to 2008.  CW6 was responsible for signing off on the Document History Record ("DHR") for CyberKnife systems prior to shipment and also processed equipment returns and input inventory figures in the Great Plains and Max computer systems.

        (g)     Confidential Witness No. 7 ("CW7") worked at Accuray from January 2006 until January 2008 as a Regulatory Affairs/Compliance Associate.  CW7 handled all incoming customer issues and complaints that came through customer service or technical support.

(h) Confidential Witness No. 9 ("CW9") is a Microsoft Access developer who worked at Accuray as a database analyst from June to December 2008. S/he was employed by Accuray to work on the Backlog Quality Management System ("BQMS"). In the course of his/her employment, CW9 had access to the databases of each of these departments, including databases containing each of the Company's contracts and the contingencies associated therewith.

(i) Confidential Witness No. 10 ("CW10") worked was an Accuray Operations Specialist from 2006 to 2009. CW10 was tasked with drafting a standard operating procedures manual which required him/her to cross train with various personnel in the Sales Operations group and learn their roles and functions. CW10 reported to Fiona Noah, who reported to defendant Hampton.

(j) Confidential Witness No. 11 ("CW11") as a member of the Company's Sales Operations group in the Company's Sunnyvale office responsible for reviewing potential deals and entering them into backlog. CW11 was also a participant in the backlog meetings with sales personnel, including defendant Hampton during which s/he and other sales operations representatives would make recommendations as to whether or not certain deals should be added into backlog.

## CONTROL PERSONS

44. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

45. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and

1 misleading statements were being issued regarding the Company, and approved or ratified these
2 statements, in violation of the federal securities laws.

3       46. As officers and controlling persons of a publicly held company whose common stock
4 was, and is, registered with the Securities and Exchange Commission ("SEC") pursuant to the
5 Exchange Act and the Securities Act of 1933, and was traded on the NASDAQ and governed by the
6 provisions of the federal securities laws, the Individual Defendants each had a duty to promptly
7 disseminate accurate and truthful information with respect to the Company's financial condition and
8 performance, growth, operations, financial statements, business, markets, management, earnings and
9 present and future business prospects, and to correct any previously issued statements that had
10 become materially misleading or untrue, so that the market price of the Company's publicly traded
11 securities would be based upon truthful and accurate information. The Individual Defendants'
12 misrepresentations and omissions during the Class Period violated these specific requirements and
13 obligations.

14       47. The Individual Defendants participated in the drafting, preparation, and/or approval
15 of the various public, shareholder and investor reports and other communications complained of
16 herein and were aware of, or recklessly disregarded, the misstatements contained therein and
17 omissions therefrom, and were aware of their materially false and misleading nature. Because of
18 their board membership and/or executive and managerial positions with Accuray, each of the
19 Individual Defendants had access to the adverse undisclosed information about Accuray's financial
20 condition and performance as particularized herein and knew (or recklessly disregarded) that these
21 adverse facts rendered the positive representations made by or about Accuray and its business issued
22 or adopted by the Company materially false and misleading.

23       48. The Individual Defendants, because of their positions of control and authority as
24 officers and/or directors of the Company, were able to and did control the content of the various SEC
25 filings, press releases and other public statements pertaining to the Company during the Class
26 Period. Each Individual Defendant was provided with copies of the documents alleged herein to be
27 misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent
28 their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

1   responsible for the accuracy of the public reports and releases detailed herein and is therefore

2   primarily liable for the representations contained therein.

3       49.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme and

4   course of business that operated as a fraud or deceit on purchasers of Accuray common stock by

5   disseminating materially false and misleading statements and/or concealing material adverse facts.

6   The scheme: (i) deceived the investing public regarding Accuray's business, operations,

7   management and the intrinsic value of Accuray common stock; (ii) enabled the Individual

8   Defendants and other Accuray insiders to sell more than 10.5 million shares of their personally held

9   Accuray common stock, generating proceeds of more than $209 million; and (iii) caused plaintiffs

10  and other members of the class to purchase or acquire Accuray securities at artificially inflated

11  prices.

12              **FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS IN**
                **VIOLATION OF THE EXCHANGE ACT**
13

14      50.    Beginning with the February 7, 2007 Registration Statement which became effective

15  on or about February 7, 2007, the Company began to issue false and misleading statements regarding

16  its true financial condition and outlook for sales and service revenue associated with the CyberKnife

17  system.

18      51.    False and Misleading Statement: On February 7, 2007, Accuray filed a Form S-1/A

19  Registration Statement with the SEC for the IPO.  On or about February 7, 2007, the Registration

20  Statement became effective, including the exercise of the over-allotment, more than 18 million

21  shares of Accuray's common stock were sold to the public at an opening price of $18.00 per share.

22  The Company raised more than $171 million after discounts and commissions.  The Registration

23  Statement was signed by defendants Thomson, Tu, Wu, Adler, McNamara and Weiss.

24      52.    The Registration Statement contained untrue statements of material facts, omitted to

25  state other facts necessary to make the statements made not misleading.  In particular, the

26  Registration Statement made false statements concerning separate but related topics: (i) the current

27  state of sales and contracting process, (ii) the receipt of deposits from customers upon execution of

28  LOI or contracts, and (iii) revenue recognition regarding sales to international distributors.

53.   <u>False Statement:</u> The Registration Statement falsely described the Company's backlog as follows:

**Backlog**

**We define backlog as the sum of the following two components: deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received.  Backlog includes contractual commitments from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with our shared ownership programs.**

Ex. 1 at 44.

54.   <u>False Statement</u>: The Registration Statement also made false and misleading representations regarding the Company's sales and installation cycle falsely stating that the Company typically receives a deposit from customers upon execution of a contract:

**We typically receive a deposit at the time the CyberKnife system purchase contract is executed, and the remaining balance for the purchase of the CyberKnife system upon installation. . . .**

*Id.* at 42.

55.   <u>False Statement</u>: The Registration Statement made the following false and misleading statements regarding the Company's revenue recognition on CyberKnife sales, particularly on deposits and sales to international customers through distributors:

Under our revenue recognition policy, we generally do not recognize revenue attributable to a CyberKnife system purchase **until after installation has occurred. For international sales through distributors, we typically recognize revenue when the system is delivered to the end user's site. . . .**

\*        \*        \*

**In the event that a customer does not, for any of the reasons above or other reasons, proceed with installation of the system after entering into a purchase contract, we would only recognize the deposit portion of the purchase price as revenue. . . .**

*Id.* at 13.

56.   <u>False and Misleading Statement</u>: On March 15, 2007, Accuray announced its 2Q07 financial results for the period ended December 30, 2006 in a press release titled "Accuray Incorporated Reports Second Quarter Fiscal 2007 Financial Results."  The press release repeated the false and misleading statements concerning the manner in which the Company reported backlog,

specifically stating that backlog did not include contracts that had any contingencies or contingencies had already been met:

> Total net revenues were $26.3 million for the quarter ended December 30, 2006, as compared to $11.3 million for the quarter ended December 31, 2005, an increase of 133 percent. The net loss for the second quarter was $7.3 million, or $0.45 per share, compared to a net loss of $7.9 million, or $0.50 per share, for the same quarter in 2005.

*     *     *

> ***Reported backlog includes only contracts which contain no contingencies, or for which all contingencies have been met and does not include signed contracts that have contingencies such as the receipt of certain approvals, financing dependencies, or the formation of certain legal structures.***

> ***The number of signed contracts with contingencies continued to increase in the quarter ended December 30, 2006. These contingent contracts will be added to backlog once all contingencies have been met.***

Ex. 2.

57.     <u>False and Misleading Statement</u>: On March 15, 2007, Accuray filed its Form 10-Q with the SEC for the period ended December 31, 2006. The Form 10-Q which repeated certain facts and repeated the financial information reported in the March 15, 2007 press release, including reported backlog of $327.9 million. The Company again falsely stated that its backlog consists of *only* contracts that contain no contingencies or where all contingencies have been met:

> ***We define backlog as the sum of the following two components: deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received.***

> ***Backlog includes non-contingent contractual commitments from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with our shared ownership programs. Backlog does not include signed contracts that have contingencies such as board approvals, financing dependencies or the formation of certain legal structures.***

Ex. 3.

58.     On March 20, 2007, JPMorgan issued a report titled "Accuray – Driving the StereoTactic Radiosurgery Market." The report noted again that backlog consists only of signed contracts without contingencies. It also repeated the false representation that backlog revenue is not recorded until installation. The report disclosed for the first time that the Company had changed its contracting process and instituted "Term Agreement":

**Strong backlog should provide visibility on future revenues**
As with other capital equipment companies, order backlog remains an important quarterly tracking metric . . . .

***Backlog for Accuray is comprised of two components: deferred revenue and contractually committed future payments that have yet to be received. . . .***

***Backlog is recognized as revenue as the installations take place, upgrades are delivered and services are provided to the customers.***

\*     \*     \*

Notably, the $327.9 million backlog figure compares with $330.2 million at the end of the September quarter, with the decline attributed to contractually committed future payments totaling $175.6 million (versus $185.0 million in the previous quarter). ***This stems from a transition to "term agreements," which occurred following the December quarter.***

As a reminder, ***Accuray only books signed contracts without contingencies as committed future payments in their backlog. . . .***

Ex. 4.

59.     Indeed, the report disclosed the switch to Term Agreements and thus the way that backlog would be calculated occurred "following the December quarter" which was prior to the February 7, 2007 Registration Statement.

60.     <u>False and Misleading Statement</u>: On May 1, 2007, Accuray announced its 3Q07 financial results for the period ended March 31, 2007 in a press release.  In addition, the Company reported a huge increase in reported backlog (from $328 million at December 31, 2006 to $559 million at March 31, 2007) because it began publicly reporting both non-contingent and contingent contracts as backlog and falsely told investors that the new backlog figures were the best indicator of future revenue results.

61.     In connection with its 3Q07 (January 1, 2007 to March 31, 2007) financial results, Accuray for the first time publicly announced that the Company had changed the way in which it would calculate, define and report backlog:

As of March 31, 2007, the Company's total backlog, which the Company now defines as backlog ***under signed non-contingent contracts as well as backlog under signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue, was approximately $559 million***. . . .

\*     \*     \*

1

*On a quarterly basis, the Company will review each contingent contract to determine whether progress toward satisfaction of contingencies is sufficient to support inclusion of the contract within backlog. . . .*

2

3   Ex. 5.

4   62.   <u>False and Misleading Statement</u>: On May 1, 2007, Accuray held a conference call

5   with analysts to discuss the Company's 3Q07 financial performance and the change to the

6   Company's backlog.   The conference call was hosted by defendants Thomson and McNamara.

7   During the call, the Company falsely stated that the change in the definition of backlog was driven

8   by the ***increased demand*** for the CyberKnife and new contracts with customers and assured

9   investors that backlog was the best and a very reliable way to assess the Company's future revenue

10   and earnings.   Defendants also confirmed that new contracts go into backlog:

11

12

13

*To position ourselves for ongoing growth and to support the increased volume of customer contracts, we've recently streamlined our internal contract process. Historically our approach was to combine discussion of financial and legal terms in a single negotiation involving all relevant parties at Accuray and at our customer sites.   However, the significant growth in the number of new contracts has guided us to separate discussion of these terms.*

14

15

*Our sales representatives in the United States now generally negotiate the business terms to acquisition and agree to term agreements containing all financial aspects of the transaction.*

16

17

*In parallel, the legal aspects of our contracts have become more standardized and any modifications to these terms are discussed subsequent to agreeing the financial terms of sale.*

18

19                                           *   *   *

20

Now it's primarily this shift in our contractual process that has driven the change in reported backlog.   Our old definition of non-contingent backlog precluded mentions of this new contract format.

21

22

*As the prevalence of these new term agreements has grown, it's become more appropriate and indicative of the state of our business to disclose total backlog.*

23                                           *   *   *

24

*On balance, we feel confident that 90% of the total backlog reported will be converted to revenue.*

25

26

27

*To aid interpretation of the backlog number, I'd like to point out what might be considered a fairly obvious point that the total backlog reported this quarter, taken in conjunction with reported revenue, is a good and reliable indicator that the new business generated during a given quarter.*

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW                                   - 23 -

The majority of revenue is shipped from backlog. ***Simultaneously, new contracts generated by sales activities add to backlog.***

\*          \*          \*

***We believe that our current definition of backlog is a more meaningful metric for Accuray as an indicator of future revenue.***

***[W]e're not going to be discussing contracts per se, but again the dollars associated with backlog we feel is a pretty good metric in terms of what the revenues might be going forward.***

Ex. 6 at 5, 8, 16.

63.     On May 2, 2007, JPMorgan issued a report titled "Evolving Backlog Definition Creates Some Confusion in Otherwise Uneventful F3Q." The report highlighted that revenues and earnings reported in the quarter were below JPMorgan's estimate and noted the change in the way that the Company would report backlog. By changing the way it calculated this metric, the Company was able to report a huge increase in backlog. Analysts expected this change might cause some pushback from investors but could nevertheless be "a better reflection of contracts":

**Accuray Neutral**

\*          \*          \*

- **Backlog is again redefined.** With F3Q results, Accuray also announced changes to its definition of backlog, which previously only included signed contracts without contingencies (*i.e.*, signed non-contingent contracts) as committed future payments. ***Under the new terms, ARAY redefined backlog to include both signed non-contingent contracts as well as signed contingent contracts that management believes have a "substantially high probability" of being booked as revenue (on average, ARAY expects ~90% of backlog will eventually convert into revenue).***

- ***While this approach to booking backlog clearly relies on some amount of judgment by management and will likely result in some investor pushback due to the timing and uncertainties of future backlog recognition, it could ultimately be a better reflection of contracts***

- **Backlog increases, but restated numbers may cause confusion** As we expected (and hoped), backlog was a focal point of management commentary, due to investor concern over the sequential decline in backlog reported in the December quarter (F2Q). . . .

Ex. 7.

64.     <u>False and Misleading Statement</u>: On May 2, 2007, Jefferies & Company, Inc. ("Jefferies"), one of the Company's underwriters, published a report titled "Impressive FY3Q

Results; This is The Horse To Bet On In Radiation Oncology!" The report repeated the Company's 3Q07 financial results, including false 3Q07 earnings and false and misleading statements concerning reported backlog and raised FY07 earnings estimates stating that the Company believed that this new reporting metric provided investors with improved visibility into revenue projections:

- **Backlog was strong.** *The company reported a strong uptake in backlog, going from $513 million in FY2Q to $559 million in the current Q. ARAY also announced that it would no longer only be reporting non-contingent backlog, and is now going to release a total backlog figure (which represents a combination of previously differentiated contingent and non-contingent backlog).*

- *The company believes that this new backlog recognition policy will give investors improved visibility into future revenue projections.*

- Total backlog will include contingent backlog when management deems that the contingent contract has a **high probability** of being realized and generating revenue. *We believe that this new backlog number will give a more reliable picture of the company's progress in booking new orders*.

Ex. 8.

65.     After the May 1, 2007 announcement of its 3Q07 revenues and earnings and analyst repetitions of the false and misleading statements, Accuray's stock price **increased from $23.28 per share on May 1, 2007, to $25.62 per share on May 2, 2007** on a of 1.6 million volume shares trading.

66.     <u>Reasons Why Defendants' Statements in ¶¶51-62 Were False and Misleading:</u> Defendants' statements that backlog with reported revenue was a good reliable indicator of new business and that reported backlog (including substantially high confidence level of backlog conversions to revenue) was a good metric to use to measure future growth was false and misleading.  As reported by multiple CWs, defendants knew but failed to disclose that reported backlog included the following deals with little likelihood of resulting in CyberKnife installations or revenues for example:

(a)     Agreements which had no customer deposits or included refundable deposits which was entirely inconsistent with representations made in the Registration Statement representation that the Company typically received deposits upon execution of contract **and** even when deals were cancelled, the Company would recognize deposits as revenue, *see* ¶¶70-72.

1    (b)    Agreements which contained contingencies that the Company would simply

2    *deem* satisfied simply through the customer's silence and the passage of time, allowing even

3    contingent deals to be included in backlog deals without any action by the customer so long as the

4    customer remained silent;

5    (c)    Agreements on which customers had *already* communicated cancellations but

6    simply delayed debooking or removing from backlog;

7    (d)    Agreements entered by salespeople including John Nash ("Nash") and Jim

8    Mills that historically were not materializing into CyberKnife installations and would ultimately

9    have to be removed from backlog – which they were; and

10    (e)    Agreements with international distributors were not arm's-length parties but

11    instead partners of the Company and had not identified end-users for CyberKnife systems they were

12    purporting to purchase and had not paid deposits.

13    <u>Reports from Confidential Witnesses Provide the True Facts Concerning the Company's Sales
and Backlog and Defendants' Knowledge of Falsity</u>

14

15    67.    Confidential witnesses, each of whom was in a position to know the facts which they

16    report, demonstrating that defendants' statements regarding (i) the sales and contracting process;

17    (ii) receipt of deposits from customers; (iii) revenue recognition or international orders; and (iv)

18    amount and composition of backlog were knowingly false and misleading during the Class Period.

19    68.    <u>Defendants Knowingly Misrepresented the Sales and Contracting Process and Its

20    Impact on Backlog</u>: Confidential witnesses describe a sales and contracting process that differed

21    materially from what defendants told the market, both in the February 7, 2007 Registration

22    Statement and afterward.  Specifically in describing the CyberKnife sales process, defendants stated

23    that it typically enters into LOI, which in about 90 days is converted into a contract for the sale of a

24    CyberKnife.  However, at the time of the Registration Statement, the Company already stopped

25    using LOIs.  In or around December 2006/January 2007, prior to the filing of the Registration

26    Statement and the IPO, the Company had already changed its sales and contracting process from

27    using LOIs to using what it called Term Agreements.  According to multiple CWs, the Term

28    Agreement method substantially affected the sales process, and materially impacted the makeup and

1   reporting of backlog which the Company described as *the* key metric for measuring corporate

2   performance.  The Company said in the Registration Statement that backlog consisted of CyberKnife

3   sales with no contingencies that customers were contractually committed to make.  However, CWs

4   report that the Term Agreements already in use contained language allowing for contingencies to be

5   self-satisfying, in that customers need not do anything for a contingency to be satisfied, resulting in

6   the backlog being inflated and deals being reported as non-contingent or having a substantially high

7   probability of being converted to revenue when this was not the case.  Later, in May 2007 (12 weeks

8   after the IPO), when the Company for the first time publicly announced that it had changed its

9   contracting and backlog reporting process, it still failed to disclose that the new procedure had been

10  in place and in use for months – rendering representations in the Registration Statement false.

11  Secondly, defendants still failed to disclose the true facts concerning the backlog and its contents,

12  including self-satisfying contingencies and other factors.  As reported, defendants used these Term

13  Agreements to misleadingly and artificially inflate backlog with purported sales contracts that they

14  knew were unlikely to result in real sales and installations.

15          (a)    CW1, a former Accuray Regional Sales Director, responsible for CyberKnife

16  sales prior to the IPO and during several months afterward, described the LOIs used by the Company

17  prior to the IPO as a "very generic" document produced by Accuray.  The Company had used and

18  considered an LOI as simply a gesture of a good faith interest in purchasing a CyberKnife.[2]  By no

19  means LOIs represent a formal commitment to proceed with a contract with Accuray.  CW1 stated

20  that Accuray utilized LOIs up to December 2006/January 2007, after which (but prior to the IPO) the

21  Company changed the way they negotiated prospective deals by using so-called "term agreements."

22  CW1 said that the Company executives did not explain to the sales staff why this change was being

23  made but that language in the new Term Agreements seemed geared to allow far more speculative,

24  contingent deals to be added to the order backlog.  In particular, CW1 found that the Term

25  ───────────

26  [2]        CW1 also stated that converting an LOI into a formal contract within 90 days was virtually
    impossible given the complexities of having to arrange financing for the customer, organizing the
27  customer into the requisite legal entity (*i.e.*, an LLC composed of various physicians who would use
    the system) and physically preparing the site where the CyberKnife system would be located.

28

1   Agreements were intentionally drafted to allow the Company to report what it knew to be contingent

2   backlog as backlog thereby inflating reported backlog numbers.  For example, according to CW1,

3   the Term Agreements stated that if the customer did not cancel the contract by a certain date – for

4   instance 90 days from the date the term agreement was signed – ***then Accuray would consider that***

5   ***the contingencies had been waived on the part of the customer*** unless the client specified

6   otherwise.  CW1 reported that s/he believed it was crazy to simply assume that such significant

7   contingencies had been satisfied without written confirmation from customers.  CW1 said that in this

8   2007 timeframe, Accuray was not informing investors and the public that the order backlog included

9   orders where myriad contingencies were not satisfied.

10              (b)     CW1 reported that in May 2007, when the Company publicly announced it as

11  changing the way it reported backlog to the public, s/he almost "threw up" and viewed the

12  announcement in conjunction with the new Term Agreements already in use as a red flag.

13  Moreover, even with the term agreements there were contingencies – including joint venture

14  formation, financing, certificates of need and building a structure – in the deals and that meant there

15  was a good chance the deals would not be consummated.  Defendants nevertheless these deals were

16  added to backlog and said that they had a 90% likelihood of converting all backlog to revenue.

17              (c)     CW3, a former Sales Specialist also provided details regarding the Term

18  Agreements.  According to CW3, when a customer signed a term agreement, the Company would

19  list that deal as backlog or potential revenue.  In CW3's experience, however, instead it was merely

20  an agreement that the parties would eventually move forward with the deal.  CW3 said that after the

21  Company went public, the Company began calling these term agreements "contracts."  CW3 stated

22  that there were numerous contingencies factors that could cause a term agreement not to become a

23  real deal.  According to CW3, many of the term agreements never materialized into anything.

24              69.     The reports of CWs are corroborated by internal corporate records specifically

25  identifying deals during the Class Period where contingencies were self satisfying.  For instance

26  "Joint Venture Formation" or "Sign[ing] T[erms] & C[ondition]s" – ***would be "deemed waived"*** and

27  the agreement would be considered "binding," if the customer did not notify the Company

28  otherwise.  This information is drawn from a Microsoft Access database made available by a former

employee of Accuray.  The database entries contain information regarding the terms and status of CyberKnife sales and shared ownership contracts:

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Contingency 2 | Contingency Terms |
|---|---|---|---|---|---|---|---|
| CA, Pasadena, Select Healthcare Solutions, LLC (CK2) | G4 Purchase Term Agreement | 3,960,000.00 | $100,000.00 deposit due within 90 days of signed Agreement $296,000.00 of the total amounts specified herein ("Purchase Price") payment, due upon JV/LLC formation on or before November 14, 2008 $2,772,000.00 of the Purchase Price due upon delivery of the CyberKnife System April 17, 2009. $792,000.00 of the Purchase Price due upon Acceptance (as defined in Attachment A, Section 7 of the Accuray Terms and Conditions set forth below). | 6/27/2008 | Joint Venture Formation | | Customer shall send written notification that the Contingency has or has not been satisfied on or before November 14, 2008. **If the notification has not been received by this date than the contingency shall be deemed waived and the Agreement and all of its terms and conditions shall be binding** |
| OH, Cincinnati, Dr. Bobby C. Baker (CK4) | G4 Purchase Term Agreement | 3,960,000.00 | $100,000 deposit due with signed Agreement. $692,000 due upon LLC formation (on or before September 26, 2008) $2,772,000 due upon delivery of the CyberKnife System (May 30, 2009). $396,000 due upon Acceptance | 6/26/2008 | LLC Formation | Sign Ts & Cs | (1) If Accuray **doesn't receive written confirmation by D/L, then Ag't will become binding**. |

## The Registration Statement Misrepresented that Accuray Received Deposits and Recognized Deposits as Revenue Even on Cancelled Orders

70.     Defendants' statements that they typically received deposits from customers upon execution of deals and that the Company would recognize deposits as revenue even after a cancellation were both false and misleading.

(a)     CW1 stated that with term agreements, sales people could accept a deposit of $50,000, at which point the order was added to backlog.  According to CW1, even when a deposit was received, most times $50,000, it was still likely a deal was not going to happen because of the complexities and the number of contingencies in the agreement.  However, if the customer opted not to go forward with a contract, ***Accuray would return their $50,000 deposit***.  According to CW1, an estimated 50% of all term agreements that were entered into the order backlog would not result in final, bona fide deals.  According to CW1, some deals were added to backlog ***without any deposit at all***.

1    (b)    CW3, a Former Sales Specialist, reported that the Company would sign Term

2    Agreements with potential customers and put them in backlog *even if no deposit was received from*

3    *the customer*.

4    (c)    CW10, a former Sales Operations Specialist, also stated that when the

5    Company received a cancellation, Accuray would refund customer deposits.

6    (d)    CW11 stated that even when contingent deals had deposits, those deposits

7    were almost always refunded back to the customers in the event the customers cancelled the

8    contracts.  In fact, non-contingent contracts also ended up being cancelled and those deposits were

9    also refunded. CW11 further reported that Accuray would enter into contracts which specifically

10   required a deposit, but many times, the deposits were not actually received until months later.

11   Nonetheless, these same contracts had been added to the order backlog.  These would be discussed at

12   the backlog meetings (which were attended by defendants Hampton) and some of these contracts

13   that were added to the backlog ended up being cancelled outright and the deposit never even

14   received.

15   71.    An internal document from the Company's accounting department identifying

16   Company refunds of customer deposits independently corroborates the reports of CWs 1, 3, 10 & 11:

17

| Accounting Department – Customer Refunds from Zarina Bhandari 09/05/2006 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Journal Entry | Series | TRX Date | Account Number | Account Description | Credit Amount | Debit Amount | Originating Master Name |
| 98637 | Purchasing | 2/15/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | The Urology Group |
| 100287 | Purchasing | 2/28/02006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Sibley Memorial Hospital |
| 101517 | Purchasing | 3/14/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Capital Health System |
| 101518 | Purchasing | 3/14/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Shore Memorial Hospital |
| 118905 | Purchasing | 7/31/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | SAMARITAN HOSPITAL |
| 118920 | Purchasing | 7/31/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | RADIATION ONCOLOGISTS, P.A. |
| 118921 | Purchasing | 7/31/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | DELWARE CYBERKNIFE LEASING |

| Journal Entry | Series | TRX Date | Account Number | Account Description | Credit Amount | Debit Amount | Originating Master Name |
|---|---|---|---|---|---|---|---|
| 123671 | Purchasing | 8/21/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | St. Lukes – Roosevelt Hospital Center |
| 124242 | Purchasing | 8/23/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Bon Secours Richmond Health System |

*See* Ex. 50.

72.    Another internal document indicated that the Company refunded deposits as opposed to recognizing them as revenue:

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Contingency 2 | Contingency Terms |
|---|---|---|---|---|---|---|---|
| Singapore, Singapore West Point Hospital (Direct) | G3 Purchase Agreement (Quote) | 5,321,935.00 | $200,000 deposit due with signed Purchase Agt 90% of the purchase price due upon delivery (June 13, 2008) 10% of purchase price due upon completion of first patient treatment or 4 weeks after Acceptance, whichever is earlier | 12/27/2007 | LLC Formation | | If Accuray does not timely receive written confirmation by 2/8/08, this contingency shall be deemed waived and this Agt and all of its TC's shall become binding on all parties. ***Should this Agreement terminate upon timely notice from Customer of failure to satisfy this Con, Accuray shall refund any money paid by Customer within 30 days.*** |

**Defendants Knew of and Encouraged the Artificial Inflation of Backlog and Permitted Phony Sales to Be Entered Into and Reported as Backlog**

73.    Defendants knew of and encouraged artificial inflation of the backlog figures throughout the Class Period by including transactions from sales staff whom they knew had a history of padding possible sales, which ultimately never resulted in CyberKnife installations.

(a)    CW1 disclosed that the Company knew that reported backlog was artificially inflated and that the Company knew of and encouraged certain of the sales representatives to submit agreements or contracts that they knew had little likelihood of turning into real sales. The Company nevertheless included these suspect deals in reported backlog. For example, CW1 reported that for 2006, sales representative John Nash (who was terminated in October 2008 because deals he signed were not materializing) had won the award for most sales in the year but that it was known within the Company that Nash's deals were in large part phony deals that rarely resulted in installations that

1    could be recorded as revenue and had to be de-booked or removed from backlog.[3]  CW1 reported

2    that Nash had even submitted contracts he entered into with his best friend.  According to CW1,

3    Nash had a history of specious deals that never materialized and recalled that in one year, Nash

4    booked 16 CyberKnife systems but only four or five were actually installed and these deals could

5    account for about millions being removed from backlog.  CW1 reported that s/he believed that 50%

6    of Nash's deals were removed from backlog.  CW11 stated that there were numerous contracts that

7    were entered into the backlog that ended up being cancelled and many though not all cancelled

8    contracts were deals that had been put into place by John Nash.

9            (b)     CW2 corroborated the report of CW1 and reported that Nash was held out by

10   the Company as its "savior" sales person because he was "miraculously" booking a lot of orders.

11   CW2 stated that as a result of these orders, Nash was being paid bonuses up front for systems that

12   were not being installed.  According to CW2, however, the orders were not turning into installations

13   and thus had to be removed from backlog.  CW2 confirmed that Nash was fired in 2008 because of

14   the phony deals.

15           (c)     CW4 corroborated the reports of CWs 1 and 2, stating that the Company knew

16   of and encouraged the inclusion of questionable orders into reported backlog and specifically

17   reported that Nash was falsely booking orders knowing that they were not going to result in

18   installations.  According to CW4, the Company fired Nash in 2008 because of these phony deals.

19   According to CW4, everybody, including defendants, knew that Nash was falsely booking orders.

20   According to CW4, Nash would get people to sign agreements, "knowing good and well" that the

21   customers would never actually purchase a system.  Because Nash had so many deals on the books,

22   he would receive a lot of stock in the Company as a bonus.  According to CW4, Nash's bogus sales

23   caused a big "blowout" among the sales force because Nash was essentially stealing stock options

24   from the other sales representatives.  They were not getting rewarded for their own sales results

25   because of Nash's false bookings.

26   _____

27   [3]      Nash brags that he was the Company's top sales person at the Company.  *See* Ex. 49.

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW                                          - 32 -

1          (d)     CW4 reported that Nash's boss Snarsky, Eastern Region Sales Manager,

2   would also receive stock awards for Nash's "sales," and that Tom Snarsky knew of Nash's phony

3   bookings.  CW4 reported that Tom Snarsky spoke openly about Nash's sale and recalled Snarsky

4   telling Nash that Nash's orders were going to fall off the books.  Snarsky said that Nash was going to

5   end up having to pay the Company back.  In addition to sales personnel and Snarsky, CW4 said that

6   senior management knew that Nash's deals were bogus because these deals were not materializing

7   into installations that could be recorded as revenue, but were being carried as backlog for long

8   periods of time.

9          (e)     CW4 stated that, in conjunction with phony deals, defendants knew that

10  Nash's orders and his sales forecasts (which the Company adopted) were wildly inflated.  *See also*

11  CW4's report regarding FY08 forecasts at ¶88.  CW4 reported that the sales managers also had to

12  give presentations in Sunnyvale, California on what their year was going to look like.  This

13  presentation typically took place in the first quarter, and all of the senior executives attended,

14  including defendant Thomson, and heard Nash's ridiculous numbers at sales presentations in

15  Sunnyvale, California. CW4 stated that in sales meetings, for example, other representatives would

16  forecast four, five and six orders for the year.  However, Nash forecast 22 sales.  CW4 explained if a

17  salesperson had forecast even eight orders for the year, people would roll their eyes in skepticism,

18  and if you actually sold eight, "you are like god."  CW4 reported that when Nash openly claimed

19  that he had 22 orders, people were saying, "***What?!***"  CW4 said that Goode and defendant Hampton

20  also attended Company-wide sales meetings where Nash would make outrageous forecasts.

21         (f)     CW5, a former Director of Marketing and Placement, corroborated CWs 1, 4

22  and 11 regarding sales cancellations of Nash's orders and stated that Nash was the salesperson

23  known for having the highest percentage of cancelled contracts at the Company.

24         (g)     CW10, another Sales Operations Specialist, reported that Nash engaged in

25  underhanded activities to generate orders.  S/he stated that Nash's orders were placed in backlog but

26  did not turn in to system installations and he was fired over this.  CW10 also reported that if a deal

27  was cancelled, Accuray refunded the customer's deposit, including on Nash's phony deals.

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE          - 33 -
FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1    (h)    In a separate example of how the Company knowingly and artificially inflated

2  backlog while failing to disclose its true contents, CW1 explained that frequently Oncuris, which

3  was run by the former CEO of Accuray, James Doty, would sign an agreement and put up a

4  "deposit" despite having never met the customers that the CyberKnife system was purportedly

5  intended for.  For instance, CW1 reported that in summer of 2007, Doty of Oncuris "signed" an

6  "agreement" and paid a deposit for a CyberKnife purportedly to be installed at Corona Regional

7  Medical Center, but CW1 reported that the representatives at Corona had no idea that Doty had

8  signed the agreement or that he paid this deposit on its behalf since they had never even met Oncuris

9  representatives.

10    (i)    The report of CW1 regarding Corona is corroborated by internal Accuray

11  documents which indicate that a CyberKnife system order was placed for Corona Regional Medical

12  Center and Oncuris in June 2007 and that at the time an LLC had not been formed.  In addition, the

13  documents show that, here again, this contingency of forming an LLC would be deemed to be

14  waived whether or not the Company actually received any notice from the "customer" that the

15  contingency had been satisfied, or any confirmation that a LLC had been formed:

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Contingency 2 | Contingency Terms |
|---|---|---|---|---|---|---|---|
| CA, Corona, Corona Regional Medical Center (Oncuris) | G4 Purchase Term Agreement | 3,800,000.00 | $100,000 within 30 days of signed Agt. $1,040,000 upon LLC formation (on or before October 19, 2007)" $2,280,000 upon Delivery (March 28, 2008) $380,000 upon Acceptance | 6/28/2007 | LLC Formation | | Customer shall send written notice to ARAY on or before Oct. 19, 2007 *otherwise contingency is deemed waived*. |

22    (j)    More importantly, to date, there is no evidence that the Corona Regional

23  Medical Center *ever* purchased or even intended to purchase a CyberKnife system.  In fact, CW11, a

24  former Sales Operations Specialist reported that as of the time of his/her departure from the

25  Company, Corona Regional Medical Center had not purchased a CyberKnife system.

26    (k)    CW11 reported that Oncuris was run by Dr. James Doty, a former Accuray

27  executive.  S/he also confirmed that Oncuris provided down-payments for customers that did not

28

1   otherwise have sufficient cash.  CW11 also reported that s/he heard Oncuris Doty provided deposits

2   or financing for customers without even meeting the customers.

3           (l)     CW9 is a former database analyst who was hired to fix problems in the

4   Company's BQMS system, the system from which Accuray generated its reported backlog.

5   According to CW9, reported that database system included many deals that had significant

6   subjectivity associated with the deals.  CW9 reports that as part of his/her duties s/he regularly

7   worked with the personnel in Sales Operations and was told by representatives from those

8   organizations who were in charge of supporting the sales staff, and who analyzed backlog and

9   attended backlog meetings that Accuray "should not be reporting" orders in the backlog because of

10  the high level of subjectivity associated with the deals.  CW9 was told by employees in Sales

11  Operations that the contingent contracts in the backlog were totally wrong and should never have

12  been entered into the backlog in the first place.

13          (m)     CW11 stated that s/he attended and participated in regular backlog meetings

14  with defendant Hampton, as well as representatives from Accuray's Finance, Legal, and Sales

15  departments.  Fiona Noah also participated in the meetings.  The purpose of these meetings was to

16  ascertain the progress of all the contracts and to assign subjective confidence levels to the contracts.

17  CW11 reported that the subjective confidence ratings assigned to contracts ranged from 1 – 5 with a

18  5 rating being the lowest confidence rating and meant the order was not supposed to be included in

19  the order backlog.  A 1 rating meant the system had actually been installed, a 2 rating meant the

20  system was close to being installed.  Ratings of 3 and 4 meant that there were various contingencies

21  and other requirements that needed to be achieved before the system could be shipped and installed.

22  However all deals with ratings of 3 and 4 were definitely added to the order backlog, regardless of

23  whether there were contingencies associated with the contracts.  CW11 stated that only deals with a

24  rating of 5 were not added to the backlog.  From CW11's perspective, no contingent orders of any

25  kind should have been included in the backlog.  In facts CW11 reported that current general counsel

26  Darren Milliken also commented to him/her in October 2007, that Accuray should not be reporting

27  anything except non-contingent deals.  CW11 also reported on a specific series of orders that were

28  placed into backlog in 2007 which was suspect because there were "no homes" or identified end-

1  users for the eight systems.  CW11 reported that two of the orders ended up being cancelled, but four

2  of the remaining six were being counted as part of the order backlog, but should not have been

3  because of the lack of end-users.  Ultimately, *only one* was installed.  CW11 maintained that three

4  orders in the backlog should not have been added to the backlog "because there was nothing

5  indicating that they would convert" to revenue; nor should they have still been in the backlog in

6  October 2009 when CW11 left.  CW11 said that the J.L. Parrott deals were definitely included in the

7  Watch List during the backlog meetings.  CW11's report regarding the Parrott deals are also

8  corroborated by internal documents showing the eight deals entered into in November and December

9  2007:

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Due Date | Contingency Terms | Status |
|---|---|---|---|---|---|---|---|---|
| KY, Louisville, The Parrott Group 4 - Manhattan (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 1 - Howard (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | (2) If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 2 - Cumberland (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | (1) If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 3 - Salisbury (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | (1) If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |

| KY, Louisville, The Parrott Group 5 - Bethesda (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
|---|---|---|---|---|---|---|---|---|
| KY, Louisville, The Parrott Group 8 - Germantown (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 6 - Somers Point (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 7 - Queens (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |

**Defendants Knew that Reported Backlog, Including the "Definition" of Backlog Before and During the Class Period, Was False Because They Failed to De-book Deals They Knew Customers Had Cancelled or Had Become Dormant**

74.     Confidential witnesses report that Accuray's knowing failure to timely de-book deals that customers cancelled, as well as resisting customers' efforts to cancel transactions, inflated backlog and caused the definition of backlog to be knowing or recklessly false and misleading.

(a)     CW1 reported that the time between Accuray receiving notice that a customer wanted to cancel and the time Accuray would actually remove items from backlog depended on how much the Company needed the deal in backlog. The Company would receive letters from customers requesting that Accuray de-book a deal and the Company would not remove the deal from backlog, sometimes for months.

(b)     CW5 corroborated the reports of CWs 1 and 2 that it was definitely known internally that there were "cancelled contracts" which were not removed "until subsequent quarters." CW5 reported that customers would notify Accuray to cancel their orders, but if it was shortly before

1   the end of a quarter, it would delay de-booking the orders.  CW5 reported that s/he and other

2   personnel were aware of cancelled orders that still showed up in regularly generated issued which

3   was a list of pending installations with target dates for when the installations were to be completed.

4   Accordingly, CW5 believed that the failure to remove cancelled orders was deliberate and s/he was

5   personally "troubled" by the Company's practices in this regard, which s/he contrasted to "good

6   practices" at a former employer in the medical devices field.

7            (c)    CW2 reported that s/he heard that the Company would delay taking a sale off

8   the books even after a customer would ask to have it cancelled, resulting in inflated backlog figures.

9   CW2 believed that the Company probably knew about the need for reductions to its backlog "easily"

10  a year or so before the actual first reductions.

11           (d)    CW11 reported  contracts were added to the backlog and then no further or

12  very little additional work was done on the contracts for long periods which indicated that they had

13  little likelihood of later converting to revenue.  CW11 stated that even where a deal was in backlog

14  and rated as a 2 because Accuray had received a deposit, nothing would happen on the contract

15  thereafter but it would still hold a 2 confidence rating and stay in backlog unless it was changed

16  manually.

17       75.   In addition to the facts reported by confidential witnesses that clearly demonstrate the

18  that the Company falsity of defendants' statements as detailed set forth above, defendants would

19  ultimately admit the truth (a) it was not collecting deposits from customers, in particular,

20  international distributors; (b) would remove more than $127 million from reported backlog by the

21  end of the Class Period and another $131 million after the Class Period; and (c) was reverting to its

22  pre-IPO and pre-Class Period method of reporting backlog because the new and current method

23  (which it falsely said was a more accurate way to measure the Company's financial condition) was

24  *not* a reliable predictor of future revenues.

25       76.   <u>False and Misleading Statements</u>: On May 14, 2007, JPMorgan hosted an investor

26  lunch and day of meetings with defendant McNamara where he discussed Accuray's contingent

27  backlog, including the fact that generally, the Company received a deposit from customers upon

28  initiating a contract and that *afterward*, contingencies it had previously identified generally in the

1    May 1, 2007 conference call needed to be satisfied.  Defendants reiterated falsely that they continued

2    to believe that ***90% of all backlog would result in revenue***.  A summary of the meeting was reported

3    by JPMorgan in a research report on May 17, 2007:

4              •  **Contingency specifics discussed. . . .**  McNamara provided additional details
                   around three primary contingencies, which are resolved ***after initial contract***
5                  ***signing and, generally, a down payment: (1) Hospital board approval – the***
                   ***most common contingency and most likely to be resolved, although the***
6                  ***process can typically take up to 6 months depending on the timing on***
                   ***Board meetings; (2) Legal entities (LLC or JV) – which are generally***
7                  ***formed by a physician group (e.g., neurosurgeons) that sees profit potential***
                   ***from owning a shared CyberKnife. . . .***

8              •  ***In general, ARAY continues to assume that 90% of orders (contingent or***
9                  ***otherwise) will convert into backlog (vs. ~98% for VAR).***

10             •  **CyberKnife sales reps paid on a ramping scale. . . .**  McNamara discussed
                   pay structure for the 25 existing U.S. sales reps (32 in total), who are paid on
11                 a ramping scale, meaning that commission per sale increases as rep gets
                   closer to and exceeds predetermined quarterly quotas.  ***In addition, cash***
12                 ***payments are made to reps in installments based on milestones, incl.***
                   ***contract signing, initial customer deposit, 10% customer deposit and***
13                 ***CyberKnife installation (where ~60% of the commission is paid).***

14   Ex. 9.

15        77.    <u>False and Misleading Statement and Partial Disclosure</u>: On August 16, 2007, Accuray

16   announced its fiscal fourth quarter and fiscal year 2007 financial results for the period ended June

17   30, 2007 in a press release titled "Accuray Reports Record Revenue in Fiscal Fourth Quarter and

18   Fiscal Year Ended 2007; Revenue Growth of 166 Percent Year Over Year; Total Backlog Reaches

19   Record Level of $619 Million":

20             •  At the end of fiscal 2007, ***backlog increased to approximately $619***
                   ***million . . . .***
21
               •  ***Backlog is defined as signed contracts that the Company believes have a***
22                 ***substantially high probability of being booked as revenue.***

23                                       *        *        *

24   "The Accuray team and I are very pleased with our strong financial performance,
     ***including record revenue, fourth quarter profitability and record backlog. . . .***"
25   Ex. 10.

26        78.    <u>False and Misleading Statement</u>: On August 16, 2007, Accuray held a conference call

27   with analysts to discuss the Company's financial performance reported in the August 16, 2007 press

28

release and the Company's reported and exploding backlog.  The call was hosted by defendants Thomson and McNamara and stressed the strong growth in backlog and new contracts.  The Company strongly asserted that all new contracts go into reported backlog, and further, that the increase in the backlog numbers was representative of contracts that truly had a 90% likelihood of resulting in future revenue.  Defendant McNamara also knowingly and misleadingly encouraged investors to use backlog figures to analyze both historical activity and future economic and financial condition, including specifically stating that backlog provided "excellent visibility" into the future revenues:

> *But backlog, which is the key indicator of future revenue, reached the record level of $619 million at the end of fourth quarter, growing $187 million during the fiscal year.*

*      *      *

> *Backlog is defined as signed contracts that Accuray believes have a substantially high probability of being realized as revenue in the future.  It can be used to analyze both historical activity and future activity.  Historically, the change in backlog, combined with the revenue recognized, can be used to determine the approximate economic contract value created over the past year.*

*      *      *

> *Moving to the future and guidance for going forward, Accuray's backlog provides excellent visibility into future revenue, again, since nearly all revenue comes out of that backlog number.*

*      *      *

> *Using this as a backdrop and considering that more contracts have been signed in the second half of 2007 than the first half, we believe revenues for FY '08 should be between $250 million and $270 million.*

*      *      *

Ex. 12 at 3, 6.

79.    Underline: False and Misleading Statement and Partial Disclosure: During the August 16, 2007 conference call, Thomson was asked what was driving the huge increase in backlog.  Thomson falsely claimed that growing demand was fueling backlog when in truth the Company was falsely inflated backlog:

> [Analyst]:  Clearly, we thought – or $619 million in backlog was clearly better than we suspected or we had modeled for.  Can you just talk about what is driving that?

As well as, if my math is correct, you did about $104 million in new orders in the quarter; where that's coming from, and what is driving that?

[Thomson]: *. . . I think that what's fundamentally fueling it is the clinical diversification of radiosurgery and the fact that CyberKnife really is the only whole-body full-time solution for the radiosurgery market. . . .*

Also, we're seeing, coming into the market sort of the larger group players . . . . *[W]e're getting increased interest from the stand-alone centers and some of the providers of multiple stand-alone systems.  So it's really the complete spread; the big, high-end hospitals, community hospitals, the stand-alone centers, it's a very diverse mix.*

*Id.* at 8.

80.     In fact, defendants knew, but did not disclose (i) that the backlog was padded with deals with no real likelihood of resulting in installations and revenue, (ii) backlog included deals with no deposit or refundable deposits, as well as suspect deals generated by Nash, (iii) sales personnel it knew to be impacting numbers, (iv) deals with significant contingencies the Company would simply *deem* waived due to the passage of time, and (v) deals that had already been cancelled but not yet removed from backlog.

81.     In addition, during the question and answer session, Thomson was asked how he and the Company arrived at the $104 million in new orders that they were reporting as backlog. Thompson was challenged by analysts on those figures because the math did not agree with the reported figures.  CIBC analyst Amit Hazan explained that basic mathematics would not lead to a $104 million number but instead suggested that the Company only had $50 million in new orders. Unable to reconcile the issues raised by Hazan, in frustration, Thomson told Hazan he was simply "wrong."  Thomson's and the Company's inability to answer inquiries (because they were omitting the known truth) led to analyst downgrades and a significant stock price decline on August 17, 2007. Specifically, during the call, CIBC analyst Amit Hazan challenged the Company's reported "new orders" figures of $104 million:

**Hazan – *CIBC World Markets – Analyst***   Okay, and then in terms of the backlog . . . .  If I look at that component and I try to break out what the new orders were in terms of just the product, I am coming out to about $50 million.  If you take product backlog from this quarter versus product backlog that you gave last quarter versus the product revenue you just put out, you get about a $50 million number. That's about 15 unit orders.  What am I doing wrong there, or did you just have a lot of shared unit orders in the quarter?  *I just can't get to the $104 million* . . . .

**McNamara** – We would have to see the detail that you have there in order to comment precisely on it.

**Hazan** – Let me take you through the math.

**McNamara** – We don't actually discuss the actual orders.

**Hazan** – But is it correct that you had about $305 million in backlog, in product backlog in the March quarter? And now, you have $321 million?

**McNamara** – Yes, that is correct.

**Hazan** – And you have $321 million now, and you had about $35 million in product revenue. The difference is $50 million. If you take a $3.3 million ASP, that is about 15 unit orders. I'm just wondering what the other (MULTIPLE SPEAKERS)

**McNamara** – *Again, I can tell that it's wrong, the 15 unit orders for sure, but I'm not sure what your math is. . . .*

*Id.* at 12-13.

82.     The CIBC analyst also questioned Thomson on what appeared to be a slow down in reported installations. Defendant Thomson defiantly denied any slow down and shifted focus to the Company's growing – but falsely inflated – backlog figure:

**Hazan** – And then the last one from me is just in terms of installations. If my numbers are right, it looks like installations in the U.S. were somewhere around – if they were 20 this year, this fiscal year for you, they were about 19 last fiscal year. . . . I'm just wondering, are you seeing any kind of a slowdown in installations for any reason relative to your historical years or any thoughts on that?

**Thompson** – No, I don't think so. . . . I think we see an acceleration in sales that takes a little while to work its way through to installations, *which is why the backlog increases*. . . .

*Id.* at 14.

83.     On August 17, 2007, CIBC issued a report on the Company's 4Q07 earnings reports including defendants' comments during the conference call. The report further noted the disappointing slowdown in CyberKnife installations in light of the reported growth in backlog and rated the Company a Sector Underperformer:

**4Q Leaves as Many Questions as Answers**

- Overall, ARAY's 4Q left us with hard-to-answer questions. . . .*unit installs in the U.S. actually fell in FY07 vs. FY06, and FY08 sales guidance trailed Street estimates*.

- WW orders of $102M (+2% y/y) missed our $116M est, and latest-12-mo. order growth is now 39% (down from 69% in FY06). "***Product*" orders of $50M (15 units) dropped q/q**. . . .

- ***With the significant growth in backlog last year, we are puzzled why the 20 unit installs for FY07 (just ended) were down from 22 in FY06.***

- FY08 sales guidance is $250-$270M, below Street view of $266M. . . .***Our price target goes from $19 to $16***.

*       *       *

**Unit Installations Are Not Keeping Up**

Accuray's total cumulative installed base is now 109 units, up from 77 in June 2006. Of the 32 units installed in FY07, 20 were in the U.S. and 12 were O-U.S. This is another point of concern for us, as there were 28 units installed in the prior FY06, with 22 in the U.S. (including 3 shared ownership systems). ***The decline in y/y installations is hard for us to understand given the rate of growth for new unit orders [backlog] during the past two years. Management said that install times have not changed of late, and we continue to work on this issue.*** . . .

Ex. 13.

84.     On August 17, 2007, Jefferies issued a positive research report on Accuray titled "FY4Q Results Were Solid; Stereotactic Radiosurgery is the Wave of the Future." The report echoed the false statements by defendants concerning strength and reiterated meaningfulness of backlog and new order growth which purported to support forecasted revenues:

- ***Backlog and new orders were strong. The company reported a strong uptake in backlog, increasing by $60MM from $559MM in FY3Q to $619MM in FY4Q (beating our estimate of $585MM). FY07 backlog grew $187MM (+43% YoY) from $432MM to $619MM.***

- ***The company's new order growth supports our thesis that demand for CyberKnife system is strong and growing . . . .***

Ex. 15.

85.     On August 17, 2007, *Bloomberg* published an article titled "Accuray Falls After Analyst Reduces Revenue Estimate for 2008." The analyst downgrade by CIBC and JPMorgan caused the stock price to decline but it nevertheless remained inflated as the complete truth concerning the Company's backlog had yet to be disclosed:

**Accuray Falls After Analyst Reduces Revenue Estimate for 2008**

Aug, 17 (Bloomberg) – Accuray Inc. fell as much as 24 percent, the most since its February initial public offering, after an analyst reduced his revenue estimate for the year.

1          Accuray fell $3.55, or 20 percent, to $14.52 at 12:34 p.m.  New York time in
   Nasdaq Stock Market composite trading and touched $13.70.
2
          The Sunnyvale, California-based maker of a robotic device to treat cancer
3     forecast revenue of $250 million to $270 million for fiscal 2008.  JPMorgan
      Securities analyst Tycho W. Peterson reduced his estimate to $261.9 million from
4     $271.7 million.

5     Ex. 14.

6          86.  On August 17, 2007, the Company's stock price declined from close of $18.07 per

7     share on August 16, 2007 to a close of $13.45 per share on August 17, 2007, on a volume of

8     4,535,800 shares traded.  The trading volume on August 16, 2007 was a mere 861,200.

9          87.  <u>Reasons Why Statements in ¶¶76-79 Were False and Misleading</u>: Notwithstanding

10    the partial truths exposed by analysts and the analysts' stock downgrades, defendants made

11    continuing false and misleading statements regarding the amount and composition of the Company's

12    reported backlog the reasons why backlog was increasing and its FY08 revenue and forecast.  As

13    discussed in ¶¶68-73, defendants knew, or deliberately disregarded the truth, when they falsely

14    claimed that the Company's backlog, was $619 million and that it was comprised of deals with

15    "substantially high probability of being booked as revenue."  Defendants knew or deliberately

16    disregarded and thus failed to disclose the following:

17          (a)  Even though the Company had changed its reported backlog definition to

18    include both contingent and non-contingent backlog, defendants failed to disclose the true facts that

19    were known about the composition of the backlog.  For example, even where the contracts or Term

20    Agreements had specific significant contingencies like joint venture formation and Accuray had not

21    received any information from the customer on whether the contingencies had been satisfied, the

22    Company would simply ***deem contingencies satisfied*** so long as the customer remained silent.

23          (b)  Reported backlog included deals wherein third parties – like Oncuris – placed

24    deposits for orders on behalf of doctors they had not even yet met.  CW1 reported, and internal

25    documents confirm, that Doty placed a deposit from a deal with Corona Medical Center when he had

26    not yet met with doctors from that medical practice.  Internal documents show a deal with Corona

27    Regional Medical Center which required the customer to notify Accuray before a given date that the

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW                                        - 44 -

1    LLC had not been formed "otherwise the contingency is deemed waived."  *See* ¶¶72, 73(i).  That

2    deal never materialized.

3            (c)    Reported backlog included deals which customers had requested be cancelled

4    and debooked but the Company simply delayed adjusting backlog.  CWs 1, 2 and 5 reported that

5    defendants delayed removing deals from backlog particularly at or near the end of a quarter so that

6    the backlog figure would not be reduced.

7            (d)    Reported backlog included suspect deals brought in by Nash and other sales

8    personnel whose deals were not materializing into sales.  CWs 1, 2, 4 and 5 all reported that Nash

9    was booking deals which had no likelihood of resulting in installations.

10           (e)    Reported backlog included deals with international distributors who had not

11   put down deposits who were not arm's-length parties and had not identified end-users.  CWs 5, 6 and

12   7 reported that CyberKnife systems purchased by international distributors ended up sitting in

13   warehouses for extended periods of time.

14           (f)    Reported backlog included deals which had no deposits or ***refundable***

15   deposits.  CWs 1, 3, 10 and 11 report this fact and are corroborated by internal documents which

16   show, for instance, Accuray would "refund any money paid by Customer [Singapore West Point

17   Hospital] within 30 days." upon notice that the customer failed to form an LLC.  *See* ¶¶71, 72.

18       88.    <u>Defendants Actually Knew that the FY08 Revenue Forecast Was False and</u>

19   <u>Misleading</u>: The FY08 public forecast provided by defendants of $250-$270 million was false and

20   misleading.  Defendants had actual knowledge of facts that materially undermined the forecast.

21   With respect to the Company's FY08 forecasts publicly issued on August 17, 2007, CWs provided

22   facts known to defendants leading up to the false forecasts including defendants' actual knowledge

23   of falsity.   Indeed, multiple CWs report that the forecast was based on defendant Hampton's

24   arbitrary decision to double that sales personnel believed they could sell roughly 50 units to 100

25   CyberKnife sales.

26           (a)    CW1 reported that in the year 2007, the Company's sales quotas went up

27   dramatically *i.e.*, between 50%-70%.

28

(b)      CW2 corroborated CW1 and reported that prior to the IPO, Company's sales quotas increased significantly and his/her quota, for example in the northwestern United States, increased to sales of seven CyberKnife units, whereas in the five years prior to the IPO, the Company had only sold a ***total*** of three units in the region.  CW2 reported that these sales quotas were ***not*** set in accordance with what the sales staff believed could be sold, but instead were set by top management and the sales staff were simply told to meet the numbers.

(c)      CW3, a former Accuray Sales Specialist between 2006 and 2009, stated that expectations were raised to an unrealistic level after the Company went public, especially considering the $4 million price of the CyberKnife system and the downturn of the economy.  CW3 reported that Hampton, as Head of Worldwide Sales, was the key person who set the sales forecast, along with the defendants Thomson and McNamara.  CW3 reported that for FY07, the Company had installed approximately 51 units.  However, Hampton, with the approval of the senior staff, simply doubled that number to 101 for FY08.  According to CW3, there was no basis for such an increase in sales forecast and no one in sales organization believed that the Company could meet the 2008 sales forecast.  According to CW3, the sales staff, including Regional Sales Directors, made it clear to Hampton during sales meetings that the 2008 forecast was simply unrealistic.  Ultimately, in FY08, the Company failed miserably and only hit around the 50 systems mark.

(d)      From CW3's perspective, the Company began to include all deals – as opposed to just non-contingent deals – in reported backlog because the Company was not hitting sales numbers but at least could show there were deals in the works.

(e)      CW4 corroborated the reports of CWs 1, 2 and 3 with respect to the Company's FY08 forecasts.  CW4 stated that when the Company was about to go public, defendants polled what each salesperson was going to sell.  CW4 reported that the sales staff had actually provided a legitimate realistic forecast of what they could sell, but Accuray management just "threw it out the window."  CW4 said, "They were throwing around some bogus numbers, and they knew it."  According to CW4, Wade Hampton told the sales team that the Company was going to forecast 100 CyberKnife units.  CW4 stated that the sales people, however, told Hampton that there was no way the Company was going to be able to sell 100 CyberKnife systems.  CW4 reported that s/he

1    personally told Hampton, "You're crazy"; "You're not going to sell 100." Hampton just told him

2    that was what Accuray had committed to. CW4 reminded Hampton that the Company did not even

3    sell 100 in 2006 when they had an amazing year. CW4 recalled telling his/her spouse of this

4    exchange with Hampton and telling him/her that there was no way they could sell 100 and felt this

5    was misleading. CW4 said that s/he believed there was something illegal about going public and

6    making false claims about what kind of sales one can make.

7            (f)    CW4 explained that Accuray's forecast upset the sales people because they

8    had provided legitimate estimates of what they thought they were going to sell in the year but the

9    Company said it thought they could sell twice as much. As far as the forecast of 100 sales,

10   everybody knew that was a "bogus" number. CW4 corroborated CW3 stating that, when the

11   Company made the forecast, even Snarsky said, "they're f-ing crazy." According to CW4, the

12   Company had just gone public, and employees had to work like crazy to pump sales up, and that

13   Accuray used Nash's "bogus numbers" in backlog to show that those sales were in the works. CW4

14   stated that though Nash's sales were called "dirty deals" behind the scenes, the Company used his

15   numbers for its public projections.

16           (g)    CW5 reported that s/he found it "troubling" when Accuray maintained its

17   guidance to investors regarding the number of installations it had increasing the Company's reported

18   forecasted for a given year when the actual number of installations at the time was much less.

19   <u>Accuray Changes FY08 Executive Bonus Structure to Be Weighted Toward Backlog, Further
     Encouraging Sales Staff to Sign Deals Which Defendants Already Knew, or Deliberately</u>

20   <u>Disregarded, Were Including Bogus Deals in Backlog</u>

21           89.    On September 4, 2007, Accuray filed with the SEC its Form 10-K for FY07, the

22   period ended June 30, 2007, and reiterated the Company's financial results reported in Accuray's

23   August 16, 2007 press release and conference call. The September 4, 2007 Form 10-K also

24   disclosed the details of the Company's executive bonus structure and its direct correlation with

25   reported backlog. Defendants were incentivized to enter into term agreements and grow backlog.

26   Accuray's Compensation Committee changed the financial metrics to be used in determining

27   bonuses for Accuray's senior executive officers for FY08. Accuray changed backlog to include for

28

1   FY08 to be the single largest financial metric for determining the bonuses of certain senior

2   executives, including defendants Thomson (CEO) and Hampton (CSO):

3       Weighting of financial metrics in the case of our Chief Executive Officer shall be as
        follows: net income (10%), operating income (10%), revenue (20%), gross margin
4       (10%), **and backlog (20%)**.

5                       *       *       *

6       For our Chief Sales Officer [Hampton], approximately 15% of his bonus will be
        based on achievement of corporate financial objectives (revenue 3.5%, net income
7       1.75%, operating income 1.75%, gross margin 1.75% **and backlog 6.5%**).   The
        remaining approximately 85% of his bonus will be based primarily on achievement
8       of **quarterly sales quotas**.

9   Ex. 17.

10  Defendants Intentionally Exclude Analyst with a Negative Rating on Accuray from Company
    Sponsored Investor Event; Big Investment Houses and Underwriters Issue Positive Outlook
11  Reports

12          90.     On October 5, 2007, Accuray held its analyst day, inviting only a select group of

13  securities analysts, including the defendant underwriters, that provided positive ratings on Accuray.

14  CIBC analyst Amit Hazan, who had criticized the Company for vague and seemingly unsupportable

15  installation, sales and backlog figures, was not invited.  He concurrently issued a report detailing the

16  Company's lagging installation numbers and failure to clarify or differentiate "sold" units from

17  "leased" units which created uncertainty about the Company's true financial condition.  The report

18  further suggested an even "broader credibility issue" with Accuracy management:

19      **Our Issues with ARAY Are Growing**

20      As we described above, our key issues regarding investment in ARAY today are
        (1) a weak management team, in our opinion; (2) the Street's disregard for unit order
21      type (sale or lease) and its impact on future sales; (3) a concerning pattern of slow
        installations in the U.S. over the past year, . . .
22
        **The Key to Any Stock Investment Starts with Management**
23
        Our personal experience as it relates to Accuray's "analyst day" seems to be in a way
24      a microcosm of a broader credibility issue with this management team, in our
        opinion.  In our experience, this marks the first time that we were not allowed to
25      attend a company sponsored event (for any company we have ever covered) held
        specifically for analysts.
26
        **Considering that we are the only analysts right now with a differentiated (or
27      negative) position on the stock, this action is disturbing.  Again, we highlight this
        point only because it further underscores our growing concern that this
28      management team may not be fully forthright in dealing with investors, with a**

1    *distinct inability to answer uncomplicated questions.  This issue came up most*
2    *clearly (and publicly) a few times on the last earnings call.*

Ex. 18.

3         91.    Large investment house analysts invited to the Company's analyst day issued reports

4    which ignored or contradicted the issues raised in the CIBC report and largely parroted the

5    Company's positive spin on the state of its business.  In particular, the October 5, 2007 report by

6    Mark Richter of Jefferies offered a bullish analysis of the Company's backlog and market

7    opportunity.  The report stated:

8         **Analyst Day Provides More Evidence for the Value Proposition of the**
9         **CyberKnife**

10        **Investment Summary**

11        We would be buyers of ARAY at current levels and believe the stock is poised to
          trade higher on strong FY1Q revenue growth, *an expanding backlog, and*
12        *accelerating CyberKnife unit placements*.

13                               *       *       *

14        The analyst day provided further insight into the large and growing SRS opportunity,
          and *we believe ARAY is poised to dominate this market*.

15                               *       *       *

16
          CFO Robert McNamara reviewed Accuray's business model and highlighted
17        *ARAY's steady order/new contract growth from $75 million in FY06, to $150*
          *million in FY05, to $240 million in FY06 and then $325 million in FY07*. . . .

18
          **Wade Hampton, Chief Sales Officer,** provided a worldwide sales overview and
19        provided company goals of expanding ARAY's global sales channel, *maintaining*
          *backlog expansion, and establishing a top tier sales organization to ensure the*
20        *company's dominant WW SRS market position. . . .  [H]e believes that ARAY will*
          *be able to grow its international business to 50% of total WW sales and will be able*
21        *to expand ARAY's backlog to over $1 billion*.

22   Ex. 19.

23        92.    On October 5, 2007, Accuray's stock price declined from an October 4, 2007 close of

24   $17.93 per share to a close of $17.35 per share or October 5, 2007.  However notwithstanding the

25   negative CIBC report, the stock continued to trade at artificially inflated prices.

26

27

28

<u>Accuray Reiterates Knowingly False FY08 Forecast; Makes Even Bolder False Backlog
Statements and Issues Disclosure that the Company Was Recognizing Revenue on International
Deals Upon Shipment</u>

93.    <u>False Statement</u>: On November 7, 2007, Accuray issued a press release announcing
its 1Q08 financial results in a press release titled "Accuray Reports Record Revenue in First Quarter
of Fiscal 2008; Fiscal First Quarter 2008 Highlights: Record Quarterly Revenue of $48.6 Million;
Backlog Reaches Record Level of $642 Million."  The press release bragged again of increased
backlog consisting of "*firm signed contracts*" and again reassured investors that the Company
believed there to be a high probability of the revenue being recognized.  The Company also
reiterated a knowingly false revenue forecast for FY08 of $250 million to $270 million for which
confidential witnesses report had no reasonable basis to the extent that it was based even in part on
reported sales and reported backlog or Hampton's unreasonable sales predictions.  The false forecast
was supported by bold, but false, statements concerning backlog and false claims of visibility going
forward:

> *The first quarter of fiscal 2008 backlog increased by $23 million from the fourth
> quarter fiscal 2007 . . . .  Accuray's backlog is composed of firm, signed contracts
> that the company believes have a substantially high probability of being recognized
> as revenue.*

*      *      *

> Based on the current business outlook, *Accuray is reiterating its fiscal 2008 revenue
> guidance of $250 million to $270 million. . . .*

Ex. 20.

94.    <u>False Statement</u>: On November 7, 2007, Accuray held a conference call with analysts
to discuss the Company's 1Q08 results.  The conference call was hosted by defendants Thomson and
McNamara during which defendants reiterated that the growth in reported backlog, revenue and
sales was evidence of even more growth to come and provided forward visibility into the Company's
revenue stream:

> In Q1, we achieved record quarterly revenues of $48.6 million, an impressive 48%
> increase year over year.  *We also grew our backlog to $642 million, one of the
> highest levels in the industry.*

> *Once again achieving another quarter of record backlog and record revenue in the
> same quarter demonstrates a continued success of our sales effort with a very good*

1
2

*indication of even more growth to come. A point of note is that this is the third consecutive quarter that we have grown both revenue and backlog to record levels.*

\*     \*     \*

3
4
5

*Based on analysis of the positive change in backlog and the revenue that we generated during the quarter, you can see that we have brought in added contract value of approximately $17 million to our backlog. This represents an increase of approximately 90% over the same period last year.*

6

\*     \*     \*

7
8

*[O]ur business model generates significant backlog, currently at $642 million which provides forward visibility into our revenue stream.*

9

\*     \*     \*

10
11

*Backlog consists of firm signed contracts for CyberKnife systems, long-term premium service contracts and minimum monthly payments associated with shared ownership systems.*

12

\*     \*     \*

13

*This year-over-year increase demonstrates the effectiveness of Accuray's growing sales force which has expanded over the past 12 months.*

14
15

*This enhanced sales team is producing qualified and robust sales leads and producing signed contracts more efficiently . . . .*

Ex. 21 at 1-2, 5-7.

16
17
18
19
20
21
22
23
24
25

95.   <u>False Statement and Partial Disclosure</u>: In addition to falsely reassuring investors that it would have enough installations to meet FY08 forecasts, the Company specifically highlighted international sales (including sales to or through international distributors) which were also included in the Company's backlog figures. According to defendants, these orders would be a significant reason why the Company's forecasts would be achieved. In fact, when one analyst focused the decline in installation figures and inquired as to how the Company planned on meeting its revenue guidance. The Company disclosed for the first time according to analysts that international sales revenue would be ***recorded upon shipment to the distributor (as opposed to the end-user) and it would be recorded even if the CyberKnife was not installed***:

26
27

**Q - Amit Hazan**: Okay. And then with regard to installations . . . because the installs have not really shown much growth, ***what can you tell us to give us confidence that you can actually grow the number of installs by what you will need to do to make '08 guidance?***

28

**A - Euan Thomson**: *I think one sign is the units that obviously have gone to the international distributors, its [sic] not that* we are not expecting them to be installed, so they are on a path to get there.  I think the other thing is that – when we map things out at the beginning of the year this is approximately what we saw.  *We go through customer by customer on a regular basis looking at where they are with their install time and where they are with construction programs that will allow us to install and we keep those very tight metrics.*

*                 *                 *

**Q - Amit Hazan**: Hi just a quick follow up.  I just want to make sure I understand in terms of the international orders that you booked as revenue but were not installed. . . .  *Do you recognize that revenue upon shipment to your distributor?*

*A - Robert McNamara: . . . If we are meant to install it then we have to install it before we recognize revenue.  If the distributor has the capability to install or we've fulfilled sort of our obligation, if you will, then we would recognize revenue.  So in some cases, we would recognize it upon shipment . . . .*

*Id.* at 10, 14.

Securities Analysts Criticize Weak Installation Figure; Wonder About the International Sales Disclosure; Repeat Reiteration of 2Q08 Forecast and Stock Price Declines.

96.     On November 8, 2007, Jefferies issued a research report on Accuray.  Unlike the negative CIBC report of November 7, 2007, the Jefferies report was positive about the Company's first quarter financial results and characterized the perceived issue pertaining to the placement of CyberKnife units as "resolved."  The report was titled "Confusion Over Unit Placements Was *Resolved* – FY108 Results Were Solid."  The report then repeated bullish representations concerning the Company's backlog and purported new order growth.  The Jefferies report also never mentioned the new disclosure that international sales were being recognized as revenue upon shipment as opposed to installation:

**Investment Summary**

*We would be buyers of ARAY.  We believe the company's fundamentals remain strong and continue to be encouraged by an expanding backlog. . . .*

*                 *                 *

- *Backlog and new orders were strong.  The company reported a strong uptake in backlog as it increased by $23MM from $619MM in FY4Q07 to $642MM in FY1Q08.  New orders in FY1Q08 totaled $71.6MM.*

- *We believe that new order growth is an important metric to follow, and ARAY recorded an impressive 95% increase in new orders YoY albeit against an easy comparable (from $36.8MM in FY1Q07 to $71.6MM in FY1Q08).*

- ***The company's new order growth demonstrates the significant demand for the CyberKnife in the radiation oncology and surgical communities.***

Ex. 23.

97.      On the same day, November 8, 2007, JPMorgan also issued a report titled "More Questions than Answers in F1Q Results." The report noted investors would be concerned about the "soft install number" but repeated comments made by defendants and expressed that it was impressed with the Company's reported backlog growth. JPMorgan increased its revenue projections for 2008, in light of management's revenue projection increase, including the expectation that reported backlog, would continue to convert into revenue:

**Revenue and earnings hit the mark, but light CK installs raise questions.** F1Q results were generally positive, with revenues of $48.6mm, +48% (+11% q/q) exceeding our $44.3mm, +35%, proj. and the Street ($45.8mm), while GAAP EPS of $0.04 met Consensus, but was a penny shy of our $0.05 proj. While results were notable for both the q/q and y/y increase, ***investors are likely to gravitate around the soft install number (5 CK systems installed, all U.S., incl. 1 shared system), as the bulk of growth came from a combination of billed but-as-yet-uninstalled international systems (6 CKs placed, but awaiting validation)***, deferred revenues (*i.e.*, legacy contracts), service contracts ($7mm, +24% q/q), and a one-time boost to Other ($2.4mm), due to custom projects in Japan. ***Needless to say, questions remain about the 6 "uninstalled yet billed" o-U.S. systems***, which management attributed to ***more flow through distributors***. In terms of other metrics, backlog ($642mm, +$23mm q/q) was again impressive, while GMs at 53.3% (-560 bps y/y) were light, due lower margin international sales.

***Revenue guidance ($250-270mm) reiterated – adj. est.***

\*       \*       \*

***F1Q08 EPS of $0.04 came in $0.01 below our estimate and in line with the Street, on better than projected revenues . . . .***

\*       \*       \*

***While management had previously guided to a sequentially flat quarter in F1Q, we (and undoubtedly, investors) were surprised to see only five new CyberKnife systems installed during the quarter*** (versus our projection of twelve), all of which were in the United States.

***Despite that, overall revenues managed to beat expectations, as the company also recognized revenues from an additional six CyberKnife systems, which were sold (but not yet installed) through international distributors . . . .***

[M]anagement clarified ***that certain international distributors are qualified to perform CyberKnife installations and, in those cases, Accuray will ship systems directly to a hospital for distributor installation***. For these systems (of which there were apparently six in the quarter), ***Accuray recognizes revenue on delivery and not on system activation.***

*     *     *

> *Reported total backlog of $642 million was up from $619 million in F4Q07 (+47% increase versus F1Q07) . . . . With $48.6 million in revenues booked in the quarter, this backlog number yields a new contract value of ~$71.8 million, which we believe is a tracking metric management will continue to point to in the future.*

Ex. 24.

98. On November 8, 2007, CIBC issued a report noting that the Company's sales appeared to be declining sequentially, from 18 united in 3Q07 to 15 units in 4Q07. CIBC also noted the Company's reported backlog figures continued to grow without the Company providing a detailed explanation of whether it was "new orders" that made up the growth. Finally CIBC noted that it was the first time that defendants disclosed the revenue recognition upon shipment to international distributors:

**Fiscal 1Q Analysis; Weak Installs Calls FY08 Sales Guidance Into Question**

*     *     *

Accuray's total cumulative worldwide installed base is now 114 units, up from 109 last quarter and 82 in September 2006. *Only five units were installed in 1Q08, all in the U.S., but ARAY said that it recognized revenue for another six units outside the U.S. that were sold through distributors* who take responsibility for installing the units (these units are not yet installed).

Apparently half of Accuray's O-U.S. distributors have the capability to perform the installation, which would allow the company to recognize revenue immediately upon shipping the unit (as opposed to the more customary revenue recognition upon installation). *This may be perfectly legitimate, but we do point out that this is the first time we have come across this issue for ARAY (despite O-U.S. unit installations every prior quarter). . . .*

Ex. 22.

CWs Report Accuray Recognized Revenue on Warehoused International Shipments and Uninstalled Systems Including Chinese and Asian Customers

99. In addition to the disclosure that the Company was recognizing revenue on shipments to distributors, as opposed to on installation or delivery to the end user's site, as stated in the Registration statement, multiple CWs describe pressure to ship products at the close of a quarter, which provides further evidence that the Company was recognizing revenue on shipment to international distributors (which the Company ultimately admitted), not upon installation or delivery to the end-user as the Company represented in the Registration Statement and would later admit.

1      (a)     CW5 reported hearing that during the Class Period as many as seven systems

2    that were shipped to President International China that never cleared Chinese customs and ended up

3    "in a warehouse" where s/he believes they remain today.  CW5 believed the customer's purchase

4    was "premature" because Accuray did not have authorization at that time to import systems into

5    China, were there any identified end-users for the systems;

6      (b)     CW7, a former Accuray Regulatory Affairs Compliance Associate, reported

7    that Accuray sometimes shipped systems to its Asian customers or distributors, and recognized

8    revenue well in advance of when those systems were actually installed at a customer's facility and

9    these systems ended up "sitting" for upwards of eight months before they were actually installed.

10   S/he knew that at least a couple systems had sat for "so long" at an Asian distributor's warehouse

11   that when it was finally time for them to be installed, the systems required a software upgrade since

12   the software that had been shipped with the systems had become outdated.  CW10 also reported that

13   Accuray shipped finished CyberKnife systems to warehouses far in advance of when the customer's

14   site would be ready.  S/he stated that this was particularly the case with international orders sold

15   through distributors.

16     (c)     CW6 reported that despite tremendous pressure to get systems shipped by

17   quarter-end, some systems ended up sitting in "the warehouse" for six months to a year from when

18   they had supposedly been shipped to the customer.  CW6 also reported that in the period

19   immediately ***prior to Accuray's public offering***, there was a great deal of pressure to ship 13 to 14

20   systems to China. CW6 recalled going to the Company's warehouse in Milpitas approximately eight

21   months later and seeing two of the systems "sitting in the warehouse."  S/he recalled saying to

22   her/himself, "hey that's China," meaning s/he remembered they were the systems that were supposed

23   to have shipped months prior.  CW6 said s/he saw systems intended for Japan in the Milpitas

24   warehouse long after they had supposedly been shipped to the customers from the Sunnyvale

25   facility.  CW6 stated that the Company recognized revenue on systems as soon as they shipped from

26   Accuray.  CW6 noted that systems for Asian customers were shipped by ocean vessel and took two

27   to three months crossing the Pacific Ocean.

28

100.     Defendants' statements concerning the reported backlog figure of $642 million – and that statement concerning the composition of the Company's backlog and that it consisted of "firm signed contracts" – was false and misleading.  As discussed in detail in ¶¶68-73, defendants knew but failed to disclose that the backlog representations were false and misleading and reported backlog grossly inflated with deals that had no real likelihood of ever resulting in a CyberKnife install.

101.     After the 1Q08 revenue and earnings report disclosing international deals were being recognized up front and calling into question FY08 forecasts (although reiterated specifically by defendants), the Company's stock price declined from $19.02 on November 7, 2007 to $17.00 on November 9, 2007 on $1.7 million shares traded on November 9 (as compared to 823,000 shares on November 7).  The stock price continued to decline to $15.30 by November 15, 2007.

102.     The reiteration of the FY08 forecast was also knowingly false and misleading.  As discussed in detail at ¶88, the Company's forecast had no connection to the number of CyberKnife systems its sales staff anticipated selling.  Its backlog figure, which it told investors was an accurate way of measuring future performance, was also materially false and misleading, a fact that multiple CWs stated the defendants were aware of.

103.     <u>False Statement:</u> On November 13, 2007, Accuray filed its Form 10-Q for 2Q08 for the period ended September 29, 2007 with the SEC and reiterated the Company's financial results reported in Accuray's November 7, 2007 press release and conference call.  The Form 10-Q also included language regarding the contingencies in deals contained in backlog:

> Beginning with the quarter ended March 31, 2007, we revised our definition of backlog to consist of the sum of deferred revenue, future payments that our customers are ***contractually committed to make*** and signed contingent contracts that we believe have a substantially high probability of being booked as revenue from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with our shared ownership programs.  We adopted this new definition of backlog in part because of the changes in our customer contracting process under which customers initially enter into a terms agreement setting forth the business and economic terms for purchase of a CyberKnife system and then have a specified time frame in which to negotiate legal terms.  ***Contingencies associated with contingent contracts that are included within backlog may include final negotiation and agreement upon our legal terms for the purchase or acquisition of the CyberKnife system, state or local government approval of a certificate of need for the installation of a radiosurgery system, approval by the board of directors of the hospital or other purchaser of the system and***

*establishment of financing and legal entities by purchasers of systems.* We review, on a quarterly basis with respect to each contingent contract included in backlog, whether customer engagement and *progress toward satisfaction of contingencies warrant continued inclusion of the contract within backlog*. We previously defined backlog as the sum of the deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received.

Ex. 25 at 22-23.

104.     Reasons Why the Statement in ¶103 Is False and Misleading and Defendants Knew It: For all the reasons set forth above at ¶¶68-73, defendants knew but failed to disclose the true facts concerning the Company's backlog.  In particular, when defendants claimed to review contingencies to determine whether or not they had been satisfied and whether the deals warrant continued inclusion in the Company's reported backlog, they still failed to disclose that contingencies were self-satisfying.

Accuray Announces 2Q08 Results – Misses Sales Revenue and Earnings Expectations, Removes $34 Million from Backlog and Reduces 2008 Forecast by Up to $60 Million – Stock Price Collapses

105.     On January 30, 2008, Accuray issued a press release announcing its 2Q08 financial results in a press release titled "Accuray Reports Continued Growth in Second Quarter of Fiscal 2008; Fourth Consecutive Quarter of Record Revenue and Backlog."  The Company reported revenues of $52 million, well below Wall Street analyst expectations of $58 million.  The Company also reported EPS of $0.04, as compared to Wall Street expectations of $0.09.  While reporting that its backlog grew to $660 million, the Company reported the removal of roughly $34 million of contracts previously included in backlog and reduced its FY08 revenue forecast by $60 million.  The Company nevertheless continued to make false representations about its backlog, including its quality, contents and likelihood of resulting in future revenues.  Finally, the Company falsely stated that the reason for the withdrawal of millions from backlog was associated with the tightening credit markets as opposed to the truth, that backlog was full of deals with no real likelihood of ever resulting in a system install:

> For the second quarter of fiscal 2008, Accuray reported total revenue of $52.0 million, a 98 percent increase over second quarter fiscal 2007 total revenue of $26.3 million.
>
> Net income for the quarter ended December 29, 2007 was $2.3 million, or $0.04 per diluted share, compared to a loss of $7.3 million, or a loss of $0.45 per share . . . .

\*       \*       \*

> *For the period ended December 29, 2007, backlog increased to approximately $660 million, with approximately $365 million associated with CyberKnife(R) Robotic Radiosurgery System contracts . . . .*
>
> *Accuray's backlog is composed of firm, signed contracts that the company believes have a substantially high probability of being recognized as revenue.*

\*       \*       \*

> *"While this was a positive quarter with respect to revenue and backlog growth, . . ."*
>
> Based upon current economic conditions, specifically the tightening of credit markets in the United States, *Accuray is adjusting revenue guidance for fiscal 2008 to be in the range of $210 million to $230 million, which would represent revenue growth of 50 percent to 64 percent over fiscal 2007.*

Ex. 26.

106.   On the same day, the Company held a conference call to discuss the Company's 2Q08 results.  The call was hosted by defendants Thomson and McNamara.  Defendant Thomson falsely blamed the U.S. credit market (as opposed to suspect sales practices or the calculation and make-up of the backlog) for the reduction in FY08 forecasts: "[W]e believe the near-term tightening of the credit markets in the United States has led us to modify our full year revenue guidance." Ex. 27 at 3. Defendant McNamara also stated that "contracts most affected by the tightening economy were removed" from backlog and that those "customers were generally those whose financing is now delayed or in question."  *Id.* at 6.  According to McNamara, approximately $30 million of orders were removed from backlog and "[p]retty much" all of those backlog customers were U.S. freestanding centers, the very same customers the Company previously reported were responsible for the big leap in new sales contracts and increases in reported backlog:

> As Bob will explain in a minute, *this increase in backlog also occurred at a time when the changing financial environment resulted in us removing several purchased contracts from backlog*. . . .

\*       \*       \*

> *While we have continued to grow our revenue, net income and backlog, we now feel it's sensible to adjust our expectations for the remainder of the year.*  At the start of this fiscal year, we stated revenue guidance of between $250 million and $270 million for fiscal year 2007. . . . *Today, however, we are adjusting the revenue guidance for FY 2008 to $210 million to $230 million . . . .*

> *The primary reason for this change is that those customers requiring credit to finance either their equipment purchase or the construction of their facility, are having greater than expected challenges. As a result, some of our U.S. customers who had committed to installation timetables have slowed their installation plans. This inevitably has affected our revenue forecast for the year.*
>
> \*        \*        \*
>
> *This quarter we felt it sensible to remove a number of contracts [$30 million] from backlog in order to give our investors greater visibility into the potential effect of this market adjustment. . . .*

*Id.* at 4-5.

107.    On January 30, 2008, Oppenheimer issued a report titled "From Bad to Worse; Lowering PT and Reiterate Underperform." The report discussed the Company's revenue and earnings miss, the FY08 $60 million forecast reduction, sales and revenue recorded on shipment to distributors in China and the slash to the Company's reported backlog and that another $34 million of backlog had been removed:

> *ARAY has just put up what we consider the weakest, most confusing and most concerning quarterly results since its IPO one year ago. Both revenue and EPS missed consensus, and FY08 guidance was lowered materially. But our biggest concerns came from backlog (which was revised lower) . . . .*
>
> •    **A New Issue Emerges.** *ARAY now says the credit markets are hurting their customers' ability to get financing, which has delayed some installations and also eliminated about 7-10 contracts that were in their backlog. We checked with ARAY's competitors last night and no one seems to be having the same issue . . . .*
>
> \*        \*        \*
>
> •    **Sales and EPS Missed by a Long Shot.** *Sales of $52.0M missed both our $54.5M estimate and Street's $58.2M.* Revenue generating installs (18) were again an issue with at least 4 legacy units (no cash flow impact) and as many as 8 units going to OUS distributors (not yet installed). *EPS of $0.04 also missed us at $0.07 and Street at $0.09 . . . .*
>
> •    FY08 sales guidance was decreased from $250M - $270M to $210M - $230M, far below the Street's $264.8M and our $257.3M estimates. . . .

Ex. 28.

108.    In addition, the January 30, 2008 Oppenheimer report disclosed that the Company's sales to China through distributors were (i) being recognized as revenue upon shipment to the distributor as opposed to shipment to the end-user or shipment to the end-user by the distributor, as the Company had indicated in its Registration Statement (*see id.*; ¶55); and (ii) the shipments to

distributors which the Company was recognizing as revenue up front, were likely sales to Accuray

partners with a vested interest in the Company's reported financial results, as opposed to hospitals

with a real current need for the CyberKnife.  Analysts also noted that none of Accuray's competitors

had mentioned anything about tightening credit markets or financing issues:

> *All six O-U.S. installations were units sold through a distributor into China and already recognized as revenue last quarter.  Separately, the company indicated that there were 18 "revenue-generating" units impacting sales in 2Q, with 10 units in the U.S., one in Europe, and seven in Asia.  Based on our analysis of this data, we determine that only six installed units were recognized as revenue in the quarter. The remainder of the "revenue-generating" units were comprised of four Legacy units in the U.S., one distributor sale in Europe, and another seven units sold through its distributor into China.  Based on our checks, we have identified this distributor as potentially being "Signum US Healthcare, Inc.", a portfolio company of a U.S. private equity firm, Tivis Healthcare, LLC.  Signum is currently involved in a joint venture to develop CyberKnife projects with Accuray.  It is very hard for us to gauge the seriousness with which we should take these unit orders into China.*

*       *       *

> *For fiscal 2008, ARAY reduced its revenue guidance to $210 million to $230 million, considerably lower than its prior guidance of $250 million to $270 million and Street expectation of $265 million. . . .  Roughly $34 million in backlog (~7-10 units) were taken out due to anticipated financing risk and/or installation push-back from certain customers, particularly free-standing customers with "questionable" credit worthiness.  The company provided little granularity and congruency as far as the methodology by which it determined the backlog reduction.*

> *Again, this raises additional concern for us as based on our discussions with ARAY's competitors, we have not found such credit/financing issues to be a problem at all. . . .  Net/net, this downward adjustment of backlog truly calls into question the reliability of ARAY's backlog on a go-forward basis, and thus into sales and EPS expectations. . . .*

Ex. 28.

109.     On January 31, 2008, a *Bloomberg* article titled "Accuray Plunges as Forecast Misses

Expectations" stated, in pertinent part, as follows:

> Accuray Inc., maker of the CyberKnife system for radiation surgery, *lost a third of its value in Nasdaq composite trading after the company forecast lower fiscal 2008 sales than analysts expected.*

> *The shares dropped $5.44, or 36 percent, to $9.54 – the most ever and the second-biggest percentage loss in U.S. trading. . . .*

Ex. 31.

110.    On January 31, 2008, JPMorgan issued a report titled "Backlog Issues Surface Again; Lowering Estimates."  The JPMorgan report discussed the Company's revenue and earnings miss and backlog reduction making a specific note of the fact that the Company had reiterated (falsely) its FY08 revenue forecasts as late as November 2007.  Finally, the JPMorgan report noted that the revenue forecast reductions were directly tied to the risky adoption of lenient backlog standards.  Of course, the Company had previously and fraudulently tried the increase in reported backlog to "excellent" forward looking visibility into the Company's revenue and earnings forecasts:

**Backlog Issues Surface Again; Lowering Estimates**

***With disappointing F2Q results, lowered guidance (which is down 15% at the midpoint), and generally low visibility, shares are likely to once again come under pressure tomorrow, in what has become an all too familiar pattern.  In explaining the lowered fiscal 2008 expectations, management cited a tightening U.S. credit market, which is driving purchase and installation delays, and accordingly, the company has now removed ~$30mm (7-8 systems) from backlog, and $40mm from guidance. . . .***

**Revenue and EPS both miss.**  ***F2Q revs of $52.0mm came in below both our $54.9mm proj. and the Street ($58.2mm), with the shortfall due primarily to lower than expected CyberKnife installs. . . .***

\*          \*          \*

**Top-line guidance reduced by $40M – lowering est.**  ***After reiterating revenue guidance in F1Q (on 11/8), management significantly reduced the 2008 outlook . . . .  Specifically, ARAY lowered the FY08 outlook from $250-270mm to $210-230mm . . . .***

\*          \*          \*

**Bracing for another sell-off**

As we have stated in prior notes, ***installation and revenue visibility have been chief concerns since Accuray first re-stated backlog in F3Q07 (May 2007) to include contracts with contingencies.***  While we have previously given the company some benefit of the doubt with regards to projections, the disappointing F2Q results, and accompanying reduction to guidance, ***clearly show the risks in adopting more lenient backlog standards****. . . .*

Ex. 29.

111.    On January 31, 2008, even Jefferies which had been bullish on the Company's reported backlog figures and cheering the Company's FY08 outlook, also issued a report regarding the Company's disappointing results:

**Event**

ARAY reported FY2Q revenue and GAAP EPS of $52.0MM and $0.04 vs. FC consensus of $58.2MM and $0.09. The company reduced FY08 guidance from $250MM-$270MM by $40MM to $210MM-$230MM and eliminated $30MM from its backlog.

**Key Points**

- ***FY1Q08 results were light. Accuray reported disappointing FY2Q revenue of $52.0MM, lower than our estimate of $63.2MM, and GAAP EPS of $0.04 versus our estimate of $0.13. FC Consensus was $58.2MM and $0.09. . . .***

- **Backlog expanded despite a $30MM reduction.** The company reported an increase in backlog of $18.0MM from $642.0MM in FY1Q07 to $660.0MM in FY2Q08. Management reported that new orders in FY2Q08 exceeded $100.0MM as 22 CyberKnife systems were ordered in the quarter. Management noted that in FY2Q free standing radiation oncology centers who had placed orders began to experience changes in their ability to finance (due to adverse changes in the credit market). ***ARAY was no longer 90%-plus certain that these LOIs or contracts would lead to installations and therefore made a ~30MM reduction in contingent backlog due to these financing issues.***

- ***Backlog adjustments need to be monitored.*** Management reduced its backlog by ~5% to $660MM eliminating some of the contingent backlog associated with free standing centers. Despite this reduction, we would highlight that the backlog number is still impressive . . . .

*       *       *

***Backlog reduction is concerning. We believe that ARAY's $30MM reduction in backlog will be an issue for investors, as it does not provide confidence that another reduction will not occur in future quarters (especially with recessionary trends continuing). We have not been aware of other players in the radiation oncology industry*** (ie Varian (VAR, $53.04, Hold) and TomoTherapy (TOMO, $13.85, NC)) ***experiencing the same issues with customers losing financing options and limiting their ability to fund a $3MM-$4MM purchase. We believe this disconnect comes from ARAY's inclusion of contingent backlog in their total backlog number. . . .*** We are encouraged that ARAY is moderating its contingent backlog and providing a better backlog number for investors, ***but we are concerned that backlog reductions could occur again***.

*       *       *

***Cutback in revenue guidance is disappointing. Management reduced FY08 top-line guidance by $40MM, from $250MM-$270MM to $230MM-$210MM, due to the financing issues experienced by free standing centers and the realization that some installations will be pushed out into 2HCY08.***

*       *       *

**Revising estimates.** We are lowering our FY08 revenue estimate from $273.7MM to $230.0MM and reducing our FY08 F/T Cash EPS estimate from $0.81 to $0.53.

1    We are reducing our CY08 revenue estimate from $310.2MM to $$287.0MM and
     also reducing our CY08 F/T Cash EPS estimate from $1.10 to $0.75. . . .

2

3    Ex. 30.

     112.    In response to the January 30, 2008 disclosures, and the analyst reports following,

4

5    that Accuray's profit and revenue had badly missed forecasted financial results, that millions of

6    dollars of customer orders were again removed from backlog and the $60 million reduction of

7    forward revenue forecasts, Accuray shares plummeted from a close of $14.98 per share on January

8    30, 2008 to a close of $9.52 per share (a decline of more than 36%), on more than 10 million shares

     traded.

9
     Defendants Continue to Misrepresent Backlog But Disclose Serial and Significant Backlog
10   Reductions

11   113.    On April 29, 2008, Accuray announced its 3Q08 financial results for the period ended

12   March 29, 2008 in a press release titled "Accuray Reports Record Revenue in Third Quarter of

13   Fiscal 2008; Fourth Consecutive Quarter of Profitability":

14        For the nine months ended March 29, 2008, total revenue was $159.4 million, a 65
          percent increase over the $96.5 million in total revenue during the same period last
15        year.  Net income for the first nine months of fiscal 2008 was $5.2 million, or $0.09
          per diluted share, compared to a loss of $6.1 million, or a loss of $0.26 per share, for
16        the first nine months of fiscal 2007.

17   Ex. 32.

18   114.    That same day, Accuray held a conference call with investors and analysts and

19   reiterated the Company's financial results and disclosed that Accuray eliminated an additional *$58

20   million from backlog*.  The Company conceded that it had apparently been focusing – too heavily –

21   on free-standing centers (discussed by CWs above) as opposed to hospitals to sell its CyberKnife and

22   had in the last quarter removed some of them from backlog because the Company had less

23   confidence that they would turn into installation.

24        During this fiscal year, proposed regulatory changes in the general economy and
          credit environment have placed more pressure on the business plans at these free-
25        standing centers.  As a consequence, we have experienced some slow-down in
          planned revenue from this market segment.
26
          Last quarter, *we reported that some orders had been canceled and that we had
27        removed others from backlog simply because we now have less confidence that
          certain customers would take delivery of a CyberKnife system in a timely manner.*

28

1     ***To reiterate, this change in the environment predominately impacted one segment of our U.S. market.***  There has been no ***significant impact on our hospital-based***

2     ***customers in the U.S. or in our international business.***

3     *See* Ex. 33 at 4.

4          115.   <u>False Statement and Partial Disclosure</u>: During the same call, on April 29, 2008, the

5     Company stated that its sales force, was focusing on hospital-based customers as opposed to

6     focusing on free-standing customers.  In addition, the Company boasted of growth in its international

7     business citing to six new orders.  However, the Company failed to disclose that it did not receive

8     deposits for the international orders – in stark contrast to what it told investors beginning with the

9     IPO – "***We typically receive a deposit at the time the CyberKnife system purchase contract is***

10    ***executed*** . . . ." *See* Ex. 1 at 42.  Further, the Company particularly noted that its backlog definition

11    had remained the same but it was removing some contracts in order to give investors an "accurate

12    picture of business trends."  Nevertheless, backlog had increased year over year but declined

13    sequentially from 2Q08:

14         ***U.S. sales force is now focused predominately on hospital-based customers and on customers who are less impacted by the regulatory and economic challenges. . . .***

15

16         ***Looking outside of the U.S., I'm pleased to report that six of the 16 orders received during Q3 were from international customers.  This represents continued growth in our international business. . . .***

17

18         ***Again, the issues I've just described regarding free-standing centers do not apply internationally since a vast majority of CyberKnife sales made outside of the U.S. are to hospitals.***

19

20         In peril to new order generation, we did continue to reevaluate our backlog in the ways I've just described.  ***As a result, we once again removed certain contracts and backlog to ensure that we continue to give investors an accurate picture of business trends. . . .***

21

22         However, in summary, we generated substantial new backlog, ***but also removed certain pre-list included contracts from backlog as a result of some cancellations and some unfavorable changes in our perspective of the likelihood of revenue resulting from the contracts***.

23

24                  \*      \*      \*

25

26         ***Accuray has taken the appropriate steps to refocus its sales strategy and sales activity.  Our sales pipeline is strong, and sales performance in Q3 was solid.  Of particular note is the continued growth of our international business.***

27                  \*      \*      \*

28

*Let me start by saying that our definition of backlog has remained the same and that backlog includes signed contracts that the company believes have a high probability of being recognized as revenue in the future.*

\* \* \*

*Backlog at the end of the third quarter of fiscal 2008 was $602 million, up from the same period last year, but down sequentially from the previous quarter's balance of $660 million.*

*Aside from revenue coming out of backlog, the sequential decrease of $58 million is a net result of cancellations of existing contracts of approximately $54 million, combined with unfavorable contract movements out of backlog based on our specific assessment.*

\* \* \*

Of the ending total backlog of $602 million, approximately 64%, or $386 million, is non-contingent backlog, in that the contingencies to which the contracts are subject have been satisfied.  This reflects an increase of $14 million over the last quarter and represents a movement of $86 million from contingent to non-contingent during the quarter.

*The remaining 36%, or $216 million, of backlog is contingent backlog which may include standard contingencies such as board approval or certificates of need.  Of this contingent segment, about two-thirds represents hospitals and roughly one-third consists of contracts that are associated with entrepreneurial free-standing sites which includes physicians or physician groups that are embarking on their first equity venture without an existing hospital relationship.*

*It is also important to note that not all contracts signed this quarter are included in backlog.*  Every order that is received is reviewed to assess the magnitude of the contingencies and, if they are deemed significant, then the order is excluded from the ending backlog . . . .

Ex. 33 at 4, 6, 8-9.

116.    During the question and answer session, the Company reiterated false and misleading statements concerning its backlog:

**Analyst**

*Relative to the $54 million of contracts that you removed from backlog, when you guys described your backlog assumptions back in the fiscal second quarter, I guess the question becomes why didn't you remove this $54 million of contracts back then . . . ?*

**Bob McNamara – Accuray Incorporated SVP, CEO**  Well, first of all, let me just say the cancellations occurred for several reasons, mostly due to the concerns around the *uncertainty relating to regulatory changes, underwriting arrangements with hospitals*.

\* \* \*

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- 65 -

**Analyst –**

So, on the backlog, first, thank you very much for providing more information because I think that's going to be helpful for us and for investors.

Are you going to restate or provide the details going back farther given how long the window is from order to install? . . .

**Bob McNamara** – [T]he way to think about this – because *I think what you're really asking what's the risk profile of this backlog?  And the way to think about it is the non-contingent, very, very low, low risk. . . .*

*If you focus on the contingent piece, you know that we've actually pulled out a lot of the contracts out of here based on this quarter's assessment.  And when we do that, we look at each contract and we say, "Okay.  What is the demonstrated progress towards contingency resolution, and what milestones have they achieved?"  So, we've really scraped this.*

**Euan Thompson** – *Accuray Incorporated – President, CEO*

[W]e have such a low fall-out rate from our non-contingent backlog that it really should reinforce your ability to build the model.

**Eric Schneider** – *UBS – Analyst –* And on the new orders, do those almost all go into the contingent bucket of that backlog? When we calculate the changes second to third quarter and look at the new orders, it looks like about $69 million of those $77 million of new orders is now in the contingent bucket of backlog.  Is that right, or did I mess up the math?

*        *        *

**Euan Thompson** – *And it's rare, I would say, for the dollar value of orders to go straight into non-contingent backlog.  The exception to that, I think, would be international orders where we, I think – what number was it – five systems from international customers that went straight into non-contingent this quarter.*

*Id.* at 15, 18-19.

117.    On April 29, 2008, Oppenheimer issued a report titled "'Stuff Happens' Again in Q3; Reiterate Underperform."  The report described the Company's $54 million reduction in backlog as yet another sign of Company-specific problems at Accuray, and the Company's attempt to obscure order figures for the quarter:

**Summary**:  3Q was another absolute mess, with another (more significant) *backlog revision, the lowest level of new orders in six quarters (down 35% y/y), and another weak unit installation number* (only 8 installs) that has us scratching our heads wondering why the rate of unit installs has been so dismal.  Add to that a steadily declining gross margin (EPS est were missed again) and there is *plenty of reason to believe more downside to this stock is coming*. . . .

•    **Backlog is Vanishing into Thin Air.** *ARAY blamed regulatory uncertainty and customer financing difficulties at free standing clinics for another*

***revision to backlog, which eliminated $54M in contracts.  For those keeping score, that's $88M in backlog revisions in just the past two quarters.*** We now estimate LTM new orders (less this $88M) are down over 30% y/y. ***Simply put, we think the business is in trouble. Mgmt now says 64% of backlog is non-contingent orders, but we view this backlog as largely irrelevant at this point, and expect more revisions to come.***

- **Weak Orders Hidden by More Complication.** ARAY said it posted WW system orders of $76.6M (16 systems), but now makes ***a new claim that "not all of these orders went into reported backlog***."

*       *       *

**New Orders Lose Even More Value**

Management said that there were $76.6 million in new orders in the quarter (-5% y/y), which comes out to 16 units, six of which were international.  However, there was a new twist to this number - as management now says that ***not all new orders they are reporting will go into "reported" backlog.  This is not only new, but notably disturbing considering the continued revision of orders that actually made it into backlog and increasing confusion surrounding this topic....***

Ex. 34.

118.    After the 3Q08 financial report and conference calls, Accuray stock price declined from $8.09 to $7.83 on April 29, 2008 and increased to $8.56 on May 1, 2008.  By May 5, 2008 and for the remainder of May, the Company's stock price traded well above $9.00 per share.

<u>Accuray Announces Revenue and Earnings Miss of Wall Street Estimates Again, Removes Another $39 Million in Backlog</u>

119.    On August 19, 2008, the Company issued its 4Q08 financial results in a press release. The Company's financial results missed Wall Street revenue and earnings expectations. Nevertheless, the Company boasted of a backlog increase also indicating that now its non contingent backlog consisted of 71% of all backlog and that all of the contingencies associated with that non-contingent backlog had been satisfied:

28 New Contracts Valued at $115.5 Million Signed in Fourth Quarter

SUNNYVALE, Calif., August 19, 2008 – Accuray Incorporated (Nasdaq: ARAY), a global leader in the field of radiosurgery, announced today financial results for the fourth quarter and fiscal year ended June 28, 2008.

For the fourth quarter of fiscal 2008, Accuray reported total revenue of $50.9 million, a 16 percent increase over fourth quarter of fiscal 2007 total revenue of $44.0 million.  For the fiscal year ended June 28, 2008, total revenue was $210.4 million, a 50 percent increase over the $140.5 million in total revenue for the fiscal year ended June 30, 2007.

> Net income for the fourth quarter of fiscal 2008 was $191,000, or breakeven on a per diluted share basis, compared to net income of $502,000, or $0.01 per diluted share, in the fourth quarter of fiscal 2007.  Net income for fiscal year 2008 was $5.4 million, or $0.09 per diluted share, compared to a net loss of $5.6 million, or $0.18 per diluted share, for the fiscal year 2007.
>
> Non-cash, stock based compensation charges for the fourth quarter of fiscal 2008 were $4.1 million, or $0.07 per diluted share.  For the full fiscal year 2008, non-cash stock-based compensation charges were $16.9 million, or $0.28 per diluted share.
>
> During the fourth quarter of fiscal 2008, the company signed 28 new contracts with a value of $115.5 million which were entered into backlog.  Of the 28 contracts, 17 came from international customers.
>
> At June 28, 2008, backlog was approximately $647 million, with approximately $359 million associated with CyberKnife(R) Robotic Radiosurgery System contracts and approximately $288 million associated with services and other recurring revenue. Accuray's backlog is composed of signed contracts that the company believes have a substantially high probability of being recognized as revenue in future periods.  Of the $647 million in backlog at fiscal year end, 71 percent consisted of non-contingent contracts, representing backlog for which contractual contingencies have been satisfied.

Ex. 36.

120.   That same day, Accuray held a conference call with analysts and investors and reiterated the financial results in the August 19, 2008 press release.  The call was hosted by defendants Thomson and McNamara who revealed that Accuray *removed another $39 million from backlog*.  Thus, Accuray removed approximately *$127 million in backlog during the most recent three quarters of FY08*:

> We had an extremely successful quarter for new orders.  In total, 28 new contracts are added to backlog in the quarter, representing a total value of $115.5 million.  *At the end of fiscal 2008, our total backlog was $647 million.  New orders contributed $68 million directly to non-contingent backlog, and importantly, the proportion of non-contingent backlog increased to 71% of the total or $460 million.*
>
> *                    *                    *
>
> Specifically the entrepreneurial was challenged by proposed regulatory changes, the general economy and the credit environment.
>
> During fiscal 2008 we believe we have made significant progress in actively addressing this situation, *by refocusing our sales professionals on more established healthcare providers, particularly hospitals.  We've also carefully examined our backlog each quarter and have removed any contracts that no longer meet our criteria for inclusion.*
>
> *                    *                    *

Of the 28 new contracts entered into backlog during the quarter, 17 were international contracts.

\* \* \*

*Of the 28 orders that went into backlog for the fourth quarter, 18 of these, or 64% went directly into non-contingent backlog, which represents $68 million. In addition, approximately $50 million moved from contingent backlog into non-contingent backlog. In total, $118 million flowed into the non-contingent backlog this quarter.*

*Finally, we did have eight orders which we adjusted out of contingent backlog, either because we received notification from the customer that the order was cancelled or our confidence level decreased to a level where future revenue recognition is currently in question. Of these eight orders, all were within the contingent category. The total value of these adjustments was approximately $39 million, again, all of these adjustments came out of contingent backlog and are reflected in the balance shown on the chart.*

Ex. 37 at 2-3, 11.

121. On August 20, 2008 Oppenheimer issued a report titled "Talking Big, Delivering Nothing" commenting on the Company's 4Q08 revenue and earnings results and specifically highlighting that the Company had removed yet another $39 million from its backlog:

Here are the facts: *sales and EPS missed Street once again*, new orders were down y/y for the third straight quarter, backlog was "materially" revised downward for the third straight quarter, and actual unit installations were down for the second consecutive year in the U.S. (and flat WW for the past three years). . . .

*ARAY eliminated another $39M from backlog due to customer cancellations and other doubtful "stuff", and so about $127M has now been removed from backlog in the past three quarters. We view backlog as largely irrelevant at this point (expecting more revisions to come)*, and would focus attention on installations instead.

Only six units were installed (vs our 12 est). . . .

Ex. 38.

122. On August 20, 2008, in response to the disclosures of elimination of orders from backlog, shares of Accuray declined from a close of $7.57 per share on August 19, 2008 to a low of $6.90 per share (or almost 9%), and eventually closed at $7.71 per share on extremely high volume.

<u>Accuray Terminates Its Chief Financial Officer McNamara and Its General Counsel Mitchell; Delays Quarterly Results Due to Internal Review</u>

123. On September 12, 2008, Jefferies issued a report discussing the abrupt departure of the Company's CFO Robert McNamara and its General Counsel Christopher Mitchell:

**CFO Resigns; 10-K Review Holds No Big Surprises**

We believe in the innate technology value of the CyberKnife system and that accelerating clinical interest and utilization trends will eventually be driven by clinical data. ***But, legitimate concerns surrounding backlog validity, decelerating new order growth.***

\*　　　\*　　　\*

**Key Points**

- Mr. McNamara has decided to step down from his position as CFO to pursue other interests. ***Since the company's successful IPO in February 2007, ARAY has experienced significant pressure. The re-definition of back log, restatement of COGS, backlog revisions, and guidance reductions have all contributed to the depreciation of the stock price along with the challenges of procuring new order growth and meeting top line expectations.***

Ex. 39.

124.   On October 28, 2008 the Company filed a Form 8-K with the SEC announcing the terminations of defendant McNamara and Mitchell, the Company's Senior Vice President and General Counsel.  Ex. 40.

125.   On October 29, 2008, the Company issued a press release announcing that it would be delaying the disclosure of its FY08 revenue and earnings results because of possible inventory accounting errors.  The Company also reiterated its backlog definition and the confidence that most of its backlog figures are non-contingent – *i.e.*, contingencies have been satisfied:

**SUNNYVALE, Calif., October 29, 2008** – Accuray Incorporated (Nasdaq: ARAY), a global leader in the field of radiosurgery, announced today that it is rescheduling the earnings release call to November 6, 2008 when Accuray will release its full financial results for the first quarter of fiscal 2009, ended September 27, 2008. While the majority of financial information is available at this time, certain aspects of Accuray's quarterly reporting have not yet been completed.

\*　　　\*　　　\*

For the first quarter of fiscal 2009, Accuray reported total revenue of approximately $55.9 million, a 15 percent increase over first quarter of fiscal 2008 total revenue of $48.6 million and a 10 percent sequential increase over the fourth quarter of fiscal 2008 total revenue of $50.9 million.

During the first quarter of fiscal 2009, the company added 12 new contracts to backlog, representing a total value of $58.6 million.  Of the 12 contracts, ***7 came from international customers***.

At September 27, 2008, backlog was approximately $644 million, with approximately $358 million associated with CyberKnife® Robotic Radiosurgery System contracts and approximately $286 million associated with services and other

recurring revenue. ***Accuray's backlog is composed of signed contracts that the company believes have a substantially high probability of being recognized as revenue in future periods***. Of the $644 million in backlog at the end of the quarter, 70 percent consisted of non-contingent contracts, ***representing backlog for which contractual contingencies have been satisfied***.

Ex. 41.

<u>Accuray Admits Lack of Adequate Internal Controls and Inventory Overstatement</u>

126.     On December 18, 2008, the Company announced its delayed 1Q09 results including the results of its internal investigation regarding accounting for obsolete inventory:

**Accuray Announces Results for First Quarter of Fiscal 2009**

*Inventory Investigation Concluded*

**SUNNYVALE, Calif., December 18, 2008** – Accuray Incorporated (Nasdaq: ARAY), a global leader in the field of radiosurgery, announced today financial results for the first quarter of fiscal 2009, ended September 27, 2008.

For the first quarter of fiscal 2009, Accuray reported total revenue of $55.9 million, a 15 percent increase over first quarter of fiscal 2008 total revenue of $48.6 million and a 10 percent sequential increase over the fourth quarter of fiscal 2008 total revenue of $50.9 million.

Net loss for the first quarter of fiscal 2009 was $3.2 million, or $0.06 per diluted share, compared to net income of $2.3 million, or $0.04 per diluted share, during the same period last year. ***The loss for the quarter was driven primarily by non-recurring employee separation expenses of $2.1 million and inventory write downs of $1.3 million.***

Non-cash, stock based compensation charges for the first quarter of fiscal 2009 were $5.0 million, or $0.09 per diluted share.

                              *          *          *

***Accuray's Audit Committee concluded its independent investigation into allegations made by a former Accuray employee regarding possible improprieties in the handling and accounting of certain inventory items. Upon completion of the investigation, the Audit Committee determined that although a material weakness has been identified in the company's internal control over financial reporting with respect to inventory processes, no material prior period adjustments were identified.*** It was therefore determined that no financial restatement was needed for prior quarters or years.

Ex. 42.

127.     On August 24, 2009, the Company issued a press release announcing in 4Q09 revenue and earnings results:

**Accuray Announces Results for Fourth Quarter and Fiscal Year 2009**

**SUNNYVALE, Calif., August 24, 2009** – Accuray Incorporated (Nasdaq: ARAY), a global leader in the field of radiosurgery, announced today financial results for the fourth quarter and fiscal year 2009, ended June 27, 2009.

For the fourth quarter of fiscal 2009, Accuray reported total revenue of $58.8 million, a 15 percent increase over the fourth quarter of fiscal 2008 total revenue of $50.9 million.  For the fiscal year ended June 27, 2009, total revenue was $233.6 million, an 11 percent increase over the $210.4 million in total revenue recorded for fiscal year 2008.

Ex. 43.

128.    On August 24, 2009, the Company held a conference call for investors and analysts to discuss 4Q09 revenue and earnings results.  The call was hosted by defendant Thomson and the new CFO Derek Bertocci.  The Company announced that it was removing approximately $65 million from the Company's backlog including non-contingent backlog:

We added 15 new systems to backlog in the fourth quarter, which together with $14 million of renewal of service contracts, represented a total addition to backlog of $89 million.  Seven of the CyberKnife systems are for United States customers and eight systems are for international customers.

***Customers cancelled seven systems during the fourth quarter, removing $34 million from backlog.  Three of the systems were cancelled from non-contingent backlog, which represents the only cancellations from non-contingent backlog in fiscal 2009.  We downgraded our assessment of the probability of installation to six systems, removing an additional $31 million from backlog during the fourth quarter.  At the end of the fourth quarter, Accuray's total backlog was $556 million, down $35 million or 6% from $591 million at the end of the third quarter of fiscal 2009.***

                    *         *         *

As we have indicated during fiscal 2009, b***eginning with fiscal year 2010, we will no longer provide information about contingent backlog.  We think that such information is of limited use in building financial models.  Orders that we consider to be contingent will not be disclosed until all contingencies have been cleared. . . .*** As part of the transition in our reporting methods, ***we also plan to refine our definition of backlog in fiscal 2010 to enhance the usefulness of this information in analyzing and building models of our business.  Orders that do not meet these refined criteria will not be reported as backlog.***

In terms of trends, ***this is likely to lead to a reduction in backlog in the first quarter of fiscal 2010 from what was previously reported in the fourth quarter of fiscal 2009, fully apart from the amount of new orders received in the first quarter. . . .***

Ex. 44 at 5.

1    129.    On August 25, 2009 defendant Jefferies issued a report discussing the serial backlog

2    reductions, including a $75 million reduction in 4Q09 according to Jefferies.  Ex. 45.

3    130.    On August 25, 2009, after these disclosures, in particular to the backlog reduction,

4    Accuray's stock price declined from $7.52 per share on August 24, 2009, to $6.58 per share or

5    August 25, 2009 on $1.6 million shares traded on August 25, nearly a 150% increase over August

6    24.

7    131.    On October 20, 2009, the Company announced the termination of defendant

8    Hampton, Senior Vice President and Chief Sales Officer.  Ex. 46.  As reported by CW4, defendant

9    Hampton knew but ignored that the sales staff had communicated that the nature of the CyberKnife

10   product, its cost and lengthy sales process made the top down forecast not achievable.  *See* ¶45.

11   132.    On October 29, 2009, the Company held a conference call to discuss its 1Q10

12   earnings for FY10.   On the call, defendants announced that non-contingent backlog was

13   $290.5 million under its refined criteria – a reduction of nearly 30% in total non-contingent backlog.

14   Defendants also provided a backlog segmentation showing that of the $291 million, ***only $99 million***

15   ***was attributable to CyberKnife system sales***.  Just one quarter before, defendants had claimed to

16   have non-contingent backlog of $203.2 million attributable to CyberKnife sales.  For the first time,

17   the Company also announced that it had been including orders from international distributors in non-

18   contingent backlog ***despite the fact that the customer was not paying a deposit***.  Defendants

19   attributed the ***50% decline in systems backlog*** to the removal of these orders:

20   In the past, we included sales orders in reported backlog that contained
     contingencies.  ***Over time we concluded that including contingent orders in backlog***
21   ***was reducing the usefulness of backlog as a predictor of future system shipments***
     ***and revenue.***   Accordingly during our conference call in January 2009 to report
22   results for our second quarter fiscal 2009, we provided advanced notice that we
     intended to change our reporting of new orders and backlog in fiscal 2010 to exclude
23   all orders that contained contingencies.

24   We reminded investors of this intent again during our third quarter conference call in
     April 2009.  During our conference call in August 2009 to report results for our
25   fourth quarter of fiscal 2009, we again reminded investors of our intent to change
     reporting of backlog, and also stated that we intended to review our criteria for
26   including orders in reported backlog.

27   We found that some orders were not proceeding in shipment in a predictable manner.
     Accordingly we refined our criteria for including an order in reported backlog with
28   the goal of including only orders with characteristics that in prior orders have shown

1    a pattern of predictably proceeding to shipment.  We believe this refinement provides
2    investors with better insight about our backlog and its future conversion to revenue.

3    *As a result, and as we indicated in our last call, we will only report contracts as
     backlog that meets these refined criteria.  While many non-contingent contracts
4    already met the refined backlog criteria, there were others that did not.  Most of
     those contracts that are now not included in reported backlog did not meet the
5    refined criteria because we had not received a deposit for the order.  Those orders
     were generally from international distributors, and we have not always required a
6    deposit on such orders.*

7                                    *       *       *

8    Once criteria are fulfilled, contracts will be re-entered into reported backlog.  For
     comparative purposes, if we were to apply our current refined definition of backlog
9    to the backlog as of the end of our fiscal fourth quarter, it would yield a backlog of
     $282.2 million.  At the end of the first quarter of fiscal 2010, Accuray's total backlog
10   was $290.5 million, representing a 3% sequential increase based upon the refined
     backlog criteria.

11   Ex. 47 at 5.

12          133.    On October 30, 2009, Oppenheimer released a report titled "Are you Kidding Me?

13   1Q Analysis" expressing disbelief at the Company's further reduction in backlog – in particular a

14   reduction of 50% of what the market was told were **non-**contingent CyberKnife system sales:

15   **Accuray, Inc. Are You Kidding Me? 1Q Analysis**

16   We'll try to put this into words, but we may simply be beyond that point by now.
     After all the backlog issues this company has gone through since its IPO, it was the
17   planned return to "non-contingent" backlog this quarter that brought slight hope or
     optimism for better visibility.  *Non-contingent, after all, had in the past at least
18   some concrete tone to it, no?  So it's perplexing to us how non-contingent product
     backlog (which investors have long relied on) can be restated downwards by about
19   60%.  We have no words.*  Issues with the P&L also remain, and FY10 guidance
     looks entirely unachievable. . . .

20
     *Lets start [sic] with the backlog restatement.  June quarter non-contingent backlog
21   was reduced from $407M to $282M (-31%) due to another edition of "refining the
     definition of backlog."  We estimate the product segment of that backlog was
22   restated down by about 60%.  The change stands directly in contradiction to
     mgmt's many prior comments about "noncontingent."*
23
     *The restatement reduces CyberKnife units in June backlog from 68 to 28, we
24   calculate.  So 40 units that just three months ago were considered "non-
     contingent" are gone.*
25
                                    *       *       *
26
     *There is a credibility issue here . . . .*
27

28   Ex. 48.

1

**LOSS CAUSATION/ECONOMIC LOSS**

2      134.   During the Class Period, as detailed herein, defendants made false and misleading

3  statements concerning the current and future financial condition of the Company and engaged in a

4  scheme to deceive investors regarding the same.  These materially false representations caused

5  Accuray's stock to trade at an inflated level (trading as high as $29.25 per share on February 9,

6  2007) and operated as a fraud or deceit on the class.  Later, when the relevant truth regarding the

7  Company's reported revenues, earnings and outlook, including the Company's backlog figures,

8  began to be disclosed, Accuray's stock price declined, and the prior artificial inflation came out of

9  the stock price.  As a result, plaintiffs and other members of the class suffered economic loss, *i.e.*,

10  damages, under the federal securities laws.

11      135.   Throughout the Class Period, it was part of defendants' scheme to present a

12  misleading picture of Accuray's true financial condition, including the Company's backlog and other

13  reported metrics, such as reported revenue, earnings, product installations as a basis for CyberKnife

14  revenue earnings forecasts.  Throughout the Class Period as alleged herein, the Company's publicly

15  reported backlog installation, financial forecasts, numbers and other metrics were materially

16  misleading.

17      136.   Defendants' false and misleading statements had their intended effect, causing

18  Accuray's stock to trade at artificially inflated prices throughout the Class Period and thereafter until

19  2009, when the artificial inflation was more fully dissipated.

20      137.   On August 16, 2007, the relevant truth began to be disclosed, in particular during the

21  quarterly conference call and analysts' inquiries concerning the Company's reported backlog and

22  installation numbers.  During the call and onward, facts were disclosed that indicated that the

23  Company's calculation of CyberKnife installations and backlog (which it had bragged to the market

24  of being reliable and the key metric necessary to evaluate the Company's current and future financial

25  performance), may not be reliable as the Company could not explain inconsistencies in reported

26  numbers.  *See* ¶¶81-85.  Following the call, securities analysts reduced estimates and downgraded

27  Accuray stock, causing a 25% price decline from $18.07 per share on August 16, 2007 to $13.45 per

28  share on August 17, 2007.  The Company nevertheless continued to misrepresent the contents,

1      quality, and reliability of its reported backlog and its reliability for supporting the Company's future

2      revenue and earnings outlook, in particular, the Company's FY08 forecasts.   As such,

3      notwithstanding the August 17, 2007 disclosures, the stock price continued to be artificially inflated.

4          138.   On November 7, 2007, reporting its 1Q08 financial results and repeating false bullish

5      statements about its backlog and revenue and earnings forecast for FY08, the Company disclosed for

6      the first time that it recognized revenue from international sales upon shipment to international

7      distributors, as opposed to upon installation or delivery at the end-user's site.  *See* ¶¶95-98.  Analysts

8      also reported softening installation figures, casting doubt upon the reliability of the reported backlog

9      numbers.  *See id.*  The November 7, 2007 report and follow on analyst coverage served as another

10      partial disclosure and caused a partial dissipation of the artificial inflation in Accuray's stock price.

11      Accuray's stock price dropped from $19.02 per share on November 7, 2007 to $17.00 per share on

12      November 9, 2009 and continued to decline to $15.30 per share on November 15, 2007 –  a total

13      decline of 20%.  ¶101.

14          139.   On January 30, 2008, Accuray announced its 2Q08 revenue and earnings results

15      which, contrary to prior bullish and boastful forecasts, had badly missed revenue and earnings

16      estimates.  The Company also reported that it had removed $34 million of contracts from reported

17      backlog and that its FY08 revenue forecast would be reduced by up to $60 million.  *See* ¶¶105-112.

18      Following the January 30, 2008 disclosures, shares of Accuray fell from a closing price of $14.98

19      per share on January 30, 2008 to a closing price of $9.52 per share on January 31, 2008, a drop of

20      more than 36% on ***more than 10 million shares traded***.  The Company nevertheless stated that it

21      had removed the risky contracts from backlog and bragged that notwithstanding the negative news,

22      going forward, the Company's backlog was comprised of "firm signed contracts" with a high

23      probability of being recognized as revenue.  ¶93.

24          140.   On April 29, 2008, the Company issued its 3Q08 financial results.  ¶¶113-118.  The

25      Company also disclosed that it was removing another ***$58 million*** from reported backlog.  The

26      Company continued, however, to misrepresent the content and quality of its reported backlog and

27      reported additional increases to reported backlog while failing to disclose the true facts concerning

28      backlog and revenue forecasts.  After the April 29, 2008 report, Accuray's stock price declined from

1   $8.09 per share to $7.83 per share on April 30, 2008.  The Company continued to boast of

2   international sales growth and stated that "the removal of deals from backlog now ensure[d] that we

3   continue to give investors an accurate picture of business trends."  The Company further stated that

4   its sales were strong and that it had checked backlog to remove unfavorable deals.  The stock price

5   thus continued to trade at artificially inflated prices.

6        141.   On August 13, 2008, Jefferies issued a report on Accuray titled "Moving to Sidelines

7   on Valuation; Lowering to Hold," stating that notwithstanding defendants' assurances, the Company

8   ***continued*** to be subject to the forces that led to the backlog revisions, and suggesting ***more*** could be

9   in store.  Ex. 35.  After the Jefferies report, the Company's stock price began to decline from a

10   closing price of $8.67 per share on August 12, 2007 to a closing price of $8.00 per share on August

11   18, 2007.  Indeed, this decline resulted from disclosure by analysts between August 13-20 regarding

12   the Company's true financial condition and expected further bad news regarding Accuray's backlog

13   and related metrics.

14        142.   On August 19, 2008, Accuray reported its 4Q08 financial results in a press release.

15   The Company's financial results missed Wall Street expectations and the Company revealed that it

16   was removing another $39 million from reported backlog (¶¶119-123), resulting in approximately

17   $127 million in backlog reductions in the prior three quarters.  On August 20, Accuray stock opened

18   at $7.00 per share, a drop of 7.5% from the closing price of $7.57 per share on August 19, 2008.

19        143.   Like other members of the class of purchasers of Accuray stock who purchased at

20   artificially inflated prices during the class period, lead plaintiff suffered an economic loss, *i.e.*,

21   damages, when Accuray's stock price continued to decline following the Company's several partial

22   disclosures on August 16, 2007, November 7, 2007, January 30, 2008, and August 13 through 20,

23   2008 regarding defendants' scheme to conceal Accuray's true financial condition.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

24

25        144.   The market for Accuray common stock was open, well-developed and efficient at all

26   relevant times.  As a result of these materially false and misleading statements and failures to

27   disclose as set forth above, Accuray common stock traded at artificially inflated prices during the

28

1  Class Period.  Plaintiffs and other members of the class purchased or otherwise acquired Accuray

2  common stock relying upon the integrity of the market price of Accuray common stock and market

3  information relating to Accuray, and have been damaged thereby.

4          (a)     Accuray stock met the requirements for listing, and was listed and actively

5  traded on the NASDAQ, a highly efficient and automated market;

6          (b)     As a regulated issuer, Accuray filed periodic public reports with the SEC and

7  the NASDAQ;

8          (c)     Accuray regularly communicated with public investors via established market

9  communication mechanisms, including through regular disseminations of press releases on the

10  national circuits of major newswire services and through other wide-ranging public disclosures, such

11  as communications with the financial press and other similar reporting services; and

12          (d)     Accuray was followed by several securities analysts employed by major

13  brokerage firms who wrote reports which were distributed to the sales force and certain customers of

14  their respective brokerage firms.  Each of these reports was publicly available and entered the public

15  marketplace.

16       145.    As a result of the foregoing, the market for Accuray common stock promptly digested

17  current information regarding Accuray from all publicly-available sources and reflected such

18  information in the price of Accuray stock.  Under these circumstances, all purchasers of Accuray

19  common stock during the Class Period suffered similar injury through their purchase of Accuray

20  common stock at artificially inflated prices and a presumption of reliance applies.

21  **CLASS ACTION ALLEGATIONS**

22       146.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

23  Procedure 23(a) and (b)(3) on behalf of themselves and all persons who purchased or acquired

24  Accuray securities and common stock pursuant or traceable to the Company's IPO, as well as

25  purchasers of Accuray common stock between February 7, 2007 and August 19, 2008, inclusive,

26  who were damaged by the conduct alleged herein (the "Class").  Excluded from the Class are

27  defendants herein, members of the immediate family of each of the defendants, any person, firm,

28  trust, corporation, officer, director or other individual or entity in which any defendant has a

1  controlling interest or which is related to or affiliated with any of the defendants, and the legal

2  representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

3       147.   The members of the Class are so numerous that joinder of all members is

4  impracticable.  Accuray sold more than 18 million shares in the IPO and throughout the Class

5  Period, and Accuray common shares were actively traded on the NASDAQ.  While the exact number

6  of Class members is unknown to plaintiffs at this time and can only be ascertained through

7  appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the

8  proposed Class.  Record owners and other members of the Class may be identified from records

9  maintained by Accuray or its transfer agent and may be notified of the pendency of this action by

10  mail, using the form of notice similar to that customarily used in securities class actions.

11       148.   Plaintiffs' claims are typical of the claims of the members of the Class as all members

12  of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

13  complained of herein.

14       149.   Plaintiffs will fairly and adequately protect the interests of the members of the Class

15  and has retained counsel competent and experienced in class and securities litigation.

16       150.   Common questions of law and fact exist as to all members of the Class and

17  predominate over any questions solely affecting individual members of the Class.  Among the

18  questions of law and fact common to the Class are:

19            (a)    whether the federal securities laws were violated by defendants' acts as

20  alleged herein;

21            (b)    whether statements made by defendants to the investing public during the

22  Class Period misrepresented material facts about the business, operations and management of

23  Accuray; and

24            (c)    to what extent the members of the Class have sustained damages and the

25  proper measure of damages.

26       151.   A class action is superior to all other available methods for the fair and efficient

27  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

28  damages suffered by individual Class members may be relatively small, the expense and burden of

1    individual litigation make it impossible for members of the Class to individually redress the wrongs

2    done to them. There will be no difficulty in the management of this action as a class action.

3                                    **NO SAFE HARBOR**

4           152.    The statutory safe harbor provided for forward-looking statements under certain

5    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

6    Many of the specific statements pleaded herein were not identified as "forward-looking statements"

7    when made. To the extent there were any forward-looking statements, there were no meaningful

8    cautionary statements identifying important factors that could cause actual results to differ materially

9    from those in the purportedly forward-looking statements. Alternatively, to the extent that the

10   statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

11   liable for those false forward-looking statements because at the time each of those forward-looking

12   statements was made, the particular speaker knew that the particular forward-looking statement was

13   false, and/or the forward-looking statement was authorized and/or approved by an executive officer

14   of Accuray who knew that those statements were false when made.

15                                      **COUNT I**

16          **For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
                                  **Against All Defendants**
17

18          153.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

19          154.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

20                  (a)     employed devices, schemes and artifices to defraud;

21                  (b)     made untrue statements of material facts or omitted to state material facts

22   necessary in order to make the statements made, in light of the circumstances under which they were

23   made, not misleading; or

24                  (c)     engaged in acts, practices and a course of business that operated as a fraud or

25   deceit upon plaintiffs and others similarly situated in connection with their purchases of Accuray

26   common stock during the Class Period.

27          155.    Defendants named herein are liable for making false statements; failing to disclose

28   adverse facts known to them about Accuray; or participating in, permitting or causing contrivances

---

1    and manipulative acts regarding Accuray's financial statements.  Defendants' fraudulent scheme and

2    course of business operated as a fraud or deceit on purchasers of Accuray's publicly traded

3    securities, as it: (a) deceived the investing public regarding Accuray's business and finances; (b)

4    artificially inflated the prices of Accuray's publicly traded securities; (c) allowed Accuray executives

5    to sell millions of dollars worth of Accuray stock at artificially inflated prices while in possession of

6    material non-public information concerning the Company's true financial condition; and (d) caused

7    plaintiffs and other members of the class to purchase Accuray publicly traded securities at artificially

8    inflated prices, and suffer economic loss and damages when the artificial inflation came out of

9    Accuray's stock price.

10        156.    During the Class Period, defendants disseminated or approved the false statements

11   specified above, which they knew or were severely reckless in disregarding that the statements were

12   misleading in that they contained misrepresentations and failed to disclose material facts necessary

13   in order to make the statements made, in light of the circumstances under which they were made, not

14   misleading.

15        157.    During the Class Period, each defendant's primary liability and controlling person

16   liability arises from as detailed above, their occupation of high-level position at the Company and

17   being privy to non-public information concerning the Company.  Each of them knew or were

18   severely reckless in disregarding the adverse facts specified herein and omitted to disclose these

19   facts.  Notwithstanding their duty to abstain from selling Accuray stock while in possession of

20   material, adverse, non-public information concerning the Company, defendants sold Accuray stock

21   at inflated prices, improperly personally profiting and benefiting from their wrongful conduct and

22   false and misleading statements.

23        158.    Investors who purchased Accuray stock and other publicly traded securities at prices

24   artificially inflated by defendants' materially false representations and omissions suffered millions in

25   damages when the artificial inflation came out of Accuray's stock price.

26        159.    Defendants named herein acted with scienter in that they knew or were severely

27   reckless in disregarding that the public documents and statements issued or disseminated in the name

28   of the Company were materially false and misleading; knew that such statements or documents

1  would be issued or disseminated to the investing public; and knowingly and substantially

2  participated or acquiesced in the issuance or dissemination of such statements or documents as

3  primary violations of the federal securities laws.  Had plaintiffs, the other members of the Class and

4  the marketplace knew the truth concerning Accuray, which was not disclosed by defendants,

5  plaintiffs and other members of the class would not have purchased or otherwise acquired Accuray

6  publicly traded securities or if they had acquired such securities during the Class Period, they would

7  not have done so at the artificially inflated prices which they paid.

8        160.    As a direct and proximate result of defendants' wrongful conduct and fraudulent

9  scheme, plaintiffs and the other members of the Class suffered damages in connection with the

10  respective purchases of the Company's securities during the Class Period, as evidenced by, among

11  other things, the several stock price declines alleged herein, when the artificial inflation came out of

12  Accuray's stock price.

13                                    **COUNT II**

14                    **For Insider Trading Violations of Rule 10(b) and**
                      **SEC Rule 10(b)(5)(1) Against Defendants**
15
        161.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.
16
    Defendants violated §10(b) of the Exchange Act and Rule 10b-5(1) in that they are liable for making
17
    false statements and failing to disclose adverse facts known to them about Accuray.  Defendants
18
    alleged herein while in possession of material non-public information about the Company's true
19
    financial condition sold millions of dollars worth of Accuray stock at artificially inflated prices.
20
                                    **COUNT III**
21
                    **For Violation of Section 20(a) of the Exchange Act**
22                  **Against the Individual Defendants**

23        162.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

24  forth herein.

25        163.    The Individual Defendants acted as controlling persons of Accuray within the

26  meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of

27  Accuray, and their ownership of Accuray stock, the Individual Defendants had the power and

28  authority to cause Accuray to engage in the wrongful conduct complained of herein.  Accuray

1   controlled each of the Individual Defendants and all of its employees.  By reason of such conduct,

2   the Individual Defendants and Accuray are liable pursuant to §20(a) of the Exchange Act.

3                                    **PRAYER FOR RELIEF**

4           WHEREFORE, plaintiffs pray for relief and judgment, as follows:

5           A.      Determining that this action is a proper class action, designating plaintiffs as lead

6   plaintiffs and certifying plaintiffs as a Class representative under Rule 23 of the Federal Rules of

7   Civil Procedure and plaintiffs' counsel as lead counsel;

8           B.      Awarding compensatory damages in favor of plaintiffs and the other Class members

9   against all defendants, jointly and severally, for all damages sustained as a result of defendants'

10  wrongdoing, in an amount to be proven at trial, including interest thereon;

11          C.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this

12  action, including counsel fees and expert fees; and

13          D.      Such other and further relief as the Court may deem just and proper.

14                                    **JURY DEMAND**

15          Plaintiffs hereby demand a trial by jury.

16  DATED:  December 30, 2009          COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
17                                     SHAWN A. WILLIAMS
                                       DANIEL J. PFEFFERBAUM
18

19                                     _____
                                                    /s/
20                                         SHAWN A. WILLIAMS

21                                     100 Pine Street, 26th Floor
                                       San Francisco, CA  94111
22                                     Telephone:  415/288-4545
                                       415/288-4534 (fax)
23
                                       COUGHLIN STOIA GELLER
24                                       RUDMAN & ROBBINS LLP
                                       DARREN J. ROBBINS
25                                     BRIAN O. O'MARA
                                       655 West Broadway, Suite 1900
26                                     San Diego, CA  92101
                                       Telephone:  619/231-1058
27                                     619/231-7423 (fax)

28                                     LABATON SUCHAROW LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTOPHER J. KELLER
JONATHAN GARDNER
MARK GOLDMAN
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

Co-Lead Counsel for Plaintiffs

S:\CasesSD\Accuray\secy\CPT00062613 Consolidated_Corrected.doc

1

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

2

3        WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff")

4   declares:

5        1.      Plaintiff has reviewed a complaint and authorized its filing.

6        2.      Plaintiff did not acquire the security that is the subject of this action at the

7   direction of plaintiff's counsel or in order to participate in this private action or any

8   other litigation under the federal securities laws.

9        3.      Plaintiff is willing to serve as a representative party on behalf of the

10  class, including providing testimony at deposition and trial, if necessary.

11       4.      Plaintiff has made the following transaction(s) during the Class Period in

12  the securities that are the subject of this action:

13  | Security | Transaction | Date | Price Per Share |
14

15                          *See* attached Schedule A.

16       5.      Plaintiff has not sought to serve or served as a representative party for a

17  class in an action filed under the federal securities laws except as detailed below

18  during the three years prior to the date of this Certification:

19  *Fulton County Employees' Retirement System v. MGIC Investment Corporation, et al.*, No. 2:08-
            CV-00458-LA (E.D. Wis.)
20  *In re Spectranetics Corporation Sec. Litig.*, No. 1:08-cv-02048-REB-KLM (D. Colo.)

21

22

23

24

25

26
         6.      The Plaintiff will not accept any payment for serving as a representative
27
    party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,
28

                                                                        ACCURAY

1   except such reasonable costs and expenses (including lost wages) directly relating to
2   the representation of the class as ordered or approved by the court.
3        I declare under penalty of perjury that the foregoing is true and correct.
4   Executed this _11th_ day of _December_, 2009.
5                                    WAYNE COUNTY EMPLOYEES'
                                     RETIREMENT SYSTEM
6
7                                    By: _____
8                                    Its: _Deputy Director of Retirement_
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                    - 2 -

                                                            ACCURAY

## SCHEDULE A

### SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 02/27/2007 | 600 | $25.75 |
| 02/28/2007 | 1,500 | $25.54 |
| 03/20/2007 | 1,700 | $21.88 |
| 06/05/2007 | 1,000 | $23.27 |
| 06/05/2007 | 1,300 | $23.46 |
| 07/06/2007 | 800 | $21.71 |
| 07/09/2007 | 900 | $22.63 |
| 07/16/2007 | 3,400 | $19.97 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 12/13/2007 | 3,300 | $14.80 |
| 12/19/2007 | 2,600 | $15.74 |
| 01/14/2008 | 5,300 | $17.87 |

1

<u>CERTIFICATE OF SERVICE</u>

2

    I hereby certify that on December 30, 2009, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

    I further certify that I caused this document to be forwarded to the following Designated

8

Internet Site at:  http://securities.stanford.edu.

9

    I certify under penalty of perjury under the laws of the United States of America that the

10

foregoing is true and correct.  Executed on December 30, 2009.

11

12

  /s/ SHAWN A. WILLLIAMS
SHAWN A. WILLIAMS

13

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP

14

100 Pine Street, 26th Floor
San Francisco, CA  94111

15

Telephone:  415/288-4545
415/288-4534 (fax)

16

E-mail:shawnw@csgrr.com

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 4:09-cv-03362-CW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas G Ciarlone , Jr**
  tciarlone@lawssb.com

- **Alan I. Ellman**
  aellman@labaton.com

- **Daniel R Forde**
  dforde@robbinsumeda.com

- **Jonathan Gardner**
  jgardner@labaton.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Robert S. Green**
  CAND.USCOURTS@CLASSCOUNSEL.COM

- **Christopher J. Keller**
  ckeller@labaton.com,cchan@labaton.com,electroniccasefiling@labaton.com

- **Mark P. Kindall**
  firm@izardnobel.com,mkindall@izardnobel.com

- **LAPIDUS GROUP**
  cand.uscourts@classcounsel.com

- **Jeffrey S. Nobel**
  jnobel@izardnobel.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@csgrr.com,aserros@csgrr.com,nrogers@csgrr.com,khuang@csgrr.com,gfreemon@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Ignacio Evaristo Salceda**
  isalceda@wsgr.com,rlustan@wsgr.com

- **Amanda C. Scuder**
  ascuder@lawssb.com

- **Ralph M. Stone**
  rstone@lawssb.com

- **Stefanie Jill Sundel**
  ssundel@labaton.com

- **Marc M. Umeda**
  MUmeda@robbinsumeda.com,notice@robbinsumeda.com

- **Diane Marie Walters**
  dwalters@wsgr.com,smills@wsgr.com

- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com,travisd@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Mark S. Goldman
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
```