1   BORIS FELDMAN, State Bar No. 128838
    boris.feldman@wsgr.com
2   IGNACIO E. SALCEDA, State Bar No. 164017
    isalceda@wsgr.com
3   DIANE M. WALTERS, State Bar No. 148136
    dwalters@wsgr.com
4   DOMINIQUE-CHANTALE ALEPIN, State Bar No. 241648
    dalepin@wsgr.com
5   BRYAN J. KETROSER, State Bar No. 239105
    bketroser@wsgr.com
6   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
7   650 Page Mill Road
    Palo Alto, CA 94304-1050
8   Telephone:  (650) 493-9300
    Facsimile:   (650) 565-5100
9

10  Attorneys for Defendants
    Accuray Inc., Euan S. Thomson,
11  Robert E. McNamara, Wade B. Hampton,
    Ted Tu, Wayne Wu, John R. Adler, Jr.,
12  and Robert S. Weiss

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                    OAKLAND DIVISION

16

17  In re ACCURAY INC. SECURITIES          )   Master File No. 09-cv-03362-CW
    LITIGATION,                            )
18  _____)   CLASS ACTION
                                           )
19  This Document Relates To:              )   **DEFENDANTS' NOTICE OF**
                                           )   **MOTION AND MOTION TO**
20     ALL ACTIONS.                        )   **DISMISS; MEMORANDUM OF**
                                           )   **POINTS AND AUTHORITIES IN**
21                                         )   **SUPPORT THEREOF**
                                           )
22                                         )   Date:   None per Oct. 26, 2009 Order
                                           )
23  _____)   Before: Hon. Claudia Wilken

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ......................................................................... 1

STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3)) ...................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ........................ 3

ARGUMENT .................................................................................................................. 6

I.      LEGAL STANDARDS ..................................................................................... 6

II.     PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION ............ 7

        A.      Plaintiffs Fail to Allege Falsity with respect to the Backlog Statements ............... 8

                1.      Registration Statement Definition of Backlog. ............................. 8

                2.      Change in the Definition of Backlog. ........................................... 9

                3.      "[Q]uality and makeup of backlog." ............................................. 9

                4.      Reasons for the Reductions in Backlog. ...................................... 11

        B.      Plaintiffs' Falsity Allegations Regarding Deposits Are Insufficient ................... 12

                1.      Receipt of Deposits. ..................................................................... 12

                2.      Recognition of Deposits as Revenue. .......................................... 12

        C.      Plaintiffs' Falsity Allegations with respect to International Sales Also Fail ........ 12

III.    THE FORWARD-LOOKING STATEMENTS ARE NOT ACTIONABLE ................... 14

        A.      Many of the Challenged Statements Were Forward-Looking ............................. 14

        B.      The Company Provided Meaningful Cautionary Language .................................. 16

IV.     PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ............... 17

        A.      Plaintiffs Provide No Direct Evidence of Scienter ............................................... 17

                1.      The Complaint Does Not Plead Facts Demonstrating Each
                        Defendant's Awareness of Contemporaneous Internal Information
                        Contradicting the Challenged Public Statements. ....................... 17

                2.      The Confidential Witnesses' Allegations Do Not Overcome
                        Plaintiffs' Failure to Allege Contemporaneous Facts Known to the
                        Defendants. ................................................................................... 18

B.   Plaintiffs' Motive Allegations Are Insufficient to Raise a Strong Inference of Scienter ...................................................................................... 19

1.   The Stock Sale Allegations Fail to Provide the Missing Inference of Scienter. ................................................................................. 19

2.   The Compensation Allegations Add Little to the Analysis...................... 22

3.   The Company's Share Repurchase Negates Scienter. .............................. 22

C.   Plaintiffs' Reliance on the "Core Operations Inference" Is Unavailing .............. 23

D.   Plaintiffs Cannot Counter the Strong, Competing Inference Raised by the Repeated Voluntary Disclosures of Negative Information ................................... 23

E.   Plaintiffs Have Not Pleaded Corporate Scienter ................................................... 24

F.   The Claims Against the Outside Directors Should Be Dismissed ....................... 24

V.   PLAINTIFFS' "RULE 10(b)"/"RULE 10(b)(5)(1)" CLAIM IS UNINTELLIGIBLE ................................................................................................... 25

VI.   PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED............................ 25

CONCLUSION ......................................................................................................................... 25

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd*, 256 Fed. Appx. 74
    (9th Cir. 2007) ................................................................................................. 10, 18

*Arthur Children's Trust v. Keim*,
    994 F.2d 1390 (9th Cir. 1993) ........................................................................ 25

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ..................................................................... 15, 16

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) ........................................................ 10, 24

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ................................................. 12, 14, 21

*Davis v. SPSS, Inc.*,
    385 F. Supp. 2d 697 (N.D. Ill. 2005) ............................................................. 24

*Employers Teamsters Local Nos. 175 and 505 Pension Plan Trust Fund v. Clorox Co.*,
    353 F.3d 1125 (9th Cir. 2004) ..................................................................... 14, 16

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ......................................................................... 24

*Harris v. IVAX*,
    182 F.3d 799 (11th Cir. 1999) ........................................................................ 16

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ........................................................................ 25

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
    2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878
    (8th Cir. 2009) .......................................................................................... 23, 24

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ....................................... 7, 11, 24

*In re ESS Tech., Inc. Sec. Litig.*,
    2004 WL 3030058 (N.D. Cal. Dec. 1, 2004) ................................................ 16

*In re Medicis Pharma. Corp. Sec. Litig.*,
    2009 WL 4755406 (D. Ariz. Dec. 2, 2009) .................................................. 19

*In re Metawave Communications Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) .................................................... 18

*In re Portal Software, Inc. Sec. Litig.*,
    2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ............................................. 14

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ....................................................... 9, 18, 20, 22

*In re Seracare Life Scis., Inc.*,
2007 WL 935583 (S.D. Cal. Mar. 19, 2007) .................................................... 13

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ............................................................ 7, 19, 20, 21

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...................................................... 16

*In re Tibco Software, Inc. Sec. Litig.*,
2006 WL 1469654 (N.D. Cal. May 25, 2006) .............................................. 22, 24

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
432 F. Supp. 2d 571 (E.D. Va. 2006)........................................................ 20

*Karacand v. Edwards*,
53 F. Supp. 2d 1236 (D. Utah 1999) .......................................................... 17

*Lipton v. PathoGenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ................................................................ 21, 25

*McCasland v. FormFactor, Inc.*,
2009 WL 2086168 (N.D. Cal. July 14, 2009) ........................................... 18, 23

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)............................................................... 7, 17, 18, 20

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993) ......................................................................... 25

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) ..................................................................... 17

*Pittleman v. Impac Mortgage Holdings, Inc.*,
2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ............................................... 24

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)................................................................*passim*

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)................................................................... 23

*Stack v. Lobo*,
903 F. Supp. 1361 (N.D. Cal. 1995) ........................................................ 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................ 6, 7, 23

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

*Tripp v. IndyMac Fin. Inc.*,
     2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ................................................................. 20

*Weiss v. Amkor Techn., Inc.*,
     527 F. Supp. 2d 938 (D. Ariz. 2007) .......................................................................... 9

*Zucco Partners, LLC v. Digimarc Corp.*,
     552 F.3d 981 (9th Cir. 2009) ........................................................................... 6, 7, 19


**STATUTES**

15 U.S.C. § 78u-4(b)(1) .................................................................................................. 6

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................ 7

15 U.S.C. § 78u-4(b)(2) ............................................................................................ 7, 17

15 U.S.C. § 78u-4(b)(3) .................................................................................................. 6

15 U.S.C. § 78u-5(c)(1) ............................................................................................... 14

15 U.S.C. § 78u-5(c)(1)(A) .......................................................................................... 15

15 U.S.C. § 78u-5(c)(1)(A)(i) ....................................................................................... 16

15 U.S.C. § 78u-5(c)(1)(B) ............................................................................................ 7

15 U.S.C. § 78u-5(c)(2)(B)(i) ....................................................................................... 16

15 U.S.C. § 78u-5(h)(i)(1) ............................................................................................ 15

15 U.S.C. § 78u-5(h)(i)(1)(A) ....................................................................................... 15


**MISCELLANEOUS**

Donald E. Kieso, et al., INTERMEDIATE ACCOUNTING (10th Ed. 2001) ........................................... 4

H.R. Conf. Rep. No. 104-369, 1995 U.S.C.C.A.N. 730 (1995) ..................................................... 14

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

**NOTICE OF MOTION AND MOTION**

Defendants Accuray, Inc. ("Accuray" or the "Company"), Euan S. Thomson, Robert E. McNamara, Wade B. Hampton, Ted Tu, Wayne Wu, John R. Adler, Jr. and Robert S. Weiss (collectively, "Defendants") move pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA"), and Federal Rules of Civil Procedure 12(b)(6), 8 and 9(b), for an order dismissing the [Corrected] Consolidated Class Action Complaint ("Complaint" or "¶ _"). The Court's October 26, 2009 Order stated that the motion would be taken under submission on the papers. Defendants respectfully believe oral argument would be appropriate.

Defendants move to dismiss the Complaint on the grounds that plaintiffs have failed to satisfy the stringent pleading requirements of the Reform Act. This motion is based upon this Notice and Motion; the Memorandum of Points and Authorities; the Request for Judicial Notice; the Declaration of Diane Walters and attached exhibits; the pleadings, records, and papers filed in this action; oral argument of counsel; and any other matters properly before the Court.

**STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3))**

1. Have plaintiffs alleged with sufficient particularity the existence of an actionable misrepresentation or omission?

2. Have plaintiffs alleged with sufficient particularity facts giving rise to a strong inference that each of the Defendants acted with scienter?

3. Have plaintiffs stated a Section 10(b) claim against certain Defendants for statements they did not make?

4. Have plaintiffs pleaded a cause of action for control person liability?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Imagine that you have been diagnosed with brain cancer. You have two treatment options. Option One: the surgeon cuts your skull open and excises the tumorous portions of the brain. After recovering from surgery, you undergo prolonged treatment with chemotherapy and/or radiation. Option Two: the CyberKnife® System ("CyberKnife"), a non-invasive radiosurgery system. You go into a local hospital or out-patient center. A computer-controlled

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

1   robot delivers beams of pain-free radiation to the tumor site with pinpoint accuracy.  No cutting

2   or anesthesia.  No nausea or hair loss.  Little or no recovery time.  Which would you prefer?

3       Founded in 1990, Accuray develops and sells the CyberKnife, which provides patients

4   with an alternative to traditional surgery for the treatment of tumors.  In 1999, Accuray received

5   FDA clearance for the treatment of tumors in the head and neck, and in August 2001, it received

6   clearance to treat tumors anywhere in the body where radiation treatment is indicated.  Accuray's

7   growth accelerated dramatically in the ensuing years.  In the two years prior to its February 2007

8   initial public offering ("IPO"), Accuray's revenues increased 136%, from $22.4 million in fiscal

9   2005 to $52.9 million in fiscal 2006.  Revenues continued to increase following the IPO, with

10  fiscal 2007 revenues increasing to $140.5 million (a 166% increase over fiscal 2006) and fiscal

11  2008 revenues increasing to $210.4 million (a 50% increase over fiscal 2007).

12      Although revenues were growing, Accuray encountered difficulties as a newly public

13  company in a difficult economic and regulatory environment.  As with any new medical device

14  or treatment, CyberKnife sales are affected by many factors outside the Company's control,

15  including, among others, FDA rules and regulations, a labyrinth of federal, state and third party

16  payor requirements regarding insurance coverage and reimbursement, and market acceptance.  In

17  addition, given the several million dollar cost of each CyberKnife, the ability of customers to

18  obtain financing is critical.  Accuray provided detailed and extensive warnings regarding these

19  risks in the IPO Registration Statement, subsequent SEC filings and other public statements.

20      Unfortunately, certain of the identified risks became realities.  The uncertain economic

21  environment, and in particular, tightening credit markets, began to impact customers' ability to

22  obtain financing.  In addition, uncertainty regarding proposed regulatory changes led to a

23  slowdown in Accuray's free-standing center market segment.

24      The Complaint seeks to transform the difficulties that Accuray encountered into

25  securities fraud.  The gravamen of the Complaint is that during the Class Period, February 7,

26  2007 through August 19, 2008, Accuray and seven of its current and former officers and

27  directors deliberately misrepresented the Company's financial condition, and in particular, its

28  backlog, as part of a scheme to artificially inflate the price of Accuray's stock to allow certain of

2   DEFENDANTS' MOTION TO DISMISS
    Master File No. 09-cv-03362-CW

1  the individual defendants to sell stock at inflated prices.

2       Plaintiffs' allegations suffer from numerous fatal defects.  *First*, plaintiffs fail to plead

3  sufficiently the existence of a material misrepresentation or omission – an essential element of a

4  Section 10(b) claim.  The Reform Act requires plaintiffs to plead, with particularity, each

5  statement alleged to have been misleading, the reasons why the statement was misleading, and

6  all facts on which the allegations are based.  Although plaintiffs cite a plethora of public

7  statements, they fail to plead the requisite particularized facts necessary to establish falsity.

8       *Second*, many of the challenged statements were forward-looking in nature and

9  accompanied by meaningful risk disclosures.  Such statements are immunized from liability

10  under the Safe Harbor for forward-looking statements.  As the Complaint and its exhibits reveal,

11  Accuray repeatedly cautioned investors about the potential negative impact of financing

12  difficulties and proposed regulatory changes and promptly disclosed negative information.

13       *Third*, plaintiffs fail to plead particularized facts giving rise to a strong inference of

14  scienter as to any of the Defendants.  Indeed, plaintiffs do not plead any facts indicating what

15  each individual defendant allegedly knew and when.  Unable to plead facts to establish scienter

16  directly, plaintiffs instead rely on "motive and opportunity" stock sale and executive

17  compensation allegations.  Plaintiffs' motive allegations, however, are equally deficient and fail

18  to provide the requisite strong inference of fraudulent intent.

19       In sum, plaintiffs' allegations fail to withstand the formidable pleading requirements of

20  the Reform Act, and the Complaint should therefore be dismissed.

21           **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

22       Founded in 1990, Accuray designs, develops, and sells the CyberKnife, an image-guided

23  robotic radiosurgery system designed to treat solid tumors.  ¶ 2; *see* Ex. 1 to Plaintiffs' Appendix

24  of Exhibits to the Complaint ("Pl. Ex. _"), at 1.  The CyberKnife received clearance from the

25  Food and Drug Administration ("FDA") for the treatment of tumors in the head and neck in July

26  1999, and in August 2001, it received clearance to treat tumors anywhere in the body where

27  radiation treatment is indicated.  Pl. Ex. 1 at 1.  Key benefits of the CyberKnife include: (1) it

28  can be used to treat tumors that cannot be treated through surgery due to their location, number,

3                    DEFENDANTS' MOTION TO DISMISS
                     Master File No. 09-cv-03362-CW

1   size, shape or proximity to vital organs, or because of the age or health of the patient; (2) the

2   procedure can be performed on an outpatient basis and does not involve any cutting or

3   anesthesia; and (3) the procedure requires little or no recovery time.  *Id.* at 3.

4        Each CyberKnife costs several million dollars.  ¶ 2.  The sales and installation cycle is

5   lengthy and often requires well over one year from negotiations to installation.  Pl. Ex. 1 at 42.

6   In the years preceding its IPO, Accuray grew rapidly, with revenues increasing to $52.9 million

7   in fiscal 2006 ("FY06") from $22.4 million in FY05, an increase of 136%.  Pl. Ex. 1 at F-4.

8        On February 7, 2007, Accuray conducted its IPO.  ¶ 50.  In its Registration Statement,

9   Accuray provided extensive disclosures detailing the risks related to its business.  Among other

10  risk factors, Accuray disclosed the following:

11       Because of the high unit price of the CyberKnife system, and the relatively small
         number of units installed each quarter, each installation of a CyberKnife system can
12       represent a significant component of our revenue for a particular quarter. Therefore,
         if we do not install a CyberKnife system when anticipated, our operating results
13       may vary significantly and our stock price may be materially harmed.

14       * * *
         Events beyond our control may delay installation and the satisfaction of
15       contingencies required to receive cash inflows and recognize revenue, such as: . . .
         **customer funding or financing delay**. . . . Therefore, delays in the installation of
16       CyberKnife systems or customer cancellations would adversely affect our cash
         flows and revenue, which would harm our results of operations and could cause our
17       stock price to decline.

18       * * *
         *If third-party payors do not continue to provide sufficient coverage and*
19       *reimbursement to healthcare providers for use of the CyberKnife system, our*
         *revenue would be adversely affected.*

20  Pl. Ex. 1 at 12-13 (emphasis added); *see id.* at 11-30.  Accuray also disclosed the amount of

21  business it had in backlog, and explained that the figure included only "deferred revenue and

22  future payments that our customers are contractually committed to make, but which we have not

23  yet received."  ¶ 6; Pl. Ex. 1 at 44.[1]  Accuray further cautioned that it "may be unable to convert

24

25  _____

26       [1] Backlog typically is not reported in corporate financial statements and is not subject to
    Generally Accepted Accounting Principles ("GAAP").  *See* Donald E. Kieso, et al.,
27  INTERMEDIATE ACCOUNTING, at 4 (10th Ed. 2001), attached as Ex. H to the Declaration of Diane
    Walters ("Walters Decl., Ex. _").  Thus, companies have discretion in selecting a methodology to
28  calculate backlog.

1    all of this backlog into recognized revenue due to factors outside our control."  Pl. Ex. 1 at 44.[2]

2           On May 1, 2007, in a press release concerning its 3Q07 results, Accuray disclosed that it

3    would begin including contracts containing contingencies in backlog.  ¶¶ 11, 61.

4           On August 16, 2007, Accuray announced its FY07 financial results (¶ 77), reporting

5    revenues of $140.5 million, a 166% increase over FY06.  Pl. Ex. 11.  During a call with analysts

6    the same day, Accuray provided revenue guidance for FY08 of $250-270 million. ¶ 78.

7           On September 4, 2007, Accuray filed its SEC Form 10-K for FY07 (¶ 89; Pl. Ex. 17 at

8    30), which provided detailed risk disclosures and also specifically cautioned that:

9           in connection with the release of proposed Medicare reimbursement rates for
            calendar 2008, CMS has also proposed significant amendments to the regulations
10          under the federal Ethics in Patient Referrals Act, which is more commonly known
            as the Stark Law. These proposed regulations would, among other things, impose
11          additional limitations on the ability of physicians to refer patients to medical
            facilities in which the physician has an ownership interest for treatment. Physician
12          owned entities have increasingly become involved in the acquisition of medical
            technologies, including the CyberKnife. In many cases, these entities enter into
13          arrangements with hospitals that bill Medicare for the furnishing of medical
            services, and the physician owners are among the physicians who refer patients to
14          the entity for services. The proposed regulations, if adopted, would limit these
            arrangements and could require the restructuring of existing arrangements between
15          physician owned entities and hospitals and may also discourage physicians from
            participating in the acquisition and ownership of medical technologies. As a result,
16          these proposed regulations, if enacted, could have an adverse impact on our product
            sales and therefore on our business and results of operations.
17

18          On November 7, 2007, Accuray issued a press release announcing record quarterly

19   revenues of $48.6 million for 1Q08, representing a 48% increase over 1Q07.  Pl. Ex. 20.

20          On January 30, 2008, Accuray announced revenues of $52 million for 2Q08, representing

21   a 98% increase over 2Q07 revenues.  ¶ 105; Pl. Ex. 26.  Accuray, however, cautioned that, due to

22   economic conditions, and specifically the tightening credit markets, it was adjusting its revenue

23   guidance for FY08 to $210-230 million, which would represent revenue growth of 50-64% over

24   FY07.  Pl. Ex. 26.  During an analyst conference call that same day, Accuray disclosed that a

25   number of contracts were being removed from backlog and explained that the freestanding center

26

27          [2] Accuray continued to provide detailed risk disclosures in its quarterly and annual filings
     throughout the Class Period.  *See, e.g.*, Pl. Exs. 3 at 29-46, 17 at 26-46, 25 at 30-47.
28

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

1    market segment had been negatively impacted by proposed regulatory changes and tightening

2    credit markets.  Pl. Ex. 27 at 4-5.

3         On April 29, 2008, Accuray announced revenues of $58.8 million for 3Q08, representing

4    a 57% increase over 3Q07.  ¶ 113; Pl. Ex. 32.  Accuray also disclosed that additional contracts

5    were being removed from backlog due to, among other factors, the tightening economy and

6    uncertain regulatory environment.  Pl. Ex. 33.

7         On August 19, 2008, Accuray announced its 4Q08 and FY08 results.  ¶ 119.  Accuray

8    reported FY08 revenues of $210.4 million, a 50% increase over FY07.  *Id.*  Accuray also

9    disclosed that additional contracts were being removed from backlog due to various factors,

10   including proposed regulatory changes, the general economy and the credit environment.  ¶ 120.

11        Nearly a full year later, on July 22, 2009, the first of three class action complaints was

12   filed in this Court challenging Accuray's statements regarding backlog.  The Court consolidated

13   the actions, and on December 17, 2009, plaintiffs filed the instant Complaint.  The Complaint

14   asserts causes of action for alleged violations of Sections 10(b) and 20(a) of the Securities

15   Exchange Act of 1934 (the "Exchange Act") and generally alleges that the Defendants made

16   false and misleading statements regarding Accuray's business and financial performance.

                                     **ARGUMENT**

17

18   **I.    LEGAL STANDARDS**

19        To state a Section 10(b) claim, a plaintiff must plead: "'(1) a material misrepresentation

20   or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security,

21   (4) transaction and loss causation, and (5) economic loss.'"  *Zucco Partners, LLC v. Digimarc*

22   *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted).  The Reform Act imposes rigorous

23   pleading requirements for plaintiffs alleging securities fraud and provides that complaints that do

24   not satisfy these requirements "shall" be dismissed. 15 U.S.C. § 78u-4(b)(1)-(3); *see Tellabs, Inc.*

25   *v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

26        Among other requirements, plaintiffs must: "specify each statement alleged to have been

27   misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

28   the statement or omission is made on information and belief … state with particularity all facts

                                          6          DEFENDANTS' MOTION TO DISMISS
                                                     Master File No. 09-cv-03362-CW

1   on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  Plaintiffs also must plead

2   particularized facts "evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate,

3   or defraud.'"  *Tellabs*, 551 U.S. at 313 (citation omitted); 15 U.S.C. § 78u-4(b)(2) (plaintiffs

4   must "state with particularity facts giving rise to a strong inference that the defendant acted with

5   the required state of mind.").  In the Ninth Circuit, the requisite mental state for a Section 10(b)

6   claim is "deliberately reckless or conscious misconduct."  *In re Silicon Graphics, Inc. Sec. Litig.*,

7   183 F.3d 970, 974 (9th Cir. 1999) ("*SGI*").  With respect to claims based on "forward-looking"

8   statements, actual knowledge of falsity is the required state of mind.  15 U.S.C. § 78u-5(c)(1)(B).

9           Where, as here, plaintiffs rely on statements from confidential witnesses ("CWs") to

10   plead their claims, they "must pass two hurdles to satisfy the PSLRA[:]" (1) "the confidential

11   witnesses whose statements are introduced to establish scienter must be described with sufficient

12   particularity to establish their reliability and personal knowledge;" and (2) "those statements

13   which are reported by confidential witnesses with sufficient reliability and personal knowledge

14   must themselves be indicative of scienter."  *Zucco*, 552 F.3d at 995.

15   **II.     PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION**

16           Plaintiffs allege four general categories of purportedly false or misleading statements:

17   (1) "the definition, quality, and makeup of backlog;" (2) "the receipt of and accounting for

18   customer deposits;" (3) "the Company's revenue and earnings forecasts for FY08;" and

19   (4) "revenue recognition processes on CyberKnife system sales to international customers."  ¶ 5.[3]

20           "A litany of alleged false statements, unaccompanied by the pleading of specific facts

21   indicating why those statements were false, does not meet [the PSLRA] standard."  *Metzler Inv.*

22   *GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  Rather, "facts supporting

23   falsity must be pled with particularity, including the 'who, what, when, where, and how[.]'"  *In re*

24   *Downey Sec. Litig.*, 2009 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009) (citation omitted).  As

25   set forth below, because plaintiffs fail to plead with particularity material misrepresentations or

26   omissions, the Complaint fails to state a claim under Section 10(b).

27   _____

28        [3]  Forward-looking statements regarding (1) and (3) are discussed in Section III, *infra*.

A.      **Plaintiffs Fail to Allege Falsity with respect to the Backlog Statements**

Most of the statements challenged in the Complaint pertain to the manner in which the Company defined and reported backlog during the Class Period.  Plaintiffs' allegations – which rely heavily on CWs – fail to meet the stringent requirements of the Reform Act.

1.      **Registration Statement Definition of Backlog.**

Plaintiffs claim that the "definition" of backlog used in the Registration Statement and subsequent SEC filings was false and misleading (¶¶ 5, 6, 53) because, although Accuray represented that "backlog consisted of CyberKnife sales and revenues with no contingencies, that customers were contractually committed to make" (¶ 7), Accuray had switched from Letters of Intent ("LOIs") to "Term Agreements" which "contained language allowing for contingencies to be self-satisfying[.]"  ¶ 68.  Plaintiffs further allege that self-satisfying contingencies resulted in backlog being inflated because the "customers need not do anything for a contingency to be satisfied, resulting . . . [in] deals being reported as non-contingent or having a substantially high probability of being converted into revenue when this was not the case." ¶ 68.[4]  Plaintiffs appear, however, to be mixing concepts, as the challenged statements do not make any reference to "LOIs" or "Term Agreements," nor do Plaintiffs explain how "self-satisfying" contingencies made conversion to revenue less likely.

Instead, plaintiffs rely heavily on opinions purportedly offered by CW1, allegedly a regional sales director from 2004 to 2007.  ¶¶ 43(a), 68(a).  CW1's personal opinion regarding the use of "Term Agreements," however, has no bearing on the accuracy of the backlog definition.  CW1 does not purport to have been involved in the development of the definition, nor does CW1 claim to have been involved in determining which deals would be included in backlog.  Moreover, CW1 concededly had no communications with executives regarding the use of Term Agreements. ¶ 68(a) ("CW1 said that the Company executives did not explain to sales staff why this change was being made[.]").  CW1's opinion that the language of the Term

---

[4] Plaintiffs also contend that the inclusion of contracts with self-satisfying contingencies in backlog after May 1, 2007 rendered statements regarding backlog false and misleading. *See e.g.* ¶ 104.  For the same reasons as articulated below, this claim also fails.

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

1   Agreements "seemed geared to allow far more speculative, contingent deals to be added to the

2   order backlog" (*id.*) is nothing more than speculation.  *See, e.g.*, *Weiss v. Amkor Techn., Inc.*, 527

3   F. Supp. 2d 938, 954 (D. Ariz. 2007) (finding CW allegation that "inflated forecasts occurred

4   because senior management failed to implement a centralized and effective forecasting system"

5   insufficient because it was "simply CW1's purported opinion").

6      In any event, plaintiffs' allegations regarding "self-satisfying contingencies" make no

7   sense.  The use of agreements with self-satisfying contingencies – a practice that is far from

8   unusual – does not render the statement that backlog included only non-contingent contracts

9   false.  If the contingencies in a contract were satisfied, whether by act or time, and the customer

10   was thus legally obligated to purchase a CyberKnife, the contract would be "non-contingent."

11        **2.**   **Change in the Definition of Backlog.**

12      Plaintiffs further contend that Accuray's statements on May 1, 2007 regarding the

13   decision to now include contingent contracts in backlog (*e.g.*, ¶¶ 60-62) were false and

14   misleading because Accuray "falsely stated that the change in the definition of backlog was

15   driven by the ***increased demand*** for the CyberKnife and new contracts with customers[.]"  ¶ 62.[5]

16   Nowhere in the Complaint, however, do plaintiffs provide particularized facts demonstrating that

17   demand for the CyberKnife *was not increasing* in May 2007 or that the number of new contracts

18   was not growing.  Nor can plaintiffs plead falsity as to this and later statements reiterating the

19   new definition based on Accuray's subsequent reductions in backlog or the later decision to

20   exclude contingent contracts from backlog.  ¶ 128.  As this Court recently explained, "[p]laintiffs

21   cannot simply rely on a 'fraud by hindsight' theory to demonstrate falsity."  *In re Rackable Sys.,*

22   *Inc. Sec. Litig.*, 2010 WL 199703, at *5 (N.D. Cal. Jan. 13, 2010) (citation omitted).

23        **3.**   **"[Q]uality and makeup of backlog."**

24      Plaintiffs also challenge a number of statements regarding what plaintiffs characterize as

25

26     [5] To the extent that plaintiffs also allege that the statements regarding the definitional change
were misleading because Accuray "falsely told investors that the new backlog figures were the

27   best indicator of future revenue results" (¶¶ 60, 62), such statements are clearly forward-looking
and thus inactionable under the Reform Act's Safe Harbor.  *See infra* at Section III.

28

    DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

the "quality and makeup" of backlog and allege that they were false and misleading because

backlog included contracts for which Accuray had not received a deposit and contracts that had

been "cancelled" or were "suspect." *E.g.*, ¶¶ 5, 6, 13-14, 60, 74, 80, 87. With respect to the

deposit claim, as explained *infra* at 12, the allegations are based on a mischaracterization of

Accuray's statements and also fail to show that depositless deals were inherently "suspect."

Likewise, plaintiffs' allegations regarding "cancelled" contracts lack the requisite

specificity. Plaintiffs again rely on CW1, who allegedly reported that:

> the time between Accuray receiving notice that a customer wanted to cancel and
> the time that Accuray would actually remove the items from backlog depended on
> how much the Company needed the deal in backlog. The Company would receive
> letters from customers requesting that Accuray de-book a deal and the Company
> would not remove the deal from backlog, sometimes for months.

¶ 74. These allegations fail to support plaintiffs' claims for several reasons. As explained *supra*

at 8-9, plaintiffs do not allege that CW1, a *regional* sales director, had any involvement in

corporate level backlog decisions. The allegation is also vague as to time and as to the purported

impact on backlog; it is unclear how the alleged cancellations impacted the figures or definitions

reported by the Company. *Cf. Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815,

828 (S.D. Cal. 2006), *aff'd*, 256 Fed. Appx. 74 (9th Cir. 2007) (noting failure of CWs to

"provide any allegations quantifying the impact of the[] alleged improprieties on [the

company's] revenues, or . . . year-end financial results"). More importantly, CW1 left the

Company in 2007 (¶ 43(a)) and thus was not even employed at Accuray for much, if not most, of

the Class Period. *See Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200-01 (N.D. Cal. 2008)

("*Yahoo! I*") (where class period extended until 2006 but CW stopped working at company in

2004, the "temporal gap belies the credibility of Plaintiffs' allegation").

CW5's allegations also add little to the analysis. CW5, allegedly a Director of Marketing

and Placement, reported that cancelled orders were not "de-book[ed]" if the cancellation was

shortly before the end of the quarter and reported seeing cancelled orders in a "list of pending

installations." ¶ 74(b). Plaintiffs, however, fail to specify how CW5, as a marketing employee,

would have had access to corporate backlog reports or how a "list of pending installations" and

"de-book[ings]" bore on the figures reported by Accuray. *See supra* at 10. CW2's information

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

1    is even weaker as it concededly is based on purportedly "*hear*[*ing*] that the Company would

2    delay taking a sale off the books even after a customer would ask to have it cancelled, resulting

3    in inflated backlog figures."  ¶ 74(c) (emphasis added); *Downey*, 2009 WL 2767670, at *9

4    ("[T]he statements of a confidential witness are disregarded if lacking in specificity or based on

5    hearsay, rumor, or speculation.").  Thus, the allegations regarding cancelled contracts are

6    insufficient to plead falsity.

7         Plaintiffs further contend that backlog was inflated because it included "suspect"

8    contracts that did not have a high probability of being converted into revenue.  ¶ 73.  Once again,

9    however, the CW allegations lack specificity and are based on speculation and rumor as opposed

10   to personal knowledge.  *E.g.*, ¶ 73(f) ("CW5 . . . stated that Nash was the salesperson known for

11   having the highest percentage of cancelled contracts[.]"); ¶ 73(d) (reporting hearsay of Snarsky);

12   ¶ 73(l) ("CW9 *was told by* employees") (emphasis added); *see supra* at 10-11.[6]

13        Likewise, the personal *opinions* of CWs as to whether and which contingent contracts

14   should have been included in backlog cannot substitute for particularized facts.  For example,

15   CW11 opines that "no contingent orders of any kind should have been included in the backlog."

16   ¶ 73(m).  CW11's personal opinion, however, fails to demonstrate that the reported numbers

17   were false when made.  *See supra* at 8-9.

18                   **4.    Reasons for the Reductions in Backlog.**

19        Plaintiffs allege that the "reason for the withdrawal of millions from backlog" was not

20   "associated with the tightening credit markets," as Defendants indicated, but rather was because

21   "backlog was full of deals with no real likelihood of ever resulting in a system install[.]"  ¶¶ 105-

22   06.  As explained *supra* at 9-11, however, plaintiffs fail to plead particularized facts supporting

23   this contention.  Moreover, plaintiffs fail to allege facts showing that the tightening credit market

24   did *not* affect Accuray's business.  Indeed, such a contention defies credulity, given the sweeping

25   impact that the credit crisis has had on companies worldwide.

26

27        [6] The Complaint also fails to specify how CW1 and CW11's statements regarding the issues
     with the Oncuris deal affected reported backlog.  ¶ 73(h)-(i).

28

**B.      Plaintiffs' Falsity Allegations Regarding Deposits Are Insufficient**

**1.      Receipt of Deposits.**

Plaintiffs allege that the Registration Statement falsely stated that:

> [Accuray] *typically receive[s] a deposit at the time the CyberKnife system purchase contract is executed, and the remaining balance for the purchase of the CyberKnife system upon installation*[.]

¶ 8; *see id.* ¶ 70.  Plaintiffs allege that this was false because Accuray did not always receive a deposit.  ¶ 70.  Merely alleging that Accuray did not receive deposits for all deals, however, does not demonstrate the falsity of the challenged statement.  To the contrary, as plaintiffs' allegations make clear, Accuray simply stated that a deposit "typically" was received; it did not state that a deposit was received in every instance.  *See* ¶ 8.

**2.      Recognition of Deposits as Revenue.**

Plaintiffs further contend that the Registration Statement falsely stated that:

> *[i]n the event that a customer does not, for any of the reasons above or other reasons, proceed with installation of the system after entering into a purchase contract, we would only recognize the deposit portion of the purchase price as revenue. . . .*

¶ 8; *see id.* ¶ 70.  Plaintiffs allege that this was false because "deposits were almost always refunded back to the customers in the event that customers cancelled the contracts."  ¶ 70.  This statement, however, *says nothing* about whether Accuray had a policy of always keeping deposits upon cancellation.  To the contrary, the statement simply clarifies that where a deposit *was* kept after cancellation, Accuray would recognize it as revenue.  ¶ 8.

Regardless, the allegations are once again based on information provided by CWs (CW1, CW10, CW11), none of whom is alleged to have been in a finance or accounting position.  ¶ 70.  Thus, none of the CWs can speak to revenue recognition practices.  *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) ("*Yahoo! II*") ("Plaintiffs must describe with particularity the CW's personal knowledge of [the Company's] revenue recognition process.").

**C.      Plaintiffs' Falsity Allegations with respect to International Sales Also Fail**

Plaintiffs also challenge statements in the Registration Statement pertaining to recognition of revenue for international sales.  Plaintiffs allege that the statement that Accuray

12                    DEFENDANTS' MOTION TO DISMISS
                      Master File No. 09-cv-03362-CW

1   "typically recognized revenue when the system is *delivered* to the end user's site" (¶ 55) was

2   false and misleading because Accuray actually recognized revenue upon shipment to the

3   distributor (as opposed to the end-user).  ¶ 95.  In support of this contention, plaintiffs point only

4   to a statement made by Robert McNamara during a conference call on November 7, 2007, which

5   plaintiffs claim "revealed" the truth regarding international sales revenue recognition:

> [i]t kind of depends – it depends whether our distributor has the capability of
> installing, or as part of the contract, we are meant to install it.  If we are meant to
> install it then we have to install it before we recognize revenue.  If the distributor
> has the capability to install or we've fulfilled sort of our obligation, if you will, then
> we would recognize revenue.  So in some cases, we would recognize it upon
> shipment, but it really depends on that particular distributor and their capabilities.
> Typically, it is a ship through to the customer though.

10  Pl. Ex. 21 at 14.  This is hardly a "revelation" and certainly does not negate Accuray's prior

11  statements.  Mr. McNamara simply stated the obvious: revenue recognition depended on the

12  *terms of the contract*.  If the contract required Accuray to install the product, revenue could only

13  be recognized upon installation.  If Accuray's contractual obligation was limited to shipping the

14  system to the distributor, revenue could be recognized upon shipment.  The statement that

15  revenue was "typically" recognized upon delivery to the end user does not preclude recognition

16  upon shipment to the distributor where the contract specified that Accuray's obligations

17  terminated upon shipment.  Because the statement by Mr. McNamara is not inconsistent with the

18  prior representation by Accuray, plaintiffs have failed to demonstrate falsity.  *Ronconi v. Larkin*,

19  253 F.3d 423, 434 (9th Cir. 2001) ("The circumstances are not inconsistent with the statements

20  so as to show that the statements must have been false or misleading when made.").

21      In any event, plaintiffs fail to allege even the basic details of accounting fraud, including,

22  among others, the amounts by which the financials purportedly were overstated, the dates of the

23  transactions, or the identity of the individuals involved.  *See, e.g.*, *In re Seracare Life Scis., Inc.*,

24  2007 WL 935583, at *8 (S.D. Cal. Mar. 19, 2007) (finding CWs' allegations that "[the company]

25  habitually shipped products out before customers wanted the product at the end of quarters so

26  that they could recognize revenue during that quarter" insufficient "because they fail to allege the

27  specific products that were involved . . . when they were shipped, how much revenue was

28  recorded on [the] financial statements . . . and how [it] violated GAAP").  Nor do plaintiffs

1   allege – as they must – the cited CWs' (¶ 99) "roles in [the] revenue recognition process and that

2   they had personal knowledge of Defendants' accounting decisions."  *Yahoo! II*, 630 F. Supp. 2d

3   at 1114.  Plaintiffs' revenue recognition allegations thus fail to withstand scrutiny.

4   **III.    THE FORWARD-LOOKING STATEMENTS ARE NOT ACTIONABLE**

5           The Complaint challenges three categories of forward-looking statements:  (a) FY08

6   revenue projections;[7] (b) statements concerning the likelihood that backlog would be converted

7   to revenue; and (c) publicly announced backlog figures.  The "Safe Harbor" immunizes forward-

8   looking statements if they are either (i) identified as forward-looking and accompanied by

9   meaningful cautionary language *"or"* (ii) made without actual knowledge of falsity.  15 U.S.C.

10  § 78u-5(c)(1) (emphasis added).[8]  The provision is in the disjunctive; thus, protection is not lost

11  merely because a complaint alleges the defendants knew their statements were false:  "[t]he first

12  prong of the safe harbor requires courts to examine only the cautionary statement accompanying

13  the forward-looking statement.  Courts should not examine the state of mind of the person

14  making the statement."  H.R. Conf. Rep. No. 104-369, at 44, 1995 U.S.C.C.A.N. 730 (1995).[9]

15          Where, as here, the challenged forward-looking statements were accompanied by

16  meaningful cautionary statements, they cannot give rise to liability under the first prong of the

17  Safe Harbor.  The forward-looking statements are also separately immunized under the second

18  prong, as plaintiffs fail to plead facts showing actual knowledge.  *See infra* at 17-19, 24.

19          **A.    Many of the Challenged Statements Were Forward-Looking**

20          Forward-looking statements include: (A) "a projection of revenues . . . or other financial

---

22          [7] Although plaintiffs also allege that Defendants provided false and misleading earnings
    guidance, a review of the cited documents reveals that Defendants did not give any earnings
23  guidance, thus the non-existent earnings guidance could not have been false or misleading.  *See,
    e.g.*, Pl. Ex. 12 at 6 ("We are not giving earnings guidance for FY '08 at this time[.]").

24
            [8] The Safe Harbor effectively codified the judicially created "bespeaks caution" doctrine,
25  which also protects forward-looking statements accompanied by cautionary language.  *See
    Employers Teamsters Local Nos. 175 and 505 Pension Plan Trust Fund v. Clorox Co.*, 353 F.3d
26  1125, 1132 (9th Cir. 2004).  Defendants also seek dismissal pursuant to this doctrine.

27          [9] *See In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *12 (N.D. Cal. Aug. 17,
    2006) ("'[I]f a statement is accompanied by meaningful cautionary language, the defendants'
28  state of mind is irrelevant.'") (citation omitted).

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

1    items;" (B) "the plans and objectives of management for future operations;" (C) "a statement of

2    future economic performance;" and (D) "any statement of the assumptions underlying or relating

3    to any statement described in subparagraph (A), (B), or (C)."  15 U.S.C. § 78u-5(h)(i)(1).

4            The challenged FY08 revenue forecast[10] clearly is "a projection of revenues."  15 U.S.C.

5    § 78u-5(h)(i)(1)(A).[11]  Likewise, Accuray's statements that it believed there was a "substantially

6    high probability" of converting the contingent contracts in backlog into future revenue,[12] as well

7    as statements that it was "confident" or "believed" that 90% of the total backlog would

8    ultimately be converted to revenue,[13] were forward-looking since they contained predictions

9    about the future. 15 U.S.C. § 78u-5(c)(1)(A).[14]  Accuray's statements concerning its backlog

10   figures[15] were forward-looking for similar reasons.  Indeed, plaintiffs' own Complaint claims

11   that the backlog figures were interpreted by investors as predictions of the future.  *See, e.g.*, ¶ 30

12   ("The Company's reported backlog was . . . the metric that the Company used to measure . . .

13   future financial performance.").[16]

14

15            [10] ¶ 88; *see also id*. ¶¶ 16, 20, 78, 85, 93, 97, 106.

16            [11] Accuray also identified these statements as forward-looking in its public statements.  *See,
     e.g.*,  Pl. Ex. 12 at 2 ("I need to remind you that, except for historical information, the matters
17   presented in this conference call, including statements as to financial guidance . . . are forward-
     looking statements and within the meaning of the Safe Harbor[.]"); Pl. Ex. 20.

18            [12] *E.g.,* ¶¶ 6-7, 11, 16, 26, 61, 62, 66, 68, 77-78, 87, 93, 103, 105, 119, 120.

19            [13] *E.g.*, ¶¶ 14, 16, 31, 62, 68, 76, 78.

20            [14] The statements were also specifically identified as forward-looking in press releases, SEC
     filings and conference calls.  *See, e.g.*, note 11, *supra*.

21            [15] *E.g.*, ¶¶ 11, 13, 26, 60-61, 64, 77-79, 84, 87, 93-94, 96-97, 100, 105, 115.

22            [16] *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), is not to the contrary.
     Plaintiffs in *Berson* alleged that Applied Signal's statements regarding its backlog were rendered
23   misleading by the failure to disclose that it had received "stop-work orders" on orders it included
     in backlog.  *Id*. at 984.  The defendants argued that the statements about backlog were forward-
24   looking.  *Id*. at 990.  The company, however, had explicitly stated that its backlog was "subject
     *only to* the cancellation and modification provisions contained in our contracts."  *Id*. at 985-86
25   (emphasis added).  In holding that the statements were not forward-looking, *Berson* found that,
     "*as Applied Signal uses the term*, 'backlog' isn't a 'projection' of earnings or a 'statement' about
26   'future economic performance,'" but was instead analogous to accounts receivable in that it
     "represents Applied Signal's *contractual entitlement to perform certain work*[.]"  *Id*. at 990
27   (emphasis added; citation omitted).  Unlike Applied Signal, Accuray disclosed the inclusion of
     "contingent" contracts in its backlog, based on its estimation of whether or not those contracts
28   *would be converted to revenue in the future*.  Thus, as *Accuray* used the term, backlog *was* a
                                                                                        (continued...)

1    A statement's use of the present, past, or future tense does not determine whether it is

2    forward-looking; rather, the salient inquiry is whether truth or falsity can be discerned until some

3    point after the statement is made.  *See, e.g.*, *Harris v. IVAX*, 182 F.3d 799, 805 (11th Cir. 1999);

4    *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1067-68 (N.D. Cal. 2001).

5    Here, Accuray's actual realization of revenue from backlog could not be determined until long

6    after those statements were made.[17]

7       **B.    The Company Provided Meaningful Cautionary Language**

8       To qualify for the Safe Harbor, a defendant must also identify "important factors that

9    could cause actual results to differ materially from those in the forward-looking statements."  15

10   U.S.C. § 78u-5(c)(1)(A)(i).  A company need not list all important factors or even the particular

11   factor that caused the forward-looking statement to be an inaccurate prediction.  *See, e.g.*,

12   *Clorox*, 353 F.3d at 1133; *IVAX*, 182 F.3d at 807.

13      Accuray repeatedly warned that its results could differ from its forward-looking

14   statements.[18]  Lengthy risk disclosures in SEC filings identified specific risks that directly related

15   to the forward-looking statements.  *See, e.g.*, Pl. Ex. 17 at 26-44; Pl. Ex. 25 at 30-45.  Indeed,

16   although these disclosures need not have warned of the precise risks that came to pass for the

17

18       (...continued from previous page)
19   projection.  *See* Pl. Ex. 17 at 58 (defining contingent contracts as those that have a "substantially
     high probability" of being converted into revenue).  Indeed, Accuray further disclosed to its
20   investors that on a quarterly basis, it would review "whether customer engagement and progress
     toward satisfaction of contingencies *warrants continued inclusion* of the contract within
21   backlog."  *Id.* (emphasis added).  Where plaintiffs in *Berson* contended that the backlog figure
     was a present figure that was falsely represented, here plaintiffs argue that Defendants'
22   *projection of future revenue* to be achieved from backlog was false.

23      [17] Even if the figures were viewed as "mixed" statements consisting of both historical and
     forward-looking information, the Safe Harbor would apply.  *See, e.g.*, *IVAX*, 182 F.3d at 806
24   ("[W]hile the statute does not tell us exactly what to do with a mixed statement, extrinsic sources
     of congressional intent point strongly toward treating the entire list as forward-looking.").

25      [18] *See, e.g.*, Pl. Ex. 11 at 4 (identifying specific factors and referring investors to the detailed
     risk disclosures in the Form 10-Q); Pl. Ex. 12 at 2-3; Pl. Ex. 20.  Risk disclosures can be
26   incorporated by reference.  *See, e.g.*, *In re ESS Tech., Inc. Sec. Litig.*, 2004 WL 3030058, at *9
     (N.D. Cal. Dec. 1, 2004) (applying safe harbor where press releases directed readers to SEC
27   filings containing cautionary language); *Clorox*, 353 F.3d at 1133 (oral forward-looking
     statements do "not require that the cautions physically accompany oral statements") (citing 15
28   U.S.C. § 78u-5(c)(2)(B)(i)).

DEFENDANTS' MOTION TO DISMISS
                                         Master File No. 09-cv-03362-CW

1    Safe Harbor to apply, they did so here.  For instance, Accuray warned that it "may be unable to

2    convert all of this backlog into recognized revenue due to factors outside our control[.]"  Pl. Ex.

3    17 at 59; Pl. Ex. 25 at 23.  Accuray explained that "customer funding [and] financing delay"

4    were among "[e]vents beyond our control [that] may delay installation and the satisfaction of

5    contingencies required to receive cash inflows and recognize revenue[.]"  Pl. Ex. 17 at 28; Pl.

6    Ex. 25 at 32.  Accuray also disclosed that "[c]ontingencies associated with contingent contracts

7    that are included within backlog may include . . . establishment of financing and legal entities by

8    purchasers of systems."  Pl. Ex. 17 at 58.  Accuray further cautioned that its results could "vary

9    significantly" if it was unable to "install a CyberKnife system when anticipated" due to "a

10   change in a customer's financial condition or ability to obtain financing."  Pl. Ex. 17 at 27-28; Pl.

11   Ex. 25 at 31-32.  Thus, the forward-looking statements are protected by the Safe Harbor.

12   **IV.     PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER**

13           As an initial matter, plaintiffs cannot show scienter where, as here, they fail to plead

14   falsity, because "*a fortiori* they have not established that defendants knew those statements were

15   false."  *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999); *accord Phillips v. LCI*

16   *Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999).  Even assuming that plaintiffs had sufficiently

17   pleaded falsity, plaintiffs' scienter allegations are deficient.  The Reform Act requires plaintiffs

18   to "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the

19   required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).  Courts "must consider *all*

20   reasonable inferences to be drawn from the allegations, including inferences unfavorable to the

21   plaintiffs."  *Metzler*, 540 F.3d at 1061 (citation omitted).

22           **A.     Plaintiffs Provide No Direct Evidence of Scienter**

23                   **1.     The Complaint Does Not Plead Facts Demonstrating Each
                          Defendant's Awareness of Contemporaneous Internal Information**

24                       **Contradicting the Challenged Public Statements.**

25           To plead scienter, "the complaint must contain allegations of *specific contemporaneous*

26   *statements or conditions* that demonstrate the intentional or the deliberately reckless false or

27   misleading nature of the statements when made."  *Ronconi*, 253 F.3d at 432 (emphasis added;

28   citation omitted); *Metzler*, 540 F.3d at 1066 (same).  Plaintiffs fail to plead facts identifying

17                           DEFENDANTS' MOTION TO DISMISS
                             Master File No. 09-cv-03362-CW

contemporaneous material information known to any Defendant that contradicted public

statements at the time they were made.  Plaintiffs' failure to plead such details is fatal to their

claim.  *See, e.g.*, *Alaska Elec. Pension Fund*, 434 F. Supp. 2d at 823 ("Plaintiffs must allege facts

showing Defendants knew, when preparing the year-end financials … that the receivables should

have been written off, but they fraudulently chose to delay the write-down.").

### 2. The Confidential Witnesses' Allegations Do Not Overcome Plaintiffs' Failure to Allege Contemporaneous Facts Known to the Defendants.

As explained *supra* at 8-12, plaintiffs' CW allegations suffer from numerous deficiencies

and are thus neither cogent nor compelling.  Indeed, these allegations have no probative value at

all with respect to six of the seven individual defendants (Messrs. McNamara, Thomson, Wu,

Tu, Adler, and Weiss) because none of the CWs purports to have had any personal interaction

with these individuals.[19]  Thus, no CW is in a position to speak to what any of these individuals

did or did not know at the time each of the challenged statements was made.  *See, e.g.*, *Rackable*,

2010 WL 199703, at *8 ("The two remaining CWs … are not alleged 'to have had any

interaction or communication with any of the defendants, or to have provided any defendant with

information, or to have heard or read any statement by any defendant, that contradicted or even

cast doubt on a public statement[.]'") (citation omitted); *McCasland v. FormFactor, Inc.*, 2009

WL 2086168, at *5 (N.D. Cal. July 14, 2009) (CWs failed to provide "any *specific* information

to defendants," including emails, internal memos or reports, that "contradict[ed] any public

statement made," and failed to show "that any CW heard or read any specific private statement

by a defendant that contradicted a public statement").

With respect to Mr. Hampton, three of the CWs allegedly reported that the sales staff told

---

[19] Although CW4 claims that "all of the senior executives," including Dr. Thomson, attended sales presentations that "typically took place in the first quarter" where they allegedly would hear John Nash's "outrageous forecasts" (¶ 73(e)), the allegations once again are based on personal opinion, innuendo and gossip.  *See supra* at 10-11.  Moreover, CW4 does not claim to have had *any* communications with Dr. Thomson at these meetings or at any other time, much less discussed Mr. Nash with him.  *See, e.g.*, *In re Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1073-74 (W.D. Wash. 2003) (holding that CW allegations were not sufficiently specific where they did not include where and when meetings took place, who attended or what was specifically discussed).

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

1    him that there was "no way" that they could sell 100 CyberKnifes (¶¶ 17, 88).  As explained

2    *supra* at 8-12, however, the allegations attributed to CW2, CW3, and CW4 suffer from numerous

3    weaknesses: (1) CW2 and CW4 allegedly were regionally based (¶ 43) and thus did not have

4    personal knowledge of day-to-day activities at Accuray's corporate headquarters; (2) none of

5    these CWs purports to have been involved in determining corporate level backlog or preparing

6    revenue forecasts; (3) two of the three CWs ceased working at Accuray in 2007 – long before the

7    end of the Class Period in 2008; and (4) much of the information attributed to these CWs is

8    based on hearsay, opinion and gossip.  Moreover, and fatal to the claim against Mr. Hampton,

9    this alleged sales target was purely internal.  Although plaintiffs allege that "multiple CWs report

10   that the [$250-270 million revenue forecast] was based on" Mr. Hampton's sales targets (¶ 88),

11   not one of the CWs claims to have been involved in preparing the revenue forecast and thus

12   cannot claim to have personal knowledge about such forecasts.[20]  *See Zucco*, 552 F.3d at 996

13   (where CWs "were simply not positioned to know the information alleged," such allegations are

14   insufficient to raise a strong inference of scienter).

15       **B.    Plaintiffs' Motive Allegations Are Insufficient to Raise a Strong Inference of**
             **Scienter**
16

17               **1.    The Stock Sale Allegations Fail to Provide the Missing Inference of**
                       **Scienter.**

18           Plaintiffs rely heavily on allegations of insider trading in an attempt to establish a motive

19   to commit securities fraud.  Mere allegations of stock sales, however, do not give rise to a strong

20   inference of scienter.  To the contrary, the Ninth Circuit has held that "insider trading is

21   suspicious only when it is dramatically out of line with prior trading practices at times calculated

22   to maximize the personal benefit from undisclosed inside information."  *SGI*, 183 F.3d at 986

23   _____

24       [20] Although CW11 allegedly participated in backlog meetings attended by representatives
     from the Finance, Legal and Sales departments, including Mr. Hampton, and separately claims
25   that the "J.L. Parrott deals were definitely included in the Watch List during the backlog
     meetings" (¶ 73(m)), CW11 does not claim to have discussed these deals with Mr. Hampton (or
26   any other defendant) at any time.  *See, e.g.*, *In re Medicis Pharma. Corp. Sec. Litig.*, 2009 WL
     4755406, at *12 (D. Ariz. Dec. 2, 2009) (finding CW allegations regarding alleged interaction
27   with CFO failed "to support a conclusion that [the CW] had personal knowledge about the
     Defendants' improper state of mind" where the complaint failed to "specify when alleged
28   conversations . . . took place" or to "provide details about the content of those conversations").

DEFENDANTS' MOTION TO DISMISS
                                             Master File No. 09-cv-03362-CW

1  (citation omitted).  To analyze these allegations, courts must examine:  "(1) the amount and

2  percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were

3  consistent with the insider's prior trading history."  *Id.*  An analysis of these factors reveals that

4  the stock sale allegations fall far short of providing the requisite strong inference of scienter.

5        **Amount and Percentage Sold.**  Plaintiffs do not allege that Messrs. McNamara, Weiss,

6  or Hampton sold any stock during the Class Period.  The absence of sales by these individuals

7  contradicts plaintiffs' claim that they were committing securities fraud because they sought to

8  profit from insider stock sales.  *Ronconi*, 253 F.3d at 436 ("One insider's . . . sales do not support

9  the 'strong inference' required by the statute where the rest of the equally knowledgeable

10  insiders act in a way inconsistent with the inference that the favorable characterizations of the

11  company's affairs were known to be false when made.") (footnotes omitted); *see Metzler*, 540

12  F.3d at 1067 (same).  Further refuting an inference of scienter is the fact that two of these

13  individuals *purchased* Accuray shares during the Class Period.  Mr. Weiss purchased ***100,000***

14  ***shares*** (Ex. F) and Mr. Hampton purchased 9,000 shares (Ex. C).  *See, e.g.*, *See Iron Workers*

15  *Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 594 (E.D. Va. 2006)

16  ("The fact that a defendant acquires stock . . . further negates any idea that Defendants had a

17  motive to commit fraud.") (citations omitted).

18        With respect to the individual defendants who did sell stock,[21] the percentages were not

19  unusual or suspicious:  Dr. Thomson sold 10.5%, and outside directors Wayne Wu and Dr. John

20  Adler sold 8.2% and 17.2%, respectively.[22]  *See, e.g.*, *Metzler*, 540 F.3d at 1067 (finding CEO's

21  stock sales of "only 37%" of total holdings insufficient to support scienter).  Moreover, plaintiffs

22  omit several important facts that further weaken any inference of scienter.  For example,

23

24      [21] The alleged stock sales by Messrs. Lindquist and Raanes, who are not defendants, are
25  irrelevant.  "Plaintiffs have not alleged how these sales [by non-defendants] impute scienter to
    Defendants."  *Rackable*, 2010 WL 199703, at *9; *see Tripp v. IndyMac Fin. Inc.*, 2007 WL
26  4591930, at *4 n.1 (C.D. Cal. Nov. 29, 2007) ("Any sales by a non-defendant are irrelevant.").

27      [22] *See* Walters Decl, Exs. A, B, D, G.  Exercisable options are included in total
    stockholdings.  *See, e.g.*, *SGI*, 183 F.3d at 986-87 ("Actual stock shares plus exercisable stock
28  options represent the owner's trading potential more accurately[.]")

DEFENDANTS' MOTION TO DISMISS
Master File No. 09-cv-03362-CW

1   plaintiffs' allegations fail to reflect that Mr. Wu also **purchased 30,000 shares** during the Class

2   Period.  Walters Decl., Ex. G.  With respect to Mr. Tu, the Forms 4 for the cited transactions

3   reveal that the shares sold were not his personal holdings, but rather, the holdings of President

4   (BVI) International Investment Holdings Ltd., for which he worked.  *Id.* Ex. E.[23]

5          **Timing of the Sales and Trading Patterns.**  All but one of the challenged stock sales

6   were in the IPO, a fact that is far from unusual or suspicious, since that was the first day on

7   which there was a public market for the shares.  *See, e.g.*, *Ronconi*, 253 F.3d at 436 ("*Silicon

8   Graphics* suggests that restrictions on an insider's ability to trade are important in determining

9   whether the trading pattern is suspicious.").  Moreover, plaintiffs' contention that the individual

10  defendants "sold millions of shares of Accuray stock at artificially inflated prices of more than

11  $28.00 per share" is simply erroneous.  ¶ 10.  All of the IPO sales were at the offering price of

12  $18,[24] and the lone non-IPO sale was at $15.91.  *Id.*  In fact, although Accuray stock traded "as

13  high as $29.25 per share" (¶ 134), all of the sales were at or below the $18 IPO price.  "When

14  insiders miss the boat this dramatically, their sales do not support an inference that they are

15  preying on ribbon clerks who do not know what the insiders know."  *Ronconi*, 253 F.3d at 435.

16         Nor is the timing of the lone non-IPO stock sale suspicious.  Dr. Adler's November 12,

17  2007 sale was made following the November 7, 2007 announcement of financial results (¶¶ 10,

18  93).  *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036-37 (9th Cir. 2002) (timing not

19  suspicious where insider sold stock following positive announcement of results); *Yahoo! II*, 630

20  F. Supp. 2d at 1118 (selling stock "following earnings releases" is "common practice among

21  corporate executives").  Moreover, as with the other challenged sales, plaintiffs fail to provide

22  *any* information regarding Dr. Adler's holdings, the percentage sold, or any other contextual

23  information.  Absent such facts, the stock sales cannot support an inference of scienter.  *Ronconi*,

24

---

25     [23] The allegations regarding the number of shares sold also are inaccurate.  ¶ 10.  As is shown
    in the Forms 4, the 3,953,191 number reflects a *correction* of the 4,084,450 number.  *See* Ex. E.

26
    [24] The price reflected in the chart (¶ 10) for the February 13, 2007 transaction attributed to
27  Mr. Tu is inaccurate.  This transaction was made in connection with the exercise of the IPO
    overallotment option and was made at the offering price of $18.  Walters Decl., Ex. E.

28

1   253 F.3d at 436-37 (plaintiffs "must allege sufficient context of insider trading").

2          **2.      The Compensation Allegations Add Little to the Analysis.**

3          Plaintiffs allege that "Defendants were incentivized to enter into term agreements and

4   grow backlog," and that Messrs. Thomson and Hampton, in particular, were motivated to include

5   "bogus deals" in backlog because of the executive bonus structure.  ¶ 89.  Plaintiffs allege that

6   Accuray changed its bonus structure for FY08 to make backlog "the single largest financial

7   metric for determining the bonuses of certain senior executives," including Messrs. Thomson and

8   Hampton.  *Id.*  As plaintiffs' allegations, however, make clear, backlog accounted for just 20% of

9   Dr. Thomson's bonus and a mere ***6.5%*** of Mr. Hampton's bonus.  *Id.*  Although plaintiffs also

10  allege that "85% of [Mr. Hampton's] bonus" was to be "based *primarily* on *achievement* of

11  quarterly sales quotas," plaintiffs fail to plead any details regarding the quarterly sales quotas.

12  Moreover, the SEC Form 10-K upon which plaintiffs rely clearly states that:

13          In establishing the bonus metrics and target bonus percentages for fiscal 2008, the
            [Compensation] Committee considered the Radford [executive compensation
14          survey] select data as well as advice from [compensation consulting firm] Watson
            Wyatt regarding appropriate metrics that were both consistent with industry
15          practice and would serve to align the interests of management with those of
            stockholders.

16

17  Pl. Ex. 17 at 116.  Plaintiffs fail to plead any facts suggesting that the compensation structure

18  was somehow unusual or inconsistent with industry practice.  *See, e.g.*, *Rackable*, 2010 WL

19  199703, at *9 ("Compared to the industry norms, there is nothing remarkable about the type or

20  amount of compensation paid to Defendants.").

21          **3.      The Company's Share Repurchase Negates Scienter.**

22          Plaintiffs allege that Defendants engaged in a scheme to inflate the price of Accuray stock.

23  ¶ 49.  What plaintiffs fail to acknowledge, however, is that Accuray also entered into a stock

24  repurchase program during the Class Period and thus was *purchasing* its own shares in the open

25  market.  Pl. Ex. 25 at 16.  It makes no sense for Accuray to purchase its own stock if, in fact,

26  Defendants were knew the stock was inflated at the time.  The stock repurchase program thus

27  negates an inference of scienter.  *See, e.g.*, *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL

28  1469654, at *21 (N.D. Cal. May 25, 2006) ("Plaintiffs fail to respond to the authorities Defendants

1    cited . . . showing that stock repurchase programs actually *negate* a finding of scienter.").

2        **C.    Plaintiffs' Reliance on the "Core Operations Inference" Is Unavailing**

3            Apparently recognizing that the Complaint fails to raise a strong inference of scienter as to

4    any of the Defendants, plaintiffs attempt to invoke a "core operations" inference.[25] *See, e.g.*,

5    Complaint at 11 & ¶ 30.  The core operations inference, however, does not alter the stringent

6    requirements of the Reform Act, nor does it change the standards articulated in *Tellabs*.  The

7    Complaint remains deficient under both.  Regardless, the core operations inference, which applies

8    only in rare circumstances, has no application here.  As the Ninth Circuit has acknowledged,

9    where, as here, the "complaint relies on allegations that management had an important role in the

10   company but does not contain additional detailed allegations about the defendants' *actual*

11   *exposure* to [the disputed] information, it will usually fall short of the PSLRA standard."  *South*

12   *Ferry*, 542 F.3d at 784 (emphasis added); *McCasland*, 2009 WL 2086168, at *6 ("[T]he complaint

13   still does not (1) identify any specific information that was either received or communicated by

14   any defendant, that (2) contradicts any public statement at the time it was made.").

15       **D.    Plaintiffs Cannot Counter the Strong, Competing Inference Raised by the
             Repeated Voluntary Disclosures of Negative Information**
16

17           Under *Tellabs*, an "inference of scienter must be more than merely 'reasonable' or

18   'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  551

19   U.S. at 324.  Although plaintiffs portray Defendants as concealing adverse information, plaintiffs'

20   own allegations support the competing inference that Defendants promptly disclosed adverse

21   information as it became known.  Accuray repeatedly disclosed the negative changes affecting its

22   business throughout the Class Period.  *See, e.g.*, ¶¶ 105-06, 113-16.  Those factors, which included

23   the tightening credit markets and regulatory matters, were outside of the Defendants' control.  The

24   situation was thus far "more consistent with a company and executives confronting a deterioration

25   in the business and finding itself unable to prevent it than [it is] with a company and executives

26   recklessly deceiving the investing community."  *Cf. In re 2007 Novastar Fin., Inc., Sec. Litig.*,

27   _____

28       [25] *See generally South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).

1   2008 WL 2354367, at *4 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009).

2       **E.     Plaintiffs Have Not Pleaded Corporate Scienter**

3           Because plaintiffs fail to plead scienter as to any individual defendant, they cannot

4   impute scienter to Accuray.  *See, e.g., Pittleman v. Impac Mortgage Holdings, Inc.*, 2009 WL

5   648983, at *3 (C.D. Cal. Mar. 9, 2009) ("Because Plaintiff fails to plead scienter on the part of

6   [the CEO or COO], Plaintiff cannot successfully plead scienter on the part of Impac."); *Davis v.*

7   *SPSS, Inc.*, 385 F. Supp. 2d 697, 717-18 (N.D. Ill. 2005) (dismissing §10(b) claim against

8   company where plaintiff failed to plead scienter against CEO or CFO).  Although the Ninth

9   Circuit has not foreclosed the possibility of "collective scienter," those circumstances are not

10  present here.  *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744-45 (9th Cir. 2008).

11      **F.     The Claims Against the Outside Directors Should Be Dismissed**

12          Plaintiffs do not properly attribute any statement to four Defendants: Messrs. Tu, Wu,

13  Adler, and Weiss.  Indeed, other than certain stock sales (discussed in Section IV, *supra*), the

14  only purportedly wrongful act attributed to any of these non-employee directors is that they

15  signed the Registration Statement.  ¶¶ 42(c)-(f), 51.  Merely alleging that an individual signed a

16  registration statement is insufficient to impose Section 10(b) liability.  Plaintiffs do not allege

17  any facts showing that these individuals were involved in the preparation or drafting of the

18  Registration Statement, much less that they knowingly made a false statement.  *Cf. Yahoo! I*, 592

19  F. Supp. 2d at 1205 ("Without any supporting allegations that Defendants made false accounting

20  entries or inflated revenues, Defendants' signatures on the SEC certificates do not create a strong

21  inference of scienter.").  Because plaintiffs do not allege that the outside directors made any

22  statements other than the Registration Statement and have failed to plead a claim as to that

23  document, the Section 10(b) claim against these Defendants should be dismissed.[26]

24  _____

25      [26] The discredited group pleading doctrine does not save the claims against these individuals.
    *See, e.g., Downey*  2009 WL 2767670, at *4 n.1 ("group pleading doctrine did not survive the

26  PSLRA"); *Tibco*, 2006 WL 1469654, at *27 ("[C]ourts in this district are increasingly finding
    that the group pleading doctrine is contrary to the PSLRA.").  Indeed, even before the Reform

27  Act, an outside director could not be held liable for a public filing simply because he signed it.
    *See, e.g., Stack v. Lobo*, 903 F. Supp. 1361, 1376 (N.D. Cal. 1995) ("[A]n outside director does

28  not become liable for the contents of a group published document merely by signing it.").

**V.       PLAINTIFFS' "RULE 10(B)"/"RULE 10(B)(5)(1)" CLAIM IS UNINTELLIGIBLE**

Plaintiffs include a separate cause of action for "Insider Trading Violations of Rule 10(b) and SEC Rule 10(b)(5)(1)" against all "Defendants."  Complaint at 82.  Although it is unclear from the two sentences provided in support of this cause of action (¶ 161), plaintiffs appear to be asserting an insider trading claim under Section 10(b) and SEC Rule 10b5-1.  To pursue an insider trading claim, however, among other requirements, plaintiffs must have traded "contemporaneously" with the defendant.  *Neubronner v. Milken*, 6 F.3d 666, 670 & n.5 (9th Cir. 1993).  Because plaintiffs do not allege that they traded contemporaneously with any defendant, and because plaintiffs have not stated a Section 10(b)/Rule 10b-5 claim, this claim also fails.

**VI.      PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED**

Because the Complaint does not adequately allege an underlying primary violation, the Section 20(a) control person claim should also be dismissed.  *See Lipton*, 284 F.3d at 1035 n.15.  In addition, plaintiffs must plead "that the defendant exercised actual power or control over the primary violator[.]"  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  To establish control, a plaintiff must allege specific facts showing that the defendant participated "in the day-to-day affairs of the corporation and [possessed the] power to control corporate actions."  *Id.* (citation omitted).  The complaint fails to plead any such facts with respect to the outside director defendants and Mr. Hampton.  *See Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396-97 (9th Cir. 1993) ("A director is not automatically liable as a controlling person.").

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint.

Dated:  February 8, 2010                              WILSON SONSINI GOODRICH & ROSATI
                                                                   Professional Corporation


                                                                   By:  /s/Ignacio E. Salceda
                                                                          Ignacio E. Salceda

                                                                   Attorneys for Defendants