1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE ACCURAY, INC. SECURITIES
LITIGATION

No. 09-03362 CW

ORDER GRANTING
DEFENDANTS'
MOTION TO DISMISS

_____/

Defendants Accuray, Euan S. Thomson, Wayne Wu, Robert S. Weiss, Robert E. McNamara, John R. Adler, Jr., Wade B. Hampton and Ted Tu move to dismiss the claims in this securities fraud action. Lead Plaintiffs Zhengxu He and City of Brockton Retirement System oppose the motion. The matter was heard on August 12, 2010. Having considered all of the papers filed by the parties and oral argument on the motion, the Court grants Defendants' motion to dismiss and grants leave to amend.

BACKGROUND

Plaintiffs purchased or acquired Accuray securities at some point between Accuray's Initial Public Offering (IPO) on February 7, 2007 and August 19, 2008 (Class Period).

Defendant Accuray designs, develops and sells the CyberKnife, an image-guided robotic radiosurgery system designed to treat solid tumors. The CyberKnife is Accuray's sole product. Accuray generates revenue by selling the CyberKnife system and by providing

ongoing services and upgrades to customers following installation.

Defendant Thomson is Accuray's Chief Executive Officer and has been on the Board of Directors since March, 2002.  Defendant McNamara was Accuray's Senior Vice President and Chief Financial Officer from December, 2004 until his resignation on September 11, 2008.  Defendant Hampton served as the Senior Vice President of WorldWide Sales from August, 2006 until he became Senior Vice President, Chief Sales Officer in April, 2007.  Hampton resigned on October 15, 2009.  Defendant Tu has been a member of the Board of Directors since May, 2004.  Defendant Wu is Accuray's Chairman of the Board and has been a Director since April, 1998.  Defendant Weiss is the Chairman of the Audit Committee and has been a Director since January, 2007.  Defendant Adler was a founder of Accuray and was a Director from December, 1990 to July, 2009.

Plaintiffs allege that Defendants made material misrepresentations about Accuray's revenues and, specifically, about Accuray's backlog.  Plaintiffs rely on statements made by ten[1] confidential witnesses who worked in various positions at Accuray.  On February 7, 2007, the day Accuray initiated the IPO, it defined backlog as "deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received.  Backlog includes contractual commitments from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with our shared ownership

---

[1]The ten confidential witnesses are numbered one through seven and nine through eleven.  For some reason, Plaintiffs exclude allegations or mention of confidential witness number eight.

2

**United States District Court**
For the Northern District of California

programs."

Accuray's Registration Statement, which accompanied the IPO and was filed with the SEC, included several disclosures detailing the risks related to the business.  For instance, Accuray stated:

> Because of the high unit price of the CyberKnife system, and the relatively small number of units installed each quarter, each installation of a CyberKnife system can represent a significant component of our revenue for a particular quarter.  Therefore, if we do not install a CyberKnife system when anticipated, our operating results may vary significantly and our stock price may be materially harmed.
>
> . . .
>
> Events beyond our control may delay installation and the satisfaction of contingencies required to receive cash inflows and recognize revenue, such as . . . customer funding or financing delay . . . .  Therefore, delays in the installation of CyberKnife systems or customer cancellations would adversely affect our cash flows and revenue, which would harm our results or operations and could cause our stock price to decline.
>
> . . .
>
> If third-party payors do not continue to provide sufficient coverage and reimbursement to healthcare providers for use of the CyberKnife system, our revenue would be adversely affected.

Comp., Ex. 1 at 12-13.[2]  Accuray further noted that it "may be unable to convert all of this backlog into recognized revenue due to factors outside our control."  Id. at 44.  These disclosures were included in Accuray's quarterly and annual filings throughout the Class Period.

In a May 1, 2007 press release, Accuray announced that as of

---

[2]Although the Court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).

March 31, 2007, it had changed its definition of backlog.  The new definition included "signed non-contingent contracts as well as backlog under signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue." Comp. ¶ 61.  Accuray stated, "Contingencies under customer contracts included in backlog include customer acceptance of the Company's legal terms and conditions of sale, hospital board approvals, customer establishment of necessary financing or legal entities and, in certain U.S. states, governmental approval of a certificate of need (CON) for the operation of a radiosurgery system."  Comp., Ex. 5.

Also on May 1, 2007, Thomson and McNamara held an earnings conference call to discuss the third fiscal quarter of 2007.  In that call, Thomson stated, "On balance, we feel confident that 90% of the total backlog reported will be converted to revenue." Comp., Ex. 6 at 5.  He also noted that the "total backlog reported this quarter, taken in conjunction with reported revenue, is a good and reliable indicator that [sic] the new business generated during a given quarter."  Comp., Ex. 6 at 5.  McNamara also expressed "confidence that at least 90% of the quoted backlog will convert to revenue."  Comp., Ex. 6 at 8.  He also stated, "We believe that our current definition of backlog is a more meaningful metric for Accuray as an indicator of future revenue."  Comp., Ex. 6 at 8.  He also noted, "On a quarterly basis, the company will review each contingent contract to determine whether progress towards satisfaction of contingencies is sufficient to support inclusion of the contract within the backlog."  Comp., Ex. 6 at 8.  Accuray

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

announced increased revenues and backlogs throughout the rest of fiscal year 2007.

On August 30, 2007, Directors Thomson, Wu, Yu, Weiss, Tu and Adler authorized the repurchase of $25 million of Accuray shares. Over the course of the next year, Accuray repurchased $23.9 million of its own stock.

On January 30, 2008, Accuray announced its second quarter 2008 earnings in a press release. Comp., Ex. 26. It reported total revenue of $54 million, which was a 98% increase over second quarter 2007 earnings. Id. It also claimed that its backlog had increased to approximately $660 million. Id. However, Accuray adjusted its "revenue guidance for fiscal 2008" from $250-270 million to $210-230 million. Id. Accuray claimed that this adjustment was due to "current economic conditions, specifically, the tightening of credit markets in the United States." It stated, "While this was a positive quarter with respect to revenue and backlog growth, we believe that broader credit market issues are having a short-term impact on some of our U.S. customers' purchase and installation timelines, as obtaining financing has become more difficult." Id. In a conference call on the same day, Thomson stated that Accuray removed "a number of contracts from backlog in order to give our investors greater visibility into the potential effect of this market adjustment." Comp., Ex. 27 at 4-5. Thomson also stated that the group of customers who were experiencing credit issues were the same group who might be negatively impacted by a rule change in the way Medicare would reimburse providers for procedures conducted with the CyberKnife. The next day, Accuray's

5

stock fell 36%.

On April 29, 2008, Accuray reported total revenue of $58.5 million for the third quarter of fiscal year 2008, which was a 57% increase over the third quarter of fiscal year 2007.  Accuray experienced its fifth consecutive quarter of record revenue.  However, Accuray also reduced its backlog by $58 million, from $660 million to $602 million.  It claimed that this decrease was "a net result of cancellations of existing contracts of $54 million, combined with unfavorable contract movement out of backlog based on our specific assessment.  All of these cancellations were associated with contingent contracts . . . ."  Id. ¶ 111.  On April 29, 2008, Accuray's stock dropped from $8.06 per share to $7.83 per share, but on May 1, 2008, it increased to $8.56 per share and by May 5, it was well above $9.00 per share.

On August 19, 2008, Accuray issued its 2008 fourth quarter press release, which stated its total revenue as $50.9 million, a 16% increase over its 2007 fourth quarter revenues.  Accuray also announced a backlog of $647 million.  It claimed that new orders contributed $68 million directly to its non-contingent backlog.  However, Accuray also removed $39 million out of the backlog because either eight CyberKnife orders were cancelled or their future revenue recognition was in question.  Id. ¶ 114.  On August 20, 2008, Accuray shares began trading at $7.57 per share, at one point they dropped to a low of $6.90 per share, but they closed at $7.70 per share.

On September 11, 2008, McNamara and Christopher Mitchell resigned from Accuray.  Mitchell was Accuray's General Counsel.

Over the next year, Defendants removed several more contracts from the backlog.  On August 24, 2009, in a conference call to investors, Accuray Senior Vice President Derek Bertocci noted that "beginning with fiscal year 2010, we will no longer provide information about contingent backlog.  We think that such information is of limited use in building financial models.  Orders that we consider to be contingent will not be disclosed until all contingencies have been cleared."  Comp., Ex. 44 at 5.

On July 22, 2009, the first of three related class action complaints was filed in this Court.  The Court consolidated the actions and on December 17, 2009, Plaintiffs filed the instant complaint.  The complaint asserts causes of action for alleged violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934.

Plaintiffs generally allege that the positive statements Defendants made about Accuray and the backlog were false when made because the revised backlog definition was not a better metric than the previous backlog definition and Defendants knew that they would not realize 90% of the new backlog definition.  Plaintiffs also claim that the backlog included risky contingent contracts that did not have a substantial likelihood of resulting in future revenue and other orders that had little chance of becoming finalized CyberKnife installations.

DISCUSSION

I.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale

United States District Court
For the Northern District of California

of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5 (Rule 10b-5). To state a claim under § 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." In re Gilead Sciences Securities Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

Some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action. See Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978). Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)). As explained by the Ninth Circuit in In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970 (9th Cir. 1999), recklessness, as defined by Hollinger, is a form of intentional conduct, not merely an extreme form of negligence. See Silicon Graphics, 183 F.3d at 976-77. Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[] some degree of intentional or conscious misconduct." See id. at 977. The Silicon Graphics court

refers to this subspecies of recklessness as "deliberate recklessness." See id. at 977.

Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc). Pursuant to the requirements of the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Further, pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. See 15 U.S.C. § 78u-4(b)(2); Silicon Graphics, 183 F.3d at 977. Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. See Silicon Graphics, 183 F.3d at 979. To satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." Id.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

A.   Misrepresentation or Omission of a Material Fact

To state a claim pursuant to § 10(b) of the Exchange Act, Plaintiffs must allege, among other things, a misrepresentation or omission of a material fact.  Plaintiffs allege four categories of false or misleading statements: (1) "the definition, quality, and makeup of backlog;" (2) "the receipt of and accounting for customer deposits;" (3) "revenue recognition processes on CyberKnife system sales to international customers;" and (4) "the Company's revenue and earnings forecast for FY08."  Comp. ¶ 5.  The Court addresses each of these allegations in turn.

1.   Definition, Quality and Makeup of Backlog

In a case about the propriety of including certain cancelled sales in a backlog calculation, the Ninth Circuit held that "once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what the backlog consisted of."  <u>Berson v. Applied Signal Technology, Inc.</u>, 527 F.3d 982, 987 (9th Cir. 2008).  The issue in the present case is whether Plaintiffs have plead with particularity material misrepresentations or omissions concerning the backlog.  The Court concludes that they have not.

Plaintiffs argue that Defendants made several misrepresentations about the backlog.  First, Plaintiffs argue that the Registration Statement falsely described the contracting process and composition of the backlog.  In the Registration Statement, Accuray stated that the "backlog consisted of CyberKnife sales and revenues with no contingencies, that customers were contractually committed to make."  Comp. ¶ 7.  Plaintiffs allege

United States District Court
For the Northern District of California

that, before the IPO, Accuray switched from using Letters of Intent to Term Agreements which "contained language allowing for contingencies to be self-satisfying." This allegedly inflated the backlog because "customers need not do anything for a contingency to be satisfied" which resulted in "deals being reported as non-contingent or having a substantially high probability of being converted to revenue" when it should not have been. Comp. ¶ 68.

Plaintiffs rely heavily on allegations by CW 1, a Regional Sales Director from 2004 to 2007, and CW 3, a Senior Sales Specialist from 2006 to 2009. However, these CWs do not offer any facts regarding specific contracts that were included in the reported backlog in the Registration Statement. They do not allege that they were involved in determining which deals would be included in the backlog or had any communication with Defendants regarding the use of term agreements. CW 1's opinion that the term agreements "seemed geared to allow far more speculative, contingent deals to be added to the order backlog," Comp. ¶ 68(a), is speculative itself, and it cannot substitute for the specific facts necessary to plead falsity.

Second, Plaintiffs allege that the backlog regularly included deals which Defendants knew had been cancelled. CW 1 alleges that

> the time between Accuray receiving notice that a customer
> wanted to cancel and the time that Accuray would actually
> remove the items from backlog depended on how much the
> Company needed the deal in backlog. The Company would
> receive letters from customers requesting that Accuray de-
> book a deal and the Company would not remove the deal from
> backlog, sometimes for months.

Comp. ¶ 74. Plaintiffs included similar allegations from CWs 2, 5 and 11. For instance, CW 2, a Regional Sales Director from 2000 to

11

2007, alleged that s/he "heard that the Company would delay taking a sale off the books even after a customer would ask to have it canceled." Comp. ¶ 74(c). CW 5, a Director of Marketing and Placement, alleges that cancelled orders still showed up in a list of pending installations.

None of the CWs are alleged to have discussed any such cancelled contracts with the individual Defendants. Plaintiffs allege that only one of these CWs -- CW 11 -- was involved in making decisions regarding the contracts to be included in the backlog. CW 11, a member of Accuray's Sales Operation group, "attended and participated in regular backlog meetings with Defendant Hampton, as well as representatives from Accuray's Finance, Legal and Sales department." Comp. ¶ 73(m). "The purpose of these meetings was to ascertain the progress of all the contracts and to assign subjective confidence levels to the contracts." Id. Plaintiffs allege, "From CW 11's perspective, no contingent orders of any kind should have been included in the backlog." Id. CW's opinion on this issue does not prove the falsity of any of Defendants' statements because Accuray publicly disclosed its inclusion of contingent contracts in the backlog.

Nevertheless, CW 11 is arguably the best positioned CW to know about Accuray's wrongdoing concerning public statements about the backlog. Of all the contracts included in the backlog, CW 11 only discusses eight. He notes that contracts for eight units had no end user but were included in the backlog. Comp. ¶ 73(m). However, the complaint shows that substantial deposits were made on these contracts and at least one such unit was in fact installed.

12

United States District Court
For the Northern District of California

The fact that the backlog included later-removed contracts does not make the backlog figures false at the time they were publicly disclosed.  Moreover, Plaintiffs fail to allege that any of the other individual Defendants knew about these contracts.

There are no allegations to describe how CW 5, as a marketing employee, had personal knowledge of pending installations. Plaintiffs do not allege any facts regarding the alleged impact of the unidentified cancelled contracts on the reported backlog and revenue.  Moreover, Plaintiffs' allegations are vague as to the time they were made.  They do not specifically describe how failing to remove these contracts earlier impacted the backlog and revenues.

It is difficult to prove falsity by questioning whether certain deals should have been included in backlog based on the later removal of contracts from backlog.  Hindsight and the former opinions of former employees do not generally rise to the level of falsity.  Plaintiffs cannot simply rely on a "fraud by hindsight" theory to demonstrate falsity.  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084-85 (9th Cir. 2002) ("The purpose of [the PSLRA's] heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'").

        2.   Customer Deposits

Plaintiffs allege that the Registration Statement falsely stated that Accuray "typically receive[s] a deposit at the time the CyberKnife system purchase contract is executed, and the remaining balance for the purchase of the CyberKnife system upon installation

13

. . . ." Comp. ¶ 8. Plaintiffs allege that this statement was false because Accuray did not always receive a deposit. However, even if it were true that Accuray did not always receive a deposit, its statement is not false. Accuray simply stated that a deposit "typically" was received. It did not state that it "always" received or required a deposit. Thus, this statement of Accuray's is not false.

Plaintiffs also allege that the following section of the Registration Statement is false:

> in the event that a customer does not, for any of the reasons above or other reasons, proceed with installation of the system afer entering in to a purchase contract, we would only recognize the deposit portion of the purchase price as revenue. . . ."

Comp. ¶ 8. Plaintiffs allege that this statement is false because Defendants inaccurately stated that Accuray recognized deposits as revenue even if the orders were cancelled. Plaintiffs allege that "deposits were almost always refunded back to the customers in the event that customers cancelled the contracts." Comp. ¶ 70. None of the CWs held financing or accounting positions, so none was in a position to know when or if revenue was recognized based on a particular deposit or how often deposits were refunded. See, e.g., Brodsky v. Yahoo!, Inc., 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) (Yahoo! II) ("Plaintiffs must describe with particularity the CW's personal knowledge of Yahoo!'s revenue recognition process."). Further, this section of the Registration Statement is not inconsistent with Accuray's policy to recognize the deposit portion of the purchase price as revenue when in fact those deposits were not refunded.

14

1
            3.   CyberKnife International Sales

2       Plaintiffs also challenge the truthfulness of the sections in

3  the Registration Statement pertaining to the recognition of

4  international sales.  Specifically, Plaintiffs allege that

5  Accuray's statement that it "typically recognized revenue when the

6  system is delivered to the end user's site" was false and

7  misleading because Accuray actually recognized revenue upon

8  shipment to the distributor.  Comp. ¶ 55.  Plaintiffs claim that

9  the following statement by McNamara during a conference call to

10  investors proves the falsity of the Registration Statement:

11      [i]t kind of depends -- it depends whether our distributor
        has the capability of installing, or as part of the
12      contract, we are meant to install it.  If we are meant to
        install it then we have to install it before we recognize
13      revenue.  If the distributor has the capability to install
        or we've fulfilled sort of our obligation, if you will, then
14      we would recognize revenue.  So in some cases, we would
        recognize it upon shipment, but it really depends on that
15      particular distributor and their capabilities.

16  Comp., Ex. 21 at 4.  McNamara's comments do not negate Accuray's

17  prior statement in the Registration Statement.  The statement that

18  revenue was "typically" recognized upon delivery to the end user

19  does not preclude recognition upon shipment to the distributor

20  where the contract specified that Accuray's obligations terminated

21  upon shipment.  Therefore, the statement by McNamara is not

22  inconsistent with Accuray's prior representation.  Ronconi v.

23  Larkin, 253 F.3d 423, 434 (9th Cir. 2001) ("The circumstances are

24  not inconsistent with the statements so as to show that the

25  statements must have been false or misleading when made.").

26  Further, Plaintiffs do not allege with particularity the general

27  amounts by which the revenues were overstated or the identity of

28
                                15

United States District Court
For the Northern District of California

1   the individuals involved.   Nor do Plaintiffs allege the cited CWs'

2   "roles in [the] revenue recognition process and that they had

3   personal knowledge of Defendants' accounting decisions."   Yahoo!

4   II, 630 F. Supp. 2d at 1114.

5        4.   Revenue and Earnings Forecast

6        Plaintiffs allege that Defendants issued false fiscal year

7   2008 forecasts.   Defendants disagree and argue that the safe harbor

8   provision applies to these "forward-looking statements."

9        A forward-looking statement is "a statement containing a

10  projection of revenues, income (including income loss), earnings

11  (including earnings loss) per share, capital expenditures,

12  dividends, capital structure, or other financial items."   15 U.S.C.

13  § 78u-5(i)(A).   The safe harbor provision states in relevant part:

14       a person . . . shall not be liable with respect to any
         forward-looking statement whether written or oral, if and to
15       the extent that --

16       (A) the forward-looking statement is --

17            (i) identified as a forward-looking statement, and is
              accompanied by meaningful cautionary statements
18            identifying important factors that could cause actual
              results to differ materially from those in the
19            forward-looking statement; or

20            (ii) immaterial; or

21       (B) the plaintiff fails to prove that the forward-looking
         statement --
22
              (i) if made by a natural person, was made with actual
23            knowledge by that person that the statement was false
              or misleading; or
24
              (ii) if made by a business entity; was --
25
                   (I) made by or with the approval of an executive
26                 officer of that entity; and

27                 (II) made or approved by such officer with actual

28                                      16

> knowledge by that officer that the statement was
> false or misleading

15 U.S.C. § 78u-5(c)(1).  It is important to note that the statute

is written in the disjunctive.  The Ninth Circuit recently

summarized the statute as providing safe harbor for

> (A)(i) identified forward-looking statements with sufficient
> cautionary language;
>
> (A)(ii) immaterial statements; and
>
> (B)(i)-(ii) unidentified forward-looking statements or
> forward-looking statements lacking sufficient cautionary
> language where the plaintiff fails to prove actual knowledge
> that the statement was false or misleading.

In re Cutera Securities Litig., 2010 WL 2595281, at *7.

The challenged 2008 fiscal year revenue forecast is, by

definition, a forward-looking statement.  Similarly, statements

that Accuray believed that there was a "substantially high

probability" of converting the contingent contracts in backlog into

future revenue and statements that it was "confident" or "believed"

that 90% of the total backlog would ultimately be converted to

revenue were also forward-looking because they contained

predictions about the future.

Determining whether Accuray's statements concerning its

backlog figures were forward-looking presents a closer issue.

Accuray defined backlog as the sum of "deferred revenue and future

payments that our customers are contractually committed to make,

but which we have not yet received."  Comp. ¶ 57.  Before March 31,

2007, backlog did not include "signed contracts that have

contingencies such as board approvals, financing dependencies or

the formation of certain legal structures."  Id.  After that date,

17

backlog included "signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue." Id. ¶ 61.

In Berson v. Applied Signal Technology, the plaintiffs argued that Applied Signal's backlog reports, which included government contracts on which the government had issued stop-work orders, misled them into believing that Applied Signal was likely to perform work that, in reality, had been halted and was likely to be lost forever. 527 F.3d at 985. Applied Signal defined its backlog as follows:

> Our backlog . . . consists of anticipated revenues from the uncompleted portions of existing contracts . . . . Anticipated revenues included in backlog may be realized over a multi-year period. We include a contract in backlog when the contract is signed by us and by our customer. We believe the backlog figures are firm, subject only to the cancellation and modification provisions contained in our contracts. . . . Because of possible future changes in delivery schedules and cancellations of orders, backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period, and actual sales for the year may not meet or exceed the backlog represented. We may experience significant contract cancellations that were previously booked and included in backlog.

Id. at 985-86. The court held that this definition of backlog did not include contracts with stop-work orders and Applied Signal's inclusion of stopped work in the backlog was misleading. Id. at 986. The court also rejected Applied Signal's attempt to seek safe harbor for its statements regarding the backlog. The court stated that

> as Applied Signal uses the term, "backlog" isn't a "projection" of earnings or a "statement" about "future economic performance." 15 U.S.C. § 78u-5(i)(1). Applied Signal's backlog is, instead, a snapshot of how much work the company has under contract right now, and descriptions

United States District Court
For the Northern District of California

18

**United States District Court**
For the Northern District of California

of the present aren't forward-looking.  See No. 84
Employer-Teamster Joint Council Pension Trust Fund v.
America West, 320 F.3d 920, 936-37 (9th Cir. 2003)
(defendant's statements weren't forward-looking because they
described the "present effects" of a settlement agreement).
Backlog is much like accounts receivable: It represents
Applied Signal's contractual entitlement to perform certain
work, just like accounts receivable represents the company's
contractual entitlement to be paid for work already
performed.

Id. at 987.

In the instant case, Defendants distinguish their definition
of backlog from Applied Signal's.  Defendants emphasize that
Applied Signal's backlog was "subject only to the cancellation and
modification provisions contained in our contracts," whereas
Accuray's definition included "contingent" contracts.  This
distinction is meaningful.  Accuray's backlog did not represent "a
contractual entitlement to perform certain work."  It represented a
contractual entitlement to perform certain work after one or more
conditions were met.  Accuray included contingent contracts in its
backlog based on its estimation of whether or not those contracts
would be converted to revenue in the future.  Unlike the plaintiffs
in Berson, who asserted that the backlog was a present figure that
was falsely reported, Plaintiffs in the instant case argue that
Defendants' projection of future revenue to be achieved from
backlog was false.  Thus, as Accuray used the term, backlog was a
projection.

For a forward-looking statement to qualify for safe harbor,
the statement must be accompanied by sufficient cautionary language
which identifies "important factors that could cause actual result
to differ materially from those in the forward-looking statement."

19

United States District Court
For the Northern District of California

15 U.S.C. § 78u-5(c)(1).  Here, Accuray repeatedly warned that its results could differ from its forward-looking statements.  See, e.g., Comp., Ex. 11 at 4.  Lengthy disclosures in SEC filings identified specific risks that directly related to the forward-looking statements.  Id., Ex. 17 at 26-44; Ex. 25 at 30-45.

Even if unaccompanied by cautionary language, forward-looking statements cannot support liability unless they are made with actual knowledge of their falsity.  See 15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii).  As described below, Plaintiffs have not plead with particularity Defendants' actual knowledge of falsity.

C.    Requisite Mental State

A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325 (2007).  "The inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." Id. at 324.  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. However, "the inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id.

Plaintiffs allege that there is a strong inference that

20

United States District Court
For the Northern District of California

Defendants acted with scienter because of Defendants'
(1) interactions with CWs, (2) internal corporate records,
(3) stock transactions, (4) compensation structure and
(5) involvement in Accuray's core operations.

            1.   Confidential Witnesses

     The ten confidential witnesses described in the complaint fail
to support an inference of scienter.  First, according to
Plaintiffs' complaint, six of the seven individual Defendants --
McNamara, Thomson, Wu, Tu, Adler and Weiss -- had no personal
interactions with any of the CWs.  Thus, it is difficult to surmise
how the opinions and observations of the CWs could support a
reasonable inference about what these individual Defendants knew or
did not know at the time each of the challenged statements was
made.  See McCasland v. FormFactor, Inc., 2008 WL 2951275, at *8
(N.D. Cal.) ("none of the CWs is alleged to have had any
interaction or communication with any of the defendants, or to have
provided any defendant with information, or to have heard or read
any statement by any defendant, that contradicted or even cast
doubt on a public statement made during the class period.").

     As to Defendant Hampton, Plaintiffs allege that CW 3 observed
the sales staff tell Hampton that increasing the CyberKnife sales
targets from 51 to 101 for the 2008 fiscal year was "simply
unrealistic." Comp. ¶ 88(c).  Ultimately, Accuray only sold
"around" 50 CyberKnife systems in 2008.  Id.  Plaintiffs attempt to
link Hampton's internal sales targets to Accuray's public revenue
forecasts.  However, Plaintiffs do not allege any particular facts
about the preparation of the corporate-level revenue forecast and

21

United States District Court
For the Northern District of California

whether the sales targets were incorporated into the forecast.
Further, there is nothing about Hampton's optimistic internal
target that shows that he knew the revenue forecasts were false
when made or should have put the other Defendants on notice that
the revenue forecasts were false.

Plaintiffs also claim that Defendants knew their revenue
forecasts and backlog figures were inaccurate because they were
based, in part, on sales projections by John Nash, a sales
representative who greatly overestimated his sales projections.
Comp. ¶ 73(a)-(g).  However, it is not clear whether Defendants
incorporated Nash's estimates into the revenue projections and
backlog calculation.

Plaintiffs point to the fact that Accuray missed its fiscal
year 2008 "revenue forecast by a whopping $60 million."  Opp. at
12.  This statement is not entirely accurate or telling of
Defendants' culpability.  Accuray initially projected revenue for
fiscal year 2008 between $250 and 270 million.  It later revised
that figure to between $210 and 230 million.  In the end, it
actually reported $210 million in revenue.  Thus, it would be more
accurate to say that Accuray missed its projection by between $40
and 60 million.  Considering that each CyberKnife costs $4 million,
a shortfall of $60 million in revenue translates to only 15 units
that should have been sold, but were not.  Of course, this is a
simplified way of looking at the revenue projection discrepancy;
however, it provides a meaningful context for assessing the
magnitude of the discrepancy.

Further, Plaintiffs' complaint is deficient because they

22

United States District Court
For the Northern District of California

continually group all Defendants together in their allegations and arguments.  Plaintiffs fail to plead facts identifying what each Defendant purportedly knew about the challenged backlog figures and revenue forecasts.

### 2.   Internal Corporate Records

Plaintiffs include "excerpts of internal documents" to bolster their allegations.  Opp. at 18-19.  For instance, they claim that the complaint includes excerpts of internal documents which describe Accuray's backlog record-keeping system.  They argue that these documents demonstrate that Accuray included in the backlog contracts for which contingencies were "waived simply by the passage of time, a fact never disclosed to shareholders."  Opp. at 19.  However, the fact that certain contingencies were deemed waived unless the buyer provided written notification by a certain date does not support an inference that Defendants knew or were deliberately reckless in their backlog calculations and revenue projections.  Further, Defendants are not obliged to disclose to shareholders the details of every contract Accuray enters into with each client.

Plaintiffs also include excerpts of documents pertaining to Accuray's refunds of deposits on cancelled orders.  However, these documents do not establish anything more than the fact that deposits were refunded.  They do not show that these deposits were still counted as revenue.  In sum, these internal documents are not supported by particularized facts regarding their purpose, author or recipients.  Therefore, these documents do not give rise to a strong inference of scienter.

United States District Court
For the Northern District of California

3.   Stock Transactions

Plaintiffs contend that the quantity and timing of Defendants'
stock transactions support a strong inference of scienter.   Insider
stock sales become suspicious "only when the level of trading is
dramatically out of line with prior trading practices at times
calculated to maximize the personal benefit from undisclosed inside
information."   In re Vantive Corporation Securities Litig., 283
F.3d at 1092.   "Among the relevant factors to consider are: (1) the
amount and percentage of shares sold by insiders; (2) the timing of
the sales; and (3) whether the sales were consistent with the
insider's prior trading history."   Silicon Graphics, 183 F.3d at
986.

Plaintiffs do not dispute that three of the individual
Defendants -- McNamara, Weiss and Hampton -- did not sell any stock
during the eighteen-month Class Period.   The lack of stock
transactions by these Defendants contradicts Plaintiffs' claim that
they were committing securities fraud by profiting from insider
stock sales.   Ronconi, 253 F.3d at 435 ("One insider's well timed
sales do not support the 'strong inference' required by the statute
where the rest of the equally knowledgeable insiders act in a way
inconsistent with the inference that the favorable
characterizations of the company's affairs were known to be false
when made.") (footnotes omitted).   The stock sales attributed to
Defendant Tu were actually made by a company of which he was the
President, International Investment Holdings Ltd.   Walters Decl.,

24

United States District Court
For the Northern District of California

Ex. E.[3]  Tu's company sold 100% of its shares of Accuray for over $100 million.  This amount and Tu's connection to International Investment Holdings are suspicious.

However, when considering the timing and trading patterns involved, no inference of scienter can be gleaned from Defendants' stock transactions.  All but one of the challenged stock transactions occurred during the IPO.  This is not suspicious or unusual.  See Ronconi, 253 F.3d at 436 ("Silicon Graphics suggests that restrictions on an insider's ability to trade are important in determining whether the trading pattern is suspicious.").  Further, the prices of the stock sales were not suspicious.  All of the IPO sales were at the offering price of $18 per share and the lone non-IPO sale was at $15.91 per share.  It is also important to note that, although Accuray stock traded as high as $29.25 per share during the Class Period, all of the insider sales were at or below the $18 IP price.  "When insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know."  Id. at 435.

The timing of the lone non-IPO sale is not suspicious.  Adler's November 12, 2007 sale was made following Accuray's November 7, 2007 announcement of financial results.  Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1037 (9th Cir.2002) ("We conclude that the timing of Gantz's stock transactions was not suspicious.  Officers of publicly traded companies commonly make

---

[3]The Court grants Defendants' request for judicial notice of Exhibits A through G to Walters' declaration because SEC filings may be judicially noticed.  See Dreiling v. American Exp. Co., 458 F.3d 942, 946 (9th Cir. 2006).

United States District Court
For the Northern District of California

1  stock transactions following the public release of quarterly

2  earnings and related financial disclosures.").

3      4.   Compensation Structure

4      Plaintiffs allege that Defendants "profited handsomely" from

5  their fraud through increased bonuses.  Opp. at 23.  Specifically,

6  Plaintiffs allege that achieving certain targets for backlog

7  accounted for 20% and 6.5% of Thomson's and Hampton bonuses

8  respectively.  However, linking executive compensation to company

9  performance is not unusual or suspicious.  See In re Rackable Sys.

10  Sec. Litig., 2010 WL 199703, at *9 (N.D. Cal.) ("Compared to

11  industry norms, there is nothing remarkable about the type or

12  amount of compensation paid to Defendants.").

13      5.   Core Operations

14      Allegations regarding management's role in a company "may be

15  used in any form along with other allegations that, when read

16  together, raise an inference that is 'cogent and compelling, thus

17  strong in light of other explanations.'"  South Ferry LP v.

18  Killinger, 542 F.3d 776, 785 (9th Cir. 2008) (quoting Tellabs, 551

19  U.S. at 324); Zucco, 522 F.3d at 1001, 1007.  These allegations may

20  conceivably satisfy the PSLRA standard "without accompanying

21  particularized allegations, in rare circumstances where the nature

22  of the relevant fact is of such prominence that it would be

23  'absurd' to suggest that management was without knowledge of the

24  matter."  South Ferry, 542 F.3d at 786.

25      The Ninth Circuit described such a "rare circumstance" in

26  Berson v. Applied Signal Technology, Inc., 527 F.3d 982 (9th Cir.

27  2008).  There, the plaintiffs alleged facts which contradicted the

28                              26

**United States District Court**
For the Northern District of California

defendants' statements about the company's revenue stream.   The company had received four stop-work orders that had a "devastating effect" on the company's revenue.   Id. at 987.   The court permitted an inference of scienter from the defendants' involvement in the company's core operations because these facts were of such prominence "that it would be 'absurd to suggest' that top management was unaware of them."   Id. at 989.

Here, Defendants claim to place a high value on ensuring the accuracy of the backlog.   In a May 1, 2007 press release, Accuray stated that, "On a quarterly basis, the Company will review each contingent contract to determine whether progress toward satisfaction of contingencies is sufficient to support inclusion of the contract within the backlog."   Comp. ¶ 61.   However, Plaintiffs fail to plead any facts regarding the inaccuracy of the backlog and revenue projections of such magnitude as in Berson that it would be absurd to suggest that Defendants were unaware of them.   Although Plaintiffs allege that Defendants regularly reviewed the backlog, these assertions do not contain the required specificity to establish scienter.

In sum, even when Plaintiffs' scienter allegations are viewed holistically, they fail to allege the requisite mental state to support a § 10(b) action against Defendants.

II.   Section 20(a) of the Exchange Act

Plaintiffs allege control person liability against Defendants based on Section 20(a) of the Exchange Act, which states,

> Every person who, directly or indirectly, controls any person
> liable under any provision of this chapter or of any rule or
> regulation thereunder shall also be liable jointly and

27

1   severally with and to the same extent as such controlled
2   person to any person to whom such controlled person is liable,
    unless the controlling person acted in good faith and did not
3   directly or indirectly induce the act or acts constituting the
    violation or cause of action.

4   15 U.S.C. § 78t(a).

5        To prove a prima facie case under Section 20(a), a plaintiff

6   must prove: (1) "a primary violation of federal securities law" and

7   (2) "that the defendant exercised actual power or control over the

8   primary violator."  Howard v. Everex Sys., Inc., 228 F.3d 1057,

9   1065 (9th Cir. 2000).  "[I]n order to make out a prima facie case,

10  it is not necessary to show actual participation or the exercise of

11  power; however, a defendant is entitled to a good faith defense if

12  he can show no scienter and an effective lack of participation."

13  Id.  "Whether [the defendant] is a controlling person is an

14  intensely factual question, involving scrutiny of the defendant's

15  participation in the day-to-day affairs of the corporation and the

16  defendant's power to control corporate actions."  Id.

17       Plaintiffs allege that, by virtue of Defendants' high-level

18  positions in Accuray, they influenced and controlled the content

19  and dissemination of the myriad statements that Plaintiffs contend

20  were false and misleading.  Because Plaintiffs failed to plead a

21  primary securities violation, they have also failed to plead a

22  violation of Section 20(a).  Moreover, Plaintiffs failed to plead

23  that these Defendants' "participation in the day-to-day affairs" of

24  Accuray was such that they "exercised actual power or control over"

25  other individuals who were involved in the issuance of any

26  accounting decisions or financial statements.

27

28                                      28

United States District Court
For the Northern District of California

1

CONCLUSION

2      For the foregoing reasons, the Court grants Defendants' motion

3  to dismiss.  Docket No. 72.  Plaintiffs may amend their complaint

4  to remedy the deficiencies outlined in this order.  Any amended

5  complaint shall be filed no later than September 20, 2010.

6  Defendants shall respond by October 7, 2010.  If Defendants file a

7  motion to dismiss, Plaintiffs shall file an opposition by October

8  21, 2010 and Defendants shall file a reply by October 28, 2010.

9  The motion will be heard on November 11, 2010 at 2:00 p.m.  If

10  Defendants answer the amended complaint and no motion to dismiss is

11  filed, a case management conference will be held on October 19,

12  2010 at 2:00 p.m.

13

14      IT IS SO ORDERED.

15

16  Dated: 08/31/10          _____

17                           CLAUDIA WILKEN
                             United States District Judge

**United States District Court**
For the Northern District of California