1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    DANIEL J. PFEFFERBAUM (248631)
3   Post Montgomery Center
    One Montgomery Street, Suite 1800
4   San Francisco, CA  94104
    Telephone:  415/288-4545
5   415/288-4534 (fax)
    shawnw@rgrdlaw.com
6   dpfefferbaum@rgrdlaw.com

7   LABATON SUCHAROW LLP
    CHRISTOPHER J. KELLER
8   JONATHAN GARDNER
    MARK GOLDMAN
9   140 Broadway, 34th Floor
    New York, NY  10005
10  Telephone:  212/907-0700
    212/818-0477 (fax)
11  CKeller@labaton.com
    JGardner@labaton.com
12  MGoldman@labaton.com

13  Co-Lead Counsel for Plaintiffs

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                    OAKLAND DIVISION

17
    ZHENGXU HE, Individually and as Trustee   )   Master File No. 4:09-cv-03362-CW
18  for the He & Fang 2005 Revocable Trust and )
    Zhengxu He Roth IRA, CITY OF               )   CLASS ACTION
19  BROCKTON RETIREMENT SYSTEM, and            )
    WAYNE COUNTY EMPLOYEES'                     )   FIRST AMENDED CLASS ACTION
20  RETIREMENT SYSTEM,                          )   COMPLAINT FOR VIOLATIONS OF THE
                                                )   FEDERAL SECURITIES LAWS
21                     Plaintiffs,              )
                                                )
22            vs.                               )
                                                )
23  ACCURAY INC., EUAN S. THOMSON,             )
    ROBERT E. MCNAMARA, WADE B.                )
24  HAMPTON, TED TU and JOHN R. ADLER,         )
    JR.                                         )
25                                              )
                      Defendants.               )
26  _____)      DEMAND FOR JURY TRIAL

27  [Caption continued on following page.]

28

579521_1

1  In re ACCURAY INC. SECURITIES          )
   LITIGATION                              )
2                                          )
   _____        )
3                                          )
   This Document Relates to:               )
4                                          )
          ALL ACTIONS.                     )
5  _____        )

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND OVERVIEW ...................................................................1

    Defendants Economic Motivation to Artificially Inflate the Company's Stock Price ...........................................................................5

    Defendants Provide Knowingly False Assurances Concerning Reported Backlog, the Company Sets Knowingly False FY08 Revenue and Earnings Forecasts ...........................................................................7

    The Company's Backlog of CyberKnife Orders Was the Admitted Core of the Company's Business and Defendants Knew of Its Contents and Quality Throughout the Class Period................................................9

    The Company Revealed that the Company's Reported Backlog Was Not a Reliable Metric by Which to Measure the Company's Financial Condition.........10

    Accuray Shocks Investors with Huge Revenue Miss and Removes $34 Million from Backlog ..........................................................12

    Defendants Admit that Neither Contingent Nor Non-Contingent Backlog Was a Good Indicator of Present Condition or Future Revenue .....................................14

    The FAC Adds Significant and Particularized Allegations regarding Defendants' Fraud: ...........................................................16

JURISDICTION AND VENUE ...................................................................18

PARTIES ...................................................................................18

CONFIDENTIAL WITNESSES ...................................................................20

CONTROL PERSONS ...........................................................................22

FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS IN VIOLATION OF THE EXCHANGE ACT.......................................................24

    Reports from Confidential Witnesses Provide the True Facts Concerning the Registration Statement Representations, Including the Company's Sales Process, Backlog and Defendants' Knowledge of Falsity ...................................28

    The Registration Statement Misrepresented that Accuray Typically Received Deposits and Recognized Deposits as Revenue Even on Cancelled Orders .........33

    Defendants Knew that Reported Backlog, Including the "Definition" of Backlog Before and During the Class Period, Was False Because They Failed to De-book Deals They Knew Customers Had Cancelled or Had Become Dormant ....................................................................58

    Defendants Intentionally Exclude Analyst with a Negative Rating on Accuray from Company Sponsored Investor Event; Big Investment Houses and Underwriters Issue Positive Outlook Reports.......................................66

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

**Page**

Accuray Reiterates Knowingly False FY08 Forecast; Makes Even Bolder False
Backlog Statements and Issues Disclosure that the Company Was
Recognizing Revenue on International Deals Upon Shipment.............................67

Securities Analysts Criticize Weak Installation Figure; Wonder About the
International Sales Disclosure; Repeat Reiteration of 2Q08 Forecast and
Stock Price Declines ........................................................................................72

Confidential Witnesses Report Accuray Recognized Revenue on Warehoused
International Shipments and Uninstalled Systems Including Chinese and
Asian Customers ..............................................................................................74

Accuray Announces 2Q08 Results – Misses Sales Revenue and Earnings
Expectations, Removes $34 Million from Backlog and Reduces 2008
Forecast by Up to $60 Million – Stock Price Collapses .................................77

Defendants Continue to Misrepresent Backlog but Disclose Serial and Significant
Backlog Reductions .........................................................................................92

Accuray Announces Revenue and Earnings Miss of Wall Street Estimates Again,
Removes Another $39 Million in Backlog .......................................................96

Accuray Terminates Its Chief Financial Officer McNamara and Its General
Counsel Mitchell; Delays Quarterly Results Due to Internal Review ..................99

Accuray Admits Lack of Adequate Internal Controls and Inventory Overstatement......100

Defendant Adler, Accuray Founder, Resigns from the Board of Directors,
Publicly Rebukes Company...............................................................................101

LOSS CAUSATION/ECONOMIC LOSS ..................................................................109

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
DOCTRINE ........................................................................................................112

CLASS ACTION ALLEGATIONS ...........................................................................112

THE SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' BACKLOG
STATEMENTS....................................................................................................114

As Accuray Used the Term, Backlog Was a Statement of Present Condition and Is
Virtually Identical in Definition to the Backlog in *Applied Signal v.
Berson* ..............................................................................................................117

COUNT I ...............................................................................................................120

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
Defendants .......................................................................................................120

COUNT II ..............................................................................................................122

1

2                                                                                      **Page**

3          For Violation of Section 20(a) of the Exchange Act Against the Individual
               Defendants ...........................................................................................................122

4

5   PRAYER FOR RELIEF ........................................................................................................123

6   JURY DEMAND ..................................................................................................................123

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION AND OVERVIEW**

1.      This securities class action is brought on behalf of purchasers of Accuray Inc. ("Accuray" or the "Company") securities between February 7, 2007 and August 19, 2008, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant Accuray designs, develops, and sells one product: the CyberKnife system, an image-guided robotic radiosurgery system for the treatment of solid tumors.  The CyberKnife system which costs approximately $4 million, purports to combine continuous image-guidance technology with a compact linear accelerator to deliver high doses of radiation to a tumor from different directions.  As a radiation device, it must be housed in a purpose-built bunker, which costs up to $2 million to construct.

3.      During the Class Period, Accuray's business model includes three main sources of revenue: (i) CyberKnife Systems; (ii) shared ownership; and (iii) services.  Product revenue is generated from the sale of the Company's CyberKnife systems, which are capital equipment purchases for hospitals or radiation treatment facilities.  Under the shared ownership program, a CyberKnife system is placed in a hospital with Accuray retaining the title.  The customer is responsible for building a radiation-shielded room and making minimum monthly payments to Accuray.  Any revenue generated over and above those minimum payments is shared between Accuray and the customer.  Service contracts are typically signed for four- to five-year periods, and in most cases include six technology upgrades, when and if available, during the period.

4.      According to the Company, the sales process in the United States involves a combination of sales directors, sales specialists, customer account sales executives, product managers, account managers and training specialists.  During the Class Period, the Company's United States Sales staff consisted of only 23 people.  Exhibit 1 at 40, 70.[1]

---

[1]      Exhibits referenced herein are attached to the Appendix of Exhibits, filed concurrently herewith.

5. During the Class Period, the Company and the Individual Defendants (defined below) made materially false and misleading statements and failed to disclose material facts concerning the Company's current and future financial condition, in particular: (a) the definition, quality and makeup of backlog, including reported backlog which was used by defendants and investors to measure the past, current and future financial condition of the Company; (b) the receipt of and accounting for customer deposits; (c) the Company's revenue and earnings forecasts for FY08; and (d) revenue recognition processes on CyberKnife systems sales to international customers. As detailed herein, defendants knew or recklessly disregarded that the statements alleged herein were false and misleading when made.

6. Beginning with the February 7, 2007 Registration Statement and Prospectus (collectively, the "Registration Statement") and throughout the Class Period, the Company publicly defined (and re-defined) its definition of backlog while simultaneously identifying it as the key metric that investors should use to measure past and current sales activity and the growth of the Company. The Company made knowingly false representations regarding content and quality of backlog, including the likelihood that backlog would result in future revenue:

- ***We define backlog as the sum of the following two components: deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received. Backlog includes contractual commitments from CyberKnife system purchase agreements*** . . . .

- ***Reported backlog includes only contracts which contain no contingencies, or for which all contingencies have been met and does not include signed contracts that have contingencies. . . . These Contingent contracts will be added to backlog once all contingencies have been met***.

- ***Backlog includes non-contingent contractual commitments from CyberKnife system purchase agreements. . . . Backlog does not include signed contracts that have contingencies such as board approvals, financing dependencies or the formation of certain legal structures***.

- ***Accuray's backlog is composed of firm, signed contracts that the company believes have a substantially high probability of being recognized as revenue***.

*Id.* at 44; Exs. 2-3, 20.

7. The Registration Statement stated that backlog contained only non-contingent contracts and that the contracting process consisted first of a letter of intent ("LOIs") followed by

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

execution of a formal contract with the customer.  In truth, however, as reported by confidential witnesses ("CWs") prior to the filing of the Registration Statement, the Company had **already** changed its sales and contracting process from using LOIs and contracts, as referenced in the Registration Statement, to using a single document called a Term Agreement.  The Term Agreements materially altered the way in which the Company had conducted and would conduct the sales process as well as the makeup and reporting of backlog.

8.     The Registration Statement also stated that backlog consisted of CyberKnife sales and deferred revenues with no contingencies which customers were contractually committed to make. ¶53. The Company later repeated the statement with even stronger emphasis on the fact that backlog consisted of **only** contracts with no contingencies.  However, CWs report that prior to February 2007, Term Agreements drafted by the legal department were already in use and contained language allowing for contingencies to be self-satisfying, *i.e.*, when a customer did not affirmatively inform the Company otherwise, the contingency was presumed satisfied.  As a result, backlog was inflated as deals were reported as non-contingent or having a substantially high probability of being converted to revenue, when in truth, the Term Agreements stated that if the customer did not cancel the contract by a certain date – for instance 90 days from the date the Term Agreement was signed – **then Accuray would assume that the contingencies had been waived on the part of the customer**. Confidential witnesses report that defendants knew that these contingencies were not actually being satisfied.

9.     In addition to the false representations concerning reported backlog, the Registration Statement materially misrepresented that the Company typically received customer deposits when sales contracts were executed, and that even upon cancellation of an agreement or contract, the Company would recognize the deposits as revenue.

> *In the event that a customer does not, for any of the reasons above or other reasons, proceed with installation of the system after entering into a purchase contract, we would only recognize the deposit portion of the purchase price as revenue*. . . .

\*     \*     \*

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1

*We typically receive a deposit at the time the CyberKnife system purchase contract is executed, and the remaining balance for the purchase of the CyberKnife system upon installation.*

2

3   Ex. 1 at 13, 42.

4          10.     This was not true either.  In fact, customers were regularly not required to place

5   deposits, notwithstanding the multimillion dollar purchase price of the CyberKnife.  These deals

6   were nonetheless included in backlog and many never resulted in sales.  New confidential witnesses

7   report that deposits were waived specifically to get a Term Agreement signed and into backlog.

8          11.     In truth, CWs report that deposits (when collected) *almost always* were refunded

9   upon cancellation and in fact, the contracts and the agreements called for refunds.  The Company did

10  not recognize revenue on cancelled deals

11         12.     Finally, the Registration Statement materially misrepresented the manner in which the

12  Company recognized revenue on sales to international customers through distributors.   The

13  Registration Statement stated that the Company did not recognize revenue on CyberKnife sales until

14  installation has occurred or for some international sales through distributors, upon delivery to the

15  end-user's site:

16         Under our revenue recognition policy, we generally do not recognize revenue attributable to a CyberKnife system purchase *until after installation has occurred.*
17         *For international sales through distributors, we typically recognize revenue when the system is delivered to the end user's site.*

18

19         13.     Confidential witnesses, internal documents and defendants' admissions together

20  demonstrate that these statements were patently false.  In truth, (a) the Company was not typically

21  receiving deposits and would put contracts or agreements without any deposits at all into backlog;

22  (b) as opposed to recognizing deposits as revenue on cancelled deals, the Company was instead

23  issuing refunds on cancelled contracts; and (c) the Company was recognizing revenue simply upon

24  *shipment* to international distributors as opposed to or installation or delivery to the end-user's site.

25  Confidential witnesses further report that at times CyberKnife systems would sit in distributor or

26  Accuray warehouses for months.  Though the Company has not restated revenues, CWs' reports and

27  defendants' admissions strongly suggest violations of Generally Accepted Accounting Principles

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1  ("GAAP"), American Institute of Certified Public Accountants ("AICPA"), Statement of Position

2  ("SOP") 97-2, *Software Revenue Recognition* and the Company's own internal accounting policies.

3        14.    Indeed, after plaintiffs filed their [Corrected] Consolidated Complaint for Violations

4  of the Federal Securities Laws (Dkt. No. 70) ("CC") in December 2009, alleging the falsity of the

5  Company's statements regarding revenue recognition on international orders, the Company changed

6  its 2010 Form 10-K to inform investors that in fact revenue was recognized on shipment, not

7  delivery to the end user.

8  <u>Defendants Economic Motivation to Artificially Inflate the Company's Stock Price</u>

9        15.    While insider sales are not necessary to establish scienter in this case, defendants'

10  stock sales are consistent with the scheme to defraud.  After Accuray issued the Registration

11  Statement causing Accuray's stock price to be artificially inflated, the Individual Defendants took

12  advantage of the inflation of the stock price and sold more than $135 million worth of their Accuray

13  shares to the unsuspecting public.  Defendant Ted Tu ("Tu") alone unloaded 100% of his Accuray

14  shares for $100 million.

15        16.    On February 8, 2007, with material false and misleading statements in the

16  Registration Statement, the Company's stock price catapulted from $18.00 per share to $28.00 per

17  share.  Company insiders including certain of the Individual Defendants sold millions of shares of

18  Accuray stock at artificially inflated prices.  The Company's $18.00 per share IPO price would have

19  been substantially lower without the misrepresentations.  A summary of defendants' stock sales

20  follows:

21

| Last Name | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| ADLER | 2/8/2007 | 220,000 | $18.00 | $3,960,000 |
|  | 11/12/2007 | 100,000 | $15.91 | $1,591,000 |
|  |  | 320,000 |  | $5,551,000 |
|  |  |  |  |  |
| LINDQUIST | 2/8/2007 | 48,000 | $18.00 | $864,000 |
|  | 10/30/2007 | 10,000 | $20.00 | $200,000 |
|  |  | 58,000 |  | $1,064,000 |
|  |  |  |  |  |
| RAANES | 2/8/2007 | 76,000 | $18.00 | $1,368,000 |
|  |  | 76,000 |  | $1,368,000 |

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

| Last Name | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| THOMSON | 2/8/2007 | 200,000 | $18.00 | $3,600,000 |
| | | 200,000 | | $3,600,000 |
| | | | | |
| TU | 2/8/2007 | 3,953,191 | $18.00 | $71,157,438 |
| | 2/13/2007 | 1,878,807 | $27.61 | $51,873,861 |
| | | 5,831,998 | | $123,031,299 |
| | | | | |
| WU | 2/7/2007 | 59,000 | $18.00 | $1,062,000 |
| | | 59,000 | | $1,062,000 |
| Total | | 6,544,998 | | $135,676,299 |

17.     In addition, Accuray changes FY08 executive bonus structure to be weighted toward backlog, further encouraging sales staff to sign deals which defendants already knew were not likely to result in installations.  In the first six months as a public company defendants began rewarding executives for increasing backlog.  The Form 10-K also disclosed the details of the Company's executive bonus structure and its direct correlation with reported backlog.  Defendants were incentivized to enter into Term Agreements and grow backlog.  Accuray's Compensation Committee changed the financial metrics to be used in determining bonuses for Accuray's senior executive officers for FY08.  In FY08, the Company changed its bonus structure such that increases in backlog would account for 20% of Euan S. Thomson's ("Thomson") annual bonus and 6.5% of Wade B. Hampton's ("Hampton") bonus:

> Weighting of financial metrics in the case of our Chief Executive Officer shall be as follows: net income (10%), operating income (10%), revenue (20%), gross margin (10%), and backlog (20%).
>
> *          *          *
>
> For our Chief Sales Officer [Hampton], approximately 15% of his bonus will be based on achievement of corporate financial objectives (revenue 3.5%, net income 1.75%, operating income 1.75%, gross margin 1.75% *and backlog 6.5%*).  The remaining approximately 85% of his bonus will be based primarily on achievement of *quarterly sales quotas*.

Ex. 17.

18.     On May 1, 2007, the Company reported revenue and earnings for 3Q07.  The Company disclosed for the first time that it would change the way that it would calculate and report backlog – which would now include both contingent *and* non-contingent transactions:

> "[T]he Company now defines as backlog under signed non-contingent contracts as well as backlog under signed contingent contracts that the Company believes have a

substantially high probability of being booked as revenue, ***was approximately $559 million***."

Ex. 5.

19.     This reported change in definition materially altered the way in which the Company would conduct business and how backlog would be calculated and reported.  Though some were skeptical, many securities analysts were optimistic about the decision to change the backlog definition and bought defendants' false and misleading claims that the new backlog, notwithstanding contingencies, had a substantial likelihood of being recorded as revenue.

20.     The Company held a conference call for investors and analysts following the May 1, 2007 disclosure.  During the call defendant Robert E. McNamara ("McNamara") also told investors to expect newly reported backlog to convert to revenue in 6 to 18 months.  This was an even shorter time frame than investors had previously been told in the Registration Statement (*i.e.*, 12 to 18 months), and set expectations that the Company would be converting backlog to revenue at a faster pace.  Ex. 6 at 8.  Defendants added even more purported assurances, specifically that the Company would review each contingent transactions quarterly to determine whether it should be in backlog.

Defendants Provide Knowingly False Assurances Concerning Reported Backlog, the Company Sets Knowingly False FY08 Revenue and Earnings Forecasts

21.     Apart from particularly making false and misleading statements in the February 7, 2007 Registration Statement (and beyond) concerning the sales contracting process, backlog and revenue recognition on international orders, the Company made materially false revenue and earnings forecasts for FY08 with actual knowledge of facts that materially undermined the reasonableness of the forecast.  For example, on August 16, 2007, the Company issued a FY08 revenue forecast of $250 - $270 million.  At the same time, the Company repeatedly provided false assurances that its backlog consisted of firm signed contracts that the Company had 90% confidence would result in revenue.  Further, the Company said that a review of the Company's backlog at any given time was the best way to evaluate the Company's revenue and earnings forecasts:

(a)     "We believe that our current definition of ***backlog is a more meaningful metric for Accuray as an indicator of future revenue***."

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

(b)     "Backlog is defined as signed contracts that Accuray believes have a substantially high probability of being realized as revenue in the future. ***It can be used to analyze both historical activity and future activity*** . . . ."

(c)     Moving to the future and guidance for going forward, ***Accuray's backlog provides excellent visibility into future revenue***, again, since nearly all revenue comes out of that backlog number.

22.     Defendants also actually knew that FY08 sales, revenue and earnings forecasts were false and misleading when made.  First, the Company based the forecast in part on the artificially inflated backlog figures that defendants knew consisted of "contracts" with known infirmities that had little to no chance of materializing into installations and thus, revenue.  Defendants also knew but failed to disclose that even where there were contingencies, the Company was allowing them to be satisfied simply by the passage of time and the customer's silence, thus allowing weak or non-existent opportunities to be added to backlog.

23.     Moreover, CWs report that prior to the IPO, senior management polled the sales staff to determine what the Company's forecast ought to be.  According to CWs, the sales staff reported to upper management, specifically, defendant Hampton, that it could sell 50 units.  Defendants ignored the sales staff and forecasted 100.  At the time, CWs 2, 3 and 4 reported that the sales staff told defendants, in particular Hampton, that there was "no way" it could sell that many CyberKnife systems.  In fact, CW4 reported that even Senior Sales Director Tom Snarsky ("Snarsky") told Hampton that such a forecast was "f-ing crazy."

24.     Indeed, the Company would miss FY08 forecasted results, pre-announcing a substantial reduction to the forecast in January 2008 causing sharp price declines and investor losses.  Unsurprisingly, the Company sold about 50 units – just as the sales staff estimated.

25.     Confidential witnesses report that defendants actually knew that statements regarding its backlog made in the Registration Statement and throughout the Class Period were false and misleading for the following reasons:

(a)     Prior to the Registration Statement, defendants had implemented changes in their contracting and backlog calculation process by switching from LOIs to Term Agreements which materially impacted the way in which backlog would be calculated and reported.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1    (b)    Defendants knew but failed to disclose that the Company's new Term

2    Agreements – which were reported to the market as "contracts" – contained language which allowed

3    contingencies to be deemed satisfied or waived unless the customer notified the Company otherwise.

4    (c)    Defendants knew or deliberately disregarded that they included system sales

5    in backlog that the customer had paid no deposit at all and those orders that did have deposits were

6    nonetheless refundable.

7    (d)    Defendants knew or deliberately disregarded that backlog included sales

8    wherein a third-party financier – including a financing venture run by Accuray's former Chief

9    Executive Officer ("CEO") – placed a *refundable* deposit on behalf of institutions, sometimes

10    without the institution's knowledge or approval.

11    (e)    Defendants knew or deliberately disregarded that they included highly

12    suspicious deals that were included in backlog some which had no identifiable end-user and others

13    made by certain of its sales staff, including John Nash ("Nash") and Jim Mills, both of whom had a

14    history of suspect sales orders which failed to turn into system installs.

15    (f)    Defendants knew or were deliberately reckless in not knowing that sales to

16    international distributors were often made through interested partners with the Company, did not

17    include initial deposits, did not have specified end-users and revenue was being recorded upon

18    shipment to distributors as opposed to upon delivery to end-users.

19    (g)    Defendants knew or were deliberately reckless in not knowing that backlog

20    consisted of orders that customers had cancelled sometimes months or quarters before the Company

21    removed them from backlog.

22    <u>The Company's Backlog of CyberKnife Orders Was the Admitted Core of the Company's
Business and Defendants Knew of Its Contents and Quality Throughout the Class Period</u>

23

24    26.    Defendants knew or were deliberately reckless in not knowing throughout the Class

25    Period that the statements the Company made concerning and related to backlog were false and

    misleading.  The Company's reported backlog was admittedly the core indicator of the Company's

26    business condition and the metric that the Company used to measure the current and future financial

27    performance.  Indeed, CyberKnife sales were the Company's one-trick pony and defendants told

28

investors that backlog was the most reliable – and in fact an "excellent" – way to predict the Company's future revenues as well as measure historical performance.   Notwithstanding uncertainties by investors, the Company falsely assured investors that it reviewed and "scrutinized" the backlog every quarter to be certain of the quality of its contents and confidence in the likely conversion to revenue:

> *On a quarterly basis, the Company will review each contingent contract to determine whether progress toward satisfaction of contingencies is sufficient to support inclusion of the contract within backlog*.

Ex. 5.

> *We review, on a quarterly basis with respect to each contingent contract included in backlog*, whether customer engagement and progress toward satisfaction of contingencies warrants *continued inclusion of the contract within backlog*.

Ex. 25 at 22.

> *[W]e go through quarter by quarter, we go through everything we have in backlog, the full range of backlog.  We discuss in detail with the salespeople.*  Increasingly, we have direct points of contact with the hospitals themselves.  *And we get higher and higher quality data*, I would say, all the time about when these installations will take place.

Ex. 44 at 11.

The Company Revealed that the Company's Reported Backlog Was Not a Reliable Metric by Which to Measure the Company's Financial Condition

27.     Though a series of partial disclosures (which were accompanied by continued misrepresentations), the true facts concerning the Company's financial condition began to seep into the market resulting in significant stock price declines.  For example, on August 16, 2007, the Company issued its 4Q07 financial results in a press release.  Ex. 11.  During the conference call following the press release, defendants could not substantiate or explain the way that it calculated new order growth and how that "growth" translated into installations and reported backlog which had ballooned to $619 million.  Moreover, defendants could not explain why with large backlog growth, there were only 20 CyberKnife installations in FY07 as compared to 22 in FY06, especially since backlog was supposed to be a key indicator of sales strength.

1    28.    During the call defendant Thomson engaged in an awkward exchange with at least

2  one of the analysts regarding the financials and Thomson could not explain what should have been

3  simply how the Company had reached its current installation and backlog numbers.

4    29.    After the August 16, 2007, conference call, and notwithstanding the bold FY08

5  forecast, defendants' evasive yet defiant statements concerning the real reported installation, sales

6  figures and backlog, left investors and analysts puzzled by what appeared to be the true facts:

7    **4Q Leaves as Many Questions as Answers**

8    •    Overall, ARAY's 4Q left us with hard-to-answer questions . . . ***unit installs
         in the U.S. actually fell in FY07 vs. FY06, and FY08 sales guidance trailed***

9        ***Street estimates***.

10    •    "***Product" orders of $50M (15 units) dropped q/q***. . . .

11    •    ***With the significant growth in backlog last year, we are puzzled why the 20
         unit installs for FY07 (just ended) were down from 22 in FY06.***

12

      •    FY08 sales guidance is $250-$270M, below Street view of $266 million. . . .
13        ***Our price target goes from $19 to $16***.

14  Ex. 13.

15    30.    On August 17, 2007, the following day, two analyst firms, CIBC World Markets, Inc.

16  ("CIBC") and J.P. Morgan Securities Inc. ("JPMorgan") downgraded the Company's stock and the

17  Company's stock price declined from close of $18.07 per share on August 16, 2007 to a close of

18  $13.45 per share on August 17, 2008, or 4,535,800 shares traded.  The volume trading on August 16,

19  2007 was a mere 861,200.

20    31.    The bad news continued thereafter.  On November 7, 2007, the Company reported its

21  1Q08 financial results.  Despite huge increases to reported backlog, the Company once again

22  reported weak CyberKnife installation numbers below expectations and inconsistent with reported

23  backlog growth.  Of course the Company previously stated that nearly all revenue (*i.e.*, installations)

24  come from backlog.  Defendants nevertheless repeated false FY08 revenue and earnings forecast and

25  current backlog metrics.

26    32.    During the same November 7, 2007 report, however, the Company revealed for the

27  first time that sales to international distributors were being recorded as revenue upon ***shipment*** to the

28  distributors (as opposed to installation or delivery to the end-user) a surprise disclosure to the

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL      - 11 -
        SECURITIES LAWS - 4:09-cv-03362-CW

investing public and inconsistent with the revenue recognition policy stated in the Registration Statement:

> ***Revenue and earnings hit the mark, but light CK installs raise questions.*** *F1Q . . . investors are likely to gravitate around the soft install (5 CK systems installed, all U.S., incl. 1 shared system), as the bulk of growth came from a combination of billed but-as-yet-uninstalled international systems (6 CKs placed, but awaiting validation). . . .*

> ***Needless to say, questions remain abut the 6 "uninstalled yet billed" o-U.S. systems . . . more flow through distributors***.

> **Fiscal 1Q Analysis; Weak Installs Calls FY08 Sales Guidance Into Question**

> ***Only five units were installed in 1Q08,*** *all in the U.S.,* ***but ARAY said that it recognized revenue for another six units outside the U.S. that were sold trough distributors. . . . This may be perfectly legitimate, but we do point out that this is the first time we have come across this issue for ARAY (despite O-U.S. unit installations every prior quarter***.

Ex. 24.

33. After the disclosures, which cast doubt on the FY08 forecast, the seriousness of reported backlog and the number of sales resulting in actual CyberKnife installations, Accuray's stock price declined from more than $19.00 per share to $15.30 per share by November 15, 2007.

Accuray Shocks Investors with Huge Revenue Miss and Removes $34 Million from Backlog

34. On January 30, 2008, the Company reported its 2Q08 revenue and earnings report. Accuray (a) missed revenue forecasts; (b) slashed its FY08 earnings forecasts; and (c) removed $34 million from the Company's reported backlog.

35. Securities analysts again took the Company to task for its weak quarterly results in comparison to public forecast and backlog declines:

> (a) "***ARAY has just put up what we consider the weakest, most confusing and most concerning quarterly results since its IPO one year ago. Both revenue and EPS missed consensus, and FY08 guidance was lowered materially***."

Ex. 28.

> (b) "***Net/net, this downward adjustment of backlog truly calls into question the reliability of ARAY's backlog on a go-forward basis, and thus into sales and EPS expectations***."

Id.

> (c) "As we have stated in prior notes, ***installation and revenue visibility have been chief concerns since Accuray first re-stated backlog in F3Q07 (May 2007) to***

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- 12 -

*include contracts with contingencies*. While we have previously given the company *some* benefit of the doubt with regards to projections, the disappointing *F2Q results, and accompanying reduction to guidance, clearly show the risks in adopting more lenient backlog standards*."

Ex. 29.

36.     The January 30, 2008 disclosures about the Company's missed earnings expectations, backlog removal and reduction of future revenue earnings expectations caused the stock price to crater from *$14.98 per share on January 30 to $9.52* per share on January 31, more than 10 million shares volume trading.  On January 29, trading volume was only 1.2 million shares on significantly increased trading volume.

37.     Notwithstanding the disclosures, the Company *continued* to mislead investors concerning the content and quality of its backlog figures which it knew to be unreliable and bloated with deals that had limited if any real probability on resulting in revenue and installations. Defendants repeated the mantra they knew to be false and misleading:

> *For the period ended December 29, 2007, backlog increased to approximately $660 million, with approximately $365 million associated with CyberKnife® Robotic Radiosurgery's System contracts and approximately $295 million associated with services and other recurring revenue.  Accuray's backlog is composed of firm, signed contracts that the company believes have a substantially high probability of being recognized as revenue*.

Ex. 26.

38.     On April 29, 2008, the Company reported its 3Q08 financial results announcing that it would be removing *$54 million in cancelled contracts from its backlog*, another indication that the Company's reported backlog figures were suspect at indicating the true financial condition of the Company, notwithstanding the reports of simultaneous growth in backlog.  Ex. 32.  On April 30, 2008, the Company's stock price declined from $8.09 per share to $7.83 per share.

39.     On August 19, 2008, the Company announced that it had again missed Wall Street revenue and earnings estimates and that backlog would be reduced once again, this time by $39 million.  Analysts were befuddled:

> Here are the facts: *sales and EPS missed Street once again*, new orders were down y/y for the third straight quarter, b*acklog was "materially" revised downward for the third straight quarter, and actual unit installations were down for the second consecutive year in the U.S.* (and flat WW for the past three years). . . .

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

*ARAY eliminated another $39M from backlog due to customer cancellations and other doubtful "stuff", and so about $127M has now been removed from backlog in the past three quarters. We view backlog as largely irrelevant at this point (expecting more revisions to come)*, and would focus attention on installations instead.

*Only six units were installed (vs our 12 est)*.

Ex. 38.

40. After the August 19, 2008 disclosures, the stock suffered an immediate decline from $7.57 per share to $6.90 per share.

<u>Defendants Admit that Neither Contingent Nor Non-Contingent Backlog Was a Good Indicator of Present Condition or Future Revenue</u>

41. Despite defendants' statements that backlog was the key metric by which investors should measure the Company, CWs report that defendants continually manipulated the backlog figure to present a misleadingly optimistic view of the Company's current condition and future prospects. Defendants stuffed backlog full of deals which never had any chance of resulting in installations. The Company would later (after the Class Period) concede that its backlog calculation and reporting methodology during the Class Period had no value and reversed its process to specifically exclude contingent backlog from its public reporting process. Defendants admitted that including "contingent deals" reduced the usefulness of the backlog as a predictor of future system shipments:

*[b]eginning with fiscal year 2010, we will no longer provide information about contingent backlog. We think that such information is of limited use in building financial models.* Orders that we consider to be contingent will not be disclosed until all contingencies have been cleared.

*Id.* at 5.

*Over time we concluded that including contingent orders in backlog was reducing the usefulness of backlog as a predictor of future system shipments and revenue*.

Ex. 47 at 5.

42. Astoundingly, on October 29, 2009, the Company also admitted that even its ***non-contingent*** backlog reported during the Class Period was not reliable and would now be subject to further scrutiny. *See* ¶128. Under the Company's refined definition of "non-contingent," it reduced

1   reported backlog by an additional $274 million, bringing the total reduction in reported backlog to

2   *$527 million*.

3        43.    Even more shocking was the reduction of nearly 50% in total ***non-contingent*** systems

4   backlog.  Defendants provided a breakdown showing that of the $291 million of backlog, ***only $99***

5   ***million was attributable to CyberKnife system sales – or approximately 25 deals***.  Just one quarter

6   earlier, defendants had claimed to have non-contingent systems backlog of $203.2 million

7   attributable to CyberKnife sales.  For the first time, the Company also announced that it had been

8   including orders from international distributors in non-contingent backlog ***despite the fact that the***

9   ***customer was not paying a deposit***.  Defendants attributed the ***50% decline in systems backlog*** to

10   the removal of these orders.  This reduction prompted an incredulous analyst to write:  "***Are you***

11   ***kidding me?*** . . . non-contingent, after all, had in the past at least some concrete tone to it, no?"  *See*

12   Ex. 48.

13        44.    In total, during the Class Period and after, from January 30, 2008 to August 24, 2009,

14   the Company removed over $250 million in deals which were represented to be either (a)

15   contractually committed or (b) contingent but 90% likely to result in revenue:

| Disclosure Date | Period | Backlog Reduction in Millions |
|---|---|---|
| 01/30/08 | 2Q08 | $30 |
| 04/29/08 | 3Q08 | $54 |
| 08/19/08 | 4Q08 | $39 |
| 10/29/08 | 1Q09 | $5 |
| 01/29/09 | 2Q09 | $34 |
| 05/05/09 | 3Q09 | $27 |
| 08/24/09 | 4Q09 | $65 |
| **Total** | | $254 |

23        45.    Accuray terminated its top executives as the backlog debacle unfolded including

24   defendant McNamara in October 2008 and later on October 20, 2009, the Company announced the

25   termination of defendant Hampton, the Chief Sales Officer of the Company.  Hampton was

26   instrumental in determining backlog.  CWs report, among other things, Hampton set unachievabley

27   high sales quotes, pressured sales people to ring in Term Agreements no matter how speculative,

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1  ignore recommendations to keep deals with multiple contingencies out of backlog and attempted to

2  "revive" cancelled deals at he end of each quarter to prevent removing them from backlog.

3         46.    Of course these admission were too little too late as investors had lost millions as a

4  result of the Company's knowing or deliberately reckless misrepresentations during the Class Period.

5  <u>The FAC Adds Significant and Particularized Allegations regarding Defendants' Fraud:</u>

6         47.    The First Amended Complaint ("FAC") significantly bolsters the allegations made in

7  the  CC.   The  FAC  has  clarified  existing  allegations,  added  new  allegations  developed

8  through continued investigation and added new allegations.  The FAC address deficiencies identified

9  by the Court in its Order of August 31, 2010.  For example, the FAC contains:

10            (a)    Allegations based upon interviews with five additional former employee CWs,

11  including  a  former  Sales  Operations  Specialist,  two  former  Senior  Contracts  Administrators,  a

12  former Regional Sales Director, and a former VP of Customer Support and Customer Service.  These

13  former  employees  had  direct  contact  with  the  defendants,  in  particular,  CW15,  who  had  daily

14  interactions with defendant Hampton.

15            (b)    An account from CW15 that after the Company when public, it was obvious

16  that certain contracts in backlog were never going to result in installations.

17            (c)    An  account  from  CW15,  who  attended  quarterly  backlog  meetings  with

18  Hampton, that defendants placed contracts in backlog against recommendations formed at the

19  meeting.  These contracts had multiple contingencies and other infirmities, including no deposit or

20  no end user, which indicated that the contract was unlikely to ever result in an installation, however

21  CW15  reported  that  his/her  input  about  these  issues  was  ignored  and  s/he  was  overruled  by

22  Hampton.

23            (d)    An account from CW13 that Hampton pressured him/her to get a signed Term

24  Agreement that could be entered into backlog despite the fact that CW13 informed Hampton that the

25  purported customer, was not a physician, did not know any physicians and did not have financing or

26  even money for a deposit.  Hampton waived the deposit and told CW13 to get the Term Agreement

27  signed anyway.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    (e) An account from CW11 of a specific deal in Bakersfield, California with the

2 Comprehensive Cancer Care Center which should not have been included in backlog, but was placed

3 in backlog by defendants anyway.  New internal documents corroborate that this deal was entered

4 into on the last day of FY08 and the contract was still missing key dates.

5    (f) Excerpts from a Term Agreement, dated December 29, 2006 (prior to the

6 Company's IPO), which was signed by defendant McNamara and current General Counsel, Darren

7 Milliken ("Milliken").  The Term Agreement includes the waivable contingencies reported by CWs

8 and language that deposits would be refunded even upon cancellation – neither of which was

9 disclosed in the Registration Statement.

10    (g) Accounts from CWs who were contacted by attorney's for Accuray after the

11 filing of the CC.  Attorneys for the Company challenged the CWs on the statements attributed to

12 them.  The CWs reported to plaintiffs counsel that, not only did they stand by the statements

13 attributed to them, but report that the attorneys acknowledged that CW4 had a basis to make the

14 statements s/he did and CW5 reported that s/he challenged the attorneys to explain the defendants'

15 conduct.

16    (h) Allegations related to events occurring since the time of the filing of the CC,

17 including a change in the Company's Securities and Exchange Commission ("SEC") disclosures

18 which now significantly mirrors plaintiffs' allegations that defendants were recognizing revenue on

19 shipment of international order (as opposed to delivery to the end users' installation site).

20    (i) Allegations demonstrating that the core business inference is applicable and

21 allows the Court to infer that defendants were aware of the contents of backlog.  The defendants'

22 intense focus on backlog, both publicly in press releases and investor conference calls, and privately

23 (as reported by CWs) clearly substantiates that the Court may infer that defendants were aware of its

24 contents.

25    (j) Allegations demonstrating that backlog was a statement of present (not

26 forward looking) condition and that the definition of backlog as used by Accuray was virtually

27 identical the definition used by Applied Signal in *Applied Signal v. Berson*, 527 F.3d 982 (9th Cir.

28 2008) which the Ninth Circuit held to be not forward looking.

**JURISDICTION AND VENUE**

48.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10b-5.

49.    This Court has jurisdiction over this action pursuant to §27 of the Exchange Act 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

50.    Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District and Accuray's principal executive offices are located in this District.

51.    In connection with the acts alleged in this FAC, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

52.    Lead plaintiff Zhengxu He, individually and as Trustee for the He and Fang 2005 Revocable Trust and Zhengxu He Roth IRA, purchased or acquired Accuray securities during the Class Period and suffered damages as a result of the conduct alleged herein.

53.    Lead plaintiff City of Brockton Retirement System purchased or acquired Accuray securities during the Class Period and suffered damages as a result of the conduct alleged herein.

54.    Plaintiff Wayne County Employees' Retirement System purchased or acquired Accuray securities during the Class Period and suffered damages as a result of the conduct alleged herein.  *See* Certification of Named Plaintiff attached hereto.

55.    Defendant Accuray is incorporated in Delaware and headquartered in Sunnyvale, California.  The Company designs, develops, and sells the CyberKnife system, an image-guided robotic radiosurgery system for the treatment of solid tumors.  The CyberKnife system combines continuous image-guidance technology with a compact linear accelerator to deliver high doses of radiation to a tumor from different directions.  Accuray generates revenue by selling the CyberKnife

1   system and by providing ongoing services and upgrades to customers following installation.

2   Accuray had 386 employees as of December 31, 2006.

3       56.    With respect to manufacturing, the Company stated in the Registration Statement that

4   it purchases major components of the CyberKnife system, including the robotic manipulator,

5   treatment table or robotic couch, magnetron, which creates the microwaves for use in the linac,

6   imaging cameras and computers, from outside suppliers.  Accuray manufactures certain other

7   electronic and electrical subsystems, including the linac, at its Sunnyvale, California facility.  It then

8   assembles and integrates these components *with its proprietary software for treatment planning*

9   *and treatment delivery and perform essential testing prior to shipment to customer sites*.

10       57.    Defendant Euan S. Thomson served as the Company's CEO and a member of the

11   board of directors since March 2002.  He has been the President since October 2002 and at all

12   relevant times herein.  From March 1999 to February 2002, Thomson served during various periods

13   as President, CEO and a member of the board of directors of Photoelectron Corporation, a publicly

14   held medical device company, which went bankrupt in 2003.  Thomson signed the Registration

15   Statement (defined above).  During the Class Period, Thomson sold 235,000 shares of Accuray stock

16   for $3,811,485.

17       (a)    Defendant Robert E. McNamara served as Senior Vice President, Chief

18   Financial Officer ("CFO") from December 2004 until his resignation on September 11, 2008.

19   McNamara signed the Registration Statement.  During the Class Period, McNamara also sat on the

20   board of directors of Northstar Neuroscience Inc., a medical device company.

21       (b)    Defendant Wade B. Hampton served as Senior Vice President, Worldwide

22   Sales from August 2006 until April 2007, when he became Senior Vice President, Chief Sales

23   Officer.  Hampton was terminated from the Company on October 15, 2009.  As part of his

24   responsibilities, CWs report that Hampton had to approve of all deals that went into backlog.  He

25   attended quarterly backlog meetings with non-executives and the final backlog meeting with

26   Thomson and McNamara where backlog was calculated.  Hampton was also primarily responsible

27   for setting sales forecasts and quotas for sales personnel.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1           (c)        Defendant Ted Tu has been a member of the board of directors since May

2   2004 and at all relevant times herein.  Since May 2005, Tu has served as the President of President

3   International Development Corporation, an investment holding company, and since January 2006,

4   Tu has been the President of President Life Sciences Co., Ltd.  From May 2000 to May 2005, Tu

5   served as Executive Vice President of President International Development Corporation.  Tu signed

6   the Registration Statement.  During the Class Period, Tu indirectly sold 5,831,998 shares for

7   $123,031,299.  President International Investment Holdings, Ltd. sold an additional 2,900,000 shares

8   for $15,908,500.

9           (d)        Defendant John R. Adler, Jr. ("Adler") was a founder of the Company and

10  served as a member of the board of directors from December 1990 until his resignation on July 21,

11  2009.  From September 1999 through May 2004, Adler served as Chairman of the board of directors,

12  and from October 1999 to March 2002, as the Company's CEO.  From January 1995 until July 1999,

13  he served as the Vice Chairman of the board of directors.  Adler signed the Registration Statement.

14  During the Class Period, Adler sold 320,000 shares for $5,551,000.

15          (e)        Thomson, McNamara, Hampton, Tu, and Adler are collectively referred to

16  herein as the "Individual Defendants."

17                              **CONFIDENTIAL WITNESSES**

18          58.        The allegations included herein are based in part on information and belief and are

19  supported by first-hand accounts of former Accuray employees referred to herein as CWs.  The

20  allegations pled herein are made on information and belief and are supported by first-hand accounts

21  of 15 CWs.  These witnesses are comprised of former Accuray employees, each of whom were

22  employed during the Class Period and provided facts from numerous departmental and geographic

23  vantage points within the Company.  The information provided by the former employees is reliable

24  because: (i) each witness worked at Accuray's headquarters in the Sunnyvale office or sold Accuray

25  products in the United States and/or Canada during the Class Period; (ii) each witness has personal

26  knowledge of the information provided; (iii) the witness' job title, position and responsibilities show

27  s/he was in a position to know the fact on which s/he provided; (iv) many of the witness accounts

28

1   corroborate one another; and/or (v) the witnesses' accounts are corroborated by other information

2   alleged herein.

3       (a)     Confidential Witness No. 1 ("CW1") is a former Accuray Regional Sales
        Director ("RSD") responsible for sales of the CyberKnife system and associated
4       products and services from 2004 to 2007. CW1 was responsible for sales in the
        Mountain and Pacific regions, including California.

5
        (b)     Confidential Witness No. 2 ("CW2") is a former Accuray RSD responsible
6       for sales of the CyberKnife system and associated products and services between
        2000 and 2007. CW2 at one point covered sales covering one quarter of the United
7       States and during 2005 to 2007 in CWs last year at the Company, his/her sales region
        covered the Northwest.

8
        (c)     Confidential Witness No. 3 ("CW3") was a Senior Sales Specialist at
9       Accuray between 2006 and 2009. S/he covered multiple regions of the United States
        including Colorado, Utah, Arkansas, Nevada, New Mexico, Minnesota, Iowa,
10      Mississippi and New York.

11      (d)     Confidential Witness No. 4 ("CW4") was a RSD for the northeastern portion
        of the United States and Canada from 2005 to 2007. CW4 also participated in
12      weekly calls with other RSDs in the east and heard each of their forecasts.

13      (e)     Confidential Witness No. 5 ("CW5") worked at the Company between 2000
        and 2008 as a Director of Marketing and Placement. CW5 worked with the Centers
14      for Medicare & Medicaid Services to assure that CyberKnife procedures were
        covered and reimbursed. S/he reported to Chief Medical Officer Eric Lundquist who
15      reported to defendant Thomson.

16      (f)     Confidential Witness No. 6 ("CW6") worked at Accuray as a Senior
        Manufacturing Engineer from 2004 to 2008. CW6 was responsible for signing off on
17      the Document History Record for CyberKnife systems prior to shipment and also
        processed equipment returns and input inventory figures in the Great Plains and Max
18      computer systems.

19      (g)     Confidential Witness No. 7 ("CW7") worked at Accuray from January 2006
        until January 2008 as a Regulatory Affairs/Compliance Associate. CW7 handled all
20      incoming customer issues and complaints that came through customer service or
        technical support.

21
        (h)     Confidential Witness No. 8 ("CW8") is a former Senior Contracts
22      Administration and member of the Legal Department at the Company between late
        2004/early 2005 until April 2007. During CW8's entire tenure at the Company, s/he
23      reported directly to the Company's current General Counsel Milliken. From 2005-
        2006, CW8 was responsible for overseeing the Company's due diligence work being
24      conducted by the legal department for the IPO, which included the organization of
        contracts and records. CW8 was then promoted to oversee the Contracts
25      Administration group. CW8 was responsible for hiring the personnel for the group,
        including the Contract Administrators.

26
        (i)     Confidential Witness No. 9 ("CW9") is a Microsoft Access developer who
27      worked at Accuray as a database analyst from June to December 2008. S/he was
        employed by Accuray to work on the Backlog Quality Management System
28      ("BQMS"). In the course of his/her employment, CW9 had access to the databases

of each of these departments, including databases containing each of the Company's contracts and the contingencies associated therewith.

(j)      Confidential Witness No. 10 ("CW10") worked was an Accuray Operations Specialist from 2006 to 2009.  CW10 was tasked with drafting a standard operating procedures manual which required him/her to cross train with various personnel in the Sales Operations group and learn their roles and functions.  CW10 reported to Fiona Noah ("Noah"), who reported to defendant Hampton.

(k)      Confidential Witness No. 11 ("CW11") as a member of the Company's Sales Operations group in the Company's Sunnyvale office responsible for reviewing potential deals and entering them into backlog.  CW11 was also a participant in the backlog meetings with sales personnel, including defendant Hampton during which s/he and other sales operations representatives would make recommendations as to whether or not certain deals should be added into backlog.

(l)      Confidential Witness No. 12 ("CW12") is a former Senior Contracts Administrator who worked in the Company's legal department from approximately May 2006 to April 2010.  CW12's role involved ensuring that certain contingencies and terms in Accuray's sales contracts with customers were satisfied.  S/he worked closely with Accuray's Sales Operations group in this role.  CW12 was directly involved in refunding customer deposits.

(m)      Confidential Witness No. 13 ("CW13") is a former RSD responsible for CyberKnife sales throughout Texas, New Mexico, and Louisiana.  CW13 was employed at the Company between early 2007 and early 2009.  During his/her tenure at the Company, CW12 reported to Randy Miller and Skip Goode, who reported directly to defendant Hampton.

(n)      Confidential Witness No. 14 ("CW14") is a former VP of Customer Support and Customer Service at Accuray from 2002 until late 2006/early 2007.  In this position, CW14 was responsible for all installations of CyberKnife systems around the world as well as fulfilling Accuray's ongoing service commitments to customers.

(o)      Confidential Witness No. 15 ("CW15") is a former Sales Operations Specialist at Accuray from January 2007 through March 2010.  For majority of CW15's tenure at Accuray s/he reported to Fiona Noah, who reported to defendant Hampton.  Following Noah's departure, s/he reported to current General Counsel, Milliken.  CW15 oversaw all of Accuray's international contracts.  S/he had daily interactions with defendant Hampton.  CW15 also attended quarterly backlog meetings with Hampton, Bill Calkins ("Calkins"), Noah (and at times Holly Grey ("Grey") and Milliken).

## CONTROL PERSONS

59.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance

1   at management and board of directors meetings and committees thereof and via reports and other

2   information provided to them in connection therewith.

3           60.     It is appropriate to treat the Individual Defendants as a group for pleading purposes

4   and to presume that the false, misleading and incomplete information conveyed in the Company's

5   public filings, press releases and other publications as alleged herein are the collective actions of the

6   narrowly defined group of defendants identified above.  The Individual Defendants, by virtue of

7   their high-level positions with the Company, directly participated in the management of the

8   Company, were directly involved in the day-to-day operations of the Company at the highest levels

9   and were privy to confidential proprietary information concerning the Company and its business,

10  operations, growth, financial statements and financial condition, as alleged herein.  Said defendants

11  were involved in drafting, producing, reviewing and/or disseminating the false and misleading

12  statements and information alleged herein, were aware, or recklessly disregarded, that the false and

13  misleading statements were being issued regarding the Company, and approved or ratified these

14  statements, in violation of the federal securities laws.

15          61.     As officers and controlling persons of a publicly held company whose common stock

16  was, and is, registered with the SEC pursuant to the Exchange Act and the Securities Act of 1933,

17  and was traded on the NASDAQ and governed by the provisions of the federal securities laws, the

18  Individual Defendants each had a duty to promptly disseminate accurate and truthful information

19  with respect to the Company's financial condition and performance, growth, operations, financial

20  statements, business, markets, management, earnings and present and future business prospects, and

21  to correct any previously issued statements that had become materially misleading or untrue, so that

22  the market price of the Company's publicly traded securities would be based upon truthful and

23  accurate information.  The Individual Defendants' misrepresentations and omissions during the

24  Class Period violated these specific requirements and obligations.

25          62.     The Individual Defendants participated in the drafting, preparation, and/or approval

26  of the various public, shareholder and investor reports and other communications complained of

27  herein and were aware of, or recklessly disregarded, the misstatements contained therein and

28  omissions therefrom, and were aware of their materially false and misleading nature.  Because of

their board membership and/or executive and managerial positions with Accuray, each of the Individual Defendants had access to the adverse undisclosed information about Accuray's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Accuray and its business issued or adopted by the Company materially false and misleading.

63.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

64.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Accuray common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Accuray's business, operations, management and the intrinsic value of Accuray common stock; (b) enabled the Individual Defendants and other Accuray insiders to sell more than 6.5 million shares of their personally held Accuray common stock, generating proceeds of more than $135 million; and (c) caused plaintiffs and other members of the class to purchase or acquire Accuray securities at artificially inflated prices.

**FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS IN VIOLATION OF THE EXCHANGE ACT**

65.     Beginning with the February 7, 2007 Registration Statement, the Company began to issue false and misleading statements regarding its true financial condition and outlook for sales and service revenue associated with the CyberKnife system. Accuray filed a Form S-1/A Registration Statement with the SEC for its IPO; on or about February 7, 2007, the Registration Statement

became effective, including the exercise of the over-allotment. More than 18 million shares of Accuray's common stock were sold to the public at an opening price of $18.00 per share and the Company raised more than $171 million after discounts and commissions. The Registration Statement was signed by defendants Thomson, Tu, Adler, and McNamara.

66. The Registration Statement contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading. In particular, the Registration Statement made false and misleading statements concerning separate but related topics: (a) content, quality and make up of backlog; (b) the current state of the Company's sales and contracting process, (c) the receipt of deposits from customers upon execution of LOI or contracts, and (d) revenue recognition regarding sales to international distributors.

67. Underline False and Misleading Statement: The Registration Statement falsely described the Company's backlog as containing only contractually committed payments when in fact it was already being padded with deals that had unsatisfied contingencies.

> **Backlog**
>
> ***We define backlog as the sum of the following two components: deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received. Backlog includes contractual commitments from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with our shared ownership programs***.

Ex. 1 at 44.

68. Underline False and Misleading Statement: The Registration Statement made the false and misleading representation that the Company "typically" receives a deposit from customers upon execution of a contract when in truth the Company often did not collect deposits or agreed to waive or defer deposits in part because "customers" had no money:

> ***We typically receive a deposit at the time the CyberKnife system purchase contract is executed, and the remaining balance for the purchase of the CyberKnife system upon installation***.

Ex. 1 at 42.

69. In truth, defendants were including orders in purportedly non-contingent backlog even without deposits. The Registration Statement falsely stated that deposits were recognized as revenue even up cancellation:

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- 25 -

1

> In the event that a customer does not, for any of the reasons above or other reasons, proceed with installation of the system after entering into a purchase contract, we **would only recognize the deposit portion** of the purchase price as revenue. *Id.* at 13.

2

3

70.   In truth however even when defendants did collect deposits, they were almost always

4

refunded to the customers as opposed to being recognized as revenue, as reported.

5

71.   <u>False and Misleading Statement</u>:  The Registration Statement falsely described the

6

contracting process as beginning with a LOI and then moving to a contract, when in fact defendants

7

had in fact already materially changed the purchasing and contracting process  using a Term

8

Agreement in place of both of these documents.  The Term Agreement materially changed the way

9

the Company conducted sales and calculated backlogs.

10

> The typical sales and installation cycle is 12 to 18 months in duration and involves multiple steps, which may include pre-selling activity, ***execution of a letter of intent, or LOI, execution of contracts for the purchase or acquisition of the CyberKnife system*** and multiyear service plans, and installation of the CyberKnife system. . . . On average it takes three months from the signing of an LOI to the execution of a contract.

11

12

13

*Id.* at 42.

14

72.   <u>False and Misleading Statement</u>:   The  Registration  Statement  materially

15

misrepresented the manner in which the Company  recognizes revenue on CyberKnife System sales.

16

The Company stated that with respect to international sales, the Company "typically" recognizes

17

revenue installation or ***upon delivery to the end user's site***:

18

> Under our revenue recognition policy, ***we generally do not recognize revenue attributable to a CyberKnife system purchase until after installation has occurred. For international sales through distributors, we typically recognize revenue when the system is delivered to the end user's site***. . . .  Under our current forms of purchase and service contracts, we receive a majority of the purchase price for the CyberKnife system upon installation of the system.

19

20

21

22

                    *       *       *

23

> ***The Company records revenues from an arrangement with distributors based on a sell-through method where revenue is recognized upon shipment of the product to the end user customer once all revenue recognition criteria are met***.

24

25

*Id.* at F-14.

26

73.   In truth, as discussed in detail below, the Company was admittedly recognizing

27

revenue on sales to distributors upon shipment, ***not*** pursuant to the sell through method and not upon

28

delivery to the end user.  According to multiple CWs, the Company would recognize revenues on

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1   CyberKnife systems shipped to distributors even when the distributors had no ability to install them

2   or simply stored CyberKnifes in a warehouse.   CW15, a former Sales Operations Specialist

3   responsible for oversight of international contracts, reported that half the systems shipped during

4   2008-2009 – upon which revenue was recognized – were sitting in distributor warehouses.

5   Moreover, there is evidence that these "distributors" were not arms-length parties and never had end

6   users for the CyberKnife systems.   According to CW15 certain distributors were not even capable of

7   performing the installations, contrary to defendants' claimed revenue recognition policies.

8           74.    Underline{False and Misleading Statement}: On March 15, 2007, Accuray announced its 2Q07

9   financial results for the period ended December 30, 2006 in a press release titled "Accuray

10   Incorporated Reports Second Quarter Fiscal 2007 Financial Results."   The press release repeated the

11   false and misleading statements concerning the manner in which the Company reported backlog,

12   specifically stating that backlog did not include contracts that had any contingencies or contingencies

13   had already been met:

> *Reported backlog includes only contracts which contain no contingencies, or for which all contingencies have been met and does not include signed contracts that have contingencies such as the receipt of certain approvals, financing dependencies, or the formation of certain legal structures*.
>
> *The number of signed contracts with contingencies continued to increase in the quarter ended December 30, 2006.  These contingent contracts will be added to backlog once all contingencies have been met*.

Ex. 2.

           75.    <u>False and Misleading Statement</u>: On March 15, 2007, Accuray filed its Form 10-Q

with the SEC for its FY2Q07, the period ended December 31, 2006.  The Form 10-Q repeated

certain facts and repeated the financial information reported in the March 15, 2007 press release,

including *a decline in reported backlog to $327.9 million*.  The Company again falsely stated that its

backlog consists of *only* contracts that contain no contingencies or where all contingencies have

been met:

> *We define backlog as the sum of the following two components: deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received*.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW                                          - 27 -

*Backlog includes non-contingent contractual commitments from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with our shared ownership programs.*

*Backlog does not include signed contracts that have contingencies such as board approvals, financing dependencies or the formation of certain legal structures.*

Ex. 3.

76.     On March 20, 2007, JPMorgan issued a report titled "Accuray – Driving the StereoTactic Radiosurgery Market." The report noted again that backlog consists only of signed contracts without contingencies. It also repeated the false representation concerning the manner in which revenue is recognized from sales of CyberKnife systems, stating that backlog revenue is not recorded until installation takes place, upgrades are delivered and services are provided to customers. The report disclosed for the first time that the Company had changed its contracting process and instituted the use of "Term Agreements" prior to the IPO – "following the December [2006] quarter."

**Strong backlog should provide visibility on future revenues**
As with other capital equipment companies, order *backlog remains an important quarterly tracking metric*. . . .

*Backlog for Accuray is comprised of two components: deferred revenue and contractually committed future payments that have yet to be received*. . . .

*Backlog is recognized as revenue as the installations take place, upgrades are delivered and services are provided to the customers.*

*         *         *

Notably, the $327.9 million backlog figure compares with $330.2 million at the end of the September quarter, with the decline attributed to contractually committed future payments totaling $175.6 million (versus $185.0 million in the previous quarter). *This stems from a transition to "term agreements," which occurred following the December quarter.*

As a reminder, *Accuray only books signed contracts without contingencies as committed future payments in their backlog*.

Ex. 4 at 16-17.

Reports from Confidential Witnesses Provide the True Facts Concerning the Registration Statement Representations, Including the Company's Sales Process, Backlog and Defendants' Knowledge of Falsity

77.     The reports of CWs, each of whom was in a position to know the facts which they report, demonstrate that defendants knew their statements to be false and misleading in the

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1   Registration Statement and thereafter regarding: (a) the sales and contracting process in place prior

2   to the Registration Statement; (b) receipt of deposits or lack thereof (and recognition of revenue)

3   from customers; (c) revenue recognition on international orders; and (d) amount, quality and

4   composition of backlog.

5        78.    The Registration Statement knowingly misrepresented the sales and contracting

6   process and its impact on backlog. At least four CWs describe a sales and contracting process that

7   differed materially from what defendants told the market, both in the February 7, 2007 Registration

8   Statement and afterward.  Specifically, in describing the CyberKnife sales process, the Registration

9   Statement stated that the Company typically enters into LOI, which in about 90 days is converted

10  into a contract for the sale of a CyberKnife.  The material fact not disclosed to investors, was that in

11  or around December 2006/January 2007, prior to the filing of the Registration Statement and the

12  IPO, the Company had already changed its sales and contracting process from using LOIs to using

13  what it called Term Agreements.  The use of the Term Agreements materially altered the way in

14  which the Company conducted sales and reported backlog of its one product, the CyberKnife.  Usage

15  of the Term Agreements permitted (according to CWs) unfettered inclusion of prospective, highly

16  uncertain contingent sales prospects to be entered into the Company's backlog.  Where backlog had

17  previously been comprised of actual contracts, it was now bloated with "glorified LOIs."

18       79.    According to multiple CWs (and admitted by defendants), the shift from LOIs to

19  Term Agreements occurred before the issuance of the Registration Statement and substantially

20  affected the sales and contracting process, and materially impacted the makeup and reporting of

21  backlog which the Company described as *the* key metric for measuring corporate performance.  For

22  example, the Registration Statement stated that the Company defined backlog as CyberKnife sales

23  with no contingencies that customers were contractually committed to make.  However, CWs report

24  that even before February 7, 2007, the Term Agreements which were *already in use* contained

25  language allowing for contingencies to be self-satisfying, *i.e.*, that customers need not do anything

26  for a contingency to be satisfied.  This would result in highly contingent deals being automatically

27  converted into non-contingent deals purportedly having a substantially high probability of being

28  converted to revenue when this was not the case.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL           - 29 -
SECURITIES LAWS - 4:09-cv-03362-CW

(a)     CW1, a former Accuray RSD, responsible for CyberKnife sales prior to the IPO and during several months afterward, described the LOIs used by the Company prior to the IPO as a "very generic" document produced by Accuray.  The Company had used and considered an LOI as simply a gesture of a good faith interest in purchasing a CyberKnife.[2]  By no means did LOIs represent a formal commitment to proceed with a contract with Accuray.  CW1 stated that Accuray utilized LOIs up to December 2006/January 2007, after which (but prior to the IPO) the Company changed the way they negotiated prospective deals by using so-called "Term Agreements."

(b)     CW1 also reported that the Company executives did not explain to the sales staff why this change to the Term Agreements was being made but that language in the new Term Agreements appeared geared to allow deals which were far more far more speculative – because of the contingencies – to be included in backlog.  In particular, CW1 reported that the Term Agreements appeared *intentionally* drafted to allow the Company to report deals it knew to be contingent as backlog, thereby inflating reported backlog numbers.

(c)     For example, according to CW1, the Term Agreements stated that if the customer did not cancel the contract by a certain date – for instance 90 days from the date the Term Agreement was signed – *then Accuray would consider that the contingencies had been waived on the part of the customer* unless the client specified otherwise.  Moreover, Term Agreements included contingencies such as joint venture formation, financing, certificates of need and building a structure which created a good chance the deals would never be consummated. CW1 reported that s/he believed it was crazy for the Company to simply assume that such significant contingencies had been satisfied without receiving written confirmation from customers.  CW1 said that in this 2007 timeframe, Accuray was not disclosing to investors and the public that the order backlog included orders where significant contingencies were deemed satisfied through silence.

---

[2]     CW1 also stated that converting an LOI into a formal contract within 90 days was virtually impossible given the complexities of having to arrange financing for the customer, organizing the customer into the requisite legal entity (*i.e.*, an LLC composed of various physicians who would use the system) and physically preparing the site where the CyberKnife system would be located.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1         (d)     CW1 further reported that in May 2007, when the Company publicly

2  announced it as changing the way it reported backlog to the public, s/he almost "threw up."  S/he

3  viewed the announcement, in conjunction with the new Term Agreements already in use, as a red

4  flag that the use of the Term Agreements was what s/he had suspected.

5         (e)     CW3, a former Sales Specialist also provided details regarding the Term

6  Agreements.  According to CW3, when a customer signed a Term Agreement, the Company would

7  list that deal as backlog or potential revenue.   This fact is further corroborated by defendant

8  McNamara's statement during a May 1, 2010 conference call. *See* ¶¶95-97.  In CW3's experience,

9  however, the Term Agreement was merely an agreement that the parties would eventually move

10  forward with the deal.  CW3 said that after the Company went public, the Company began calling

11  these Term Agreements "contracts."  CW3 stated that the Term Agreements contained numerous

12  contingencies factors that could cause a Term Agreement not to become a real deal.  According to

13  CW3, many of the Term Agreements never materialized into anything.

14         (f)     CW8, a former Senior Contracts Administrator, corroborated the account of

15  CW1, that the Legal/Contracts Administration department was responsible for the drafting and

16  creation of the new standardized Term Agreements and that the Company transitioned to Term

17  Agreements at the ***end of 2006*** to replace the Letters of Intent that the Sales Operations group had

18  previously been using.  According to CW8, the Term Agreements were created by the Company's

19  attorneys and were signed by defendant McNamara.

20         (g)     CW15, a former Sales Operations Specialist, also reported that the standard

21  contract forms were written by the legal department under the supervision of Milliken.  CW15

22  reported that even though the Company contracts or Term Agreements would permit the Company

23  to technically say that all contingencies had been eliminated, the Company "knew" that specific

24  contingencies, for example Board approval, had not been satisfied.

25        80.     The reports of CWs concerning defendants' knowledge of facts materially

26  inconsistent with their public statements are corroborated by internal corporate records that

27  specifically demonstrate that defendants knew that: (a) Term Agreements were being used to

28  conduct and report sales ***before*** the issuance of the Registration Statement; (b) internal record show

that these Term Agreements contained contingencies, like joint venture formation and financing that could be waived simply by silence, purportedly converting the deals to "non-contingent" causing backlog to be artificially inflated); (c) executed Term Agreements were signed by McNamara and Milliken.

81.     Attached as Ex. 51 is a December 29, 2006 CyberKnife G4 Term Agreement signed by McNamara and Milliken with Western Cancer Center.[3]   The Term Agreement contained the following contingencies corroborating the reports of numerous CWs, including CWs 1, 4, 11, and 15:

> This Agreement is ***contingent upon formation of a Limited Liability Company ("LLC") or a Joint Venture***, as applicable by Customer and upon all the payment terms above being met.  Customer shall send written confirmation to Accuray in accordance with the "Notice" provisions herein that this contingency has or has not been satisfied, as the case may be, such written confirmation to be sent to Accuray on or before April 15, 2007.  This Agreement shall remain contingent through April 15, 2007, after which time, ***if Accuray does not timely receive such written confirmation, this contingency shall be deemed waived and this Agreement and all of its terms and conditions shall become binding on all parties***.  Should this Agreement terminate under this paragraph, upon timely notice from Customer or failure to satisfy this contingency, ***Accuray shall refund any money paid by Customer within 30 days***.

*See* Ex. 51 at 3.

82.     The Term Agreement with Western Cancer Center contract was also signed by defendant McNamara and Milliken .  This document demonstrates their actual and knowledge of the contents of the Term Agreements and that the Company's policies and procedures materially differed from their public statements.  The Term Agreement corroborates CWs reports of their contents and that contingencies were waived by silence and that deposits (even if received) would be refunded upon cancellation.

83.     Additional corroborative detail is drawn from an Accuray Microsoft Access database made available by a former employee of Accuray.  The database entries contain information regarding the terms and status of CyberKnife sales contracts showing that even after the IPO, the

---

[3]     It is unclear whether this particular Term Agreement resulted in an installation.  However, the purpose of its inclusion is to demonstrate the corroboration of confidential sources and defendants' knowledge of the alleged facts as the contract signed by McNamara.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

Company continued even after the Registration Statement to include in backlog, contracts that contained the alleged contingencies, like "Joint Venture Formation" or "Sign[ing] T[erms] & C[ondition]s" – *which would be "deemed waived"* and the agreement would be considered "binding," if the customer did not notify the Company otherwise:

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Contingency 2 | Contingency Terms |
|---|---|---|---|---|---|---|---|
| CA, Pasadena, Select Healthcare Solutions, LLC (CK2) | G4 Purchase Term Agreement | 3,960,000.00 | $100,000.00 deposit due within 90 days of signed Agreement $296,000.00 of the total amounts specified herein ("Purchase Price") payment, due upon JV/LLC formation on or before November 14, 2008 $2,772,000.00 of the Purchase Price due upon delivery of the CyberKnife System April 17, 2009. $792,000.00 of the Purchase Price due upon Acceptance (as defined in Attachment A, Section 7 of the Accuray Terms and Conditions set forth below). | 6/27/2008 | Joint Venture Formation | | Customer shall send written notification that the Contingency has or has not been satisfied on or before November 14, 2008. **If the notification has not been received by this date than the contingency shall be deemed waived and the Agreement and all of its terms and conditions shall be binding** |
| OH, Cincinnati, Dr. Bobby C. Baker (CK4) | G4 Purchase Term Agreement | 3,960,000.00 | $100,000 deposit due with signed Agreement. $692,000 due upon LLC formation (on or before September 26, 2008) $2,772,000 due upon delivery of the CyberKnife System (May 30, 2009). $396,000 due upon Acceptance | 6/26/2008 | LLC Formation | Sign Ts & Cs | (1) If Accuray **doesn't receive written confirmation by D/L, then Ag't will become binding**. |

### The Registration Statement Misrepresented that Accuray Typically Received Deposits and Recognized Deposits as Revenue Even on Cancelled Orders

84.     The Registration Statement falsely and misleading stated that Accuray typically received deposits from customers upon execution of contracts.  The Registration Statement also falsely stated that the Company would recognize deposits as revenue even after a cancellation. The Registration Statement omitted the material facts, discussed below.  The omitted information was material to investors because it revealed that: (i) contracts in backlog were not supported by deposits; (ii) customers faced no penalty for backing out of a deal; (iii) deals were not as serious as previously represented; and (iv) the Company was not assured of any revenue for deals in backlog.

85.     Confidential witnesses report that the Company would not "typically" receive deposits upon execution of contracts; in fact the Company often waived the deposit, and thus did not

1   collect one at all, or deferred the collection of a deposit.  Confidential witnesses reported that at

2   times, non-collection of a deposit or a waiver of a deposit was because a "customer" simply did not

3   have the money even for a deposit, much less financing for the complete CyberKnife system and

4   defendants knew it.  Further, based on a review of the Term Agreement attached as Ex. 51, the

5   standard Term Agreement with customers contemplated the return of deposits (not forfeiture and

6   recognition of revenue) when and if the Term Agreement was cancelled.  Defendants nonetheless

7   included these deals in backlog.  Following the Class Period, defendants admitted that may

8   purportedly ***non-contingent*** deals didn't have deposits.  Now five CWs report on the fact that

9   defendants were not collecting deposits:

10          (a)     CW1, a RSD, discussed the Company's approach to collecting deposits and

11   stated that with Term Agreements, sales people could accept a deposit of $50,000, at which point the

12   order was added to backlog.[4]  According to CW1, even when a deposit was received, most times

13   $50,000, it was still likely a deal was ***not*** going to happen because of contingencies in the agreement.

14   If the customer opted not to go forward with a contract, Accuray would return their $50,000 deposit.[5]

15   According to CW1, some deals were added to backlog ***without any deposit at all***.  In addition, CW1

16   reported that an estimated 50% of all Term Agreements that were entered into the order backlog

17   would not result in final, bona fide deals.

18          (b)     CW13 also confirmed that when contingent deals fell out, which they often

19   did, ***Accuray always refunded whatever monies*** the customer had paid as a down-payment.

20

21

22   [4]     Corroborating that the sales staff would in fact be in a position to know the terms and
        circumstances of the sales contracts, on May 1, 2007, defendant McNamara specifically stated that
23      "the U.S. sales representatives negotiate Term Agreements with customers."

24   [5]     The August 31, 2010 Order (Dkt. No. 94) ("Order") did not credit prior allegations regarding
        the refunding of deposits: "None of the CWs held financing or accounting positions, so none was in
25      a position to know when or if revenue was recognized based on a particular deposit or how often
        deposits were refunded."  Order at 14.  The complaint adds and clarifies that refunds were always
26      given to customers and that this was written into the Term Agreements which were standardized
        across all customers.  The CWs – many of whom were in sales and worked directly with customers –
27      were in a position to know that refunds were given and no accounting experience is required to
        conclude that Accuray could not recognize revenue on refunded money.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW                                                    - 34 -

1         (c)     Defendants also knew that deals were being entered into backlog where no

2 deposit was collected and customer had no money.  CW3, a Former Sales Specialist, reported that

3 the Company would sign Term Agreements with potential customers and put them in backlog *even if*

4 *no deposit was received from the customer*.  This fact is now further corroborated by CW13 who

5 explained that Hampton pressured CW13 to execute a Term Agreement with a "customer" known to

6 have no money and no financing.  That transaction did not result in any actual sale.  Notably as

7 alleged herein, defendants Thomson and Hampton's bonus was in part determined simply by the

8 increase in reported backlog.

9         (d)     CW10, another former Sales Operations Specialist, stated that when the

10 Company received a cancellation, Accuray would refund customer deposits.  This is consistent with

11 the language of the Term Agreement now attached as Ex. 51 to the Appendix of Exhibits, which was

12 executed by the Company's General Counsel Milliken, and defendant McNamara.

13         (e)     CW11, a former member of the Sales Operations Group, stated that even

14 when contingent deals had deposits, those deposits were almost always refunded back to the

15 customers in the event the customers cancelled the contracts.  In fact, even so-called non-contingent

16 contracts ended up being cancelled and those deposits were also refunded. CW11 further reported

17 that Accuray would enter into contracts which *specifically required a deposit, but many times, the*

18 *deposits were not actually received until months later*.  Nonetheless, these same contracts had been

19 added to the order backlog.

20         (f)     CW12, a former Senior Contracts Administrator who worked in the Legal

21 Department reported that s/he was directly involved in refunding any deposits received in the event

22 the customer cancelled its order.  According to CW12, Accuray *always* refunded deposits when an

23 order was cancelled.

24        86.     An internal document from the Company's accounting department identifying

25 Company refunds of customer deposits independently corroborates the reports of CWs 1, 3, 10, 11

26 and 12 shows that the Company was in fact refunding deposits (not recognizing them as revenue)

27 before the February 7, 2007 Registration Statement:

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

| Accounting Department – Customer Refunds from Zarina Bhandari 09/05/2006 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Journal Entry | Series | TRX Date | Account Number | Account Description | Credit Amount | Debit Amount | Originating Master Name |
| 98637 | Purchasing | 2/15/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | The Urology Group |
| 100287 | Purchasing | 2/28/02006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Sibley Memorial Hospital |
| 101517 | Purchasing | 3/14/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Capital Health System |
| 101518 | Purchasing | 3/14/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Shore Memorial Hospital |
| 118905 | Purchasing | 7/31/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | SAMARITAN HOSPITAL |
| 118920 | Purchasing | 7/31/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | RADIATION ONCOLOGISTS, P.A. |
| 118921 | Purchasing | 7/31/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | DELAWARE CYBERKNIFE LEASING |
| 123671 | Purchasing | 8/21/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | St. Lukes – Roosevelt Hospital Center |
| 124242 | Purchasing | 8/23/2006 | 000-2620-000 | System Deposits | $0.00 | 50,000.00 | Bon Secours Richmond Health System |

*See* Ex. 50.

87.     Another internal document indicated that the Company refunded deposits as opposed to recognizing them as revenue:

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Contingency 2 | Contingency Terms |
|---|---|---|---|---|---|---|---|
| Singapore, Singapore West Point Hospital (Direct) | G3 Purchase Agreement (Quote) | 5,321,935.00 | $200,000 deposit due with signed Purchase Agt 90% of the purchase price due upon delivery (June 13, 2008) 10% of purchase price due upon completion of first patient treatment or 4 weeks after Acceptance, whichever is earlier | 12/27/2007 | LLC Formation | | If Accuray does not timely receive written confirmation by 2/8/08, this contingency shall be deemed waived and this Agt and all of its TC's shall become binding on all parties. *Should this Agreement terminate upon timely notice from Customer of failure to satisfy this Con, Accuray shall refund any money paid by Customer within 30 days.* |

88.     In a stark admission that the statements in the Registration Statement concerning the collection of deposits and recognition of revenue in the Registration Statement were false and misleading, on September 4, 2007, in its Form 10-K, the Company changed it disclosure to reflect the reality that deposits were in fact refunded.  The new Form 10-K disclosed that it would only

recognize up to the deposit portion of the purchase price as revenue, ***unless the deposit was refunded to the customer***:

> In the event that a customer does not, for any of the reasons above or other reasons, proceed with installation of the system after entering into a purchase contract, we would only recognize up to the deposit portion of the purchase price as revenue, ***unless the deposit was refunded to the customer***."

Ex. 17 at 28; *Compare* ¶9 (citing statement in the Registration Statement).

89.     Later admissions by the Company that millions of dollars of purported backlog would be removed ***because the Company had never collected a deposit***, confirms the misleading nature of the Registration Statement ***and*** corroborates the known uncertainty associated with including deals, including purportedly non-contingent deals, without deposits placed in backlog during the Class Period.  After serial removals from backlog, both during and after the Class Period, totaling $254 million, defendants admitted that they ***had not been requiring deposits on many orders*** – even on orders labeled ***non-contingent***.

90.     Though it was disclosed in bits and pieces for more than a year after the Class Period, defendants' deliberate backlog manipulation eventually caught up to them.  The following chart indicates the value of systems removed from backlog from January 2008 to August 2009.  At approximately $4 million per CyberKnife, $254 million represents more than 60 system installations which fell out of backlog after previously being represented to be contractually committed and have a high probability (*i.e.*, 90%) of installing:

| Disclosure Date | Period | Backlog Reduction in Millions |
|---|---|---|
| 01/30/08 | 2Q08 | $30 |
| 04/29/08 | 3Q08 | $54 |
| 08/19/08 | 4Q08 | $39 |
| 10/29/08 | 1Q09 | $5 |
| 01/29/09 | 2Q09 | $34 |
| 05/05/09 | 3Q09 | $27 |
| 08/24/09 | 4Q09 | $65 |
| **Total** | | **$254** |

91.     Indeed, on October 29, 2009 after serial reductions of backlog totaling $254 million, defendants "refined" their non-contingent backlog definition and stated that, going forward, non-

contingent backlog would require a deposit.  Unsurprisingly, defendants announced that orders without deposits were not converting to revenue:

> We found that some orders were not proceeding in shipment in a predictable manner. Accordingly we refined our criteria for including an order in reported backlog with the goal of including only orders with characteristics that in prior years have shown a pattern of predictably proceeding to shipment. We believe this refinement provides investors with better insight about our backlog and its future conversion to revenue.
>
> As a result, and as we indicated in our last call, we will only report contracts as backlog that meets these refined criteria.  While many non-contingent contracts already met the refined backlog criteria, there were others that did not. ***Most of those contracts that are now not included in reported backlog did not meet the refined criteria because we had not received a deposit for the order.  Those orders were generally from international distributors, and we have not always required a deposit on such orders***.

Ex. 47 at 5; *see* ¶183.

92.     On top of the $254 million in backlog reductions, redefining non-contingent backlog caused a further reduction from $556 million to $291 million.  In particular, non-contingent systems backlog fell from $203 million to just $99 million – or a backlog of less than 25 systems.

93.     <u>False and Misleading Statement</u>: On May 1, 2007, Accuray announced its 3Q07 financial results for the period ended March 31, 2007 in a press release.  In addition, the Company reported a huge increase in reported backlog (from $328 million at December 31, 2006 to $559 million at March 31, 2007) because it began publicly reporting both non-contingent and contingent contracts as backlog and falsely told investors that the new backlog figures were the best indicator of future revenue results.

94.     In connection with its 3Q07 (January 1, 2007 to March 31, 2007) financial results, Accuray for the first time publicly announced that the Company had changed the way in which it would calculate, define and report backlog:

> As of March 31, 2007, the Company's total backlog, which the Company now defines as backlog ***under signed non-contingent contracts as well as backlog under signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue, was approximately $559 million***.
>
> *                   *                   *
>
> ***On a quarterly basis, the Company will review each contingent contract to determine whether progress toward satisfaction of contingencies is sufficient to support inclusion of the contract within backlog***.

1    Ex. 5.

2        95.    <u>False and Misleading Statement</u>: On May 1, 2007, Accuray held a conference call

3    with analysts to discuss the Company's 3Q07 financial performance and the change in the

4    Company's backlog.  The conference call was hosted by defendants Thomson and McNamara.

5    During the call, the Company falsely stated that the change in the definition of backlog was driven

6    by the increased demand for the CyberKnife and assured investors that backlog was the best and

7    most reliable way to assess the Company's present and future condition.  Defendants also confirmed

8    that new contracts go into backlog and told investors to expect backlog to start converting to revenue

9    in as little as six months:

10          ***To position ourselves for ongoing growth and to support the increased volume of
11          customer contracts, we've recently streamlined our internal contract process.
            Historically our approach was to combine discussion of financial and legal terms
12          in a single negotiation involving all relevant parties at Accuray and at our
            customer sites.  However, the significant growth in the number of new contracts
13          has guided us to separate discussion of these terms***.

14       96.    Defendants also disclosed that the sales representatives negotiated the terms of the

15   Term Agreement confirming that such witnesses would be a position to know facts concerning such

16   as agreements:

17          ***Our sales representatives in the United States now generally negotiate the business
            terms to acquisition and agree to term agreements containing all financial aspects
18          of the transaction***.

19          ***In parallel, the legal aspects of our contracts have become more standardized and
            any modifications to these terms are discussed subsequent to agreeing the financial
20          terms of sale***.

21   Ex. 6 at 5.

22       97.    <u>False and Misleading Statement</u>:  Defendant McNamara stated that the switch to

23   "Term Agreements" drove defendants to redefine reported backlog, and that the addition of the

24   contingent deals to backlog made the figure a more accurate reflection of the current state of the

25   Company:

26          ***Now it's primarily this shift in our contractual process that has driven the change
            in reported backlog.  Our old definition of non-contingent backlog precluded
27          mentions of this new contract format***.

28          ***As the prevalence of these new term agreements has grown, it's become more
            appropriate and indicative of the state of our business to disclose total backlog***.

1

\*       \*       \*

2      *On balance, we feel confident that 90% of the total backlog reported will be converted to revenue.*

3    *Id.* 6 at 5, 8, 16.

4

5      98.   <u>False and Misleading Statement</u>:  During the same call, the Company (through

6    defendant McNamara) identified backlog as the most meaningful way to assess the Company's

7    current financial condition.  Indeed it was the core business metric the company used to measure and

8    report Accuray's financial performance, including how to calculate the value of new contracts

9    generated in the previous quarter from the change in reported backlog.  McNamara also noted the

10   significance of backlog as a metric because "the majority of revenue is shipped from backlog."

11   Defendants also refused to discuss individual "contracts per se" – which would be a recurring theme

12   as they refused to provide investors any granular information about backlog which may have

13   revealed their fraud:

14      *To aid interpretation of the backlog number, I'd like to point out what might be considered a fairly obvious point that the total backlog reported this quarter, taken in conjunction with reported revenue, is a good and reliable indicator that the new business generated during a given quarter.*

15

16      *The majority of revenue is shipped from backlog.  Simultaneously, new contracts generated by sales activities add to backlog.*

17

18                 \*       \*       \*

19      *We believe that our current definition of backlog is a more meaningful metric for Accuray as an indicator of future revenue.*

20                 \*       \*       \*

21      *Currently we expect to realize system revenue from backlog within []6 to 18 months.  For Services and Shared Ownership revenue the realization period is typically one to four years. . . .   That is to say the contracts are signed and converted to revenue within a 12-month period.*

22

23                 \*       \*       \*

24

25      *[W]e're not going to be discussing contracts per se, but again the dollars associated with backlog we feel is a pretty good metric in terms of what the revenues might be going forward.*

26   *Id.* 6 at 5, 8, 16.

27

28

99.     On May 2, 2007, JPMorgan issued a report titled "Evolving Backlog Definition Creates Some Confusion in Otherwise Uneventful F3Q." The report highlighted that revenues and earnings reported in the quarter were below JPMorgan's estimate and noted the change in the way that the Company would report backlog. By changing the way contracted for sales through Term Agreements, and it calculated this metric, the Company was able to report a huge increase in backlog. Analysts believed defendants' story and reported that this change might cause some pushback from investors but could nevertheless be "a better reflection of contracts":

**Accuray Neutral**

\*       \*       \*

- **Backlog is again redefined.** With F3Q results, Accuray also announced changes to its definition of backlog, which previously only included signed contracts without contingencies (*i.e.*, signed non-contingent contracts) as committed future payments.

- ***Under the new terms, ARAY redefined backlog to include both signed non-contingent contracts as well as signed contingent contracts that management believes have a "substantially high probability" of being booked as revenue (on average, ARAY expects ~90% of backlog will eventually convert into revenue).***

- ***While this approach to booking backlog clearly relies on some amount of judgment by management and will likely result in some investor pushback due to the timing and uncertainties of future backlog recognition, it could ultimately be a better reflection of contracts***.

- **Backlog increases, but restated numbers may cause confusion.** As we expected (and hoped), ***backlog was a focal point of management commentary, due to investor concern over the sequential decline in backlog reported in the December quarter*** (F2Q).

Ex. 7.

100.     <u>False and Misleading Statement</u>: On May 2, 2007, Jefferies & Company, Inc. ("Jefferies"), one of the Company's underwriters, published a report titled "Impressive FY3Q Results; This is The Horse To Bet On In Radiation Oncology!" The report repeated the Company's 3Q07 financial results, including false 3Q07 earnings and false and misleading statements concerning reported backlog and raised FY07 earnings estimates stating that the Company believed that this new reporting metric provided investors with improved visibility into revenue projections in addition to a more reliable picture of the Company's bookings progress:

- **Backlog was strong.** *The company reported a strong uptake in backlog, going from $513 million in FY2Q to $559 million in the current Q. ARAY also announced that it would no longer only be reporting non-contingent backlog, and is now going to release a total backlog figure (which represents a combination of previously differentiated contingent and non-contingent backlog).*

- *The company believes that this new backlog recognition policy will give investors improved visibility into future revenue projections.*

- Total backlog will include contingent backlog when management deems that the contingent contract has a high probability of being realized and generating revenue. *We believe that this new backlog number will give a more reliable picture of the company's progress in booking new orders.*

Ex. 8.

101.     After the May 1, 2007 announcement of its 3Q07 revenues and earnings and analyst repetitions of the false and misleading statements, Accuray's stock price ***increased from $23.28 per share on May 1, 2007, to $25.62 per share on May 2, 2007*** on a of 1.6 million volume shares trading.

102.     <u>Reasons Why Defendants' Statements in ¶¶93-100 Were False and Misleading:</u> Plaintiff incorporates allegations from ¶¶77-92:11-124.  In addition, defendants' statements that the change in backlog (in combination with reported revenue) was a good and reliable indicator of new business generated in the prior quarter; that reported backlog was currently a more meaningful metric to use to measure future growth; and that reported backlog had a substantially high possibility of converting to revenue (which defendants placed at 90%) was false and misleading.  As reported by multiple CWs, defendants knew but failed to disclose that reported backlog included deals with little likelihood of resulting in CyberKnife installations or revenue.  For example defendants knew but failed to disclose that reported backlog included:

(a)       Term Agreements and contracts that had specific significant contingencies, like joint venture formation and obtaining financing, that Accuray presumed to be satisfied in the event the customer was silent.  CWs report that the Company knew that purportedly non-contingent contracts in fact had unsatisfied contingencies.  CWs 11 and 15 attended backlog meetings wherein recommendations were made to ***not*** add certain deals to backlog because of significant unsatisfied contingencies or a lack of progress toward installation, but these deals were included by defendants

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    in backlog anyway.  CW11 reported on a specific deal with Comprehensive Cancer Care Center in

2    Bakersfield, California that was added to backlog against the recommendation formed at the backlog

3    meeting.  CW15 reported that it was obvious to the CEO, CFO, COO and legal that certain contracts

4    were never going to result in installations.  CW13 reported that "[I]t got to be that you could add

5    anything" to backlog.

6          (b)      Deals with friendly third-party financiers who placed refundable deposits for

7    orders on behalf of customers (*i.e.*, doctors or hospitals) they had not even yet met.  CW1 reported

8    that James Doty (former Accuray CEO) placed a deposit for just such a deal with Corona Regional

9    Medical Center ("Corona") when he had not yet met with doctors from that medical practice.

10   Internal documents corroborate this account and show a deal with Corona that required the customer

11   to notify Accuray before a given date that the LLC had not been formed "otherwise the contingency

12   is deemed waived."  *See* ¶115.  That deal never materialized.

13         (c)      Deals that had refundable deposits, deferred deposits or no deposit at all. CWs

14   1, 3, 10 and 11 report this fact and are corroborated by internal documents which show, for instance,

15   Accuray would "refund any money paid by Customer [Singapore West Point Hospital] within 30

16   days." upon notice that the customer failed to form an LLC.  *See* ¶87.  CWs 12 and 13 also reported

17   that *all* monies placed as a deposit were refunded if the deal did not go through.  CW13 reported that

18   Hampton waived the deposit to get a signed Term Agreement signed so that the deal could be

19   entered into backlog.

20         (d)      Deals which customers had requested be cancelled and debooked but the

21   Company simply delayed removing from backlog.  CWs 1, 2 and 5 reported that defendants delayed

22   removing deals from backlog particularly at or near the end of a quarter so that the backlog figure

23   reported to investors would not be reduced.  CW15 reported that Hampton often attempted to

24   "revive" deals already cancelled by customers in an effort to keep them from falling out of backlog,

25   citing specifically certain deals with Dr. Birdie.

26         (e)      Term agreement and contracts brought in by Nash and other sales personnel

27   who had a history of bringing in suspect deals that did not materialize into sales.  CWs 1, 2, 4, 5 and

28   11 all reported that Nash was booking deals that had no likelihood of resulting in installations.  In

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    particular, CW11 reported on a series of deals with the J.L. Parrott Group that Nash brought in.

2    CW11 reported that the Company included four of these deals in backlog but none of them should

3    have been in backlog because they had no end users and only some had (refundable) deposits.

4            (f)     Reported backlog included deals with international distributors who had: (i)

5    not put down deposits; (ii) who were not arm's-length parties; and (iii) who had not identified end-

6    users for the purported CyberKnife deals.  As reported by CWs 5, 6, 7 and 15, CyberKnife systems

7    purchased by international distributors ended up sitting in warehouses for extended periods of time.

8    In fact, CW15 reported that half the sales to international distributors during 2008-09 ended up

9    simply sitting in warehouses around the world.

10           103.    <u>False and Misleading Statements</u>: On May 14, 2007, JPMorgan hosted an investor

11   lunch and day of meetings with defendant McNamara where he discussed Accuray's contingent

12   backlog, including the fact that generally, the Company received a deposit from customers upon

13   initiating a contract and that **_afterward_**, contingencies it had previously identified in the May 1, 2007

14   conference call needed to be satisfied.  Defendants falsely reiterated that they continued to believe

15   that **_90% of all backlog would result in revenue_**.  A summary of the meeting was reported by

16   JPMorgan in a research report on May 17, 2007:

17      •   **Contingency specifics discussed**. . . .  McNamara provided additional details
            around three primary contingencies, which are resolved **_after initial contract_**
18          **_signing and, generally, a down payment: (1) Hospital board approval – the_**
            **_most common contingency and most likely to be resolved, although the_**
19          **_process can typically take up to 6 months depending on the timing on_**
            **_Board meetings; (2) Legal entities (LLC or JV) – which are generally_**
20          **_formed by a physician group (e.g., neurosurgeons) that sees profit potential_**
            **_from owning a shared CyberKnife_**.
21
        •   **_In general, ARAY continues to assume that 90% of orders (contingent or_**
22          **_otherwise) will convert into backlog_** (vs. ~98% for VAR).

23      •   **CyberKnife sales reps paid on a ramping scale**. . . .  McNamara discussed
            pay structure for the 25 existing U.S. sales reps (32 in total), who are paid on
24          a ramping scale, meaning that commission per sale increases as rep gets
            closer to and exceeds predetermined quarterly quotas.  **_In addition, cash_**
25          **_payments are made to reps in installments based on milestones, incl._**
            **_contract signing, initial customer deposit, 10% customer deposit and_**
26          **_CyberKnife installation (where ~60% of the commission is paid)_**.

27   Ex. 9.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
     SECURITIES LAWS - 4:09-cv-03362-CW

104.    <u>False and Misleading Statement and Partial Disclosure</u>: On August 16, 2007, Accuray announced its fiscal fourth quarter and fiscal year 2007 financial results for the period ended June 30, 2007 in a press release titled "Accuray Reports Record Revenue in Fiscal Fourth Quarter and Fiscal Year Ended 2007; Revenue Growth of 166 Percent Year Over Year; Total Backlog Reaches Record Level of $619 Million":

- At the end of fiscal 2007, ***backlog increased to approximately $619 million*** . . . .

- ***Backlog is defined as signed contracts that the Company believes have a substantially high probability of being booked as revenue.***

                    *          *          *

"The Accuray team and I are very pleased with our strong financial performance, ***including record revenue, fourth quarter profitability and record backlog***."
Ex. 10.

105.    <u>False and Misleading Statement</u>: On August 16, 2007, Accuray held a conference call with analysts to discuss the Company's financial performance reported in the August 16, 2007 press release and the Company's exploding backlog figure. The call was hosted by defendants Thomson and McNamara who stressed the strong growth in backlog and new contracts. The Company asserted that ***all new contracts go into reported backlog***, and further, that the increase in the backlog numbers was representative of contracts that truly had a 90% likelihood of resulting in future revenue. Defendant McNamara also knowingly and misleadingly encouraged investors to use backlog figures to analyze ***both historical activity and future economic*** and financial ***condition***, (destroying any contention that backlog is a forward looking statement) including specifically stating that backlog currently provided "excellent visibility" into the future revenues. Finally, defendants reasserted the significance of backlog as the core business metric that investor and the Company could rely upon, stating that nearly all revenue comes out of that backlog number:

> ***But backlog, which is the key indicator of future revenue, reached the record level of $619 million at the end of fourth quarter, growing $187 million during the fiscal year***.

                    *          *          *

> ***Backlog is defined as signed contracts that Accuray believes have a substantially high probability of being realized as revenue in the future***.

1                                     *       *       *

2   *It can be used to analyze both historical activity and future activity.  Historically,*
    *the change in backlog, combined with the revenue recognized, can be used to*
3   *determine the approximate economic contract value created over the past year.*

4                                     *       *       *

5   *Moving to the future and guidance for going forward, Accuray's backlog provides*
    *excellent visibility into future revenue, again, since nearly all revenue comes out of*
6   *that backlog number.*

7                                     *       *       *

8   *Using this as a backdrop and considering that more contracts have been signed in*
    *the second half of 2007 than the first half, we believe revenues for FY '08 should*
9   *be between $250 million and $270 million.*

10  Ex. 12 at 3, 6.

11       106.   <u>False and Misleading Statement and Partial Disclosure</u>: During the August 16, 2007

12  conference call, Thomson was asked what was driving the huge increase in backlog.  Thomson

13  falsely claimed that growing demand, in particular from stand alone centers, was fueling backlog

14  when in truth the Company was inflating backlog with bogus deals and failing to remove already

15  cancelled deals:

16       [Analyst:]  Clearly, we thought – or $619 million in backlog was clearly better than
         we suspected or we had modeled for.  Can you just talk about what is driving that?
17       As well as, if my math is correct, you did about $104 million in new orders in the
         quarter; where that's coming from, and what is driving that?
18
19       [Thomson:]  . . . *I think that what's fundamentally fueling it is the clinical*
         *diversification of radiosurgery and the fact that CyberKnife really is the only*
20       *whole-body full-time solution for the radiosurgery market.* . . .

21       Also, we're seeing, coming into the market sort of the larger group players . . . .
         *[W]e're getting increased interest from the stand-alone centers and some of the*
22       *providers of multiple stand-alone systems.  So it's really the complete spread; the*
         *big, high-end hospitals, community hospitals, the stand-alone centers, it's a very*
         *diverse mix.*
23
    *Id.* at 8.
24
         107.   In addition, during the question and answer session, Thomson was asked how he and
25
26  the Company arrived at the $104 million in new orders that they were touting.  Thomson was

27  challenged by analysts on those figures because the math did not agree with the reported figures – in

28  essence $54 million of the purported new orders were not reflected in the new backlog figure or the

past quarter's revenues.  CIBC analyst Amit Hazan ("Hazan") explained that the basic analysis that

defendants endorsed (*i.e.*, revenue plus change in backlog equals new orders) would not lead to the

$104 million number, but instead indicated that the Company only had $50 million in new orders.

Unable to reconcile the issues raised by Hazan, and in frustration, Thomson told Hazan he was

simply "wrong."  And, defendants refused to discuss the actual contracts in backlog – as this level of

detail would likely exposed their backlog manipulations.

> [Hazan:] Okay, and then in terms of the backlog . . . .  If I look at that component and I try to break out what the new orders were in terms of just the product, I am coming out to about $50 million.  If you take product backlog from this quarter versus product backlog that you gave last quarter versus the product revenue you just put out, you get about a $50 million number.  That's about 15 unit orders.  What am I doing wrong there, or did you just have a lot of shared unit orders in the quarter?  *I just can't get to the $104 million* . . . .

> [McNamara:] We would have to see the detail that you have there in order to comment precisely on it.

> [Hazan:] Let me take you through the math.

> [McNamara:] We don't actually discuss the actual orders.

> [Hazan:] But is it correct that you had about $305 million in backlog, in product backlog in the March quarter?  And now, you have $321 million?

> [McNamara:] Yes, that is correct.

> [Hazan:] And you have $321 million now, and you had about $35 million in product revenue.  The difference is $50 million.  If you take a $3.3 million ASP, that is about 15 unit orders.  I'm just wondering what the other (MULTIPLE SPEAKERS)

> [McNamara:] *Again, I can tell that it's wrong, the 15 unit orders for sure, but I'm not sure what your math is*.

*Id.* at 12-13.

108.    The CIBC analyst also questioned Thomson on what appeared to be a slow down in

reported installations.  Defendant Thomson defiantly denied any slow down and shifted focus to the

Company's growing – but falsely inflated – backlog figure and claimed that the Company was

seeing sales accelertion:

> [Hazan:] And then the last one from me is just in terms of installations.  If my numbers are right, it looks like installations in the U.S. were somewhere around – if they were 20 this year, this fiscal year for you, they were about 19 last fiscal year. . . . I'm just wondering, are you seeing any kind of a slowdown in installations for any reason relative to your historical years or any thoughts on that?

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

[Thomson:] No, I don't think so. . . . I think we see an acceleration in sales that takes a little while to work its way through to installations, *which is why the backlog increases*.

*Id.* at 14.

109.    Thomson's and the Company's inability to answer inquiries (because they were omitting the known truth) led to analyst downgrades and a significant stock price decline on August 17, 2007.  On August 17, 2007, CIBC issued a report on the Company's 4Q07 earnings reports including defendants' comments during the conference call.  The report further noted the disappointing slowdown in CyberKnife installations in light of the reported growth in backlog and rated the Company a Sector Underperformer:

**4Q Leaves as Many Questions as Answers**

- Overall, ARAY's 4Q left us with hard-to-answer questions . . . *unit installs in the U.S. actually fell in FY07 vs. FY06, and FY08 sales guidance trailed Street estimates*.

- WW orders of $102M (+2% y/y) missed our $116M est, and latest-12-mo. order growth is now 39% (down from 69% in FY06).  "*Product" orders of $50M (15 units) dropped q/q*. . . .

- *With the significant growth in backlog last year, we are puzzled why the 20 unit installs for FY07 (just ended) were down from 22 in FY06*.

- FY08 sales guidance is $250-$270M, below Street view of $266M. . . . *Our price target goes from $19 to $16*.

                              *       *       *

**Unit Installations Are Not Keeping Up**

Accuray's total cumulative installed base is now 109 units, up from 77 in June 2006.  Of the 32 units installed in FY07, 20 were in the U.S. and 12 were O-U.S.  This is another point of concern for us, as there were 28 units installed in the prior FY06, with 22 in the U.S. (including 3 shared ownership systems).  *The decline in y/y installations is hard for us to understand given the rate of growth for new unit orders [backlog] during the past two years.  Management said that install times have not changed of late, and we continue to work on this issue*.

Ex. 13.

110.    On August 17, 2007, Jefferies issued a positive research report on Accuray titled "FY4Q Results Were Solid; Stereotactic Radiosurgery is the Wave of the Future."  The report echoed the false statements by defendants concerning strength and reiterated meaningfulness of backlog and new order growth which purported to support forecasted revenues:

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1      •     **Backlog and new orders were strong.** *The company reported a strong uptake in backlog, increasing by $60MM from $559MM in FY3Q to $619MM in FY4Q (beating our estimate of $585MM). FY07 backlog grew $187MM (+43% YoY) from $432MM to $619MM.*

      •     *The company's new order growth supports our thesis that demand for CyberKnife system is strong and growing.*

Ex. 15.

111.    On August 17, 2007, *Bloomberg* published an article titled "Accuray Falls After Analyst Reduces Revenue Estimate for 2008." The analyst downgrade by CIBC and JPMorgan caused the stock price to decline but it nevertheless remained inflated as the complete truth concerning the Company's backlog had yet to be disclosed:

**Accuray Falls After Analyst Reduces Revenue Estimate for 2008**

Accuray Inc. fell as much as 24 percent, the most since its February initial public offering, after an analyst reduced his revenue estimate for the year.

Accuray fell $3.55, or 20 percent, to $14.52 at 12:34 p.m. New York time in Nasdaq Stock Market composite trading and touched $13.70.

The Sunnyvale, California-based maker of a robotic device to treat cancer forecast revenue of $250 million to $270 million for fiscal 2008. JPMorgan Securities analyst Tycho W. Peterson reduced his estimate to $261.9 million from $271.7 million.

Ex. 14.

112.    On August 17, 2007, the Company's stock price declined from close of $18.07 per share on August 16, 2007 to a close of $13.45 per share on August 17, 2007, on a volume of 4,535,800 shares traded. The trading volume on August 16, 2007 was a mere 861,200.

113.    <u>Reasons Why Defendants Knew Statements in ¶¶105-110 Concerning Backlog were Materially False and Misleading</u>: Notwithstanding the partial truths exposed by analysts and the analysts' stock downgrades, defendants made continuing false and misleading statements regarding the amount quantity and composition of the Company's reported backlog. As discussed in ¶¶77-92, defendants knew but failed to disclose material facts when they falsely claimed that the Company's backlog was $619 million and that it was comprised of deals with "substantially high probability of being booked as revenue." Defendants also knew, or deliberately disregarded the truth, that even their dismissal of analyst Hazan's questions about new orders was misleading and that backlog was not being driven by increased demand.

1      114.    Defendants also knew the specifics of all contracts that were included in backlog

2   including those which confidential witnesses report should never have been included.  Defendants, in

3   particular Hampton, were aware of the contents of backlog because they determined which contracts

4   Term Agreements were included in backlog and attended backlog meetings where each contract was

5   discussed and evaluated.  This is in addition to the fact that McNamara signed all of the Term

6   Agreements.

7           (a)     According to CW11, backlog meetings were attended by Hampton, CW15,

8   Noah and Milliken.

9           (b)     In one instance, CW13 reported that in late 2007 or 2008, defendant Hampton

10   pressured him/her into getting a Term Agreement executed with Scott Sitton ("Sitton") who was

11   associated with an entity called CyberKnife Houston. CW13 warned Hampton that Sitton was very

12   interested in the CyberKnife product, but: (i) was not a physician; (ii) did not have a relationship

13   with a physician (who would ultimately use the system) at the time the deal was put together; and

14   (iii) did not have independent financing to make a deposit or carry out the other costly elements

15   necessary to purchase a CyberKnife and set up an operating CyberKnife facility.  According to

16   CW13, Hampton said "don't worry about the deposit" and "deferred" any down payment.  Sitton

17   signed the agreement on behalf of CyberKnife Houston.  CW13 believed that Hampton pressured

18   him/her to get a signed Term Agreement so the deal could be reported in backlog.  There is no

19   evidence that a CyberKnife Houston ever purchased or installed a CyberKnife.

20           (c)     According to CW13, "[I]t got to be that you could add anything you wanted

21   [to backlog]," and it was obvious that some of the Term Agreements were not very legitimate.

22   CW13 reported that there were some Term Agreements that were still contingent three years after

23   the orders had first been signed.  CW13 referenced a particular deal with a customer in Amarillo that

24   had been entered into by Accuray in years prior to CW13's joining the Company.  CW13 researched

25   the deal, which had no meaningful activity toward conversion in years because it was in his sales

26   area and concluded that it was not worth continued pursuit.

27           (d)     CW15, a former Sales Operations Specialist, participated in backlog meetings

28   with Noah, Hampton, and Milliken, reported that *only three out of ten deals (30%) that the*

1  ***Company included in the backlog had a likelihood of resulting in actual sales and seven out of ten***

2  ***(70%) should never have been included in backlog because of the types of contingencies in the***

3  ***contracts***.  The combined and corroborating reports of CW11 and CW15 are consistent with

4  Company's ultimate October 2009 admission that backlog, as it was defined, was not a meaningful

5  metric to measure the Company's performance.  *See* ¶97.  During the same October 2009

6  announcement, Accuray reduced its reported backlog to a mere $282 million.  When compared to the

7  height of reported backlog during the Class Period, $660 million reduction is approximately 57%.

8       (e)    CW15 also reported that it was obvious to all including the CEO, CFO, COO

9  and legal as well that certain contracts were never going to result in installations.  S/he reported that

10  it was also well known internally that Nash's deals were booked prematurely and that most of his

11  contracts would not result in installations.  CW15 estimated that only one in every five of Nash's

12  deals in backlog actually should have been there.

13       115.    In a separate and specific example of how the Company knowingly and artificially

14  inflated backlog while failing to disclose its true contents, CW1 explained that frequently Oncuris,

15  an entity run by the former CEO of Accuray, James Doty ("Doty"), would sign an agreement and put

16  up a "deposit" despite having never met the customer doctors that the CyberKnife system was

17  purportedly intended for.  For instance, CW1 reported that in summer of 2007, Doty of Oncuris

18  "signed" an "agreement" and paid a deposit for a CyberKnife purportedly to be installed at Corona,

19  but CW1 reported that the representatives at Corona had no idea that Doty had signed the agreement

20  or that he paid this deposit on its behalf since they had never even met Oncuris representatives.

21       (a)    The report of CW1 regarding Corona is corroborated by internal Accuray

22  documents which indicate that a CyberKnife system order was placed for Corona and Oncuris in

23  June 2007 and that at the time an LLC had not been formed.  In addition, the documents show that,

24  here again, this contingency of forming an LLC (usually the first step toward attaining financing)

25  would be deemed to be waived whether or not the Company actually received any notice from the

26  "customer" that the contingency had been satisfied, or any confirmation that a LLC had been

27  formed:

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Contingency 2 | Contingency Terms |
|----------|----------|-------|---------------|---------------|---------------|---------------|-------------------|
| CA, Corona, Corona Regional Medical Center (Oncuris) | G4 Purchase Term Agreement | 3,800,000.00 | $100,000 within 30 days of signed Agt. $1,040,000 upon LLC formation (on or before October 19, 2007)" $2,280,000 upon Delivery (March 28, 2008) $380,000 upon Acceptance | 6/28/2007 | LLC Formation | | Customer shall send written notice to ARAY on or before Oct. 19, 2007 *otherwise contingency is deemed waived*. |

(b)      In this instance above with Corona, unlike the later alleged "contracts" with J.L. Parrot, (disclosed below) it does not appear that the deposit was received at the time an entry into the contract, instead, it was scheduled to be received 30 days afterwards – notably after the close of Accuray's fiscal year 2007.  More importantly, to date, there is no evidence that Corona *ever* purchased or even intended to purchase a CyberKnife system.   In fact, CW11, a former Sales Operations Specialist reported that as of the time of his/her departure from the Company, Corona had not purchased a CyberKnife system.

(c)      CW11 corroborates CW1, reporting that Oncuris was run by Doty, a former Accuray executive.  S/he also confirmed that Oncuris provided down-payments for customers that did not otherwise have sufficient cash.  CW11 also reported that s/he heard Oncuris and Doty provided deposits or financing for customers without even meeting the customers.

(d)      CW11 also reported on a specific series of orders that were placed into backlog in 2007 which was suspect because there were "no homes," *i.e.*, identified end-users for the eight systems.  The deals had been arranged by Nash with J.L. Parrot.[6]  According to CW11 Mr. Parrot died thereafter and Nash tried to save deals by entering into modifications of the J.L. Parrot deals with Radiosurgery Partners, a Company run by Nash's friend, John Gimino ("Gimino"). CW11 reported that two of the orders ended up being cancelled, but four of the remaining six were being counted as part of the order backlog, but should not have been because of the lack of end-users.  Ultimately, *only one* was installed.  CW11 maintained that three orders in the backlog should

---

[6]      The August 31, 2010 Order previously held that CC did not allege that Nash's suspect deals went into backlog.  Order at 22.  The FAC explicitly identifies the eight suspect J.L. Parrot deals as being brought in by Nash and that six were added to backlog despite lacking end-users.

1   not have been added to the backlog "because there was nothing indicating that they would convert"

2   to revenue; nor should they have still been in the backlog in October 2009 when CW11 left.  CW11

3   said that the J.L. Parrott deals were definitely included in the Watch List during the backlog

4   meetings.

5           (e)     CW11's report regarding the J.L. Parrott deal is corroborated by internal

6   documents showing the eight deals entered into in November and December 2007, numbered the

7   Parrott Group 1, the Parrott Group 2, etc.  The documents illustrate that the purported contracts did

8   not have even a customer assigned to them.  Each of the deals was also contingent upon LLC

9   formation and converted to "binding" even if the Company did not receive any written confirmation

10  that the customer had met with contingency.  McNamara publicly stated that LLC formation was

11  among the three primary contingencies which would need to be resolved after initial contract

12  signing.

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Due Date | Contingency Terms | Status |
|---|---|---|---|---|---|---|---|---|
| KY, Louisville, The Parrott Group 4 - Manhattan (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 1 - Howard (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | (2) If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 2 - Cumberland (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | (1) If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

| Customer | Contract | Price | Payment Terms | Contract Date | Contingencies | Due Date | Contingency Terms | Status |
|---|---|---|---|---|---|---|---|---|
| KY, Louisville, The Parrot Group 3 - Salisbury (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $100K deposit (rec) - non-refundable by 01/15/08 $2,555,000 due upon delivery (July 15, 2008) $995,000 due upon acceptance | 11/20/2007 | LLC Formation | 1/15/2008 | (1) If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 5 - Bethesda (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 8 - Germantown (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 6 - Somers Point (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |
| KY, Louisville, The Parrott Group 7 - Queens (CyberTouch) | G4 Purchase Agreement (Quote) | 3,650,000 | $2,655,000 due upon delivery (Nov. 30, 2008) $995,000 due upon acceptance | 12/21/2007 | LLC Formation | 3/31/2008 | If Accuray doesn't receive written confirmation by D/L, then Ag't shall become binding. | Complete |

(f)     While it appears that four of the J.L. Parrot deals at least had deposits, four did not.  The total of the four deposits apparently received was $400,000.  However, the total amount of the eight contracts, if they were converted to revenue, was ***$29,200,000***.  Thus the total deposits for these transactions was a measly 3%.  Notwithstanding the small deposit, the lack of customer and the undisclosed self satisfying contingency, four of these transactions were incorporated into backlog as part of the Company's contention that reported that the backlog was a credible picture of the current and future financial condition of the Company.   CW13 reported that Accuray's deposits were disproportionately small in comparison with the purchase price of the CyberKnife.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1        (g)    CW15 specifically recalled a series of deals brought in by Nash with a "Dr.

2    Birdie" which were entered into backlog as "Dr. Birdie #1" "Dr. Birdie #2" etc, which should never

3    have been in backlog.[7]

4        (h)    CW9 is a former database analyst who was hired to fix problems in the

5    Company's BQMS system, the system from which Accuray generated its reported backlog.

6    According to CW9, reported that database system included many deals that had significant

7    subjectivity associated with the deals.  CW9 reports that as part of his/her duties s/he regularly

8    worked with the personnel in Sales Operations and was told by representatives from those

9    organizations who were in charge of supporting the sales staff, and who analyzed backlog and

10   attended backlog meetings that Accuray "should not be reporting" orders in the backlog because of

11   the high level of subjectivity associated with the deals.  CW9 was told by employees in Sales

12   Operations that the contingent contracts in the backlog were totally wrong and should never have

13   been entered into the backlog in the first place.

14       (i)    CW12, a former Senior Contracts Administrator, reported that the Legal

15   Department  headed by General Counsel, Milliken, tracked contract contingencies and payment

16   terms.  Even further, CW12 reported that these were some deals that sat in the backlog for protracted

17   periods of time **without any activity, "just sitting there doing nothing**."  In addition, CW12 reported

18   that there were meetings all the time involving senior executives about the order backlog, including

19   when systems were due to be installed.

20       (j)    CW11 stated that s/he attended and participated in regular **backlog meetings**

21   **with defendant Hampton**, as well as representatives from Accuray's Finance, Legal, and Sales

22   departments.  Noah also participated in the meetings.  The purpose of these meetings was to

23   ascertain the progress of all the contracts and to assign subjective confidence levels to the contracts.

24   CW11 reported that the subjective confidence ratings assigned to contracts ranged from 1 to 5 with a

25   5 rating being the lowest confidence rating and meant the order was not supposed to be included in

26

27   [7]    It is unclear if "Dr. Birdie" refers to the same deals with the "J.L. Parrott" group, which were also numbered sequentially and brought in by Nash, or whether this is merely a coincidence.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    the order backlog.  A 1 rating meant the system had actually been installed, a 2 rating meant the

2    system was close to being installed.  Ratings of 3 and 4 meant that there were various contingencies

3    and other requirements that needed to be achieved before the system could be shipped and installed.

4    However all deals with ratings of 3 and 4 were definitely added to the order backlog, regardless of

5    whether there were contingencies associated with the contracts.  CW11 stated that only deals with a

6    rating of 5 were not added to the backlog.

7            (k)     From CW11's perspective, no contingent orders of any kind should have been

8    included in the backlog.  ***In fact, CW11 reported that general counsel Milliken also commented to***

9    ***him/her in October 2007 that Accuray should not be reporting anything except non-contingent***

10   ***deals***.  Further, CW11 reported that Milliken directed part of the blame for the inclusion of

11   speculative deals into backlog on defendant Hampton, stating to CW11, that the processes for

12   inclusion of deal in backlog was in place and "all [Hampton] had to do was follow it," but more

13   enforcement of the policy clearly needed to be done.

14           (l)     CW11 reported that at the backlog meetings the Sales Operations Specialists

15   would advocate ***not*** to add particular orders to the backlog but that they would nonetheless be added

16   against their recommendations.  For instance, CW11 reported on the Comprehensive Cancer Care

17   Center, located in Bakersfield, California.  CW11 reported that a signed contract from this customer

18   came in around "spring-break 2008."  CW11 stated that it was agreed at the backlog meeting – prior

19   to the C-Level meeting, attended by defendants Thomson, McNamara and Hampton – that the deal

20   should not be added to backlog.  However, CW11 reported that the deal was added to backlog

21   against his/her recommendation and the recommendation formed at the backlog meeting.

22           (m)     CW11's report is corroborated by internal documents indicating that a

23   contract with "CA, Bakersfield, Comprehensive Blood and Cancer Center" was signed on June 30,

24   2008 – the last day of the Company's FY08.  Consistent with CW11's allegations that this deal

25   should not have been added to backlog, the Company's internal records reflect that the deal did not

26   have a set price and that "THE PAYMENT TERMS [ ] WERE APPROVED WITHOUT ACTUAL

27   DATES FOR EACH MIL[]ESTONE."

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

| Agreement ID | Customer Name | Contract | Price | Payment Terms | Contract Date |
|---|---|---|---|---|---|
| 502 | CA, Bakersfield, Comprehensive Blood and Cancer Center (CBCC) | G4 Purchase Term Agreement | 0 | $625,000.00 of purchase price, less the $100,000.00 received due upon delivery of the CyberKnife System. $625,000.00 of the purchase price due upon installation. $937,500 of the purchase price due upon Acceptance (as defined in Attachment A, Section 7 of the Accuray Terms and Conditions set forth below). $937,500 due 6 months following 1st patient treatment. *THE PAYMENT TERMS ABOVE WERE APPROVED WITHOUT ACTUAL DATES FOR EACH MILLESTONE. | 6/30/2008 |

116.   CW15 reported that after Company went public, backlog became the most important factor in determining the success of the Company. CW15 described "misrepresentations" related to the actual reported backlog during the Class Period.  S/he reported that when it came to reported backlog during the Class Period that there was "no way [Accuray executives] were telling the truth." CW15 would tell his/her superiors that if the customer can't fork-out the money needed to initiate the contract, then it was doubtful they could pay for the entire CyberKnife.[8]

117.   CW15 reported on the backlog meetings which would occur two to three days after the close of each quarter but before the release of results to investors. The purpose of the backlog meetings was to figure out howAugust 31, 2010 many contracts should be included in the company's quarterly backlog.  This meeting was attended by CW15, Noah, Hampton and Calkins (in the latter part of his/her tenure, Grey and Milliken.)  According to CW15, the participants would discuss each and "every" contract. According to CW15, any contract that appeared in the backlog required Hampton's approval, and sometimes also that of either Thomson or McNamara.  CW15 would specifically be asked for the status of each of the international contracts.  CW15 also reported that s/he would cite multiple contingencies in various contract that were going to effect the sale and she would be "completely disregarded."  CW15 reported that even when s/he would advise the group of problems or issues s/he saw with each a customer, Hampton would say "we're going to get it" even though it was obvious to all that the contract would never become an actual sale. According to CW15, this was Hampton's way of justifying the inclusion of these contracts on the backlog. CW15

---

[8]   CW15 recalled on a number of occasions that defendant Thomson made it very clear that all he wanted them to focus on was the "damn" numbers.  CW15 reported that Thomson placed tremendous pressure on Hampton.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1    recalled that she left each meeting wondering "why the hell did you bring me in when you just

2    disregard my input."

3         118.   CW15 further reported on that Hampton would offer "discounts" to a customer to

4    sign a contract so that the contract could be included in backlog. According to CW15, the discount

5    would enable Accuray to include that customer on the backlog even though it was extremely

6    unlikely that the sale would ever be completed.  This corroborates the report of CW13 who said that

7    Hampton would waive deposits for "customers" that had no money so that the deal could be put into

8    backlog.

9         119.   CW15 described his/her tenure at Accuray as having unrealistically high expectations.

10   CW15 recalled that executive management did not care what it took in order to achieve backlog

11   numbers. CW15 reported that of the contracts in the backlog during the Class Period only "three" of

12   "ten" were going to become actual sales and "seven" should never have been included in the backlog

13   due to customer financing issues and/or contingencies. CW15 described how once s/he "had been

14   working with a customer for three months" who could not even make the deposit payment, and thus

15   the likelihood of getting full funding was slim – but his/her superiors would not listen to him/her.

16   <u>Defendants Knew that Reported Backlog, Including the "Definition" of Backlog Before and
     During the Class Period, Was False Because They Failed to De-book Deals They Knew</u>

17   <u>Customers Had Cancelled or Had Become Dormant</u>

18        120.   Confidential witnesses report that Accuray's knowing failure to timely de-book deals

19   that customers cancelled, as well as resisting customers' efforts to cancel transactions, inflated

20   backlog and caused the definition of backlog to be knowing or recklessly false and misleading.

21             (a)    CW1 reported that the time between Accuray receiving notice that a customer

22   wanted to cancel and the time Accuray would actually remove items from backlog depended on how

23   much the Company needed the deal in backlog.  The Company would receive letters from customers

24   requesting that Accuray de-book a deal but the Company would not remove the deal from backlog,

25   sometimes for months.

26             (b)    CW5 corroborated the reports of CWs 1 and 2 that it was definitely known

27   internally that there were "cancelled contracts" which were not removed "until subsequent quarters."

28   CW5 reported that customers would notify Accuray to cancel their orders, but if it was shortly before

1  the end of a quarter, the Company would delay de-booking the orders.  CW5 reported that s/he and

2  other personnel were aware of cancelled orders that still showed up in regularly generated lists of

3  pending installations with target dates for when the installations were to be completed.  Accordingly,

4  CW5 believed that the failure to remove cancelled orders was deliberate and s/he was personally

5  "troubled" by the Company's practices in this regard, which s/he contrasted to "good practices" at a

6  former employer in the medical devices field.[9]

7          (c)      CW14 also reported on the Company's schedule of installations, which s/he

8  stated was overly aggressive and inevitably the install dates were not met.

9          (d)      CW15 reported that internal procedures required that written communication

10  of a CyberKnife order to go to sales operations and then to legal.  According to CW15, it was

11  common during the Class Period for Hampton and/or Chris Raanes to try to "revive" a contract that

12  had been cancelled by the customer. They did this in an effort to keep cancelled contracts on the

13  from falling out of backlog. CW15 reported that this "happened often" including with a couple of

14  deals in Europe and the Dr. Birdie deals previously identified.

15          (e)      CW11 reported that correspondence cancelling an order should have been sent

16  by the customer to McNamara, though at times the cancellations were addressed to General Counsel

17  Milliken or Noah, who reported to Hampton.  CW11 reported contracts were added to the backlog

18  and then no further or very little additional work was done on the contracts for long periods which

19  indicated that they had little likelihood of later converting to revenue.  CW11 stated that even where

20  a deal was in backlog and rated as a 2 because Accuray had received a deposit, nothing would

21  happen on the contract thereafter but it would still hold a 2 confidence rating and stay in backlog

22  unless it was changed manually.

23  _____

24  [9]      According to CW5, after the filing of the CC, at the behest of Milliken lawyers for Accuray
defending this litigation identified and called CW5 to challenge CW5 on the allegations in the CC
25  attributed to him/her. According to CW5, s/he confirmed to Accuray's lawyers that s/he stood 100%
beside what s/he had said and as set forth in the CC.  CW5 stated that the Accuray lawyers
26  questioned CW5 **about every allegation ascribed to him/ her**, in particular about the about the seven
systems that were sent to an overseas distributor and ended up sitting in customs. CW5, reported that
27  s/he challenged the lawyers to explain to him/her the incompetence of the Accuray senior executives
or their unethical conduct.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL        - 59 -
SECURITIES LAWS - 4:09-cv-03362-CW

1        (f)     CW2 reported that s/he heard that the Company would delay taking a sale off

2  the books even after a customer would ask to have it cancelled, resulting in inflated backlog figures.

3  CW2 believed that the Company probably knew about the need for reductions to its backlog "easily"

4  a year or so before the actual first reductions.

5       121.    In addition to the facts reported by CWs that clearly demonstrate the the that the

6  Company falsity of defendants' statements as detailed set forth above, defendants would ultimately

7  admit the truth (a) it was not collecting deposits from customers, in particular, deposits from

8  international distributors; (b) it would remove more than $127 million from reported backlog by the

9  end of the Class Period and another $131 million after the Class Period; (c) the Company reverted to

10  its pre-IPO and pre-Class Period position of reporting only non-contingent backlog because the new

11  and current method (which it falsely said was a more accurate way to measure the Company's

12  financial condition) was **not** a reliable predictor of future revenues; and (d) the Company even

13  "redefined" non-contingent backlog because many of these orders were not resulting in installments

14  and revenues.  Most tellingly, Accuray never experienced an increase in installations commensurate

15  with its enormous backlog growth.  Though backlog doubled from $330 million to $660 million,

16  installs were flat both during and after the Class Period.

17  <u>Defendants Actually Knew of but Failed to Disclose Material Facts Which Seriously Undermined</u>
<u>the Reasonableness of the FY08 Revenue Forecast Issued on August 17, 2007</u>:

18

19       122.    In addition to the facts set forth above and reported by CWs, defendants knew of facts

20  that materially undermined the reasonableness of the forecast issued on August 17, 2008.  Indeed,

21  defendants encouraged artificial inflation of the backlog figures throughout the Class Period by

22  including transactions from sales staff whom the Company knew had a history of bring in phony

23  sales, which never ultimately resulted in CyberKnife installations.

24        (a)     CW1 disclosed that the Company knew that reported backlog was artificially

25  inflated and that the Company knew of and encouraged certain of the sales representatives to submit

26  Term Agreements or contracts that the Company knew had little likelihood of turning into real

27  CyberKnife system sales.  The Company nevertheless included these suspect deals in reported

28  backlog.  For example, CW1 reported that for 2006, sales representative Nash (who was terminated

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1   in October 2008 because deals he signed were not materializing) had won the award for most sales in

2   the year but that it was known within the Company that Nash's deals were in large part phony deals

3   that rarely resulted in installations that could be recorded as revenue and instead had to be de-booked

4   or removed from backlog.[10]

5        123.   CW1 reported that Nash had even submitted contracts he entered into with his best

6   friend – Gimino.  According to CW1, Nash had a history of specious deals that never materialized

7   and recalled that in one year, Nash booked 16 CyberKnife systems but only four or five were

8   actually installed and these deals could account for about millions being removed from backlog.

9   CW1 reported that s/he believed that 50% of Nash's deals were removed from backlog.  CW11

10  stated that there were numerous contracts that were entered into the backlog that ended up being

11  cancelled and many though not all cancelled contracts were deals that had been put into place by

12  Nash.

13       (a)   CW2, a former Regional Sales Director, corroborated the report of CW1 and

14  reported that Nash was held out by the Company as its "savior" sales person because he was

15  "miraculously" booking a lot of orders.  CW2 stated that as a result of these orders, Nash was being

16  paid bonuses up front for systems that were not being installed.  According to CW2, however, the

17  orders were not turning into installations and thus had to be removed from backlog.  CW2 confirmed

18  that Nash was fired in 2008 because of the phony deals.

19       (b)   CW4 corroborated the reports of CWs 1 and 2, stating that the ***Company knew***

20  ***of and encouraged the inclusion of questionable orders*** into reported backlog and specifically

21  reported that Nash was falsely booking orders knowing that they were not going to result in

22  installations.  According to CW4, the Company fired Nash in 2008 because of these phony deals.

23  According to CW4, everybody, including defendants, knew that Nash was falsely booking orders.

24  According to CW4, Nash would get people to sign agreements, "knowing good and well" that the

25  customers would never actually purchase a system.  Because Nash had so many deals on the books,

26   

27  [10]    Nash has bragged publicly that he was the Company's top sales person at the Company.  *See*
Ex. 49.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    he would receive a lot of stock in the Company as a bonus.  According to CW4, Nash's bogus sales

2    caused a big "blowout" among the sales force because Nash was essentially stealing stock options

3    from the other sales representatives.  They were not getting rewarded for their own sales results

4    because of Nash's false bookings.

5           (c)      CW4 reported that Nash's boss Snarsky, Eastern Region Sales Manager,

6    would also receive stock awards for Nash's "sales," and that Snarsky knew of Nash's phony

7    bookings.  CW4 reported that Snarsky spoke openly about Nash's sale and recalled Snarsky telling

8    Nash that Nash's orders were going to fall off the books.  Snarsky said that Nash was going to end

9    up having to pay the Company back.  In addition to sales personnel and Snarsky, CW4 said that

10   senior management knew that Nash's deals were bogus because these deals were not materializing

11   into installations that could be recorded as revenue, but were being carried as backlog for long

12   periods of time.

13          (d)      CW4 stated that, in conjunction with phony deals, defendants knew that

14   Nash's orders and his sales forecasts (which the Company adopted) were wildly inflated.  CW4

15   reported that the sales managers also had to give presentations in Sunnyvale, California on what their

16   year was going to look like.  This presentation typically took place in the first quarter, and all of the

17   senior executives attended, including defendant Thomson, and heard Nash's ridiculous numbers at

18   sales presentations in Sunnyvale, California.  CW4 stated that in sales meetings, for example, other

19   representatives would forecast four, five and six orders for the year.  However, Nash forecasted 22

20   sales.  CW4 explained if a salesperson had forecast even eight orders for the year, people would roll

21   their eyes in skepticism, and if you actually sold eight, "you are like god."  CW4 reported that when

22   Nash openly claimed that he had 22 orders, people were saying, "***What?!***"  CW4 said that Skip

23   Goode and defendant Hampton also attended Company-wide sales meetings where Nash would

24   make outrageous forecasts.[11]

25   _____

26   [11]     CW4 has recently disclosed, in May or June 2010, after the filing of the CC, General Counsel
     Milliken, called CW4 to have the attorneys defending this action question CW4.  Subsequently,
27   attorneys for Accuray "interviewed" CW4, questioning him/her specifically about the allegation
     attributed to him/her in the CC.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL         - 62 -
     SECURITIES LAWS - 4:09-cv-03362-CW

1           (e)     CW5, a former Director of Marketing and Placement, corroborated CWs 1, 4

2 and 11 regarding sales cancellations of Nash's orders and stated that Nash was the salesperson

3 known for having the highest percentage of cancelled contracts at the Company.

4           (f)     CW10, another Sales Operations Specialist, reported that Nash engaged in

5 underhanded activities to generate orders. S/he stated that Nash's orders were placed in backlog but

6 did not turn in to system installations and he was fired over this. CW10 also reported that if a deal

7 was cancelled, Accuray refunded the customer's deposit, including on Nash's phony deals.

8        124.     With respect to the Company's FY08 forecasts, publicly issued on August 17, 2007,

9 CWs provided additional facts known to defendants which demonstrates defendants' actual

10 knowledge of falsity. Indeed, multiple CWs report that the forecast was based on defendant

11 Hampton's arbitrary decision in early 2007 to double sales quotas for the sales personnel; sales

12 personnel believed they could sell roughly 50 units, Hampton doubled this to 100 CyberKnife sales.

---

First, Accuray, according to CW4, Accuray lawyers asked was whether CW4 actually had a discussion with defendant Hampton in which CW4 told Hampton he was "crazy" for committing to sell 100 CyberKnife units in the United States for FY08. CW4 said he told the Accuray lawyers, "Yeah, of course I said that to him." The lawyers continued to question CW4 and asked "in what context" did CW4 tell Hampton CW4 told the Accuray lawyers that he had gone to Hampton to complain that CWs supervisor – Eastern Area VP of Sales Snarsky – had been "breathing down CW4's neck" to make sales in a manner that CW4 told Hampton was "not professional."

CW4 told the Accuray lawyers, there was "no way" to achieve the kind of sales increase Hampton was projecting. CW4 further told the Accuray lawyers that sales personnel in either the eastern or western regions projecting that they saw the kinds of sales opportunities that would support Hampton's projection of selling 100 units in the year ahead. CW4 told the Accuray lawyers that he knew this because he participated in weekly "tele-calls" with the other sales personnel "and heard what everyone was saying and forecasting" and there was "no way" that 100 CyberKnife sales in the year ahead could be achieved. Furthermore, CW4 told the attorneys that he "knew what the [sales] guys were saying off the calls too" which reinforced CWs conviction that Accuray could not sell 100 CyberKnife systems in the upcoming fiscal year. CW4 told the lawyers added that the sheer cost of purchasing a CyberKnife system – several million dollars – plus the costs of preparing a site to house the system, which were easily another million dollars, as well as customers having to hire personnel, even as the economy was "already going down," made Hampton's projections even more unrealistic and unattainable.

CW4 reported that having told the Accuray lawyers these things, the female attorney told CW4 that it "sounds like you were capable of making that kind of comment" to Hampton that projecting sales of 100 CyberKnife units was very unrealistic and highly unlikely to be achieved.

1       (a)     CW1 reported that in the calendar year 2007, the Company's sales quotas

2  went up dramatically, *i.e.*, between 50%-70%.

3       (b)     CW2 corroborated CW1 and reported that prior to the IPO, Company's sales

4  quotas increased significantly and his/her quota, for example in the northwestern United States,

5  increased to sales of seven CyberKnife units, whereas in the five years prior to the IPO, the

6  Company had only sold a ***total*** of three units in the region. CW2 reported that the sales quotas nor

7  the Company's sales forecasts were in accordance with what the sales staff believed could be sold,

8  but instead were set by top management and the sales staff were simply told to meet the numbers.

9  CW2 further reported that the Company simply determined what was needed to make the numbers

10 for the year and would divide that number up among the sales territories.

11      (c)     CW3, a former Accuray Sales Specialist between 2006 and 2009, stated that

12 expectations were raised to an unrealistic level after the Company went public, especially

13 considering the $4 million price of the CyberKnife system and the downturn of the economy. CW3

14 reported that Hampton, as Head of Worldwide Sales, was the key person who set the public sales

15 forecast, along with the defendants Thomson and McNamara. CW3 reported that for FY07, the

16 Company had installed approximately 51 units. However, Hampton, with the approval of the senior

17 staff, simply doubled that number to 101 for FY08. According to CW3, there was no basis for such

18 an increase in sales forecast and no one in sales organization believed that the Company could meet

19 the 2008 sales forecast. CW3 further reported that the sales staff would tell management, *i.e.*,

20 Hampton, what they believed they could set and then management would give them a number of

21 what they needed to sell. According to CW3, defendants encouraged the execution of Term

22 Agreements without indicia of a sale likely to convert to revenue by paying commissions on Term

23 Agreements regardless of whether a deal converted. According to CW3, in the summer of 2007, the

24 company realized that it was not going to hit the 101 sales forecast and alerted securities analysts of

25 that fact. According to CW3, the sales staff, including RSDs, made it clear to Hampton during sales

26 meetings that the 2008 forecast was simply unrealistic. Ultimately, in FY08, the Company failed

27 miserably and only hit around the 50 systems mark – just as forecast by sales personnel.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1        (d)      From CW3's perspective, the Company began to include all deals – as

2  opposed to just non-contingent deals – in reported backlog because the Company was not hitting

3  sales numbers but at least could show there were deals in the works.

4        (e)      CW4 corroborated the reports of CWs 1, 2 and 3 with respect to the

5  Company's FY08 forecasts. CW4 stated that when the Company was about to go public, defendants

6  polled what each salesperson was going to sell. CW4 reported that the sales staff had actually

7  provided a legitimate realistic forecast of what they could sell, but Accuray management just "threw

8  it out the window." CW4 said, "They were throwing around some bogus numbers, and they knew

9  it." According to CW4, Hampton told the sales team that the Company was going to forecast 100

10  CyberKnife units. CW4 stated that the sales people, however, told Hampton that there was no way

11  the Company was going to be able to sell 100 CyberKnife systems. CW4 reported that s/he

12  personally told Hampton, "You're crazy"; "You're not going to sell 100." Hampton just told him

13  that was what Accuray had committed to. CW4 reminded Hampton that the Company did not even

14  sell 100 in 2006 when they had an amazing year. CW4 recalled telling his/her spouse of this

15  exchange with Hampton and telling him/her that there was no way they could sell 100 and felt this

16  was misleading. CW4 said that s/he believed there was something illegal about going public and

17  making false claims about what kind of sales one can make.

18        (f)      CW4 explained that Accuray's forecast upset the sales people because they

19  had provided legitimate estimates of what they thought they were going to sell in the year but the

20  Company said it thought they could sell twice as much. As far as the forecast of 100 sales,

21  everybody knew that was a "bogus" number. CW4 corroborated CW3 stating that, when the

22  Company made the forecast, even Snarsky said, "they're f-ing crazy." According to CW4, the

23  Company had just gone public, and employees had to work like crazy to pump sales up, and that

24  Accuray used Nash's "bogus numbers" in backlog to show that those sales were in the works. CW4

25  stated that though Nash's sales were called "dirty deals" behind the scenes, the Company used his

26  numbers for its public projections.

27        (g)      According to CW4, defendants claim that the financial crisis had nothing to do

28  with Accuray's stock price declines. This is corroborated by Oppenheimer and CIBC Analyst Hazan

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    has who reported in January 2008 that none of the other companies in Accuray's business sector

2    were suffering from the impact of the financial crisis.

3                    (h)    CW5 reported that s/he found it "troubling" when Accuray maintained its

4    guidance to investors regarding the number of installations it had increasing the Company's reported

5    forecasted for a given year when the actual number of installations at the time was much less.

6    <u>Defendants Intentionally Exclude Analyst with a Negative Rating on Accuray from Company
     Sponsored Investor Event; Big Investment Houses and Underwriters Issue Positive Outlook</u>
7    <u>Reports</u>

8            125.    On October 5, 2007, Accuray held its analyst day, inviting only a select group of

9    securities analysts, including the defendant underwriters, that provided positive ratings on Accuray.

10   CIBC analyst Hazan, who had criticized the Company for vague and seemingly unsupportable

11   installation, sales and backlog figures, was not invited.  Hazan concurrently issued a report detailing

12   the Company's lagging installation numbers and failure to clarify or differentiate "sold" units from

13   "leased" units which created uncertainty about the Company's true financial condition.  The report

14   further suggested an even "broader credibility issue" with Accuracy management:

15           **Our Issues with ARAY Are Growing**

16           As we described above, our key issues regarding investment in ARAY today are
             (1) a weak management team, in our opinion; (2) the Street's disregard for unit order
17           type (sale or lease) and its impact on future sales; (3) a concerning pattern of slow
             installations in the U.S. over the past year, . . .
18
19           **The Key to Any Stock Investment Starts with Management**

20           Our personal experience as it relates to Accuray's "analyst day" seems to be in a way
             a microcosm *of a broader credibility issue with this management team*, in our
             opinion.  In our experience, this marks the first time that we were not allowed to
21           attend a company sponsored event (for any company we have ever covered) held
             specifically for analysts.
22
23           ***Considering that we are the only analysts right now with a differentiated (or
             negative) position on the stock, this action is disturbing.  Again, we highlight this
24           point only because it further underscores our growing concern that this
             management team may not be fully forthright in dealing with investors, with a
             distinct inability to answer uncomplicated questions.  This issue came up most
25           clearly (and publicly) a few times on the last earnings call***.

26   Ex. 18.

27           126.    Large investment house analysts invited to the Company's analyst day issued reports

28   which largely parroted the Company's positive spin on the state of its business and ignored or

1   contradicted the issues raised in the CIBC report.  In particular, the October 5, 2007 report by Mark

2   Richter ("Richter") of Jefferies offered a bullish analysis of the Company's backlog and market

3   opportunity.  The report stated:

> **Analyst Day Provides More Evidence for the Value Proposition of the CyberKnife**
>
> **Investment Summary**
>
> We would be buyers of ARAY at current levels and believe the stock is poised to trade higher on strong FY1Q revenue growth, ***an expanding backlog, and accelerating CyberKnife unit placements***.
>
> *          *          *
>
> CFO Robert McNamara reviewed Accuray's business model and highlighted ***ARAY's steady order/new contract growth from $75 million in FY06, to $150 million in FY05, to $240 million in FY06 and then $325 million in FY07*** . . . .
>
> **Wade Hampton, Chief Sales Officer,** provided a worldwide sales overview and provided company goals of expanding ARAY's global sales channel, ***maintaining backlog expansion, and establishing a top tier sales organization to ensure the company's dominant WW SRS market position. . . . [H]e believes that ARAY will be able to grow its international business to 50% of total WW sales and will be able to expand ARAY's backlog to over $1 billion***.

15  Ex. 19.

16          127.    On October 5, 2007, Accuray's stock price declined from an October 4, 2007 close of

17  $17.93 per share to a close of $17.35 per share or October 5, 2007.  However, notwithstanding the

18  negative CIBC report, the stock continued to trade at artificially inflated prices.

19  <u>Accuray Reiterates Knowingly False FY08 Forecast; Makes Even Bolder False Backlog
    Statements and Issues Disclosure that the Company Was Recognizing Revenue on International
20  Deals Upon Shipment</u>

21          128.    <u>False and Misleading Statement</u>: On November 7, 2007, Accuray issued a press

22  release announcing its 1Q08 financial results in a press release titled "Accuray Reports Record

23  Revenue in First Quarter of Fiscal 2008; Fiscal First Quarter 2008 Highlights: Record Quarterly

24  Revenue of $48.6 Million; Backlog Reaches Record Level of $642 Million."  The press release

25  bragged again of increased backlog consisting of "***firm signed contracts***" and again reassured

26  investors that the Company believed there to be a high probability of the revenue being recognized.

27  The Company also reiterated a knowingly false revenue forecast for FY08 of $250-$270 million for

28  which CWs report had no reasonable basis to the extent that it was based even in part on reported

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    backlog or Hampton's unreasonable sales predictions.  The false forecast was supported by bold, but

2    false, statements concerning backlog and false claims of visibility going forward:

3       ***The first quarter of fiscal 2008 backlog increased by $23 million from the fourth
        quarter fiscal 2007. . . .  Accuray's backlog is composed of firm, signed contracts
4       that the company believes have a substantially high probability of being recognized
        as revenue.***

5                                    *        *        *

6       Based on the current business outlook, ***Accuray is reiterating its fiscal 2008 revenue
7       guidance of $250 million to $270 million.***

8    Ex. 20.

9           129.    <u>False and Misleading Statement</u>: On November 7, 2007, Accuray held a conference

10   call with analysts to discuss the Company's 1Q08 results.  The conference call was hosted by

11   defendants Thomson and McNamara.  Defendants bragged that it was the "record backlog" that

12   demonstrated the Company's "continued success," despite only five CyberKnife installs during the

13   quarter, including zero international installs.  Defendants reiterated that backlog constituted "firm

14   signed contracts" and that the growth in reported backlog, revenue and sales was evidence of even

15   more growth to come and provided forward visibility into the Company's revenue stream:

16      In Q1, we achieved record quarterly revenues of $48.6 million, an impressive 48%
        increase year over year.  ***We also grew our backlog to $642 million, one of the
17      highest levels in the industry.***

18      ***Once again achieving another quarter of record backlog and record revenue in the
        same quarter demonstrates a continued success of our sales effort with a very good
19      indication of even more growth to come.  A point of note is that this is the third
        consecutive quarter that we have grown both revenue and backlog to record levels.***

20                                   *        *        *

21
22      ***Based on analysis of the positive change in backlog and the revenue that we
        generated during the quarter, you can see that we have brought in added contract
        value of approximately $17 million to our backlog.  This represents an increase of
23      approximately 90% over the same period last year.***

24                                   *        *        *

25      ***[O]ur business model generates significant backlog, currently at $642 million
        which provides forward visibility into our revenue stream.***

26
                                     *        *        *

27
28

1  *Backlog consists of firm signed contracts for CyberKnife systems, long-term*
2  *premium service contracts and minimum monthly payments associated with shared*
   *ownership systems*.

3                              *            *            *

4  *This year-over-year increase demonstrates the effectiveness of Accuray's growing*
   *sales force which has expanded over the past 12 months*.

5
6  *This enhanced sales team is producing qualified and robust sales leads and*
   *producing signed contracts more efficiently*.

7  Ex. 21 at 1-2, 5-7.

8         130.   <u>False and Misleading Statement and Partial Disclosure</u>: In addition to falsely

9  reassuring investors that it would have enough installations to meet FY08 forecasts, the Company

10 specifically highlighted international sales (including sales to or through international distributors)

11 which were also included in the Company's backlog figures.  According to defendants, these orders

12 would be a significant reason why the Company's forecasts would be achieved.  In fact, when one

13 analyst focused the decline in installation figures and inquired as to how the Company planned on

14 meeting its revenue guidance.  The Company disclosed for the first time according to analysts that

15 international sales revenue would be *recorded upon shipment to the distributor (as opposed to the*

16 *end-user) and it would be recorded even if the CyberKnife was not installed*:

17     [Hazan:] Okay.  And then with regard to installations . . . because the installs have
       not really shown much growth, *what can you tell us to give us confidence that you*
18     *can actually grow the number of installs by what you will need to do to make '08*
       *guidance*?
19
       [Thomson:] *I think one sign is the units that obviously have gone to the*
20     *international distributors, its [sic] not that* we are not expecting them to be installed,
       so they are on a path to get there.  I think the other thing is that – when we map
21     things out at the beginning of the year this is approximately what we saw.  *We go*
       *through customer by customer on a regular basis looking at where they are with*
22     *their install time and where they are with construction programs that will allow us*
       *to install and we keep those very tight metrics*.
23
24                              *            *            *

25     [Hazan:] Hi just a quick follow up.  I just want to make sure I understand in terms of
       the international orders that you booked as revenue but were not installed. . . .  *Do*
26     *you recognize that revenue upon shipment to your distributor*?

27     [McNamara:] *. . . If we are meant to install it then we have to install it before we*
       *recognize revenue.  If the distributor has the capability to install or we've fulfilled*
28     *sort of our obligation, if you will, then we would recognize revenue.  So in some*
       *cases, we would recognize it upon shipment but it really depends on the particular*

*distributor and their capabilities. Typically it's a ship through to the customer though*."

*Id.* at 10, 14.

131. The facts concerning revenue recognition upon shipment to distributors was in stark contrast to the representations that were made to investors in the Registration Statement filed on February 7, 2007. In the Registration Statement, the Company specifically stated that apart from meeting its obligations associated with the purchase agreement, the Company recognizes revenue after the distributor has shipped the unit to the end user, otherwise, we recognize revenue once the company has installed the CyberKnife system confirmed performance. *See* Ex. 1 at 43-44.

> Under our revenue recognition policy, *we generally do not recognize revenue attributable to a CyberKnife system purchase until after installation has occurred. For international sales through distributors, we typically recognize revenue when the system is delivered to the end user's site*. . . . Under our current forms of purchase and service contracts, we receive a majority of the purchase price for the CyberKnife system *upon installation of the system*.

132. The Registration Statement went further with respect to revenue recognition on international sales:

> ***International Sales Revenue***
>
> For international sales, we recognize revenue once we have met all of our obligations associated with the purchase agreement, other than for undelivered service elements for which we have vendor specific objective evidence, or VSOE, of fair value. *In most cases, this occurs after the distributor has shipped the unit to the end user, assuming all other obligations have been satisfied.* Payments are sometimes secured through letters of credit. In situations where we are directly responsible for installation, we recognize revenue once we have installed the CyberKnife system and have confirmed performance against specification.
>
> *               *               *
>
> ***The Company records revenues from an arrangement with distributors based on a sell-through method where revenue is recognized upon shipment of the product to the end user customer once all revenue recognition criteria are met. These criteria require that persuasive evidence of an arrangement exists, the fees are fixed or determinable, collection of the resulting receivable is probable and there is no right of return.***"

Ex. 1. F-14.

133. Nowhere does the Company indicate that it would recognize revenue simply upon shipment to its distributors. Nor does the Registration Statement suggest that even contractually, that all of its obligations were or could be met simply upon shipment to an international distributor.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

As discussed below, for that reason, analysts who had been following the Company, and its history as a public company reported that it was the very fist time they had heard about revenue being recognized upon shipment alone.[12]

_____

[12]     Though Accuray has not issued a restatement of revenues associated with CyberKnife shipments, Defendants' November 7, 2007 admissions that it had recognized revenues on CyberKnife systems to international distributors on shipment alone, as opposed to delivery to the end users site, strongly suggests that the Company improperly recognized revenue in violation of GAAP and AICPA, SOP 97-2.

According to the Company's Registration Statement Accuray generated revenue primarily from the sale of CyberKnife Systems, Services and Upgrades.  The Company stated that it recognized product revenue in accordance with GAAP, and particularly SOP 97-2 and SOP 98-9 modification of 97-2 with respect to certain transactions.

"Revenue is generated from the sale of our products, our shared ownership programs, and by providing related services, which include installation services, post-contract customer support, or PCS, training and consulting. Our products and upgrades to those products include more than incidental software and accordingly, we account for the sale of our products pursuant to Statement of Position No. 97-2, *Software Revenue Recognition*, or SOP 97-2, as amended."

We recognize product revenues, for sales of the CyberKnife system, replacement parts and accessories, when there is persuasive evidence of an arrangement, the fee is fixed or determinable, collection of the fee is probable and *delivery has occurred as prescribed by SOP 97-2*." Ex. 1 at 54.

Because defendants admittedly were recognizing revenue upon shipment to distributors as opposed to delivery to either the distributor or the end user's site, "delivery" pursuant to SOP 97-2 and 98-9 had not occurred and the product had not been accepted.  The Company's obligation would appear not to have been complete such that the relevant accounting rules would permit revenue recognition. Nor would shipping CyberKnife systems to a warehouse, as reported by confidential witness satisfy defendants' obligations under the accounting rules.

Indeed, on December 4, 2009 during the Company shareholder meeting Derrick Bertocci ("Bertocci") stated that the Company, according to the accounting rules, and because of the software components to the CyberKnife systems, could not recognize revenue until the CyberKnife was shipped installed and accepted by the customer." See Ex. 52.

"I asked about an unusual line in the 10-K, on page 31: "Since the software component is significant in our solution, we are bound by the software revenue recognition rules for our business." I asked what this sentence meant, and whether the company was engaging in accounting gimmicks to boost short-term revenue at the expense of long-term growth. CFO Bertocci said the sentence related to SEC rules on software sales.  However, the CFO also said that sales under the post-2006 CyberKnife contracts allow Accuray to record revenue as soon as the product is "shipped, installed, and accepted by the customer." *Id.* at 3.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

Securities Analysts Criticize Weak Installation Figure; Wonder About the International Sales Disclosure; Repeat Reiteration of 2Q08 Forecast and Stock Price Declines

134.    On November 8, 2007, Jefferies issued a research report on Accuray.  Unlike the negative CIBC report of November 7, 2007, the Jefferies report was positive about the Company's first quarter financial results and characterized the perceived issue pertaining to the placement of CyberKnife units as "resolved."  The report was titled "Confusion Over Unit Placements Was **Resolved** – FY1Q08 Results Were Solid."  The report then repeated bullish representations concerning the Company's backlog and purported new order growth.  The Jefferies report also never mentioned the new disclosure that international sales were being recognized as revenue upon shipment as opposed to installation:

> **Investment Summary**
>
> *We would be buyers of ARAY.  We believe the company's fundamentals remain strong and continue to be encouraged by an expanding backlog.*
>
> *       *       *
>
> •     ***Backlog and new orders were strong.  The company reported a strong uptake in backlog as it increased by $23MM from $619MM in FY4Q07 to $642MM in FY1Q08.  New orders in FY1Q08 totaled $71.6MM.***
>
> •     ***We believe that new order growth is an important metric to follow, and ARAY recorded an impressive 95% increase in new orders YoY albeit against an easy comparable (from $36.8MM in FY1Q07 to $71.6MM in FY1Q08).***
>
> •     ***The company's new order growth demonstrates the significant demand for the CyberKnife in the radiation oncology and surgical communities.***

Ex. 23; *see* also Ex. 24.

135.    On the same day, November 8, 2007, JPMorgan also issued a report titled "***More Questions than Answers in F1Q Results***."  The report noted investors would be concerned about the "soft install number" but repeated comments made by defendants and expressed that it was impressed with the Company's reported backlog growth.  JPMorgan increased its revenue projections for 2008, in light of management's revenue projection increase, including the expectation that reported backlog would continue to convert into revenue:

> **Revenue and earnings hit the mark, but light CK installs raise questions.**  F1Q results were generally positive, with revenues of $48.6mm, +48% (+11% q/q) exceeding our $44.3mm, +35%, proj. and the Street ($45.8mm), while GAAP EPS of

1
2
3
4
5
6

$0.04 met Consensus, but was a penny shy of our $0.05 proj.  While results were notable for both the q/q and y/y increase, ***investors are likely to gravitate around the soft install number (5 CK systems installed, all U.S., incl. 1 shared system), as the bulk of growth came from a combination of billed but-as-yet-uninstalled international systems (6 CKs placed, but awaiting validation)***, deferred revenues (*i.e.*, legacy contracts), service contracts ($7mm, +24% q/q), and a one-time boost to Other ($2.4mm), due to custom projects in Japan.  ***Needless to say, questions remain about the 6 "uninstalled yet billed" o-U.S. systems***, which management attributed to ***more flow through distributors***.  In terms of other metrics, backlog ($642mm, +$23mm q/q) was again impressive, while GMs at 53.3% (-560 bps y/y) were light, due lower margin international sales.

7       136.   On November 8, 2007, CIBC issued a report noting that the Company's sales

8   appeared to be declining sequentially, from 18 united in 3Q07 to 15 units in 4Q07.  CIBC also noted

9   the Company's reported backlog figures continued to grow without the Company providing a

10  detailed explanation of whether it was "new orders" that made up the growth.  Finally CIBC noted

11  that it was the first time that defendants disclosed the revenue recognition upon shipment to

12  international distributors:

13      **Fiscal 1Q Analysis; Weak Installs Calls FY08 Sales Guidance Into Question**

14                                    *       *       *

15      Accuray's total cumulative worldwide installed base is now 114 units, up from 109
16      last quarter and 82 in September 2006.  ***Only five units were installed in 1Q08,*** all in
        the U.S., ***but ARAY said that it recognized revenue for another six units outside the
17      U.S. that were sold through distributors*** who take responsibility for installing the
        units (these units are not yet installed).

18      Apparently half of Accuray's O-U.S. distributors have the capability to perform the
19      installation, which would allow the company to recognize revenue immediately upon
        shipping the unit (as opposed to the more customary revenue recognition upon
20      installation).  ***This may be perfectly legitimate, but we do point out that this is the
        first time we have come across this issue for ARAY (despite O-U.S. unit
        installations every prior quarter)***.

21
    Ex. 22.
22
        Thus, as reported by CIBC, this was indeed new information that further called into question
23
    the credibility of the Company's statement with regard to backlog, informational work and revenue
24
    recognition.
25
        137.   After the 1Q08 revenue and earnings report disclosing that international deals were
26
    being recognized up front and calling into question FY08 forecasts (although reiterated specifically
27
    by defendants), the Company's stock price declined from $19.02 on November 7, 2007 to $17.00 on
28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL                    - 73 -
                SECURITIES LAWS - 4:09-cv-03362-CW

November 9, 2007 on $1.7 million shares traded on November 9, 2007 (as compared to 823,000 shares on November 7, 2007). The stock price continued to decline to $15.30 by November 15, 2007.

<u>Confidential Witnesses Report Accuray Recognized Revenue on Warehoused International Shipments and Uninstalled Systems Including Chinese and Asian Customers</u>

138.   In addition to the November 7, 2007 disclosure that the Company was recognizing revenue on shipments to distributors, as opposed to on installation or delivery to the end user's site, as stated in the Registration statement, multiple CWs describe pressure to ship products at the close of a quarter, which provides further evidence that the Company was recognizing revenue on shipment to international distributors (which the Company ultimately admitted), not upon installation or delivery to the end-user as the Company represented in the Registration Statement and would later admit.

(a)    CW5, a former Director of Marketing and Placement,  reported hearing that during the Class Period as many as seven systems that were shipped to President International China that never cleared Chinese customs and ended up "in a warehouse" where s/he believes they remained at the end of 2009. CW5 believed the customer's purchase was "premature" because Accuray did not have authorization at that time to import systems into China and there were not any identified end-users for the systems;

(b)    CW7, a former Accuray Regulatory Affairs Compliance Associate, reported that Accuray sometimes shipped systems to its Asian customers or distributors, and recognized revenue well in advance of when those systems were actually installed at a customer's facility and these systems ended up "sitting" for upwards of eight months before they were actually installed. S/he knew that at least a couple systems had sat for "so long" at an Asian distributor's warehouse that when it was finally time for them to be installed, the systems required a software upgrade since the software that had been shipped with the systems had become outdated. CW10 also reported that Accuray shipped finished CyberKnife systems to warehouses far in advance of when the customer's site would be ready. S/he stated that this was particularly the case with international orders sold through distributors;

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1    (c)    CW6 reported that despite tremendous pressure to get systems shipped by

2 quarter-end, some systems ended up sitting in "the warehouse" for six months to a year from when

3 they had supposedly been shipped to the customer.   CW6 also reported that in the period

4 immediately *prior to Accuray's public offering*, there was a great deal of pressure to ship 13 to 14

5 systems to China. CW6 recalled going to the Company's warehouse in Milpitas approximately eight

6 months later and seeing two of the systems "sitting in the warehouse."   S/he recalled saying to

7 her/himself, "hey that's China," meaning s/he remembered they were the systems that were supposed

8 to have shipped to China months prior.   CW6 said s/he also saw systems intended for Japan in the

9 Milpitas warehouse long after they had supposedly been shipped to the customers from the

10 Sunnyvale facility.   CW6 stated that the Company recognized revenue on systems as soon as they

11 shipped from Accuray.   CW6 noted that systems for Asian customers were shipped by ocean vessel

12 and took two to three months crossing the Pacific Ocean;

13    (d)    CW15 oversaw all of Accuray's international contracts, which s/he reported

14 grew exponentially during the class period (from "13%" to "51%") and that the contracts would have

15 "terms" that were never met by the customers and only about "5%" of the potential customers

16 actually met the terms in the contract; and

17    (e)    CW15 reported that Accuray would ship CyberKnife(s) to distributors

18 internationally and then immediately recognize revenue on that sale.   CW15 reported that there were

19 issues with this practice, for instance, the distributors would accept the shipment(s) of the

20 CyberKnife at a cheaper rate and then simply store the product. *CW15 reported that around the*

21 *middle of 2008 through 2009, half of the CyberKnife(s) reported as revenue were in fact sitting in*

22 *distributor's warehouses, sometimes without an end-user*.   The problem CW15 had with this was

23 that the distributor was responsible for installation as part of the contract but was not capable of

24 actually installing the multi-million dollar piece of equipment. S/he added that the contract had

25 installation by Accuray as one of the standard terms.

26    (f)    CW15 described a suspicious deal with an international distributor – Chiyoda.

27 According to CW15, Chiyoda purchased seven systems and only two of them had end-users. CW15

28 questioned the paperwork provided by Chiyoda. Specifically, s/he said to her superiors, we have a

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1   purchase order on "8.5 x 11 paper that looks like something my daughter could have made." CW15

2   was concerned because the supposed documentation from Chiyoda looked falsified and the lack of

3   end-users. CW15 questioned the "legality" of the documentation but was overridden by Stanley Gee.

4   CW15 added that s/he does not believe that Accuray was provided the "required" documents and

5   should not have recognized that Chiyoda deals as revenue. CW15 added that the Chiyoda situation

6   was not unique and this was actually common at Accuray.

7        139.   In the Company's Form 10-K for the fiscal year 2010, filed on September 1, 2010,

8   defendants changed their reported revenue recognition practices for CyberKnife system sales

9   through international distributors.  This change now adds that it recognizes revenue to distributors

10   not just on shipment but shipment with evidence of sell through, mirrors the same allegations which

11   appeared in the CC, filed with this Court in December 2009, in which it was alleged that defendants

12   were in fact recognizing revenue on shipment, as opposed to delivery to the end-users' site.  The

13   2010 Form 10-K states:

14        Under our revenue recognition policy, we generally do not recognize revenue
           attributable to a CyberKnife system purchase until after installation has occurred, if
15         we are responsible for providing installation, or delivery.  **For international sales
           through distributors, we typically recognize revenue when the system is shipped
16         with evidence of sell through to the end user**.

17   Ex. 54 at 27.

18        140.   This change in reported revenue recognition procedures confirms the allegations that

19   the Company's Registration Statement, and subsequent SEC filings, were false and misleading as the

20   Company was recognizing revenue on shipment, not on delivery to the end user.

21        141.   <u>False and Misleading Statement</u>: On November 13, 2007, Accuray filed its Form

22   10-Q for 2Q08 for the period ended September 29, 2007 with the SEC and reiterated the Company's

23   financial results reported in Accuray's November 7, 2007 press release and conference call.  The

24   Form 10-Q also included language regarding the contingencies in deals contained in backlog:

25        Beginning with the quarter ended March 31, 2007, we revised our definition of
           backlog to consist of the sum of deferred revenue, future payments that our
26         customers are **contractually committed to make and signed contingent contracts
           that we believe have a substantially high probability of being booked as revenue
27         from** CyberKnife system purchase agreements, service plans and minimum payment
           requirements associated with our shared ownership programs. We adopted this new
28         definition of backlog in part because of the changes in our customer contracting

579521_1   FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
           SECURITIES LAWS - 4:09-cv-03362-CW                                                    - 76 -

1    process under which customers initially enter into a terms agreement setting forth the
2    business and economic terms for purchase or acquisition of a CyberKnife system and
     then have a specified time frame in which to negotiate legal terms.

3    ***Contingencies associated with contingent contracts that are included within
     backlog may include final negotiation and agreement upon our legal terms for the***
4    ***purchase or acquisition of the CyberKnife system, state or local government
     approval of a certificate of need for the installation of a radiosurgery system,***
5    ***approval by the board of directors of the hospital or other purchaser of the system
     and establishment of financing and legal entities by purchasers of systems.***

6
     ***We review, on a quarterly basis with respect to each contingent contract included***
7    ***in backlog, whether customer engagement and progress toward satisfaction of
     contingencies warrant continued inclusion of the contract within backlog***.  We
8    previously defined backlog as the sum of the deferred revenue and future payments
     that our customers are contractually committed to make, but which we have not yet
9    received.

10   Ex. 25 at 22-23.

11              (a)    Reasons Why the Statement Is False and Misleading and Defendants Knew It:

12   For all the reasons set forth above, defendants knew but failed to disclose the true facts concerning

13   the Company's backlog.   In particular, when defendants claimed to review contingencies to

14   determine whether or not they had been satisfied and whether the deals warrant continued inclusion

15   in the Company's reported backlog, they still failed to disclose that contingencies were self-

16   satisfying and that contracts for which no progress was made were still being included in backlog.

17   Defendants had no basis to claim that backlog contained "contractually committed" payments or that

18   the contracts had a "high probability" of converting to revenue, in truth backlog was bloated with

19   deals riddled with infirmities that were unlikely to ever result in revenue.

20   Accuray Announces 2Q08 Results – Misses Sales Revenue and Earnings Expectations, Removes
     $34 Million from Backlog and Reduces 2008 Forecast by Up to $60 Million – Stock Price
21   Collapses

22              142.   On January 30, 2008, Accuray issued a press release announcing its 2Q08 financial

23   results in a press release titled "Accuray Reports Continued Growth in Second Quarter of Fiscal

24   2008; Fourth Consecutive Quarter of Record Revenue and Backlog."   The Company reported

25   revenues of $52 million, well below Wall Street analyst expectations of $58 million.  The Company

26   also reported EPS of $0.04, as compared to Wall Street expectations of $0.09.  While reporting that

27   its backlog grew to $660 million, the Company reported the removal of roughly $34 million of

28   contracts  previously  included  in  backlog  and  reduced  its  FY08  revenue  forecast  by  up  to

1   $60 million.  The Company nevertheless continued to make false representations about its backlog,

2   including its quality, contents and likelihood of resulting in future revenues.  Finally, the Company

3   falsely stated that the reason for the withdrawal of millions from backlog was associated with the

4   tightening credit markets as opposed to the truth, *i.e.*, that backlog was full of deals with no real

5   likelihood of ever resulting in a system installation:

6       For the second quarter of fiscal 2008, Accuray reported total revenue of $52.0
        million, a 98 percent increase over second quarter fiscal 2007 total revenue of $26.3
7       million.

8       Net income for the quarter ended December 29, 2007 was $2.3 million, or $0.04 per
        diluted share, compared to a loss of $7.3 million, or a loss of $0.45 per share.

9                                   *        *        *

10
11      ***For the period ended December 29, 2007, backlog increased to approximately $660
        million, with approximately $365 million associated with CyberKnife(R) Robotic
        Radiosurgery System contracts***. . . .

12
13      ***Accuray's backlog is composed of firm, signed contracts that the company believes
        have a substantially high probability of being recognized as revenue***.

14                                  *        *        *

15      ***"While this was a positive quarter with respect to revenue and backlog growth***, . . ."

16      Based upon current economic conditions, specifically the tightening of credit markets
        in the United States, ***Accuray is adjusting revenue guidance for fiscal 2008 to be in
17      the range of $210 million to $230 million, which would represent revenue growth
        of 50 percent to 64 percent over fiscal 2007***.

18   Ex. 26.

19       143.    On the same day, the Company held a conference call to discuss the Company's 2Q08

20   results.  The call was hosted by defendants Thomson and McNamara.  Defendant Thomson falsely

21   blamed the United States credit market (as opposed to suspect sales practices or the calculation and

22   make-up of the backlog) for the reduction in FY08 forecasts: "[W]e believe the near-term tightening

23   of the credit markets in the United States has led us to modify our full year revenue guidance." Ex.

24   27 at 3.  Defendant McNamara also stated that "contracts most affected by the tightening economy

25   were removed" from backlog and that those "customers were generally those whose financing is

26   now delayed or in question." *Id.* at 6.  According to McNamara, approximately $30 million of

27   orders were removed from backlog and "[p]retty much" all of those backlog customers were United

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
     SECURITIES LAWS - 4:09-cv-03362-CW                                              - 78 -

States freestanding centers, the very same customers the Company previously reported were responsible for the big leap in new sales contracts and increases in reported backlog:

> As Bob will explain in a minute, **this increase in backlog also occurred at a time when the changing financial environment resulted in us removing several purchased contracts from backlog**.

> *                    *                    *

> **While we have continued to grow our revenue, net income and backlog, we now feel it's sensible to adjust our expectations for the remainder of the year.** At the start of this fiscal year, we stated revenue guidance of between $250 million and $270 million for fiscal year 2007. . . . **Today, however, we are adjusting the revenue guidance for FY 2008 to $210 million to $230 million**. . . .

> **The primary reason for this change is that those customers requiring credit to finance either their equipment purchase or the construction of their facility, are having greater than expected challenges. As a result, some of our U.S. customers who had committed to installation timetables have slowed their installation plans. This inevitably has affected our revenue forecast for the year.**

> *                    *                    *

> **This quarter we felt it sensible to remove a number of contracts [$34 million] from backlog in order to give our investors greater visibility into the potential effect of this market adjustment**.

*Id.* at 4-5.

144.    Analysts pressed the defendants for details on the contracts removed from backlog, in an attempt to determine how old these contracts were, who the customers were, whether they were cancelled or delayed and why defendants just learned of these issues on product which often takes more than a year to install. Defendants were defensive, evasive and gave conflicting answers. Defendants attributed the reduction to deals with United States free-standing centers. Defendants alternatively suggested that the cancelled deals already had bunkers built and were just delaying installation and that cancelled deals were actually deals with no chance of ever getting off the ground and never even obtained financing. Defendants suggested that some deals were so speculative that the customer didn't want to cancel or delay, but defendants no longer believed the sale was credible.

> [Thom Gunderson – Piper Jaffray – Analyst ("Gunderson"):] Is the assumption then that of the CyberKnifes that are in backlog six months ago, the ones that were in backlog, some of them had a contingency and the contingency was the ability to raise the money to pay for it?

> [Thomson:] **Yes, some of them**. But also there are other factors here. **We're not saying that everything that affected our guidance adjustment has come out of**

*backlog*.  What we are seeing in many cases is people are just taking longer to get their financing resolved.  ***So the net effect on the guidance is not just people canceling contracts, it is really about us assuming that they are not going to be install***.  It is really about doing a balanced overview of what we think will happen for the rest of the fiscal year.  And that simply includes people that have been telling us that their financing is on its way.  And when we look at it and we talk to them, we think, you know what?  It may be but we now don't think you're going to be able to complete your initial installation objective.

[Gunderson :] And help me understand why it's having such an impact on the short term, in the next six months, when as I understand you have to place an order, you have to put money down and then you've got to get your contractor to build the CyberKnife house for you; all of that takes time.  One would think that these adjustments to credit and pushing out would have more impact in the 12 and 18 month period rather than the next six months.

[McNamara:] Well, it does.  Although there are payments that are made upon installation.  So if a customer wants to push that payment out, it is very easy to push it out by pushing out the installation.

[Gunderson:] Okay, but they already have a bunker all set and ready to go but they don't want the installation?  Is that the way we should look at it?  In some cases, at least?

[McNamara:] In some cases, yes.  But if the installation is meant to take place six months from now but the bunk probably isn't ready.

\*        \*        \*

[Tycho Peterson – JPMorgan – Analyst:] Maybe starting off with just some of the credit issues you have talked about.  Have you guys shifted your sales strategy?  You talked a little bit more on focusing on accounts that had financing in place but how do we think about shared ownership?  Do you start to push the shared ownership potential customers more?  And then also to the extent you are changing your sales expectations in terms of costs for this year, that would be helpful.

[Thomson:] So, in terms of sales focus, as I said just now, I think our sales force was finding that there were real opportunities for linking up with people who had definite financial interest in building a medical program.  Those sales – let's go back 12 months where – I wouldn't say easy, but they were the ones which were presented to them as opportunities.  And they were very positive passed to completed contract.  And I think that became a very – for one of our market segments, at least, for certain regions of the country, that became a particular focus for them.  And I think as naturally as things have tightened up in those areas, then they have naturally moved away toward the ones which are not requiring credit, so it has been kind of a natural evolution.  And as we've really become more aware of the situation over the last few months, we've really done some serious hard looking at both our backlog and at our future sales pipeline.

The effect on backlog is the one we've described.  We felt it sensible to make those adjustments just to a greater level of uncertainty.  In the sales pipeline, I think the changes had already taken place.  People were already focusing as we look forward to our forecast for the next couple of quarters, hardly any of those types of deals were really amongst the mix of customers that they were bringing to our attention.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

1                                              *        *        *

2    [Junaid Husain – *Soleil Securities – Analyst* ("Husain"):] I'm sorry if I missed this –
     how many instruments did you take out of backlog? I think you said you pulled less
3    than $40 million in contract value? (multiple speakers)

4    [McNamara:] We didn't actually identify the number of contracts. But if you do the
     math, it comes out to kind of net-net about $30 million.
5
     [Husain:] Got you. And then, are all of these U.S. freestanding centers then?
6
     [McNamara:] Yes.
7
     [Thomson:] Pretty much, yes.
8
     [McNamara:] The majority certainly.
9
     [Thomson:] That's not an exact write-down, but yes, and that's the impact within the
10   U.S. And those are the ones we examined hard and those are the ones we decided
     should be taken out.
11
     [Husain:] *And I am assuming that these are recently placed systems, so centers that*
12   *perhaps haven't started building out their room. Is that actually how we should be*
     *thinking about this*?
13
     [Thomson:] *The ones that would have to been removed would tended to have been*
14   *in the early stages, because they're still in the financing phase. But there are*
     *others as we mentioned which are just delaying. So there are kind of two effects*
15   *going on*.

16                                             *        *        *

17   [Husain:] Okay. And then with regards to the tightening of the credit markets, I
     guess I'm trying to understand what has changed from the fiscal first quarter to the
18   fiscal second quarter. I guess the tightening of the credit markets is more or less well
     known. So what has really changed with your customers? Was it that after you
19   issued guidance in the first quarter, you went back to your customers and did a more
     rigorous statistical analysis of what could convert to recognized revenue? And did
20   you just see as these customers were getting closer to purchasing, their creditors were
     playing hardball? I'm just trying to understand what went on in the interim between
21   quarters (multiple speakers) – ?

22   [McNamara:] Well, yes, sure. I think it's more of a – now there is very much of a
     public recognition of the very, very tight credit markets. And before, yes, sure, of
23   course there were hints of it, but as we sort of approached our customers and our
     customers were still very optimistic, and so we said, okay, well.
24
     And then as we pursued a little more detail, a little more information, it just became
25   clear that, in fact, they were going to be affected by the tight market. So over the
     late, late in the quarter and over the last few weeks, it's just become much clearer,
26   both sort of privately and publicly that the credit markets aren't necessarily available
     to everybody.
27
                                               *        *        *
28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
         SECURITIES LAWS - 4:09-cv-03362-CW

[Hazan:] I guess first of all, just to be very clear on the guidance, is there anything in the new guidance, in the reduction of guidance that comes from the write off of new orders that you – the $30 million or $34 million or so that you were writing off? Or is it all – is the reduction all tied to the delays?

[McNamara:] Well, I think it is a combination. If you look at some of the systems that were in our backlog that we thought they would be able to install by June 30, clearly the credit markets have affected that because they can push out that installation. Now, they might not go away, but they've gone away for this fiscal year. So, to the extent that they are pushing out their installation, or we believe that their installation is going to be pushed out, that does affect our outlook.

And then the backlog, it's really looked at almost – well, as a separate entity looking at each of the contracts. Not so much as a key that they are going to be installed, because that's a different process, but just looking at each of the contracts and saying okay, should this, will this turn into revenue? *So if a contract is pushing out their installation, they would probably still – well, they would – still be in backlog. But if we felt that their financing was at risk in its entirety, then in fact we would take them out of backlog. So it isn't a – I mean, they're related but at the same time they're somewhat separate*.

[Hazan:] But what is your specific criteria for deciding if to take a unit out or to delay a unit?

[McNamara:] Well, to delay a unit is simply to talk to the customer and decide whether or not they are going to be ready for installation. And so that's pretty straightforward. *To take a unit out, that's our decision – that doesn't – I mean, it involves the customer but that's not the customer's decision, per se*.

[Hazan:] *So you're taking unit out that the customer hasn't told you that they don't want the order yet*?

[McNamara:] *In some cases, correct*.

                    *        *        *

[Hazan:] Okay. So I mean, this obviously begs the question of how we get any kind of confidence in your backlog? So I'm trying – if you can give us some clarity on maybe how much of your backlog is related to freestanding clinics? Or how much of your backlog is related to contingent contracts? Just so we get an idea of what your backlog really is. Because how do you give us or investors confidence that this won't happen again?

[Thomson:] Well, I think you can gain confidence in the fact we've done this. I mean, we're demonstrating that we don't have soft orders or anything that turns soft. We don't leave it in backlog. So if you didn't see us doing this, then you should be worried. And I think that (multiple speakers) –

[Hazan:] With all due respect, you did this a couple of months ago and you didn't find these. So this is happening in real time.

[Thomson:] I think if you look at the – again, the competitive companies in the industry, I mean they, for the most part, do remove orders from backlog when either customers cancel or they judge them not to be moving ahead. So I don't think

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

there's anything unique in this.  We can point to some pretty big players in the field who do exactly the same thing.

I think under these circumstances when we saw people pushing their installation dates, it was a good policy for us to go in and really look in detail at that particular category of customer.  And to weed out ones that we just didn't feel confident enough in sitting here today telling the Street that these were customers that we felt highly confident we're going to move ahead with the installation process.

We've always done it.  We've given it particular focus this quarter for that particular market segment.  And we will continue to do that.  Which means that as you look at our new contract value every quarter and you look at our backlog value every quarter, you should feel very confident that we've been through this process and it's a solid one.

*       *       *

[Hazan:] Okay.  Just moving to, I guess, new orders.  Even if we assume your $100 million in new orders, that's flat year-over-year, and if we think about the $40 million you just removed and with some of your comments, get a sense that that $40 million in backlog that you just removed was new orders over the last six months or so, I've got two out of the last three quarters that were flat in terms of new orders.  I've got $40 million that are coming out of new orders.  I'm not seeing much growth here at all, but you're painting a picture as if there's some robust growth going on in terms of interest in your product.  What am I missing?

*Id.*

145.    On January 30, 2008, Oppenheimer issued a report titled "From Bad to Worse; Lowering PT and Reiterate Underperform" and report called Accuray "the most unnecessarily complicated one product company in our sector."  The report discussed the Company's revenue and earnings miss, the FY08 $60 million forecast reduction, sales and revenue recorded on shipment to distributors in China and the slash to the Company's reported backlog and that another $34 million of backlog had been removed:

> ***ARAY has just put up what we consider the weakest, most confusing and most concerning quarterly results since its IPO one year ago.  Both revenue and EPS missed consensus, and FY08 guidance was lowered materially.  But our biggest concerns came from backlog (which was revised lower*** . . . .
>
> • ***A New Issue Emerges.  ARAY now says the credit markets are hurting their customers' ability to get financing, which has delayed some installations and also eliminated about 7-10 contracts that were in their backlog.  We checked with ARAY's competitors last night and no one seems to be having the same issue***.
>
> *       *       *
>
> • ***Sales and EPS Missed by a Long Shot.  Sales of $52.0M missed both our $54.5M estimate and Street's $58.2M.***  Revenue generating installs (18)

were again an issue with at least 4 legacy units (no cash flow impact) and as many as 8 units going to OUS distributors (not yet installed). ***EPS of $0.04 also missed us at $0.07 and Street at $0.09***. . . .

- FY08 sales guidance was decreased from $250M-$270M to $210M-$230M, far below the Street's $264.8M and our $257.3M estimates.

\*     \*     \*

- Backlog increased to approximately $660 million (net of the $34 million adjustment). . . . ***We now find this metric to be more materially tainted than before, and following a rather elusive Q&A, we have three main points of concern regarding the rationale behind this reduction***: 1) We still have no idea how much backlog is comprised of "contingent" orders (see below); 2) we do not know how much backlog is tied to U.S. free-standing clinics, which were identified by management to have the highest credit risk among their customers; and 3) we spoke with two ARAY competitors last night, and neither one has faced this issue.

Ex. 28.

146.  In addition, the January 30, 2008 Oppenheimer report disclosed that the Company's sales to China through distributors were: (i) being recognized as revenue upon shipment to the distributor as opposed to shipment to the end-user or shipment to the end-user by the distributor, as the Company had indicated in its Registration Statement and (ii) the shipments to distributors was potentially a partner of Accuray engaged in a joint venture and with a vested interest in the Company's reported financial results, as opposed to arms-length distributors or hospitals with a real current need for the CyberKnife.  Analysts also noted that none of Accuray's competitors had mentioned anything about tightening credit markets or financing issues:

> ***All six O-U.S. installations were units sold through a distributor into China and already recognized as revenue last quarter.  Separately, the company indicated that there were 18 "revenue-generating" units impacting sales in 2Q, with 10 units in the U.S., one in Europe, and seven in Asia.  Based on our analysis of this data, we determine that only six installed units were recognized as revenue in the quarter. The remainder of the "revenue-generating" units were comprised of four Legacy units in the U.S., one distributor sale in Europe, and another seven units sold through its distributor into China.  Based on our checks, we have identified this distributor as potentially being "Signum US Healthcare, Inc.", a portfolio company of a U.S. private equity firm, Tivis Healthcare, LLC.  Signum is currently involved in a joint venture to develop CyberKnife projects with Accuray.  It is very hard for us to gauge the seriousness with which we should take these unit orders into China.***

\*     \*     \*

> ***For fiscal 2008, ARAY reduced its revenue guidance to $210 million to $230 million, considerably lower than its prior guidance of $250 million to $270 million***

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- 84 -

*and Street expectation of $265 million. . . . Roughly $34 million in backlog (~7-10 units) were taken out due to anticipated financing risk and/or installation push-back from certain customers, particularly free-standing customers with "questionable" credit worthiness. The company provided little granularity and congruency as far as the methodology by which it determined the backlog reduction.*

*Again, this raises additional concern for us as based on our discussions with ARAY's competitors, we have not found such credit/financing issues to be a problem at all. . . . Net/net, this downward adjustment of backlog truly calls into question the reliability of ARAY's backlog on a go-forward basis, and thus into sales and EPS expectations.*

Ex. 28.

147.    Analysts correctly questioned the seriousness of the seven units sold through a distributor in China. After announcing the fifth CyberKnife install in China on November 27, 2007, was not installed another CyberKnife in the country until April 2009. And, no evidence exists that Signum US Healthcare ("Signum") ever installed a CyberKnife in China. Signum's website continues to state that its ventures in China are "under development." Also undisclosed by Accuray, on September 5, 2008, China's Ministry of Health punished four hospitals in China for regulatory violations in connection with their improper acquisitions of CyberKnifes and suspend their use.

148.    On January 31, 2008, a *Bloomberg* article titled "Accuray Plunges as Forecast Misses Expectations" stated, in pertinent part, as follows:

Accuray Inc., maker of the CyberKnife system for radiation surgery, *lost a third of its value in Nasdaq composite trading after the company forecast lower fiscal 2008 sales than analysts expected.*

*The shares dropped $5.44, or 36 percent, to $9.54 – the most ever and the second-biggest percentage loss in U.S. trading.*

Ex. 31.

149.    On January 31, 2008, JPMorgan issued a report titled "Backlog Issues Surface Again; Lowering Estimates." The JPMorgan report discussed the Company's revenue and earnings miss and backlog reduction making a specific note of the fact that the Company had reiterated (falsely) its FY08 revenue forecasts as late as November 2007. Finally, the JPMorgan report noted that the revenue forecast reductions were directly tied to the risky adoption of lenient backlog standards. Of course, the Company had previously and fraudulently tried the increase in reported backlog to "excellent" forward looking visibility into the Company's revenue and earnings forecasts:

**Backlog Issues Surface Again; Lowering Estimates**

*With disappointing F2Q results, lowered guidance (which is down 15% at the midpoint), and generally low visibility, shares are likely to once again come under pressure tomorrow, in what has become an all too familiar pattern. In explaining the lowered fiscal 2008 expectations, management cited a tightening U.S. credit market, which is driving purchase and installation delays, and accordingly, the company has now removed ~$30mm (7-8 systems) from backlog, and $40mm from guidance*. . . .

**Revenue and EPS both miss.** *F2Q revs of $52.0mm came in below both our $54.9mm proj. and the Street ($58.2mm), with the shortfall due primarily to lower than expected CyberKnife installs*.

\*       \*       \*

**Top-line guidance reduced by $40M – lowering est.** *After reiterating revenue guidance in F1Q (on 11/8), management significantly reduced the 2008 outlook* . . . . *Specifically, ARAY lowered the FY08 outlook from $250-270mm to $210-230mm*.

\*       \*       \*

**Bracing for another sell-off**

As we have stated in prior notes, *installation and revenue visibility have been chief concerns since Accuray first re-stated backlog in F3Q07 (May 2007) to include contracts with contingencies.* While we have previously given the company some benefit of the doubt with regards to projections, the disappointing F2Q results, and accompanying reduction to guidance, *clearly show the risks in adopting more lenient backlog standards*.

Ex. 29.

150.   On January 31, 2008, even Jefferies, the Company's underwriter which had previously been bullish on the reported backlog figures and cheered the Company's FY08 outlook, issued a negative report regarding the disappointing results:

**Event**

ARAY reported FY2Q revenue and GAAP EPS of $52.0MM and $0.04 vs. FC consensus of $58.2MM and $0.09.  The company reduced FY08 guidance from $250MM-$270MM by $40MM to $210MM-$230MM and eliminated $30MM from its backlog.

**Key Points**

- *FY1Q08 results were light. Accuray reported disappointing FY2Q revenue of $52.0MM, lower than our estimate of $63.2MM, and GAAP EPS of $0.04 versus our estimate of $0.13.  FC Consensus was $58.2MM and $0.09.*

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- **Backlog expanded despite a $30MM reduction.** The company reported an increase in backlog of $18.0MM from $642.0MM in FY1Q07 to $660.0MM in FY2Q08. Management reported that new orders in FY2Q08 exceeded $100.0MM as 22 CyberKnife systems were ordered in the quarter. Management noted that in FY2Q free standing radiation oncology centers who had placed orders began to experience changes in their ability to finance (due to adverse changes in the credit market). ***ARAY was no longer 90%-plus certain that these LOIs or contracts would lead to installations and therefore made a ~30MM reduction in contingent backlog due to these financing issues***.

- ***Backlog adjustments need to be monitored.*** Management reduced its backlog by ~5% to $660MM eliminating some of the contingent backlog associated with free standing centers. Despite this reduction, we would highlight that the backlog number is still impressive.

\*   \*   \*

***Backlog reduction is concerning. We believe that ARAY's $30MM reduction in backlog will be an issue for investors, as it does not provide confidence that another reduction will not occur in future quarters (especially with recessionary trends continuing). We have not been aware of other players in the radiation oncology industry*** (*i.e.* Varian (VAR, $53.04, Hold) and TomoTherapy (TOMO, $13.85, NC)) ***experiencing the same issues with customers losing financing options and limiting their ability to fund a $3MM-$4MM purchase. We believe this disconnect comes from ARAY's inclusion of contingent backlog in their total backlog number***. . . . We are encouraged that ARAY is moderating its contingent backlog and providing a better backlog number for investors, ***but we are concerned that backlog reductions could occur again***.

\*   \*   \*

***Cutback in revenue guidance is disappointing. Management reduced FY08 top-line guidance by $40MM, from $250MM-$270MM to $230MM-$210MM, due to the financing issues experienced by free standing centers and the realization that some installations will be pushed out into 2HCY08***.

\*   \*   \*

**Revising estimates.** We are lowering our FY08 revenue estimate from $273.7MM to $230.0MM and reducing our FY08 F/T Cash EPS estimate from $0.81 to $0.53. We are reducing our CY08 revenue estimate from $310.2MM to $$287.0MM and also reducing our CY08 F/T Cash EPS estimate from $1.10 to $0.75.

Ex. 30.

151.     In response to the January 30, 2008 disclosures, and the analyst reports following, that Accuray's profit and revenue had badly missed forecasted financial results, that millions of dollars of customer orders were again removed from backlog and the $60 million reduction of forward revenue forecasts, Accuray shares plummeted from a close of $14.98 per share on

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1   January 30, 2008 to a close of $9.52 per share (a decline of more than 36%), on more than 10 million

2   shares traded.

3   <u>Backlog of CyberKnife Systems Was the Core of accuray's Business and the Single Most Important
    Metric to the Company; It Is Absurd to Suggest Defendants Were Unaware of Its Contents</u>

4

5   152.   Plaintiffs incorporate by reference, the reports of Confidential Witnesses above.

6   Furthermore, in light of the statements and admissions of the defendants, the reports of former

7   employee CWs, contemporary analyst reports and various post Class-Period developments, it is

8   beyond "absurd" to suggest that defendants were unaware of the quality, language of contracts and

9   overall content of all deals in reported contents of backlog.  Defendants bragged to investors that

10  backlog was the single most important metric to the Company and thus investors, for purposes of

11  measuring the Company's current, historical and future performance.  Publicly, it is the figure they

    told investors and analysts to focus on.

12

13  153.   Each CyberKnife System sale of shared ownership agreement was material to the

14  Company.  Accuray is a one product, low volume company; it sells only the CyberKnife System and

15  its attendant service packages and upgrades.  Each system costs in excess of $4 million; it also

16  requires a radiation shielded bunker (up to $2 million) and various permits from local and state

17  government.  The CyberKnife typically takes 12-24 months to sell and install, though CWs report

18  that some systems took up to three years.[13]  Installations in an given quarter were typically in the

19  single-digits, for instance in the quarter immediately prior to the Class Period, the Company installed

20  just eight units.  Though the Company had been in business for 15 years, in the Registration

21  Statement, the Company stated that there were ***just 83 systems installed worldwide***.  Ex. 1.

22  154.   Defendants' purportedly recognized revenue only upon installation (or in upon

23  international delivery to the end-users' site), because installation could be years out.  Thus,

24  defendants trumpeted backlog as the key indicator of the Company's ***present*** condition and the

    market's current appetite for the device.

25

26

27  [13] Defendants did falsely claim during the Class Period that deals would convert in as little as six
    months time.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
    SECURITIES LAWS - 4:09-cv-03362-CW

155.     Defendants told investors that revenue was derived out of backlog; backlog was the best indicator of the Company's success; backlog was the best metric for measuring the Company's performance and backlog could be used to measure the Company both on a historical basis and going forward:

- During the May 1, 2007 conference call Thomson stated: "As the prevalence of these new term agreements have grown, it's become more appropriate and indicative of the state of our business to disclose total backlog."

- McNamara stated: "*We believe that our current definition of backlog is a more meaningful metric for Accuray as an indicator of future revenue*."

- Thomson: "*The majority of revenue is shipped from backlog. Simultaneously, new contracts generated by sales activities add to backlog*."

- McNamara: "*[T]he dollars associated with backlog we feel is a pretty good metric in terms of what the revenues might be going forward*."

- During the August 16, 2007 conference call McNamara stated: "**[B]acklog, which is the key indicator of future revenue**, reached the record level of $619 million at the end of the fourth quarter, growing 187 million during the fiscal year . . .

- "[Backlog] **can be used to analyze both historical activity and further activity.** Historically, the change in backlog, combined with the revenue recognized, can be used to determine the approximate economic contract value created over the past year.

- "*Accuray's backlog provides excellent visibility into future revenues, again, since nearly all revenue* comes out of the backlog number."

- On the November 7, 2007 conference call: "We also grew our backlog to $642 million, one of the highest levels in the industry . . . *Once again achieving another quarter of record backlog and record revenue in the same quarter demonstrates a continued success of our sales staff with a very good indication of even more growth to come*. A point of note is that this is the third consecutive quarter that we have grown both revenue and backlog to record levels...**Our business model generates significant backlog, currently at $642 million which provides forward visibility into our revenue stream**."

- McNamara: "*As we do each quarter, demonstrate how new contract value generated can be estimated by comparing beginning backlog less revenue to the ending backlog balance and dividing that by $4 million*."

- "*This year-over-year increase [in backlog] demonstrates the effectiveness of Accuray's growing sales force which has expanded over the past 12 months*."

- Thomson: "Well, I think you can gain confidence in the fact we've done this [*i.e.*, reduced backlog]. I mean, we're demonstrating that we don't have soft orders or anything that turns soft. We don't leave it in backlog. So if you didn't see us doing this, then you should be worried."

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- Thomson: "*We've always done it [i.e. reviewed backlog].  We've given it particular focus this quarter for that particular market segment.  And we will continue to do that.  Which means that as you look at our new contract value every quarter and you look at our backlog value every quarter, you should feel very confident that we've been through this process and it's a solid one*."

- April 29, 2008: "*Aside from revenue coming out of backlog*, the sequential decrease of $58 million is a net result of cancellations of existing contracts of approximately $54 million, combined with unfavorable contract movements out of backlog based on our specific assessment."

156. Defendants told investors that they reviewed backlog every quarter, they were "conservative" in their projections and it was thoroughly "scrubbed."

- **On the November 7, 2007 conference call, Thomson stated:**  "*We go through customer by customer on a regular basis* looking at where they are with their install time and where they are with construction programs that will allow us to install and we keep those very tight metrics.  So, this quarter is pretty much as we planned, it maybe a little bit ahead of where we were from a revenue standpoint and I think its given us the confidence as Bob said just now to mention this year's outlook as well."

- In the Company's 2Q08 Form 10-Q, it stated: "*We review, on a quarterly basis with respect to each contingent contract included in the backlog, whether customer engagement and progress towards satisfaction of the contingencies warrants continued inclusion of the contract within the backlog*."

- Accuray's conference call on January 30, 2008, following its announcement of both record backlog and the removal of $34 million in unidentified contracts from backlog; Thomson: "*We have always stated that we review backlog on a quarterly basis and only include those contracts that we feel confident will lead to future revenue*."

- "We haven't always been given credit for this.  So we actually have *I think a very conservative approach to backlog* and what you're seeing this quarter is a result of that. . . . And we only want to include those when you tell investors about backlog, we want to include the ones which we believe have a high degree of confidence will roll out in the way that we expect contracts to roll out."

- During an April 29, 2008 earnings conference call: "[W]e once again removed certain contracts [from] backlog to ensure that we continue to give investors an accurate picture of business trends."

- McNamara stated: "*And when we do that, we look at each contract and we say, Okay.  What is the demonstrated progress towards contingency resolution, and what milestones have they achieved? So we really scraped this*."

- *We've also carefully examined our backlog each quarter and have removed any contracts that no longer meet our criteria for inclusion*."

157. Analysts, at defendants direction, uniformly looked to the backlog number reported by Accuray as a way to measure the Company's success.  Analysts reviewed statements made by the Company in press releases and explanations of the changes in backlog by its officers during

conference calls in forming their own impressions about the Company's outlook.  It is clear from the analyst reports issued during the Class Period that analysts viewed Accuray's backlog number as one which reflected, more than any other metric, the Company's success in marketing and selling the CyberKnife system and as direct connection to anticipated revenue:

- "Strong backlog should provide visibility on future revenues.  As with other capital equipment companies, order backlog remains an important quarterly tracking metric.  Ex. 4.

- "[B]acklog was a major focal point of management commentary due to investor concern over the sequential decline in backlog reported in the December quarter (F2Q)."  Ex. 7.

- "Backlog was strong . . . the company believes that this new backlog recognition policy will give investors improved visibility into future revenue projections."

- "Total backlog will include contingent backlog when management deems that the contingent contact has a high probability of being realized and generating revenue.  We believe that this new backlog number will give a more reliable picture of the company's progress in booking new orders."  Ex. 8.

- "Backlog and new orders were strong. . . .  The Company's new order growth supports our thesis that demand for CyberKnife system is strong and growing."  Ex. 15.

- When defendant Hampton reported to analysts his belief that backlog would eventually expand to **over $1 billion**, analysts were there to report that claim.  On October 5, 2007, Jeffries analyst gave Accuray a "buy" recommendation and stated his belief that the Company's shares were poised to rise based on revenue growth, on expanding backlog and accelerating installations.  Ex. 19.

- On November 8, 2007, Jeffries issued a report titled "Confusion over Unit Placements was Resolved – FY 08 Results Were Solid."  In this report, the analyst continued to focus on backlog:  "Backlog and new orders were strong. . . .  We believe new order growth is an important metric to follow."  Ex. 23.

158.    Further evidence supports the application of the core inference principal in holding that it would be absurd to suggest that defendants were unaware of the contents of backlog: (a) executed contracts with customers bear the defendants' signatures; (b) defendants reported that new contracts generated went into backlog; (c) they redefined backlog during the Class Period, resulting in a massive backlog increase on May 1, 2007; (d) defendants told investors they regularly monitored backlog and reviewed each contract; and (e) defendants were the final arbiters of what contracts went into backlog.

<u>Defendants Continue to Misrepresent Backlog but Disclose Serial and Significant Backlog</u>
<u>Reductions</u>

159.    On April 29, 2008, Accuray announced its 3Q08 financial results for the period ended March 29, 2008 in a press release titled "Accuray Reports Record Revenue in Third Quarter of Fiscal 2008; Fourth Consecutive Quarter of Profitability":

> For the nine months ended March 29, 2008, total revenue was $159.4 million, a 65 percent increase over the $96.5 million in total revenue during the same period last year.  Net income for the first nine months of fiscal 2008 was $5.2 million, or $0.09 per diluted share, compared to a loss of $6.1 million, or a loss of $0.26 per share, for the first nine months of fiscal 2007.

Ex. 32.

160.    That same day, Accuray held a conference call with investors and analysts and reiterated the Company's financial results and disclosed that Accuray eliminated an additional ***$54 million in cancelled orders from backlog***.  By comparison, system sales for 3Q08 were only $40.7 million; at approximately $4 million per system, $54 million removed from backlog represented 13-14 contracts which were purportedly firm and had a "high probability" of converting to revenues.  The Company conceded that it had apparently been focusing – too heavily – on free-standing centers (discussed by CWs above) as opposed to hospitals to sell its CyberKnife and had in the last quarter removed some of them from backlog because the Company had less confidence that they would turn into installation.

> During this fiscal year, proposed regulatory changes in the general economy and credit environment have placed more pressure on the business plans at these free-standing centers.  As a consequence, we have experienced some slow-down in planned revenue from this market segment.

> Last quarter, ***we reported that some orders had been canceled and that we had removed others from backlog simply because we now have less confidence that certain customers would take delivery of a CyberKnife system in a timely manner***.

> ***To reiterate, this change in the environment predominately impacted one segment of our U.S. market.***  There has been no ***significant impact on our hospital-based customers in the U.S. or in our international business***.

*See* Ex. 33 at 4.

161.    <u>False and Misleading Statement and Partial Disclosure</u>:  During the same call, on April 29, 2008, the Company stated that its sales force, was focusing on hospital-based customers as opposed to focusing on free-standing customers.  In addition, the Company boasted of growth in its

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- 92 -

international business citing to six new orders.  However, the Company failed to disclose that it did not receive deposits for the international orders – in stark contrast to what it told investors beginning with the IPO – "*We typically receive a deposit at the time the CyberKnife system purchase contract is executed*."  *See* Ex. 1 at 42.  Further, the Company particularly noted that its backlog definition had remained the same but it was removing some contracts in order to give investors an "accurate picture of business trends."   Nevertheless, backlog had increased year over year but declined sequentially from 2Q08:

> *U.S. sales force is now focused predominately on hospital-based customers and on customers who are less impacted by the regulatory and economic challenges*. . . .
>
> *Looking outside of the U.S., I'm pleased to report that six of the 16 orders received during Q3 were from international customers.  This represents continued growth in our international business*. . . .
>
> *Again, the issues I've just described regarding free-standing centers do not apply internationally since a vast majority of CyberKnife sales made outside of the U.S. are to hospitals*.
>
> In peril to new order generation, we did continue to reevaluate our backlog in the ways I've just described. *As a result, we once again removed certain contracts and backlog to ensure that we continue to give investors an accurate picture of business trends*. . . .
>
> However, in summary, we generated substantial new backlog, *but also removed certain pre-list included contracts from backlog as a result of some cancellations and some unfavorable changes in our perspective of the likelihood of revenue resulting from the contracts*.
>
> \*       \*       \*
>
> *Accuray has taken the appropriate steps to refocus its sales strategy and sales activity.  Our sales pipeline is strong, and sales performance in Q3 was solid.  Of particular note is the continued growth of our international business*.
>
> \*       \*       \*
>
> *Let me start by saying that our definition of backlog has remained the same and that backlog includes signed contracts that the company believes have a high probability of being recognized as revenue in the future*.
>
> \*       \*       \*
>
> *Backlog at the end of the third quarter of fiscal 2008 was $602 million, up from the same period last year, but down sequentially from the previous quarter's balance of $660 million*.
>
> *Aside from revenue coming out of backlog, the sequential decrease of $58 million is a net result of cancellations of existing contracts of approximately $54 million,*

*combined with unfavorable contract movements out of backlog based on our specific assessment.*

\*     \*     \*

Of the ending total backlog of $602 million, approximately 64%, or $386 million, is non-contingent backlog, in that the contingencies to which the contracts are subject have been satisfied. This reflects an increase of $14 million over the last quarter and represents a movement of $86 million from contingent to non-contingent during the quarter.

*The remaining 36%, or $216 million, of backlog is contingent backlog which may include standard contingencies such as board approval or certificates of need. Of this contingent segment, about two-thirds represents hospitals and roughly one-third consists of contracts that are associated with entrepreneurial free-standing sites which includes physicians or physician groups that are embarking on their first equity venture without an existing hospital relationship.*

*It is also important to note that not all contracts signed this quarter are included in backlog.* Every order that is received is reviewed to assess the magnitude of the contingencies and, if they are deemed significant, then the order is excluded from the ending backlog.

Ex. 33 at 4, 6, 8-9.

162. During the question and answer session, the Company reiterated false and misleading statements concerning its backlog:

[Junald Husain – Soleil Securities – Analyst:] *Relative to the $54 million of contracts that you removed from backlog, when you guys described your backlog assumptions back in the fiscal second quarter, I guess the question becomes why didn't you remove this $54 million of contracts back then* . . . ?

[McNamara:] **Accuray Incorporated SVP, CEO** Well, first of all, let me just say the cancellations occurred for several reasons, mostly due to the concerns around the *uncertainty relating to regulatory changes, underwriting arrangements with hospitals*.

\*     \*     \*

[Eric Schneider – UBS – Analyst:] So, on the backlog, first, thank you very much for providing more information because I think that's going to be helpful for us and for investors.

Are you going to restate or provide the details going back farther given how long the window is from order to install? . . .

[McNamara:] [T]he way to think about this – because *I think what you're really asking what's the risk profile of this backlog? And the way to think about it is the non-contingent, very, very low, low risk* . . . .

*If you focus on the contingent piece, you know that we've actually pulled out a lot of the contracts out of here based on this quarter's assessment. And when we do that, we look at each contract and we say, "Okay. What is the demonstrated*

*progress towards contingency resolution, and what milestones have they achieved?"  So, we've really scraped this.*

[Thomson:] [W]e have such a low fall-out rate from our non-contingent backlog that it really should reinforce your ability to build the model.

[Eric Schneider – *UBS* – *Analyst*:] And on the new orders, do those almost all go into the contingent bucket of that backlog?  When we calculate the changes second to third quarter and look at the new orders, it looks like about $69 million of those $77 million of new orders is now in the contingent bucket of backlog.  Is that right, or did I mess up the math?

*          *          *

[Thomson:] ***And it's rare, I would say, for the dollar value of orders to go straight into non-contingent backlog.  The exception to that, I think, would be international orders where we, I think – what number was it – five systems from international customers that went straight into non-contingent this quarter.***

*Id.* at 15, 18-19.

163.    On April 29, 2008, Oppenheimer issued a report titled "Stuff Happens' Again in Q3; Reiterate Underperform."  The report described the Company's $54 million in cancelled contracts as yet another sign of Company-specific problems at Accuray, and the Company's attempt to obscure order figures for the quarter.  The report describes backlog as "largely irrelevant" and told investors to expect more bad news.

**Summary**: 3Q was another absolute mess, with another (more significant) ***backlog revision, the lowest level of new orders in six quarters (down 35% y/y), and another weak unit installation number*** (only 8 installs) that has us scratching our heads wondering why the rate of unit installs has been so dismal.  Add to that a steadily declining gross margin (EPS est were missed again) and there is ***plenty of reason to believe more downside to this stock is coming***. . . .

•    **Backlog is Vanishing into Thin Air.**  *ARAY blamed regulatory uncertainty and customer financing difficulties at free standing clinics for another revision to backlog, which eliminated $54M in contracts.  For those keeping score, that's $88M in backlog revisions in just the past two quarters.*  We now estimate LTM new orders (less this $88M) are down over 30% y/y.  ***Simply put, we think the business is in trouble.  Mgmt now says 64% of backlog is non-contingent orders, but we view this backlog as largely irrelevant at this point, and expect more revisions to come***.

•    **Weak Orders Hidden by More Complication.**  ARAY said it posted WW system orders of $76.6M (16 systems), but now makes *a new claim that "not all of these orders went into reported backlog*."

*          *          *

**New Orders Lose Even More Value**

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

Management said that there were $76.6 million in new orders in the quarter (-5% y/y), which comes out to 16 units, six of which were international. However, there was a new twist to this number - as management now says that *not all new orders they are reporting will go into "reported" backlog. This is not only new, but notably disturbing considering the continued revision of orders that actually made it into backlog and increasing confusion surrounding this topic*.

Ex. 34.

164.     After the 3Q08 financial report and conference calls, Accuray stock price declined from $8.09 to $7.83 on April 29, 2008 and increased to $8.56 on May 1, 2008. By May 5, 2008 and for the remainder of May, the Company's stock price traded well above $9.00 per share.

<u>Accuray Announces Revenue and Earnings Miss of Wall Street Estimates Again, Removes Another $39 Million in Backlog</u>

165.     On August 19, 2008, the Company issued its 4Q08 financial results in a press release. The Company's financial results missed Wall Street revenue and earnings expectations. Nevertheless, the Company boasted of a backlog increase also indicating that now its non contingent backlog consisted of 71% of all backlog and that all of the contingencies associated with that non-contingent backlog had been satisfied:

**28 New Contracts Valued at $115.5 Million Signed in Fourth Quarter**

Accuray Incorporated, a global leader in the field of radiosurgery, announced today financial results for the fourth quarter and fiscal year ended June 28, 2008.

For the fourth quarter of fiscal 2008, Accuray reported total revenue of $50.9 million, a 16 percent increase over fourth quarter of fiscal 2007 total revenue of $44.0 million. For the fiscal year ended June 28, 2008, total revenue was $210.4 million, a 50 percent increase over the $140.5 million in total revenue for the fiscal year ended June 30, 2007.

Net income for the fourth quarter of fiscal 2008 was $191,000, or breakeven on a per diluted share basis, compared to net income of $502,000, or $0.01 per diluted share, in the fourth quarter of fiscal 2007. Net income for fiscal year 2008 was $5.4 million, or $0.09 per diluted share, compared to a net loss of $5.6 million, or $0.18 per diluted share, for the fiscal year 2007.

Non-cash, stock based compensation charges for the fourth quarter of fiscal 2008 were $4.1 million, or $0.07 per diluted share. For the full fiscal year 2008, non-cash stock-based compensation charges were $16.9 million, or $0.28 per diluted share.

During the fourth quarter of fiscal 2008, the company signed 28 new contracts with a value of $115.5 million which were entered into backlog. Of the 28 contracts, 17 came from international customers.

At June 28, 2008, backlog was approximately $647 million, with approximately $359 million associated with CyberKnife(R) Robotic Radiosurgery System contracts and

approximately $288 million associated with services and other recurring revenue. Accuray's backlog is composed of signed contracts that the company believes have a substantially high probability of being recognized as revenue in future periods.  Of the $647 million in backlog at fiscal year end, 71 percent consisted of non-contingent contracts, representing backlog for which contractual contingencies have been satisfied.

Ex. 36.

166.    That same day, Accuray held a conference call with analysts and investors and reiterated the financial results in the August 19, 2008 press release.  The call was hosted by defendants Thomson and McNamara who revealed that Accuray *removed another $39 million from backlog*.  Thus, Accuray removed approximately *$127 million in backlog during the most recent three quarters of FY08*:

We had an extremely successful quarter for new orders.  In total, 28 new contracts are added to backlog in the quarter, representing a total value of $115.5 million.  *At the end of fiscal 2008, our total backlog was $647 million.  New orders contributed $68 million directly to non-contingent backlog, and importantly, the proportion of non-contingent backlog increased to 71% of the total or $460 million*.

*         *         *

Specifically the entrepreneurial was challenged by proposed regulatory changes, the general economy and the credit environment.

During fiscal 2008 we believe we have made significant progress in actively addressing this situation, *by refocusing our sales professionals on more established healthcare providers, particularly hospitals.  We've also carefully examined our backlog each quarter and have removed any contracts that no longer meet our criteria for inclusion*.

*         *         *

Of the 28 new contracts entered into backlog during the quarter, 17 were international contracts.

*         *         *

*Of the 28 orders that went into backlog for the fourth quarter, 18 of these, or 64% went directly into non-contingent backlog, which represents $68 million.  In addition, approximately $50 million moved from contingent backlog into non-contingent backlog.  In total, $118 million flowed into the non-contingent backlog this quarter*.

*Finally, we did have eight orders which we adjusted out of contingent backlog, either because we received notification from the customer that the order was cancelled or our confidence level decreased to a level where future revenue recognition is currently in question.  Of these eight orders, all were within the contingent category.  The total value of these adjustments was approximately $39*

*million, again, all of these adjustments came out of contingent backlog and are reflected in the balance shown on the chart.*

Ex. 37 at 2-3, 11.

167.   On August 20, 2008 Oppenheimer issued a report titled "Talking Big, Delivering Nothing" commenting on the Company's 4Q08 revenue and earnings results and specifically highlighting that the Company had removed yet another $39 million from its backlog:

> Here are the facts: ***sales and EPS missed Street once again***, new orders were down y/y for the third straight quarter, backlog was "materially" revised downward for the third straight quarter, and actual unit installations were down for the second consecutive year in the U.S. (and flat WW for the past three years). . . .
>
> ***ARAY eliminated another $39M from backlog due to customer cancellations and other doubtful "stuff", and so about $127M has now been removed from backlog in the past three quarters.  We view backlog as largely irrelevant at this point (expecting more revisions to come)***, and would focus attention on installations instead.
>
> Only six units were installed (vs our 12 est).

Ex. 38.

168.   The Company's FY08 revenue of $210.4 million was a miss of up to $60 million below its original FY08 revenue projections.  This was a massive miss for the Company.[14]  At approximately $4 million per CyberKnife, failure to convert on 15 units represented more than any entire quarter's sales during the Class Period.  As the chart below indicates, Accuray never sold more than 12 CyberKnives in any given quarter during FY07 and FY08.  In FY08, 15 CyberKnives represented more than 50% of the entire year's installations of 29.

---

[14]   In the August 31, 2010 Order, the Court wrote "Considering that each CyberKnife costs $4 million, a shortfall of $60 million in revenue translates to only 15 units that should have been sold, but were not.  Of course, this is a simplified way of looking at the revenue projection discrepancy; however it provides meaningful context for assessing the magnitude of the discrepancy."  Order at 22.  In fact, failure to convert on 15 units was hardly insignificant.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

| CyberKnife Installation Summary | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY2005 | FY2006 | 1Q07 | 2Q07 | 3Q07 | 4Q07 | FY07 | 1Q08 | 2Q08 | 3Q08 | 4Q08 | FY08 |
| US Installs | 11 | 19 | 3 | 5 | 3 | 7 | 18 | 4 | 6 | 4 | 3 | 17 |
| Int'l Installs | 10 | 6 | 2 | 2 | 5 | 4 | 13 | 0 | 6 | 3 | 3 | 12 |
| Total | 21 | 25 | 5 | 7 | 8 | 11 | 31 | 4 | 12 | 7 | 6 | 29 |
| Cumulative | 49 | 77 | 82 | 89 | 97 | 109 | 109 | 114 | 126 | 134 | 140 | 140 |
| Source: Jefferies Analyst Repots dated April 30, 2008 and August 20, 2008 | | | | | | | | | | | |

169.    On August 20, 2008, in response to the disclosures of elimination of orders from backlog, shares of Accuray declined from a close of $7.57 per share on August 19, 2008 to a low of $6.90 per share (or almost 9%), and eventually closed at $7.71 per share on extremely high volume.

Accuray Terminates Its Chief Financial Officer McNamara and Its General Counsel Mitchell;
Delays Quarterly Results Due to Internal Review

170.    On September 12, 2008, Jefferies issued a report discussing the abrupt departure of the Company's CFO McNamara and its General Counsel Christopher Mitchell ("Mitchell"):

**CFO Resigns; 10-K Review Holds No Big Surprises**

We believe in the innate technology value of the CyberKnife system and that accelerating clinical interest and utilization trends will eventually be driven by clinical data. ***But, legitimate concerns surrounding backlog validity, decelerating new order growth***.

\*          \*          \*

**Key Points**

- Mr. McNamara has decided to step down from his position as CFO to pursue other interests. ***Since the company's successful IPO in February 2007, ARAY has experienced significant pressure. The re-definition of back log, restatement of COGS, backlog revisions, and guidance reductions have all contributed to the depreciation of the stock price along with the challenges of procuring new order growth and meeting top line expectations***.

Ex. 39.

171.    On October 28, 2008 the Company filed a Form 8-K with the SEC announcing the terminations of defendant McNamara and Mitchell, the Company's Senior Vice President and General Counsel.  Ex. 40.

172.    On October 29, 2008, the Company issued a press release announcing that it would be delaying the disclosure of its FY08 revenue and earnings results because of possible inventory

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

accounting errors.  The Company also reiterated its backlog definition and the confidence that most of its backlog figures are non-contingent – *i.e.*, contingencies have been satisfied:

> Accuray Incorporated, a global leader in the field of radiosurgery, announced today that it is rescheduling the earnings release call to November 6, 2008 when Accuray will release its full financial results for the first quarter of fiscal 2009, ended September 27, 2008.  While the majority of financial information is available at this time, certain aspects of Accuray's quarterly reporting have not yet been completed.
>
> \*      \*      \*
>
> During the first quarter of fiscal 2009, the company added 12 new contracts to backlog, representing a total value of $58.6 million.  Of the 12 contracts, **7 came from international customers**.
>
> At September 27, 2008, backlog was approximately $644 million, with approximately $358 million associated with CyberKnife® Robotic Radiosurgery System contracts and approximately $286 million associated with services and other recurring revenue.  **Accuray's backlog is composed of signed contracts that the company believes have a substantially high probability of being recognized as revenue in future periods**.  Of the $644 million in backlog at the end of the quarter, 70 percent consisted of non-contingent contracts, **representing backlog for which contractual contingencies have been satisfied**.

Ex. 41.

Accuray Admits Lack of Adequate Internal Controls and Inventory Overstatement

173.    On December 18, 2008, the Company announced its delayed 1Q09 results including the results of its internal investigation regarding accounting for obsolete inventory:

> **Accuray Announces Results for First Quarter of Fiscal 2009**
>
> *Inventory Investigation Concluded*
>
> Accuray Incorporated, a global leader in the field of radiosurgery, announced today financial results for the first quarter of fiscal 2009, ended September 27, 2008.
>
> For the first quarter of fiscal 2009, Accuray reported total revenue of $55.9 million, a 15 percent increase over first quarter of fiscal 2008 total revenue of $48.6 million and a 10 percent sequential increase over the fourth quarter of fiscal 2008 total revenue of $50.9 million.
>
> Net loss for the first quarter of fiscal 2009 was $3.2 million, or $0.06 per diluted share, compared to net income of $2.3 million, or $0.04 per diluted share, during the same period last year.  **The loss for the quarter was driven primarily by non-recurring employee separation expenses of $2.1 million and inventory write downs of $1.3 million**.
>
> Non-cash, stock based compensation charges for the first quarter of fiscal 2009 were $5.0 million, or $0.09 per diluted share.
>
> \*      \*      \*

*Accuray's Audit Committee concluded its independent investigation into allegations made by a former Accuray employee regarding possible improprieties in the handling and accounting of certain inventory items. Upon completion of the investigation, the Audit Committee determined that although a material weakness has been identified in the company's internal control over financial reporting with respect to inventory processes, no material prior period adjustments were identified.* It was therefore determined that no financial restatement was needed for prior quarters or years.

Ex. 42.

<u>Defendant Adler, Accuray Founder, Resigns from the Board of Directors, Publicly Rebukes Company.</u>

174.    On July 19, 2009, defendant Adler acrimoniously resigned from the board of directors.  In a public letter to friends and colleagues, Adler, who described himself as the "founder, visionary, and passionate spokesman for Accuray" provided an explanation for his departure and described the board as intolerant of any dissent:

The decision to leave Accuray stemmed from the fact that my vision for both the future of The CyberKnife technology and how business should be conducted increasingly diverged from management. *My several year effort to serve as a constructive contrarian voice on the board and within the company at large was so unwelcome (by the CEO) that I was twice issued threatening letters by Accuray-paid lawyers, demanding silence and including allegations of defamation.* As my voice was muted, I felt constructively terminated from providing any meaningful company leadership.

175.    In an interview with Matthew Rafat of *Seeking Alpha*, Adler described being forced off the board of directors:

For all intents and purposes my position at Accuray was "constructively terminated" over the past few years and I ceased to have any meaningful leadership role within the company or on the board of directors. For a long time I tried to be a constructive *contrarian voice but Accuray's current culture tends to mistake disagreement for disloyalty*, and when coming from me, criticism was interpreted as merely the whining of a never-satisfied founder.

176.    On August 24, 2009, the Company issued a press release announcing in 4Q09 revenue and earnings results:

**Accuray Announces Results for Fourth Quarter and Fiscal Year 2009**

Accuray Incorporated, a global leader in the field of radiosurgery, announced today financial results for the fourth quarter and fiscal year 2009, ended June 27, 2009.

For the fourth quarter of fiscal 2009, Accuray reported total revenue of $58.8 million, a 15 percent increase over the fourth quarter of fiscal 2008 total revenue of $50.9 million.  For the fiscal year ended June 27, 2009, total revenue was $233.6 million,

an 11 percent increase over the $210.4 million in total revenue recorded for fiscal year 2008.

Ex. 43.

177.    On August 24, 2009, the Company held a conference call for investors and analysts to discuss 4Q09 revenue and earnings results.  The call was hosted by defendant Thomson and the new CFO Bertocci.  The Company announced that it was removing approximately $65 million from the Company's backlog including non-contingent backlog:

> We added 15 new systems to backlog in the fourth quarter, which together with $14 million of renewal of service contracts, represented a total addition to backlog of $89 million.  Seven of the CyberKnife systems are for United States customers and eight systems are for international customers.
>
> ***Customers cancelled seven systems during the fourth quarter, removing $34 million from backlog.  Three of the systems were cancelled from non-contingent backlog, which represents the only cancellations from non-contingent backlog in fiscal 2009.  We downgraded our assessment of the probability of installation to six systems, removing an additional $31 million from backlog during the fourth quarter.  At the end of the fourth quarter, Accuray's total backlog was $556 million, down $35 million or 6% from $591 million at the end of the third quarter of fiscal 2009.***
>
> *          *          *
>
> As we have indicated during fiscal 2009, b***eginning with fiscal year 2010, we will no longer provide information about contingent backlog.  We think that such information is of limited use in building financial models.  Orders that we consider to be contingent will not be disclosed until all contingencies have been cleared. . . .***  As part of the transition in our reporting methods, ***we also plan to refine our definition of backlog in fiscal 2010 to enhance the usefulness of this information in analyzing and building models of our business.  Orders that do not meet these refined criteria will not be reported as backlog.***
>
> In terms of trends, ***this is likely to lead to a reduction in backlog in the first quarter of fiscal 2010 from what was previously reported in the fourth quarter of fiscal 2009, fully apart from the amount of new orders received in the first quarter***. . . .

Ex. 44 at 5.

178.    On August 24, 2009, defendants announced the cancellation of seven systems orders – three of which were previously held out to be non-contingent.  The Company downgraded the probability of installation on six additional systems.  In total, defendants removed a total of $65 million of contracts from backlog.  Ex. 44 at 5.

179.    On August 25, 2009, after these disclosures, in particular to the backlog reduction, Accuray's stock price declined from $7.52 per share on August 24, 2009, to $6.58 per share or

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1   August 25, 2009 on $1.6 million shares traded on August 25, nearly a 150% increase over

2   August 24.

3       180.   On October 20, 2009, the Company announced the termination of defendant

4   Hampton, Senior Vice President and Chief Sales officer.  Ex. 46.  As reported by CW4, defendant

5   Hampton knew but ignored that the sales staff had communicated that the nature of the CyberKnife

6   product, its cost and lengthy sales process made the top down forecast not achievable.

7       181.   On October 29, 2009, the Company held a conference call to discuss its 1Q10

8   earnings for FY10.  On the call, defendants admitted that even some non-contingent contracts were

9   not progressing toward installation and that they would be employing a new definition of "non-

10  contingent" going forward – in addition to not including deals with contingencies.  Defendants

11  announced that non-contingent backlog was $290.5 million under its refined criteria – a reduction of

12  nearly 30% in total non-contingent backlog.  Defendants also provided a backlog segmentation

13  showing that of the $291 million, ***only $99 million was attributable to CyberKnife system sales – or***

14  ***approximately 25 deals***.  Just one quarter before, defendants had claimed to have non-contingent

15  systems backlog of $203.2 million attributable to CyberKnife sales.  For the first time, the Company

16  also announced that it had been including orders, in particular, orders from international distributors,

17  in non-contingent backlog ***despite the fact that the customer was not paying a deposit***.  Defendants

18  attributed the ***50% decline in systems backlog*** to the removal of these orders:

19      In the past, we included sales orders in reported backlog that contained
    contingencies. ***Over time we concluded that including contingent orders in backlog***
20  ***was reducing the usefulness of backlog as a predictor of future system shipments***
    ***and revenue.***  Accordingly during our conference call in January 2009 to report
21      results for our second quarter fiscal 2009, we provided advanced notice that we
    intended to change our reporting of new orders and backlog in fiscal 2010 to exclude
22      all orders that contained contingencies.

23      We reminded investors of this intent again during our third quarter conference call in
    April 2009.  During our conference call in August 2009 to report results for our
24      fourth quarter of fiscal 2009, we again reminded investors of our intent to change
    reporting of backlog, and also stated that we intended to review our criteria for
25      including orders in reported backlog.

26      We found that some orders were not proceeding in shipment in a predictable manner.
    Accordingly we refined our criteria for including an order in reported backlog with
27      the goal of including only orders with characteristics that in prior orders have shown
    a pattern of predictably proceeding to shipment. We believe this refinement provides
28      investors with better insight about our backlog and its future conversion to revenue.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW     

> *As a result, and as we indicated in our last call, we will only report contracts as backlog that meets these refined criteria. While many non-contingent contracts already met the refined backlog criteria, there were others that did not. Most of those contracts that are now not included in reported backlog did not meet the refined criteria because we had not received a deposit for the order. Those orders were generally from international distributors, and we have not always required a deposit on such orders*.

*        *        *

> Once criteria are fulfilled, contracts will be re-entered into reported backlog. For comparative purposes, if we were to apply our current refined definition of backlog to the backlog as of the end of our fiscal fourth quarter, it would yield a backlog of $282.2 million. At the end of the first quarter of fiscal 2010, Accuray's total backlog was $290.5 million, representing a 3% sequential increase based upon the refined backlog criteria.

Ex. 47 at 5.

182.    On October 30, 2009, Oppenheimer released a report titled "Are you Kidding Me? 1Q Analysis" expressing disbelief at the Company's further reduction in backlog – in particular a reduction of 50% of what the market was told were **non-contingent** CyberKnife system sales:

### Accuray, Inc. Are You Kidding Me? 1Q Analysis

> We'll try to put this into words, but we may simply be beyond that point by now. After all the backlog issues this company has gone through since its IPO, it was the planned return to "non-contingent" backlog this quarter that brought slight hope or optimism for better visibility. *Non-contingent, after all, had in the past at least some concrete tone to it, no? So it's perplexing to us how non-contingent product backlog (which investors have long relied on) can be restated downwards by about 60%. We have no words.* Issues with the P&L also remain, and FY10 guidance looks entirely unachievable. . . .

> *Lets start [sic] with the backlog restatement. June quarter non-contingent backlog was reduced from $407M to $282M (-31%) due to another edition of "refining the definition of backlog." We estimate the product segment of that backlog was restated down by about 60%. The change stands directly in contradiction to mgmt's many prior comments about "noncontingent."*

> *The restatement reduces CyberKnife units in June backlog from 68 to 28, we calculate. So 40 units that just three months ago were considered "non-contingent" are gone.*

*        *        *

> *There is a credibility issue here*.

Ex. 48.

183.    With its astonishing October 30, 2009 disclosure, Accuray finally admitted that its reported backlog during the Class Period – in every form – was false and misleading. Despite its

1    endless trumpeting of backlog figures which exceeded half a billion dollars, Accuray's sales stayed

2    flat for the Class Period and beyond.  In the Registration Statement of February 7, 2007, Accuray

3    stated that its backlog of $330 million[15] contained only "deferred revenue and future payments that

4    our customers are contractually committed to make, but which we have not yet received."  This was

5    reiterated on March 15, 2007, when backlog declined to $327.9 million: "Reported backlog includes

6    only contracts which contain no contingencies, or for which all contingencies have been met."  ¶74.

7         184.    When Accuray redefined backlog on May 1, 2007, defendants told investors that the

8    new reported backlog, which contained both non-contingent and contingent deals, was "more

9    appropriate and indicative of the state of our business" and that the new definition "is a more

10   meaningful metric."  ¶98.  Under the new definition, backlog swelled to $559 million, then $619

11   million, $642 million, and peaking at $660 million on January 31, 2008.  For purposes of

12   comparison, of the $660 million in backlog, $365 million was for systems; this represented

13   approximately 91 CyberKnives at $4 million apiece – a figure which would nearly double the current

14   worldwide installations, then 126 CyberKnives.  Defendants told investors that this backlog would

15   convert to revenue in 12-18 months or even less.

16        185.    Subsequent events revealed that backlog was a sham and would not result in greater

17   CyberKnife installations.  Defendants began removing contracts piece by piece, first $30 million on

18   January 30, 2008, then $54, $39, $5, $34, $27 million and finally $65 million on August 24, 2009.

19   On August 24, 2009, defendants admitted what the market already knew; far from being a "more

20   meaningful metric" contingent backlog was of "limited use" to investors and would no longer be

21   reported.  ¶179.  However, defendants went beyond removing contingent deals from backlog.

22   Defendants also admitted that even non-contingent deals – the supposedly rock-solid deals with

23   "very, very low, low risk" – were not as solid as previously claimed, in particular because many had

24   no deposits.  Under a "refined" definition, non-contingent backlog was reported to be $282 million –

25   or almost $50 million lower than the purportedly non-contingent backlog at the Company's IPO.

26

27   [15]      The backlog in the Registration Statement was as of September 30, 2006.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW                                                    - 105 -

186.     On December 4, 2009, the Company held its annual shareholder meeting in Palo Alto, California.  During the meeting, the Company's general counsel discussed the issue of the "Stark Laws" and indicated that the Stark Law amendments would have no impact on sales.

> I asked the CEO how the amendments to the Stark Law (The Ethics in Patient Referral Act of 1989) would affect his business (see pages 42-44 of the 10K for more information).  In a nutshell, the Stark law restricts a physician from referring patients to services or programs in which the physician holds a financial interest.  The CEO looked surprised for a second, but General Counsel Milliken immediately jumped in. **GC Milliken indicated he believed the Stark Law amendments would not impact sales**.

Ex. 52.

187.     On January 6, 2010, Paolo Gorgo wrote a story titled "Accuray's Missing Accuracy with Backlog" on *Seeking Alpha*.

> With our short note, we will only try to add a few considerations, mostly related to the performance of the company in terms of product sales and communication to the market.
>
> *               *               *
>
> Since its first filings, Accuray has always mentioned the existence of a large backlog. For example, here is what the company wrote in its Form 10-Q for the Quarter Ended December 31, 2006.
>
> • As of December 31, 2006, our backlog was approximately $327.9 million.
>
> Backlog was defined as the sum of two components: deferred revenue and future payments that Accuray's customers were contractually committed to make, but which were not yet received. Basically, backlog included non-contingent contractual commitments from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with Accuray's shared ownership programs.
>
> A large part of it ($193.2 million) was represented, at that time, by CyberKnife system sales, with the rest belonging to the mentioned service plans and shared ownership programs.
>
> Assuming a selling price of about $4 million, and using simple (simplistic?) math, the average investor would have probably speculated that Accuray was holding orders for about 50 CyberKnife systems as of December 2006.  If we look at the average product installations in a year, we get to a number closer to 30 per year, in 2006, 2007 and even 2008.
>
> ***Quite disappointing, given the expectations created by the large backlog number, and the fact that the company claimed new system sales every quarter (a similar comparison could be run for revenues***, but we prefer to keep it simple talking about system sales/installations, to avoid revenue recognitions problems caused by different accounting rules used by the company).

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

To make it even more complicated, in the past Accuray used to report, in addition to non-contingent backlog (*i.e.* for which all contractual obligations had been satisfied, like the one we just mentioned for December 2006), also what was mentioned as "contingent."  The contingent backlog also contributed to inflating revenue expectations, as this number sounded like "potential CyberKnife sales" just waiting for authorization/financing.  This also consisted of several million dollars, each quarter.

Beginning with the first quarter of fiscal 2010 (July-September 2009), Accuray has started reporting only non-contingent orders as backlog, using a refined criteria.

However, while the company had stated in its 4Q 2009 P/R that:

Of the contracts signed by June 27, 2009, non-contingent contracts, for which all contractual obligations have been satisfied, accounted for approximately $407 million or 73 percent of total backlog reported for the fourth quarter of fiscal 2009.

The same backlog, using a new, more restrictive definition, was quantified in the 1Q 2010 P/R in a completely different way:

Applying these refined criteria to the backlog as of June 30, 2009 would yield a backlog of $282 million.

Over $120 million have basically been canceled from backlog due to a different, more selective approach to sales reports.

Unsurprisingly, Accuray is facing a class action alleging that the company misrepresented and failed to disclose material information concerning the quality and realistic likelihood of fulfillment of contracts in Accuray's "backlog," a figure representing the direct revenue that Accuray expects to receive from the sale and servicing of the CyberKnife system (more details about the class action are available at this link (http://securities.stanford.edu/1043/ARAY09_01/). Analysts were quite upset with Oppenheimer's Amit Hazan writing "Are You Kidding Me?" as the main headline to comment 1Q 2010 results and the backlog reinstatement, which is about 60% (there are now about 25 CyberKnife systems in the backlog, meaning that the product segment of that backlog was restated down by the new criteria as of 1Q 2010).

The mix of high market expectations (***artificially created by the presumption of future system sales justified by the company's inflated backlog comments), coupled with relatively flat sales and the surrounding economy worsening in recent times, may, in our opinion, fully explain why the stock has recently been on a continuous slide, and why there is a general perception that management may be held responsible for the company's weak performance.***

\*       \*       \*

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW



Accuray has basically been selling about 30 systems per year since 2006. In spite of the surrounding weak economy, 2009 was a record year for the company in terms of CyberKnife sales, while 2008 had seen a slight decline compared with 2007.

These basic numbers also explain why the company is not perceived by the stock market as a "growing story" – as flat would probably describe it better, so far.



\*      \*      \*

While management has messed it up with the backlog, we believe that visibility, in this kind of business, is relatively good.

Given the fact that a customer must construct or renovate a facility to house a CyberKnife (as special radiation shielding is required), when you think about it, the company knows reasonably well in advance how many systems will be, most

probably, installed in the next few months. Although we understand that slight construction delays might move an installation to a subsequent quarter, we do not think it impossible to give out realist guidance for installations forecasted in the following 6 months, rather than the useless, thus far, backlog revenue numbers.

Ex. 53.

## LOSS CAUSATION/ECONOMIC LOSS

188.    During the Class Period, as detailed herein, defendants made false and misleading statements concerning the current and future financial condition of the Company and engaged in a scheme to deceive investors regarding the same.  These materially false representations caused Accuray's stock to trade at an inflated level (trading as high as $29.25 per share on February 9, 2007) and operated as a fraud or deceit on the class.  Later, when the relevant truth regarding the Company's reported revenues, earnings and outlook, including the Company's backlog figures, began to be disclosed, Accuray's stock price declined, and the prior artificial inflation came out of the stock price.  As a result, plaintiffs and other members of the class suffered economic loss, *i.e.*, damages, under the federal securities laws.

189.    Throughout the Class Period, it was part of defendants' scheme to present a misleading picture of Accuray's true financial condition, including the Company's backlog and other reported metrics, such as reported revenue, earnings, product installations as a basis for CyberKnife revenue earnings forecasts.  Throughout the Class Period as alleged herein, the Company's publicly reported backlog installation, financial forecasts, numbers and other metrics were materially misleading.

190.    Defendants' false and misleading statements had their intended effect, causing Accuray's stock to trade at artificially inflated prices throughout the Class Period and thereafter until 2009, when the artificial inflation was more fully dissipated.

191.    On August 16, 2007, the relevant truth began to be disclosed, in particular during the quarterly conference call and analysts' inquiries concerning the Company's reported backlog and installation numbers.  During the call and onward, facts were disclosed that indicated that the Company's calculation of CyberKnife installations and backlog (which it had bragged to the market of being reliable and the key metric necessary to evaluate the Company's current and future financial

1   performance), may not be reliable as the Company could not explain inconsistencies in reported

2   numbers.  Following the call, securities analysts reduced estimates and downgraded Accuray stock,

3   causing a 25% price decline from $18.07 per share on August 16, 2007 to $13.45 per share on

4   August 17, 2007.  The Company nevertheless continued to misrepresent the contents, quality, and

5   reliability of its reported backlog and its reliability for supporting the Company's future revenue and

6   earnings outlook, in particular, the Company's FY08 forecasts.  As such, notwithstanding the August

7   17, 2007 disclosures, the stock price continued to be artificially inflated.

8        192.    On November 7, 2007, reporting its 1Q08 financial results and repeating false bullish

9   statements about its backlog and revenue and earnings forecast for FY08, the Company disclosed for

10  the first time that it recognized revenue from international sales upon shipment to international

11  distributors, as opposed to upon installation or delivery at the end-user's site.  Analysts also reported

12  softening installation figures, casting doubt upon the reliability of the reported backlog numbers.

13  *See id.*  The November 7, 2007 report and follow on analyst coverage served as another partial

14  disclosure and caused a partial dissipation of the artificial inflation in Accuray's stock price.

15  Accuray's stock price dropped from $19.02 per share on November 7, 2007 to $17.00 per share on

16  November 9, 2009 and continued to decline to $15.30 per share on November 15, 2007 – a total

17  decline of 20%.

18       193.    On January 30, 2008, Accuray announced its 2Q08 revenue and earnings results

19  which, contrary to prior bullish and boastful forecasts, had badly missed revenue and earnings

20  estimates.  The Company also reported that it had removed $34 million of contracts from reported

21  backlog and that its FY08 revenue forecast would be reduced by up to $60 million.  Following the

22  January 30, 2008 disclosures, shares of Accuray fell from a closing price of $14.98 per share on

23  January 30, 2008 to a closing price of $9.52 per share on January 31, 2008, a drop of more than 36%

24  on ***more than 10 million shares traded***.  The Company nevertheless stated that it had removed the

25  risky contracts from backlog and bragged that notwithstanding the negative news, going forward, the

26  Company's backlog was comprised of "firm signed contracts" with a high probability of being

27  recognized as revenue.

28

194.   On April 29, 2008, the Company issued its 3Q08 financial results.  The Company also disclosed that it was removing another *$54 million* in cancelled contracts from reported backlog.  The Company continued, however, to misrepresent the content and quality of its reported backlog and reported additional increases to reported backlog while failing to disclose the true facts concerning backlog and revenue forecasts.  After the April 29, 2008 report, Accuray's stock price declined from $8.09 per share to $7.83 per share on April 30, 2008.  The Company continued to boast of international sales growth and stated that "the removal of deals from backlog now ensure[d] that we continue to give investors an accurate picture of business trends."  The Company further stated that its sales were strong and that it had checked backlog to remove unfavorable deals.  The stock price thus continued to trade at artificially inflated prices.

195.   On August 13, 2008, Jefferies issued a report on Accuray titled "Moving to Sidelines on Valuation; Lowering to Hold," stating that notwithstanding defendants' assurances, the Company *continued* to be subject to the forces that led to the backlog revisions, and suggesting *more* could be in store.  Ex. 35.  After the Jefferies report, the Company's stock price began to decline from a closing price of $8.67 per share on August 12, 2007 to a closing price of $8.00 per share on August 18, 2007.  Indeed, this decline resulted from disclosure by analysts between August 13-20 regarding the Company's true financial condition and expected further bad news regarding Accuray's backlog and related metrics.

196.   On August 19, 2008, Accuray reported its 4Q08 financial results in a press release.  The Company's financial results missed Wall Street expectations and the Company revealed that it was removing another $39 million from reported backlog, resulting in approximately $127 million in backlog reductions in the prior three quarters.  On August 20, Accuray stock opened at $7.00 per share, a drop of 7.5% from the closing price of $7.57 per share on August 19, 2008.

197.   Like other members of the class of purchasers of Accuray stock who purchased at artificially inflated prices during the class period, lead plaintiff suffered an economic loss, *i.e.*, damages, when Accuray's stock price continued to decline following the Company's several partial disclosures on August 16, 2007, November 7, 2007, January 30, 2008, and August 13 through 20, 2008 regarding defendants' scheme to conceal Accuray's true financial condition.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

198.    The market for Accuray common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose as set forth above, Accuray common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the class purchased or otherwise acquired Accuray common stock relying upon the integrity of the market price of Accuray common stock and market information relating to Accuray, and have been damaged thereby.

(a)    Accuray stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Accuray filed periodic public reports with the SEC and the NASDAQ;

(c)    Accuray regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Accuray was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

199.    As a result of the foregoing, the market for Accuray common stock promptly digested current information regarding Accuray from all publicly-available sources and reflected such information in the price of Accuray stock.  Under these circumstances, all purchasers of Accuray common stock during the Class Period suffered similar injury through their purchase of Accuray common stock at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

200.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all persons who purchased or acquired

1   Accuray securities and common stock pursuant or traceable to the Company's IPO, as well as

2   purchasers of Accuray common stock between February 7, 2007 and August 19, 2008, inclusive,

3   who were damaged by the conduct alleged herein (the "Class"). Excluded from the Class are

4   defendants herein, members of the immediate family of each of the defendants, any person, firm,

5   trust, corporation, officer, director or other individual or entity in which any defendant has a

6   controlling interest or which is related to or affiliated with any of the defendants, and the legal

7   representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

8        201.   The members of the Class are so numerous that joinder of all members is

9   impracticable. Accuray sold more than 18 million shares in the IPO and throughout the Class

10  Period, and Accuray common shares were actively traded on the NASDAQ. While the exact number

11  of Class members is unknown to plaintiffs at this time and can only be ascertained through

12  appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the

13  proposed Class. Record owners and other members of the Class may be identified from records

14  maintained by Accuray or its transfer agent and may be notified of the pendency of this action by

15  mail, using the form of notice similar to that customarily used in securities class actions.

16       202.   Plaintiffs' claims are typical of the claims of the members of the Class as all members

17  of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

18  complained of herein.

19       203.   Plaintiffs will fairly and adequately protect the interests of the members of the Class

20  and has retained counsel competent and experienced in class and securities litigation.

21       204.   Common questions of law and fact exist as to all members of the Class and

22  predominate over any questions solely affecting individual members of the Class. Among the

23  questions of law and fact common to the Class are:

24           (a)   whether the federal securities laws were violated by defendants' acts as

25  alleged herein;

26           (b)   whether statements made by defendants to the investing public during the

27  Class Period misrepresented material facts about the business, operations and management of

28  Accuray; and

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

1    (c)  to what extent the members of the Class have sustained damages and the

2 proper measure of damages.

3    205.  A class action is superior to all other available methods for the fair and efficient

4 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

5 damages suffered by individual Class members may be relatively small, the expense and burden of

6 individual litigation make it impossible for members of the Class to individually redress the wrongs

7 done to them.  There will be no difficulty in the management of this action as a class action.

**THE SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' BACKLOG
STATEMENTS**

8

9

10    206.  The PSLRA statutory safe harbor for forward-looking statements does not apply to

11 any of the defendants' false and misleading statements pleaded in this FAC.

12    207.  Many of the specific statements pleaded herein were not identified as "forward-

13 looking statements" when made, therefore, the Company can not claim protection under the safe

14 harbor.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) (statement must be identified as forward looking).  For

15 example, the statements made in: (a) the Company's March 15, 2007 Press Release (Ex. 2),

16 concerning Accuray's definition of backlog and the increase in backlog; and (b) the Company's

17 April 29, 2008 Conference Call Transcript (Ex. 33), concerning the calculation, definition and

18 reporting of backlog, are not identified by the Company as forward looking statements.  In addition,

19 statements regarding contingencies in deals contained in backlog are statements of present fact and

20 therefore do not qualify for the safe harbor protection.  *See* 15 U.S.C. § 78u-5(i)(A) (A forward

21 looking statement is a "statement containing projection of revenues, income (including income loss),

22 earning (including earnings loss) per share, capital expenditures, dividends, capital structure, or other

23 financial items."), *e.g.*, November 13, 2007 Form 10-Q (Ex. 25).

24    208.  For the false statements purportedly identified as forward looking, the disclosures an

25 investor is directed to review in order to determine risk factors do not contain any relevant or

26 applicable cautionary language.  This, this language cannot be considered meaningful.  For example,

27 for the false and misleading statements alleged in the FAC regarding the Company's backlog, and

28 contained in the Company's press releases dated May 1, 2007 (Ex. 5), August 16, 2007 (Ex. 10;

¶104), November 7, 2007 (Ex. 20), and January 30, 2008 (Ex. 26), and in the Company's earnings calls from May 1, 2007 (Ex. 6), and August 16, 2007 (Ex. 12), the Company notes that "realization of backlog" may be considered a forward looking statement.  In these disclosures, an investor is directed to review a corresponding Form 10-K or 10-Q and to the "risks detailed" in the section entitled "Risk Factors."  Notably, in the "Risk Factor" section for all of these documents, there is absolutely *no discussion of backlog.*  Therefore, the Company cannot claim protection under the safe harbor for these statements. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) ("statement must be accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement").

209.    To the extent that defendants attempt to rely on statements in the Company's Forms 10-K and 10-Q, *not* contained in the "Risk Factor" section to avail themselves of the safe harbor, any purported cautionary language concerning the Company's backlog is simply not meaningful.  The false and misleading statements in the disclosures above deal with the calculation, definition and reporting of backlog, as well as the change in the contracting process driving the backlog.  Under the "Financial Operations" heading, in all of the Forms 10-K and 10-Q that correspond to the disclosures listed above, there is a "Backlog" section.  The language there indicates that the Company "may be unable to convert all of this backlog into recognized revenue due to factors outside our control." This language is not meaningful because the calculation, definition and reporting of backlog, and the contracting process driving the backlog *was* in defendants' control.  This is evidenced by the fact that throughout the Class Period, defendants themselves changed the calculation, definition and reporting of backlog, and the contracting process driving the backlog.  Defendants admittedly reviewed the deals in the backlog and made decisions as to which deals would remain in the backlog. For example, defendants chose to include in the backlog: cancelled deals, deals with no deposits, deals from sales people that had a history of booking bogus orders, and deals from international distributors where there was no end user, among others.  Therefore, defendants cannot claim protection from statements that purport to absolve them due to factors outside of their control.

210.    Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Accuray who knew that those statements were false or misleading when made.

211.   The analysis below is designed to assist the Court in identifying defendants' purported cautionary language, which, as shown below does not exist and therefore cannot be "meaningful" as required by the statute. *See* 15 U.S.C. 78u-5(c)(1)(A)(i).

| Nature of false statement; FAC ¶16; pears in public disclosure | False statements identified as forward-looking | Disclosure directs investor to review | Risk Factors |
|---|---|---|---|
| Definition of backlog; increase in backlog; 3/15/07 Press Release, Ex. 2[17] | Not identified | Not Applicable | Not Applicable |
| Calculation, definition and reporting of backlog; 5/1/07 Press Release, Ex. 5 | "realization of backlog" identified as a possible forward looking statement | 12/30/06 Form 10-Q "Risk Factors" (filed 3/15/07, Ex. 3) | No discussion of backlog |
| Change in contracting process driving backlog; 5/1/07 Conference Call Transcript, Ex. 6 | "realization of backlog" identified as a possible forward looking statement | 12/31/06 Form 10-Q "Risk Factors" section (filed 3/15/07, Ex. 3) | No discussion of backlog |
| Definition of backlog; increase in backlog; 8/16/07 Press Release, Ex. 10 | "realization of backlog" identified as a possible forward looking statement | 3/31/07 Form 10-Q "Risk Factors" section (filed on 5/14/07, attached hereto[18]) | No discussion of backlog |

[17]   All "Ex." references are to the Appendix of Exhibits.

[18]   Although defendants purport to rely on this document, they did not submit it to the Court. Plaintiffs have attached it hereto for the Court's convenience.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

- 116 -

579521_1

| Nature of false statement; FAC ¶16; pears in public disclosure | False statements identified as forward-looking | Disclosure directs investor to review | Risk Factors |
|---|---|---|---|
| Calculation, definition and reporting of backlog; increase in backlog;<br><br>8/16/07 Conference Call Transcript, Ex. 12 | "realization of backlog" identified as a possible forward looking statement | 3/31/07 Form 10-Q "Risk Factors" section (filed on 5/14/07, attached hereto) | No discussion of backlog |
| Calculation, definition and reporting of backlog; increase in backlog;<br><br>11/7/07 Press Release, Ex. 20 | "realization of backlog" identified as a possible forward looking statement | 6/30/07 Form 10-K "Risk Factors" section (filed on 9/4/07, Ex. 17) | No discussion of backlog |
| Calculation, definition and reporting of backlog; increase in backlog; ¶121<br><br>11/7/07 Conference Call Transcript, Ex. 21 | Not identified | Not Applicable | Not Applicable |

<u>As Accuray Used the Term, Backlog Was a Statement of Present Condition and Is Virtually Identical in Definition to the Backlog in *Applied Signal v. Berson*</u>

212.     In *Berson*, 527 F.3d 982, the Ninth Circuit held that backlog, as used by the defendant Applied Signal, was a statement of present condition and rejected Applied Signal's argument that it was a forward looking statement.  Applied Signal defined backlog as follows:

> Our backlog . . . consists of anticipated revenues from the ***uncompleted portions of existing contracts*** . . . .  Anticipated revenues included in backlog may be realized over a multi-year period.  We include a contract in backlog when the contract is signed by us and by our customer.  We believe the backlog figures are firm, subject only to the cancellation and modification provisions contained in our contracts. . . . Because of possible future changes in delivery schedules and cancellations of orders, backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period, and actual sales for the year may not meet or exceed the backlog represented.   We may experience significant contract cancellations that were previously booked and included in backlog.

*Id*. at 985-86 (emphasis in original).

213.     The Ninth Circuit held that defendants' failure to disclose stop-work orders made its statements regarding backlog misleading to investors.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW

The passage, moreover, speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether.

*Id.* at 986.

214.     The Ninth Circuit held that defendants' statements regarding backlog were not subject to PSLRA safe harbor protection because backlog is a "snapshot" of the work Applied Signal had under contract at the time and was neither a "projection" or statement about "future economic performance" but was analogous to accounts receivable.

Defendants argue that the PSLRA bars liability for their statements about backlog because those statements were "forward-looking." 15 U.S.C. §78u-5(c). But, as Applied Signal uses the term, "backlog" isn't a "projection" of earnings or a "statement" about "future economic performance." *Id.* §78u-5(i)(1). Applied Signal's backlog is, instead, a snapshot of how much work the company has under contract right now, and descriptions of the present aren't forward-looking. *See [No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920. 936-37 (9th Cir. 2003)] (defendant's statements weren't forward-looking because they described the "present effects" of a settlement agreement). Backlog is much like accounts receivable: It represents Applied Signal's contractual entitlement to perform certain work, just like accounts receivable represents the company's contractual entitlement to be paid for work already performed. *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (accounts receivable is not forward-looking).

*Id.* at 990.

215.     The definition of backlog as employed by Accuray and Applied Signal is virtually identical.[19] Both Accuray and Applied signal stated that future revenues would come out of backlog.

*   <u>Applied Signal</u>: backlog "consists of anticipated revenues from the uncompleted portions of existing contracts." *Berson*, 527 F.3d at 985

---

[19]     The Court previously held that Accuray's backlog was a forward looking statement and the inclusion of contingent contracts in backlog distinguished it from backlog as discussed in *Berson*. Order at 19:12:13 ("This distinction is meaningful."). However, the Ninth Circuit in *Berson* found that despite "contingencies" in those contracts, backlog was still a representation of present condition. The Order also drew a distinction between the instant case and *Berson*, holding that "Unlike the plaintiffs in *Berson*," the plaintiffs in this case "argue that Defendants' projection of future revenue to be achieved from backlog was false." Order at 17-23. However, plaintiffs assert that backlog – as a statement of present condition – was false and misleading and this framing of plaintiffs' claims does not alter that backlog is a statement of present condition. The Order states that, based on its characterization of plaintiffs' allegations (*i.e.*, that backlog was false as it relates to future revenue) then "as Accuray used the term, backlog was a projection." Order at 19:22-23. As Accuray used the term, backlog was a statement of present condition, and this determination is made separate from plaintiffs' allegations.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:09-cv-03362-CW                                                      - 118 -

- **Accuray**: backlog contains "***signed non-contingent contracts as well as backlog under signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue.***" "The majority of revenue is shipped from backlog."

216. Both Accuray and Applied signal stated that backlog may be unlikely to convert to revenue for a long period of time.

- **Applied Signal**: "Anticipated revenues included in backlog may be realized over a multi-year period."

- **Accuray**: "We anticipate that this backlog will be recognized over the next five years as installations occur, upgrades are delivered and services are provided." Ex. 17, 2007 10-K at 59.

217. Both Accuray and Applied Signal stated that backlog contained signed contracts.

- **Applied Signal**: "We include a contract in backlog when the contract is signed by us and by our customer."

- **Accuray**: backlog contains "***signed non-contingent contracts as well as . . . signed contingent contracts***."

218. The backlog of both Accuray and Applied Signal contained contracts subject to contingencies which could result in the contracts not converting to revenue.

- **Applied Signal**: "We ***believe*** the backlog figures are firm, ***subject only to the cancellation and modification provisions contained in our contracts***."

- **Accuray**: backlog contains "***signed non-contingent contracts as well as . . . signed contingent contracts that the Company believes have a substantially high probability of being booked as revenue***."

219. Both Accuray and Applied Signal stated that not all of backlog would convert to revenue (although Accuray did not include it in its risk factors).

- **Applied Signal**: "Because of possible future changes in delivery schedules and cancellations of orders, backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period, and actual sales for the year may not meet or exceed the backlog represented. We may experience significant contract cancellations that were previously booked and included in backlog."

- **Accuray**: "Although backlog includes contractual commitments from our customers, we may be unable to convert all of this backlog into recognized revenue due to factors outside our control." Ex. 17, 2007 10-K at 59.

220. There is no substantive or "meaningful" difference between the backlog definition in *Berson* and the backlog definition used by Accuray. Both Accuray and Applied Signal used the term backlog to describe: (a) the value of work to be performed in the future; (b) which was under

1   contract; and (c) but subject to potential cancellation or modification.  Both backlog definitions

2   included contingencies which may affect future revenue.  Despite the fact that the conversion of

3   backlog to revenue was uncertain, the court held, in no uncertain terms, the backlog was a snapshot

4   of the companies present contractual commitments and not a forward looking statement.

5         221.    Defendants told investors to use Accuray's backlog to measure historical activity.

6   ***It can be used to analyze both historical activity and future activity.  Historically,***
    ***the change in backlog, combined with the revenue recognized, can be used to***

7   ***determine the approximate economic contract value created over the past year***.

8         222.    Like Applied Signal, Accuray's backlog definition spoke only to unforeseen future

9   events which may have resulted in a contract not coming to fruition, Accuray did not disclose

10  existing conditions which undermined their backlog statements.  As the Ninth Circuit explained:

11  And, though the paragraph refers to customers' rights to "cancel[]" or "modif[y]'
    existing contracts, it says nothing about the right to simply stop work and thus

12  immediately interrupt the company's revenue stream.  The passage, moreover,
    speaks entirely of as-yet-unrealized risks and contingencies.  Nothing alerts the

13  reader that some of these risks may already have come to fruition, and that what the
    company refers to as backlog includes work that is substantially delayed and at

14  serious risk of being cancelled altogether.

15  *Berson*, 527 F.3d at 986.

16  **COUNT I**

17  **For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
    **Against All Defendants**

18
19        223.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

20        224.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

21        (a)    employed devices, schemes and artifices to defraud;

22        (b)    made untrue statements of material facts or omitted to state material facts

23  necessary in order to make the statements made, in light of the circumstances under which they were

24  made, not misleading; or

25        (c)    engaged in acts, practices and a course of business that operated as a fraud or

26  deceit upon plaintiffs and others similarly situated in connection with their purchases of Accuray

27  common stock during the Class Period.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW     

1       225.    Defendants named herein are liable for making false statements; failing to disclose

2 adverse facts known to them about Accuray; or participating in, permitting or causing contrivances

3 and manipulative acts regarding Accuray's financial statements.  Defendants' fraudulent scheme and

4 course of business operated as a fraud or deceit on purchasers of Accuray's publicly traded

5 securities, as it: (a) deceived the investing public regarding Accuray's business and finances; (b)

6 artificially inflated the prices of Accuray's publicly traded securities; (c) allowed Accuray executives

7 to sell millions of dollars worth of Accuray stock at artificially inflated prices while in possession of

8 material non-public information concerning the Company's true financial condition; and (d) caused

9 plaintiffs and other members of the class to purchase Accuray publicly traded securities at artificially

10 inflated prices, and suffer economic loss and damages when the artificial inflation came out of

11 Accuray's stock price.

12       226.    During the Class Period, defendants disseminated or approved the false statements

13 specified above, which they knew or were severely reckless in disregarding that the statements were

14 misleading in that they contained misrepresentations and failed to disclose material facts necessary

15 in order to make the statements made, in light of the circumstances under which they were made, not

16 misleading.

17       227.    During the Class Period, each defendant's primary liability and controlling person

18 liability arises from as detailed above, their occupation of high-level position at the Company and

19 being privy to non-public information concerning the Company.  Each of them knew or were

20 severely reckless in disregarding the adverse facts specified herein and omitted to disclose these

21 facts.  Notwithstanding their duty to abstain from selling Accuray stock while in possession of

22 material, adverse, non-public information concerning the Company, defendants sold Accuray stock

23 at inflated prices, improperly personally profiting and benefiting from their wrongful conduct and

24 false and misleading statements.

25       228.    Investors who purchased Accuray stock and other publicly traded securities at prices

26 artificially inflated by defendants' materially false representations and omissions suffered millions in

27 damages when the artificial inflation came out of Accuray's stock price.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW

229.    Defendants named herein acted with scienter in that they knew or were severely reckless in disregarding that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Had plaintiffs, the other members of the Class and the marketplace knew the truth concerning Accuray, which was not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired Accuray publicly traded securities or if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

230.    As a direct and proximate result of defendants' wrongful conduct and fraudulent scheme, plaintiffs and the other members of the Class suffered damages in connection with the respective purchases of the Company's securities during the Class Period, as evidenced by, among other things, the several stock price declines alleged herein, when the artificial inflation came out of Accuray's stock price.

### COUNT II

#### For Violation of Section 20(a) of the Exchange Act
#### Against the Individual Defendants

231.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

232.    The Individual Defendants acted as controlling persons of Accuray within the meaning of §20(a) of the Exchange Act. By reason of their positions as officers and/or directors of Accuray, and their ownership of Accuray stock, the Individual Defendants had the power and authority to cause Accuray to engage in the wrongful conduct complained of herein. Accuray controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Accuray are liable pursuant to §20(a) of the Exchange Act.

1
## PRAYER FOR RELIEF

2  WHEREFORE, plaintiffs pray for relief and judgment, as follows:

3  A. Determining that this action is a proper class action, designating plaintiffs as lead

4 plaintiffs and certifying plaintiffs as a Class under Rule 23 of the Federal Rules of Civil Procedure

5 and plaintiffs' counsel as lead counsel;

6  B. Awarding compensatory damages in favor of plaintiffs and the other Class members

7 against all defendants, jointly and severally, for all damages sustained as a result of defendants'

8 wrongdoing, in an amount to be proven at trial, including interest thereon;

9  C. Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this

10 action, including counsel fees and expert fees; and

11  D. Such other and further relief as the Court may deem just and proper.

12
## JURY DEMAND

13  Plaintiffs hereby demand a trial by jury.

14 DATED: September 27, 2010    ROBBINS GELLER RUDMAN
               & DOWD LLP
15               SHAWN A. WILLIAMS
               DANIEL J. PFEFFERBAUM

16

17                  /s/
               SHAWN A. WILLIAMS
18

19               Post Montgomery Center
               One Montgomery Street, Suite 1800
20               San Francisco, CA  94104
               Telephone:  415/288-4545
21               415/288-4534 (fax)

22

23               LABATON SUCHAROW LLP
               CHRISTOPHER J. KELLER
24               JONATHAN GARDNER
               MARK GOLDMAN
25               140 Broadway, 34th Floor
               New York, NY  10005
26               Telephone:  212/907-0700
               212/818-0477 (fax)

27               Co-Lead Counsel for Plaintiffs

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:09-cv-03362-CW           - 123 -

1

<u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on September 27, 2010, I electronically filed the foregoing with the

3  Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7          I further certify that I caused this document to be forwarded to the following Designated

8  Internet Site at:  http://securities.stanford.edu.

9          I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on September 27, 2010.

11

12                                         /s/
                                  SHAWN A. WILLIAMS

13                                ROBBINS GELLER RUDMAN
                                       & DOWD LLP
14                                Post Montgomery Center
                                  One Montgomery Street, Suite 1800
15                                San Francisco, CA  94104
                                  Telephone:  415/288-4545
16                                415/288-4534 (fax)

17                                E-mail:shawnw@rgrdlaw.com

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Fulton County Employees' Retirement System v. MGIC Investment Corporation, et al.*, No. 2:08-CV-00458-LA (E.D. Wis.)
*In re Spectranetics Corporation Sec. Litig.*, No. 1:08-cv-02048-REB-KLM (D. Colo.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ACCURAY

1   except such reasonable costs and expenses (including lost wages) directly relating to

2   the representation of the class as ordered or approved by the court.

3          I declare under penalty of perjury that the foregoing is true and correct.

4   Executed this _17th_ day of _December_, 2009.

                                        WAYNE COUNTY EMPLOYEES'
                                        RETIREMENT SYSTEM

                                        By: _____

                                        Its: _____

- 2 -

ACCURAY

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 02/27/2007 | 600 | $25.75 |
| 02/28/2007 | 1,500 | $25.54 |
| 03/20/2007 | 1,700 | $21.88 |
| 06/05/2007 | 1,000 | $23.27 |
| 06/05/2007 | 1,300 | $23.46 |
| 07/06/2007 | 800 | $21.71 |
| 07/09/2007 | 900 | $22.63 |
| 07/16/2007 | 3,400 | $19.97 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 12/13/2007 | 3,300 | $14.80 |
| 12/19/2007 | 2,600 | $15.74 |
| 01/14/2008 | 5,300 | $17.87 |

## Mailing Information for a Case 4:09-cv-03362-CW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas G Ciarlone , Jr**
  tciarlone@lawssb.com

- **Alan I. Ellman**
  aellman@labaton.com

- **Jonathan Gardner**
  jgardner@labaton.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Robert S. Green**
  CAND.USCOURTS@CLASSCOUNSEL.COM

- **Christopher J. Keller**
  ckeller@labaton.com,cchan@labaton.com,electroniccasefiling@labaton.com

- **Mark P. Kindall**
  firm@izardnobel.com,mkindall@izardnobel.com

- **LAPIDUS GROUP**
  cand.uscourts@classcounsel.com

- **Jeffrey S. Nobel**
  jnobel@izardnobel.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,khuang@rgrdlaw.com,gfreemon@rgrdlaw.com,nrogers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Ignacio Evaristo Salceda**
  isalceda@wsgr.com,rlustan@wsgr.com,21718.500ecfClassAction.palib1@matters.wsgr.com

- **Amanda C. Scuder**
  ascuder@lawssb.com

- **Ralph M. Stone**
  rstone@lawssb.com

- **Stefanie Jill Sundel**
  ssundel@labaton.com

- **Marc M. Umeda**
  MUmeda@robbinsumeda.com,notice@robbinsumeda.com

- **Diane Marie Walters**
  dwalters@wsgr.com,smills@wsgr.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Daniel R Forde
Robbins Umeda LLP
600 B Street
Suite 1900
San Diego, CA 92101

Mark S. Goldman
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
```